IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Miko Peled
3502 Pringle St.
San Diego, CA 92110
and

Susan Abulhawa
132 Pennsylvania Ave.
Yardley, PA 19067
and

Ali Ali
724 Edward Werth Drive
Rodeo, CA 94572
and

Abdur-Rahim Dudar
2638 Woodacres Rd,
Atlanta, GA 30345
and

Linda Kateeb
8933 Beacon Ct.,
Orland Hills, IL 60487
and

Linda Mansour
2909 West Central Ave.
Toledo, OH, 43606
and

Mahmoud Mohammid Ali Shaalan
Hebron, Palestine
and

Mamdouh Al-Qara, as next of kin of
Muhammad Jihad Muhammad Al-Qara;
and Wala'a Al-Qara;
Near Al-Zanna St., and Al-Kara St.,
Abbasan Al-Kaberah,
Khan Younis, Gaza Strip, Palestine
and

Ra'fat Baraka, as next of kin of
Muhammad Suleiman Mahmoud Baraka

Case No. 1:17-cv-260

Near Bank of Palestine, the Main St.
Al-Zeer Neighborhood,
Abbasan Al-Saghirah,
Khan-Younis, Gaza Strip, Palestine
and

Saad Malley
13564 S. Shannon Dr.
Homer Glen, IL 60491
and

Safwat Abd Abu-Teer, as next of kin of
Nour Abu-Teer and
Zeinab Abu-Teer;
Near Osama ben Zied Mosque,
Al-Sunati St., Abbasan Al-Kaberah,
Khan-Younis, Gaza Strip, Palestine
and

Mina Ishaq
Baleem, Ramallah, Palestine
and

Falastin Madi, as next of kin of
Sami Shawqi Ahmed Madi;
Near Ibn Taimia Mosque,
Asskar Neighborhood,
Al-Remal, Dri Al-Balah
Gaza Strip, Palestine
and

Tagrid Eleyan Mahmoud Abu-Teer
Al-Kedeeh transaction,
Abo Al-Nasser Kdeeh Internal St.,
Abo Al-Nasser Neighborhood,
Abbasan Al-Kaberah,
Gaza Strip, Palestine
and

Waddah Khalid Sofan
Home demolished in Palestine,
And has moved to
Khan-Younis, Gaza Strip, Palestine
and

Mamdouh Al-Qara, as next of kin of
Wala'a Jihad Muhammad Al-Qara and
Mihammad Al-Qara;

Near Al-Zannah St. and Al-Kara St., )
Abbasan Al-Kaberah, )
Khan-Younis, Gaza Strip, Palestine )
and )
)
Safwat Abu-Teer, as next of kin of )
Zeinab Safwat Abd Abu-Teer and )
Nour Abu-Teer; )
Near Osama ben Zied Mosque, )
Al-Sunati St., Abbasan Al-kaberah, )
Khan-Younis, Gaza Strip, Palestine )
and )
)
Reham Al-Bur'i, as next of kin of )
A'id Mahnmoud Ahmed Al-Bur'I; )
Near Moa'sskar Jabalia, )
Downtown Jabalia, )
Gaza Strip, Palestine )
and )
)
Ibrahim Abu-Teer, as next of kin of )
Ahmad Abu-Teer and )
Kamal Abu-Teer; )
Near Khaleel Al-Rahman Mosque, )
Abo-Mattar Neighborhood, )
Abbasan Al-Kaberah, )
Khan-Younis, Gaza Strip, Palestine )
and )
)
Ahmad Suleiman Mahmoud Sahmour )
Hebron, Palestine )
and )
)
Abdullah Abu-Salah, as next of kin of )
Ahmed Abdullah Muhammad Abu-Salah; )
Near Abo-Salah Neighborhood, )
Abbasan Al-Kaberah, )
Khan-Younis, Gaza Strip, Palestine )
and )
)
Ahmed Al-Zeer )
Al-Naseem Building, 1st Floor )
Main Road, )
Ramallah, Palestine )
and )
)
Muhammad Abu-Teer, as next of kin of )
Ali Abd Suleiman Abu-Teer; )

Near Al-Shalaf St.,
Abbasan Al-Kaberah,
Khan-Younis, Gaza Strip, Palestine
and

Ashraf Abu-Rahma
Mid of Town,
Baaleen Town, Palestine
and

Basem Ibrahim Ahmed Abu-Rahmeh
Hebron, Palestine
and

Bassem Al-Tamimi
Al Nabi Salih,
West of Ramallah,
West Bank, Palestine
and

Doa'a Abu Amer, as next of kin of
Ali S. Amer
Huda H. Amer
Jad A. Amer
Leen A. Amer
Majd A. Amer
Lubna A. Amer
Sufian A. Amer
Sarah S. Amer
Sa'ed H. Amer
Zeid W. Amer
Rami W. Amer
Hassan W. Amer
Ala'a W. Amer, and
Youssef W. Amer;
Khan-Younis, Gaza Strip, Palestine
and

Emad Shujaia
Dir Jareer Village
Ramallah, Palestine
and

Medhat Abu-Yousef, as next of kin of
Hanafi Mahmoud Kamel Abu-Yousef;
Near Atawabah Mosque, Abo Hanafi St.
Abo Yousif Neighborhood,
Abbasan Al-Kaberah

Khan-Younis, Gaza Strip, Palestine
and

Hiba Barghouthi, as next of kin of
Abdelrahman Bargouthi;
The Main Road, Abood Village,
Ramallah, Palestine
and

Amal Qablan, as next of kin of
Ibrahim Khalil Suleiman Qablan;
Abo Musbeh Neighborhood,
Abbasan Al-Kaberah,
Khan-Younis, Gaza Strip, Palestine
and

Shireen Qablan, as next of kin of
Ibrahim Suleiman Qablan Abu-Qablan;
Abo Musbeh Neighborbood,
Abbasan Al-Kaberah,
Khan Younis,Gaza Strip, Palestine
and

Hayat Abu-Dharifa, as next of kin of
Ismail Mahmoud Muhammad Abu-Dharifa
Abo Tharifah St.,
Abo Tharifah Neighborhood,
Abbassan Al-kaberah,
Gaza Strip, Palestine
and

Jawad Issa Ibrahim Salamah Al Horoob
Hebron, Palestine
and

Jawaher Ibrahim Abu-Rahmeh
Baaleen Town, Palestine

Plaintiffs,

v.

PRIME MINISTER BENJAMIN NETANYAHU,
Prime Minister's Office
3 Kaplan St. Hakirya
Jerusalem 91950
and

**ISRAELI MINISTRY OF DEFENSE OFFICIALS: EHUD BARAK; AVIGDOR LIEBERMAN;**
**7A Street**
**Hakirya, Tel Aviv 61909**
and

**KNESSET MEMBER TZIPI LIVNI FORMER ISRAELI MINISTER OF FOREIGN AFFAIRS**
**Knesset**
**Kiryat Ben-Gurion**
**Jerusalem 91950**
and

**DAVID FRIEDMAN, Esq.**
**Kasoqitz, Benson, Torres & Friedman LLP**
**1633 Broadway**
**New York, NY 10019**
and

**AMERICAN FRIENDS OF BET EL INSTITUTIONS**
**6827 Juno St.**
**Forest Hills, NY**
and

**KUSHNER FAMILY FOUNDATION,**
**200 Central Avenue,**
**Mountainside, NJ 07902-1926**
and

**BILLET, FEIT & PRICE, P.C.**
**42 Broadway**
**New York, NY 10004,**

**Defendants.**

---

**COMPLAINT FOR INJURIES DIRECTLY ARISING AS A RESULT OF THE WAR CRIMES COMMITTED, ENCOURAGED, OR FINANCED BY THE DEFENDANTS**

## INTRODUCTION

COME NOW the Plaintiffs herein, U.S. Citizens, Palestinian Nationals, and Palestinian and Jewish

Americans, and through undersigned counsel hereby complain of the Defendants as follows. The Plaintiffs have all been directly injured by the $2 billion money laundering scheme which is described herein, and by the war crimes engaged in, encouraged, or financed by the Defendants, including Prime Minister Netanyahu and President Trump's newly appointed Israeli-Ambassador—David Friedman. The bulk of that financing came from U.S. based pro-occupation tax-exempt entities like Friends of the Israeli Army ["FIDF"], Defendants Kushner Family Foundation [hereinafter "KFF"], and Friends of Bet El Institutions [hereinafter "FOBI"]. These tax-exempt entities are all active participants in the aforementioned $2 billion money laundering scheme. The Plaintiffs bring their claims under the Anti Terrorism Act 18 U.S.C. § 2333 (hereinafter ATA) and the Alien Torts Statute 28 U.S.C. § 1350 (Hereinafter ATS).

All Defendants knew, including Ehud Barak and Avigdor Lieberman [officials in the Israeli Ministry of Defense, (hereinafter IMD)], and Tzipi Livni [Former Minister of Foreign Affairs] that the 1945 Nuremburg Principles, U.S., UN, and Israel human rights conventions, U.S. and Israel's war crimes statutes, Israel's code of military ethics, and Geneva, Hague, and International Genocide Convention principles prohibit an occupying army from engaging in war crimes. Those statutes and conventions also prohibit other criminal conduct designed to intimidate and denationalize a civilian population, e.g. arson, theft of private real property and arms trafficking.

These conventions and statutes prohibit an occupying army from: a) murdering civilians; b) maiming them; c) stripping them of their nationality (*see South African Apartheid litigation*, 617 F. Supp. 2d. 228 (S.D.N.Y. 2009)); d) stealing or destroying their property (*see* Sixth Cause of Action: Conversion); e) inflicting inhumane treatment [using Palestinian farmers as targets during military training sessions,] on them; f) engaging in arms trafficking, ethnic cleansing or genocide; g) coercing or intimidating them to abandon their homes and olive orchards; or h) implementing an Apartheid Regime in the Occupied Territories (hereinafter "OPT"). These are all "notorious war crimes" under

customary international law. President Trump's Secretary of Defense nominee predicted an Apartheid Regime five years ago, and Hebrew University professor Eva Illouis opined that the situation actually is far worse than Apartheid because Palestinians live under conditions of slavery. *See* "Apartheid in Palestine," University of Alberta Press, 2016.

Financing, encouraging, or participating in war crimes [genocide and ethnic cleansing] fits within the definition of "international terrorism." (Violent acts that occur abroad in order to intimidate a civilian population). *See* 18 U.S.C. § 2331. By promoting, participating in, or funding international terrorism, all Defendants have also violated the recently enacted statute known as *Justice Against Sponsors of Terrorist Activity*, Public Law 114-222, (hereinafter "JASTA"), and President Clinton's 1995 Executive Order 12947, (hereinafter EO 12947). Both JASTA and that Executive Order prohibit financing violent activity in the Middle East. The U.S. Defendants named herein, and 50 other pro-occupation tax-exempt entities send $2 billion every year in illegal charitable donations to finance violence in the OPT [the aforementioned money laundering scheme]. The beneficiaries are Defendant Netanyahu, the Israeli defendants named herein, settlements, the Israeli army, and Israeli based NGOs intent on the violent expulsion of all non-Jews from the OPT—Defendant Netanyahu's stated goal 30 years ago. He even has his own U.S. based tax-exempt entity "Friends of Likud" to assist in financing the permanent occupation of the OPT.

When financing, encouraging, or engaging in acts of international terrorism the Israeli Defendants were not implementing Israeli official government policies but pursuing their own personal agenda. As chief prosecutor Sasson found in her 2005 official government report on illegal settlements, both Defendant Netanyahu and senior IMD officials have been violating Israel's criminal statutes by purposefully diverting government funds to illegal settlements. The reason—belligerent settlers needed funding to buy sophisticated military hardware to forcibly expel all non-Jews from the OPT. As the FOBI 990 annual form shows, Defendant Friedman sends settlers in

Bet El $2.2 million every year to do just that—finance arms trafficking, theft of private property, arson, and settlement expansion.

Unlike the scenario presented in *Belhas v. Moshe Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008), the Plaintiffs have alleged herein that the Israeli Defendants were pursuing their own personal agenda while committing or financing war crimes. Id. at 1282. For at least 20 years, they were illegally confiscating private property owned by Palestinian Plaintiffs named herein, so that there would be an abundant supply of affordable housing in the OPT. They were concerned about the availability of affordable housing, because they and their relatives had been priced out of Haifa and Tel Aviv—expensive real estate markets. Besides violating Geneva, Hague, and Genocide Convention principles, that conduct violates Israel's 1948 Declaration of Independence, its strict anti-settlement public policy [documented herein], and numerous Israeli criminal statutes which prohibit arms trafficking, income tax fraud, theft of private property, and money laundering. They breached Israel's money laundering statute by soliciting and receiving clean funds [U.S. charitable donations] which had been sent to them by FOBI, FIDF, and KFF officials to finance war crimes.

The war crimes and other criminal conduct financed by U.S. tax-exempt entities, Defendants Netanyahu, Friedman, Kushner family members and those engaged in by the Israeli Defendants named herein also violated: a) Israel's 1992 Basic Human Rights statute; b) Israel's money laundering statute; c) UN charter principles which both countries have adopted; d) the 1993 OSLO peace accords; e) the 1993 settlement ban imposed by the Israeli government; and f) its tax code which prohibits funding settlements with tax-deductible charitable donations. All Defendants have been violating U.S. and Israeli criminal statutes for at least twenty years by engaging in money laundering 18 U.S.C. § 1956, and funding settlement expansion, arms trafficking, ethnic cleansing, and

genocide. *These donations totaled $1.7 billion in 2007 and now total $2 billion+ a year.*[1] That results in: a) each illegal settlement receiving an annual subsidy of $2 million; b) the Israeli army receiving $100 million a year; c) settlement militia units being armed with 20,000 M16's or Kalashnikovs and millions of rounds of ammunition—enough to kill every Palestinian 10 times over; and d) the Treasury Department losing approximately $2 billion in tax revenues every year. That money laundering scheme results in a significant drain on the U.S. economy, which is also prohibited by JASTA.

As already stated, the Israeli based Defendants had a personal stake in ordering the illegal confiscation of Palestinian property. They and their relatives like Defendant Netanyahu's brother in law, could not afford a pricey home in Tel Aviv or Haifa, so they instead purchased affordable homes in illegal settlements like Bet El. The problem was that these homes were built on real property that Defendant Netanyahu and IMD officials had personally ordered confiscated not to advance official Israeli government policies, but to enrich themselves—valuable real estate investments. Some homes in the OPT now go for upwards of $750,000 because of the shortage of affordable housing.

Israeli Defendants also shared Defendant Netanyahu's personal agenda, i.e. divert funds from Israel's annual budget to enable the settlers to permanently colonize the West Bank with "under the table" financing. They have been very successful in this endeavor—200 settlements now dot the OPT landscape. They did this knowing that their conduct violated Geneva and Hague Convention principles, Israeli criminal laws, the government's 1993 ban on settlements, the 1992 Baker/Shamir Accord [explained herein], its strict anti-settlement public policy, see infra, and its tax code. Since 1993, Israel's tax code prohibited taking charitable donations made to settlements by Israeli citizens. In order to avoid that provision, U.S. tax-exempt entity officials like Friedman and

[1] "The New Philanthropy: American Jewish Giving to Israeli Organizations," Eric Flesich and Theodore Sasson, April 2012 p. 9.

Kushner family members set up sister NGOs in Israel to receive their donations. That way Israeli government tax officials could not claim that individual Israeli citizens had directly funded these pro-settlement NGOs with charitable donations.

Besides violating Israel's anti-settlement public policy and its tax code by providing "under the table" financial assistance to illegal settlements, the Israeli Defendants have also engaged in activities which are specifically prohibited by the recently enacted JASTA legislation. Consistent with JASTA 2(a)(6), American pro-occupation tax-exempt entity officials, including President Trump's son in law, Jared Kushner, and their donors [Defendant Friedman and members of the Kushner Family] are "persons [who] knowingly or recklessly contribute material support directly…to persons [belligerent settlers] or organizations [Settlements/Israeli Based NGOs intent on murdering and maiming Palestinians/Israeli Army and Air Force] that pose a significant risk of committing acts of terrorism that threaten…U.S. foreign policy or the U.S. economy."

The Israeli Defendants, especially Defendants Tzipi Livni [Former Foreign Affairs Minister], and Netanyahu, have been repeatedly threatening American foreign policy. They have financed and assisted armed belligerent settlers in stealing thousands of acres of Palestinian real property, which was to be used for establishing a Palestinian state. And, they have inflicted utter devastation on the civilian population living in the Gaza Strip [Defendant Livni has been indicted in Belgium for war crimes arising out of the last invasion of the Gaza Strip—"Operation Cast Lead"]. Plaintiff Abu Amer lost her parents and 12 siblings due to the war crimes that Defendant Livni authorized. As a result of frustrating American foreign policy objectives, the Israeli based Defendants "should reasonably anticipate being brought to court in the United States to answer for such activities." See JASTA § 2(a)(6).

They frustrated American foreign policy objectives by having Israeli army soldiers and belligerent settlers inflict wholesale violence on the Palestinian population ["filling Palestinian bodies

with bullets," "shoot for their eyes,"] which convinced them to abandon their 200-year-old homes. One soldier even stated "I killed 40 Palestinians for you." *See* "Our Harsh Logic"—700 Israeli army veterans detailed in that book the war crimes that they committed on a daily basis in the OPT. According to former U.S. army General Petraeus that criminal conduct frustrates U.S. foreign policy objectives, because it promotes "Arab anger over the Palestinian question [and] limits the strength and depth of U.S. partnership with governments and peoples [in the region]."[2]

It has also resulted in the demise of the two state solution as recently confirmed by Secretary of State Kerry and UN Resolution 2334. As shown herein, Defendant Netanyahu had an important role to play in the demise of the two state solution. The criminal activity he engaged in to make the two state solution impossible has been described in Count I, the civil conspiracy. To keep receiving $4 billion in U.S. financial aid a year, he had to convince naïve U.S. leadership that he actually supported the two state solution. As shown herein, he never has, and never will support the two state solution—since 1989 he wants a permanent occupation of the OPT. His mission, as stated in 1989, has always been "to carry out mass expulsion [ethnic cleansing] of the Arabs living in the occupied territories." *See* "Apartheid in Palestine," University of Alberta Press, 2016. That criminal conduct of course frustrates a major American foreign policy, i.e. the two state solution.

The Israeli Defendants should anticipate being brought into a U.S. Court for another reason. They have conspired with U.S. based pro-occupation tax-exempt entity officials like Defendant Friedman and Jared Kushner to send $2 billion+ to Israeli based NGOs in laundered funds every year to finance settlement expansion and war crimes. The Israeli recipients are: a) Defendant Netanyahu [he has his own 510(c)(3) entity, Friends of Likud]; b) approximately one hundred Israeli based NGOs intent on maiming and murdering Palestinians; c) settlements like Bet El, Ofra, and Ulpana which are subsidiary settlements of Bet El, and d) the Israeli army.

---

[2] *See* U.S. General: Israel-Palesinian Conflict Foments anti-U.S. Sentiment, Haaretz March 17, 2010; http://www.haaretz.com/news/u-s-general-israel-palestinian-conflict-foments-anti-u-s-sentiment-1.264910

For example, the army received $104 million in 2014 in charitable donations coming from U.S. tax-exempt entities like the Kushner Family Foundation. That foundation paid the Israeli army $315,000 between 2011 and 2013. *The $104 million sent to the Israeli army in 2014 was part of the $2 billion tax-free international income transfer, which constitutes classic money laundering activity (see 18 U.S.C. § 1956). E.g., sending clean funds [charitable donations] overseas to promote criminal activity. It also violates 18 U.S.C. § 960 which prohibits U.S. citizens from financing a foreign militia unit. And 18 U.S.C.§ 371 because they conspire with the Defendants named herein to injure foreign civilians and their property.*

*It also violates JASTA in two meaningful respects.* First, as already noted, that massive income transfer has allowed belligerent settlers to steal thousands of acres of Palestinian property, which means the demise of the two-state solution. Second, it is a tremendous drain on the U.S. economy because it deprives the Treasury Department of billions of dollars every year in tax revenues. That massive income transfer also encourages income tax fraud – i.e. U.S. donors like Defendant Friedman and Kushner family members [and perhaps President Trump] take illegal tax deductions every April 15th based on financing criminal activity overseas like theft of private property, arms trafficking genocide, ethnic cleansing and arson.

Arming belligerent settlers constitutes classic arms trafficking under both U.S. and Israeli law. That criminal activity entails purchasing—with U.S. tax-exempt funds—expensive M16's or Kalashnikovs, body armor, stun guns, sniper scopes, bullet proof vests, night vision goggles, and percussion grenades (hereinafter "military hardware"). Many years ago, the well known lobbyist Jack Abramoff financed the same criminal activity, and was sentenced to six years in prison. He stole money from his Indian Tribe's clients and funded a favorite settlement in the OPT. The rabbi in that settlement suggested printing up sniper school letterhead so he could take tax deductions based on "educational activities." It appears that Defendant Friedman, with all of his connections in the New York City Jewish Community, is the reincarnation of Jack Abramoff. Different settlements of

course, but financing the identical criminal activity.

The Israeli Defendants, including Barak, Lieberman and Tzipi Livni, had no concern about arming belligerent settlers with Kalashnikovs or M16s in order to violently subjugate the Palestinian population. They knew that arming settlers [now Netanyahu's major voting bloc] virtually guaranteed more violent criminal activity and the demise of the two state solution. That conduct [financing violence in the OPT] violates U.S. Treasury Department regulations and President Clinton's 1995 Executive Order. All Defendants knew arming belligerent settlers constitutes classic arms trafficking under both U.S. and Israeli law (See 18 U.S.C. § 922) and the Israeli statute *Combating Criminal Organizations Law*, 5763-2003). That criminal activity alone should concern IRS officials, because U.S. tax-exempt entities are not allowed to finance criminal activity of any nature, whether here or abroad. As is obvious, arms trafficking, arson, theft of private property ethnic cleansing and genocide are not charitable activities which allow donors to take legitimate tax deductions on their tax returns.

Apparently that is not obvious to the principals, however, in the Defendant accounting firm Billet, Feit & Preis, PC (hereinafter "BFP"). BFP Partners tell tax exempt entity officials like Defendant Friedman and Jared Kushner every April 15th what they want to hear, i.e. that they can take charitable deductions based on purchasing military hardware and setting up firing ranges and sniper schools. That advice of course, is music to their ears. As 18 U.S.C. § 1956 makes abundantly clear, however, sending clean funds overseas to finance illicit criminal activity is classic money laundering. That's why it appears that President Trump has aided and abetted money laundering with his "charitable donations." Thus, the U.S. Defendants named herein have been participating in an annual $2 billion money laundering scheme by sending clean funds overseas to finance wholesale violence designed to intimidate a civilian population and convince them to abandon their 200 year old homes. See 18 U.S.C. § 1956 [The money-laundering statute], §§ (a), (2), and (7); (D) § 986 –

"killing, injuring individuals, or injuring property in a foreign country." All Defendants are presumed to know what U.S. and Israeli law is regarding international monetary transfers and the type of activity those funds can be used for.

As the FBI, Treasury, and State Department Officials have repeatedly emphasized, money laundering not only damages the U.S. economy, but it also damages the integrity of our country's financial and banking sector. Unfortunately, it appears that President Trump may have also engaged in money laundering and financed arms trafficking, ethnic cleansing, and genocide if he made charitable donations to FOBI [Friedman's favorite charity], or KFF, or FIDF [one of his son in law's favorite charities]. If he did make those charitable donations, he has at least aided and abetted money laundering activity, and in the process violated numerous federal criminal statutes, e.g. 18 U.S.C. § 960 which prohibits funding the operations of a foreign army. And, if he listed those charitable donations on his 1040 tax form, he has probably committed income tax fraud as explained infra. Of course, since he refuses to produce his tax returns, only he and his accountant know if he engaged in money laundering or funded arms trafficking, arson, genocide, or ethnic cleansing, or committed income tax fraud.

The Israeli based beneficiaries of this money-laundering scheme like Defendant Friedman's Bet El Settlement finance the theft of private property to expand the settlement, set up firing ranges and sniper schools, engage in arms trafficking, and commit war crimes. They all solicit contributions on U.S. soil to finance criminal activity abroad, which appears to be the only activity that FIDF and FOBI engage in on U.S. soil, i.e. they are "pass-through" charitable entities. They have willingly accepted and used these funds to finance acts of international terrorism and have also violated Israel's money laundering statute. *See Prohibition on Money Laundering Law*, 5760-2000 (August 2000). Courtesy of the $2 billion in laundered funds that they receive every year, Israeli based beneficiaries are able to inflict wholesale violence on their Palestinian neighbors and steal more of their real

property. These funds are also used to purchase armored caterpillar tractors that enable the settlers to encroach on private Palestinian property. In the dead of the night, the settlers think nothing of demolishing Palestinian homes which are sometimes occupied. As former Prime Minister Shimon Peres said—they are "monsters," as detailed herein.

They use the $2 billion in laundered funds to: a) violently subjugate the Palestinian population [a war crime]; b) purchase sophisticated military hardware for members of the settlement militia unit [arms trafficking] see 18 U.S.C. § 922 and Israel's criminal statute: "Combating Criminal Organizations Law," 5763-2003; c) construct expensive firing ranges in the Bet El settlement and set up sniper schools there—the purpose, to train settlers how to kill Palestinian farmers trying to harvest their olive groves or taking their kids to school; and d) fund the expansion of adjacent illegal settlements [Ofra and Ulpana] which necessarily entails additional theft of private property and therefore more ethnic cleansing. As detailed herein, 400,000 Palestinians have been forcibly removed from the OPT by violent belligerent settlers in pursuit of permanent occupation of the West Bank.

The purpose in funding adjacent settlements [Ofra, Amona and Ulpana] was not only to expand them, but to strangle and surround Palestinian villages like Ramallah. That was the same strategy employed by officials in the South African Apartheid Regime—"Bantustans." That financial assistance also enabled settlement officials to hire professional forgers so that they could prepare forged deeds of excellent quality. That is exactly what happened to Palestinian American Plaintiffs Kateeb and Ali, who have lost anywhere between $3-4 million worth of real estate in the OPT based on forged deeds recorded by settlement officials. That real estate fraud is a direct result of the Defendants sending $2 billion+ every year to Israeli settlements in laundered funds. That activity constitutes real estate fraud under both U.S. and Israeli law. Plaintiffs Ali and Kateeb have no remedy to pursue in Israel as detailed herein. *See* Jurisdiction section.

As a result of engaging in or financing arms trafficking, real estate fraud, theft of private

property, and money laundering, all Defendants have violated the host country's [Israel's] civil and criminal statutes. U.S. Defendants have also violated a number of Treasury regulations, for example controlling how the funding is spent once it reaches Israel. That regulation was designed to prevent funding criminal activity abroad, a major concern on the part of Homeland Security. Distributing M16's or Kalashnikovs to settlement leaders simply increases the prospect of having military hardware fall into the hands of extremist groups. Besides violating these regulations and 18 U.S.C. § 2239 [financing terrorism], they have violated another federal criminal statute—perjury, 18 U.S.C. § 1621.

That statute prohibits U.S. citizens from lying to a government agency. Every time a fraudulent annual tax-exempt entity 990 form is filed, Defendants Friedman, KFF, and FOBI officials, and Defendant accounting firm BFP principals violate that statute. Had BFP principals properly advised U.S. Defendants that they could be indicted for perjury or engaging in income tax fraud, the settlements would never have received $2 billion a year. Therefore, they would not have had the funding necessary to outfit the local militia unit with M16's or Kalashnikovs, body armor, and expensive ammunition in order to drive 400,000 Palestinians out of the OPT. All Defendants know that ethnic cleansing violates both U.S. and Israel public policy.

Another way that Israeli Defendants violate JASTA, is by encouraging Israeli based NGOs to cooperate with their American counterparts like Defendants Friends of Bet El Institutions [FOBI], KFF, and Friends of the Israeli Army [FIDF], to finance the ongoing military campaign against the Palestinian population. That conduct of course violates numerous Israeli criminal statutes, for example money laundering and conspiracy to maim and murder civilians. The immediate goal is to rid the West Bank and East Jerusalem of all non-Jews, using force if necessary. As explained in Count I [civil conspiracy], U.S. and Israeli Defendants have conspired to finance the forcible expulsion of all non-Jews from the OPT so that belligerent settlers could permanently

colonize the West Bank—Defendants Netanyahu's, Friedman's and perhaps Jared Kushner's personal agenda.

Count II names all Defendants herein, including Barak, Lieberman and Livni, for aiding and abetting the commission of war crimes by belligerent settlers and the Israeli army. As numerous Israeli government officials and journalists have concluded—"settlers can get away with murder." (See "Israel's fanatical settlers can get away with murder – literally" by Asa Winstanley, Middle East Monitor, January 13, 2016). Count III is directed at senior officials in the IMD, Defendant Tzipi Livni, and the other Israeli defendants named herein based on their reckless failure to properly supervise IDF senior officials who have, inter alia, ordered line soldiers to commit grave war crimes which results in a large number of Palestinian civilian casualties. As an example, senior IMD officials have approved a "shoot to kill" policy issued by defendant Livni and applied very lenient rules of engagement, for example civilians, even unarmed, are appropriate targets.

Accounting Firm BFP is named in Count IV [aiding and abetting income tax fraud] and in Count V [negligence]. The Firm's principals knew that their clients were financing belligerent settlers' criminal activity in order to permanently colonize the West Bank. All Israeli defendants are named in Count VI [Conversion] for knowingly trespassing on private property and converting that property to their own profitable use. The conversion has been going on for approximately thirty five year, is permanent in nature and involved thousands of acres of private Palestinian real estate. Since 1989, Defendant Netanyahu's lifelong mission has always been to encroach on, occupy, and steal private Palestinian property and permanently colonize the West Bank.

## JURISDICTION

1. 28 U.S.C. § 1331 is invoked on behalf of the non-U.S. citizen Plaintiffs against all Defendants in connection with Count I, Civil Conspiracy, Count II, Aiding and Abetting the Commission of War Crimes, and Count III, Reckless Supervision of military personnel

against IMD senior officials. These Counts fall under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("Alien Tort Statute" or "ATS"). This Court has jurisdiction under the ATS to adjudicate Plaintiffs' claims because they: a) involve violations of Customary International Law [genocide and ethnic cleansing]; and b) touch and concern the territory of the United States as described in detail throughout this Complaint and specifically in the Venue section herein.

2. Congress' express intent in enacting the ATS was to give non-citizens access to U.S. courts to hold U.S. citizens and foreign nationals accountable for violations of international law norms, including the Law of Nations clause contained in in the Constitution [Constitution Art. I Sec. 8 Cl. 10] that "touch and concern"[3] the United States, as Defendants' actions clearly do. For example, the U.S.-based tax-exempt entities named herein have been engaging in money laundering activity [18 U.S.C. 1956] on U.S. soil for at least 20 years, i.e. raising clean funds [donor contributions] and transferring them abroad to finance war crimes. *See* 18 U.S.C. § 1956.

3. In addition, they have repeatedly defrauded the IRS by: a) making false statements on applications for tax-exempt status; and b) by filing fraudulent annual 990 tax forms describing its charitable activities. For obvious reasons, they did not disclose to the IRS that some of these "charitable activities" financed by U.S. donors included arms trafficking, arson, genocide, theft of private property, and other activity deemed to be criminal in nature by the recipient government—Israel. That reason alone can result in revocation of a tax-exempt entity's status and the indictment of its officials, e.g. Jared Kushner and its donors for income tax fraud.

[3] *Kadic v. Karadzic*, 70 F.3d 232 at 233, rehearing den'd, 74 F.3d 377.

4. The tax-exempt entity officials and BFP principals have also conspired on U.S. soil to defraud the IRS by encouraging their donors to take illegal tax deductions for expenses incurred in numerous criminal activities, e.g., setting up militia units, firing ranges, and sniper schools; buying M16's or Kalashnikovs, sniper scopes, body armor, and percussion grenades. That financial assistance has enabled Senior IMD Officials, Defendant Livni, belligerent settlers, and Israeli Army personnel to finance or commit wholesale violence against a civilian population. That conduct was financed by U.S. based tax-exempt entities and Defendant Netanyahu, or engaged in by belligerent settlers in order to enable them to permanently colonize the West Bank and Jerusalem, which has always been Defendants Netanyahu's and Friedman's personal agenda. That conduct is a clear violation of JASTA, and warrants suing Israeli Defendants in this Court.

5. The U.S. citizen Plaintiffs named herein have no potential remedies[4] to exhaust in Israel because:

(a) The remedies sought are not available in the OPT or Israel. For example, to the extent a Palestinian or Palestinian-American wanted to sue individuals and entities in Israel for intentional murder, they could not do so. Recently, members of the Dawabshe family tried to secure monetary redress in connection with the intentional burning down of their house, which cost three lives. Israeli Deputy Defense Minister Eli Ben-Dahan refused them access to Israel's courts.

(b) The Plaintiffs are filing this suit in Federal District Court for another reason—the claims alleged herein cannot be adjudicated in Israel. The Israeli Supreme Court has consistently rejected judicial disposition of these claims.[5] Unlike Israeli citizen settlers in the OPT, because of their race and/or their religion, the U.S. citizen Plaintiffs would be subject to a regime of military law, which does not recognize civil causes of action like civil conspiracy, nor claims premised on war crimes, crimes against humanity, and genocide.[6]

---

[4] The Alien Tort Statute, applicable to the non-U.S. citizen Plaintiffs herein, does not require exhaustion of local remedies. 28 U.S.C. § 1350.

[5] *See* The Role of National Courts in Applying International Humanitarian Law, Sharon Weill, 2014, p. 91.

[6] *See* The General's Son: Journey of an Israeli in Palestine, Miko Peled, 2010 (hereinafter "General's Son"). In 2010 Mr. Peled [the lead Plaintiff herein] was arrested in the West Bank and taken to an IDF military station. The station commander complained about Mr. Peled, saying "look, he is an Israeli citizen, and he has rights. He is not a Palestinian that I can just beat up and throw in prison." General's Son p. 186. *See also* The Role of National Courts In Applying International Humanitarian Law (Sharon Weill), explaining how through a series of decisions the Israeli Supreme Court has effectively extended citizenship rights to Israeli settlers in the OPT while simultaneously

(c) The remedies available in the OPT, in any case, are not adequate. Although it is possible for Palestinians to file limited grievances in military courts in the OPT, the U.S. citizen Plaintiffs are not able to hail the defendants into those military courts, and in any case, they could not file causes of action for war crimes, or civil conspiracy in those military courts for two reasons: (1) Israel's Anti-Nazi Law of 1950, its war crime statute, applies only to Jews in Israeli courts, which courts these Plaintiffs cannot access; and (2) military courts have limited jurisdiction, if any, to deal with these issues.

6. 28 U.S.C. § 1332 Diversity Jurisdiction is invoked with respect to all Defendants.

7. 18 U.S.C. § 1956(b)(2), modified by U.S.A. Patriot Act Title III, Sections 317 and 318, is the long-arm statute extending jurisdiction over persons [Defendant Friedman and Kushner family members] and entities [Israeli Defendants] who have engaged in money-laundering transactions across international borders into Israel—"the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and...the foreign person commits an offense under subsection (a) involving a financial transaction [20 years of international wire transfers to the Israeli army and 100+ illegal settlements] that occurs in whole or in part in the United States."

8. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

9. Fed. R. Civ. P. 4(k)(2) provides this Court personal jurisdiction over foreign defendants who have transacted any business in this judicial district pursuant to the District of Columbia

---

relegating Palestinians in the same territory to military rule in which broadly-defined security interests trump basic civil rights.

Long-Arm Statute, D.C. Code Ann. § 13-423. Defendants Netanyahu and senior IMD officials have been coming to this jurisdiction for at least twenty years to transact business and engage in routine commercial activity, i.e. negotiating arm sales agreements and foreign aid packages with Department of Defense and State Department officials. Negotiating arms sales agreements with Department of Defense officials constitute classic commercial activity as defined in the Foreign Sovereign Immunities Act.

10. Amnesty International's fourteen Principles on the Effective Exercise of Universal Jurisdiction lists grave breaches of the four Geneva Conventions as a basis for exercising universal jurisdiction by any national court like this Federal District Court. As detailed herein, all Defendants, have been repeatedly breaching the law of nations [Constitution Art. I Sec. 8 Cl. 10] and Geneva Convention and Nuremburg principles during the second occupation starting in 1967. Those breaches include: (a) willful extrajudicial killings [at least 15,000 Palestinians]; (b) torture or inhumane treatment [i.e Plaintiff Al-Tamimi has been arrested and tortured at least 10 times]; (c) willfully causing great suffering or serious injury to body or health [demolition of homes with relatives inside]; (d) arms trafficking [buying approximately 10,000 M16's or Kalashnikovs]; (e) extensive destruction or appropriation of property not justified by military necessity [49,000 homes have been demolished[7]]; (f) unlawfully deporting and/or transferring 400,000 indigenous Palestinians out of the OPT[8]—classic ethnic cleansing. (*See Abulhawa v. Treasury*, Civil Action No. 1:15-cv-2186 (D.DC 2015)).

11. Consistent with Amnesty International's principles on jurisdiction, the District Court of Jerusalem in 1961 decided the case of *Israel v. Eichmann*. The Court's jurisdiction was founded upon paragraph 12 of Israel's war crime statute—the Nazi and Nazi Collaborators

[7] *See* http://ichad.org/
[8] *See* "Israelis Excel at Camouflaging the Expulsion of Palestinians" Haaretz, Oct. 20, 2014.

(Punishment) law 5710-1950. *The court held regarding jurisdiction that the universal character of the crimes in question, war crimes, which are grave offenses against the Law of Nations itself, grant jurisdiction to any domestic court hearing such claims.* There are detailed allegations pled herein (see Count II) reciting the "grave" offenses [for example ethnic cleansing, "filling Palestinian bodies with bullets" or "shooting at their eyes" or "breaking their legs"], committed or financed by the Defendants.

12. Recently an Israeli Army Spokesperson, Moti Almoz, stated the obvious--"this is not the IDF, these are not the values of the IDF, and these are not the values of the Jewish people." Israeli Defense Minister Moshe Yaalon confirmed that--"shooting an unarmed Palestinian was an utter breach of the army's values and its code of ethics in combat." *See Washington Post* March 29, 2016, A9. Concerned about his voting bloc [belligerent settlers] Defendant Netanyahu could care less about murdering Palestinians, whether armed or otherwise. Shortly he will pardon an Israeli soldier who literally executed a wounded Palestinian bleeding out in the street. *See Washington Post*, "In a Split Israel, Soldier Convicted of Killing Palestinian," A8, Jan. 5, 2017. The only reason that particular soldier was prosecuted was the entire criminal activity was caught on camera. Unfortunately, The Israeli Defendants have not prosecuted hundreds who have executed Palestinian civilians with the tacit approval of Defendants Netanyahu, Defendant Livni, Defendant Lieberman, and senior IMD officials.

13. <u>The Anti Terrorism Act</u>: Plaintiffs bring claims under the Anti Terrorism Act (hereinafter ATA) 18 U.S.C. § 2333. The ATA provides that "any national of the United States injured…by reason of an act of international terrorism…may sue therefore in any appropriate district court of the United States, and *shall recover three fold the damages he or she sustained.*" 18 U.S.C. § 2333 (a). Since Plaintiffs Ali and Kateeb have lost $2-3 million in real estate, that means they can recover approximately $10 million herein. The American

Plaintiffs named herein allege that the Israeli Defendants committed predicate acts of "international terrorism" by violating two federal criminal statutes. 18 U.S.C. § 2339(A) prohibits the provision of material support or resources to persons or entities which have committed acts of international terrorism, and 19 U.S.C. § 2339(C) prohibits the financing of terrorism. All Defendants named herein have actually participated in, or have financed, acts of international terrorism, ethnic cleansing, and genocide. [See Count II herein, aiding and abetting the commission of war crimes].

14. Alien Torts Statute. The Alien Torts Statute (hereinafter "ATS") provides that "the district courts shall have jurisdiction of any civil action by an alien for a tort only committed in violation of the law of nations or a treaty of the United States." 28 USC § 1350. The ATS is a jurisdictional statute, and was enacted by Congress on the understanding that the common law would provide causes of action for a modest number of international law violations, including offenses against the Law of Nations like genocide and ethnic cleansing (*See* U.S. Constitution Art. I Sec. 8 Cl. 10). As already detailed in the introduction, all Defendants have violated international law convention principles, and have provided material assistance to facilitate the perpetration of obvious war crimes. They purposely facilitated the commission of those war crimes in order to advance Defendant Netanyahu's and Defendant Friedman's personal agenda—have the settlers permanently colonize the West Bank.

15. Foreign Sovereign Immunities Act 28 U.S.C. §1605 – 1607, and specifically the Commercial Activity section provided for in 28 U.S.C. 1605 (a)(2) and section 1605(a)(3) which provides for the illegal confiscation of private property by foreign state actors. The Commercial Activity exception eliminates immunity in cases "in which the action is based upon a commercial activity carried on in the United States by the foreign state." All Israeli Defendants have been engaged in commercial activities on U.S. soil while working for the

Israeli government. The reason why is made clear by FSIA's legislative history. I.e., evidence of a contract entered into by a foreign government to buy military hardware for its armed forces. *See MacArthur Area Citizens Association v. Republic of Peru.* 809 F.2d 918 (D.C. Cir. 1987).

16. Much like the commercial activity exception, the taking of private property which violates international law is another viable exception. As detailed in the suit, Israeli defendants named herein encouraged, promoted, financed, and engaged in the illegal taking of private property. In fact, they stole thousands of acres of private Palestinian property in the process of forcibly expelling 400,000 Palestinians from the OPT, i.e., ethnic cleansing and genocide. Some of the properties that were illegally confiscated are now occupied by an agency of the Israeli government – i.e., the Israeli Army, including senior IMD officials. As alleged in the suit [see Conversion Count VI), the taking of property by the Israeli Defendants was intended to "deliberately inflict on the group conditions of life calculated to bring about its physical destruction in whole or in part" (Genocide convention (2)(c). The Israeli Defendants have been very successful in terms of destroying the Palestinian population and their culture and heritage, i.e. 400,000 Palestinians have been forcibly removed from the OPT [ethnic cleansing].

17. As this Court probably knows, Genocide under paragraph (c) may include, but is not necessarily restricted to "…systematic expulsion from homes." *See* Simon vs. Republic of Hungary, 812 F.3d 127, 139 (D.C. Cir. 2016). As alleged herein, 49,000 Palestinian homes have been demolished or confiscated resulting in the ethnic cleansing of some 400,000 Palestinians. The Israeli army officials not only occupy these properties and use them as military barracks, administrative offices, and military courts, they also engage in classic

commercial activity in America, re the purchase of military hardware and sophisticated weaponry.

18. Every year, these officials visit Washington DC and consult with Department of Defense officials about the purchase of military hardware and sophisticated weaponry. Thus, they have been engaged in classic commercial activity in the US for the last thirty years. As this Court knows, the expropriation of private property violates Hague and Geneva convention principles. That criminal activity also violates Israel's Declaration of Independence, Israeli criminal statutes which prohibit stealing private property, and a significant number of UN resolutions. Defendant Netanyahu, of course, claims that these international conventions are inapplicable to the Occupied Territories. However, in 1967, the attorney for the Office of the Foreign Ministry Theodore Meron opined that the settlements violate international law, specifically the Geneva Convention. An occupier cannot populate an occupied territory with its own nationals except for necessary military personnel. There are approximately 700,000 non-military personnel currently occupying Palestine, i.e. belligerent settlers.

19. South African Apartheid litigation, 617 F. Supp. 2d. 228 (S.D.N.Y. 2009): In South African Apartheid litigation, the Plaintiffs alleged, just like the Plaintiffs herein, that the Defendants participated in the denationalization of a civilian population. The Court held that denationalization of a civilian population is a recognized war crime. The Defendants named herein have engaged in similar criminal conduct. They made sure that 400,000 Palestinians were forcibly removed from the occupied territories (hereinafter OPT), and that 49,000 Palestinian homes were either confiscated or destroyed by the Israeli Army and belligerent settlers. (*See Abulhawa v. Treasury*, Civil Action No. 1:15-cv-2186 (D.DC 2015)).

20. As this Court knows, American citizens have the inalienable right to petition the government in order to redress their grievances. See *Missouri v. National Organization for Women*, 620 F. 2d

1301, 1318 (8th Cir. 1980). That case emphasizes the importance of an American Citizen's right to petition his government, as former Supreme Court Justice Douglas observed: "It is one of the freedoms protected by the Bill of Rights." U.S. citizens Ali and Kateeb have a specific grievance, because belligerent settlers are now occupying their property in the OPT and claiming ownership thereof based on recorded fraudulent deeds. As this Court knows, the Fifth Amendment protects individuals like these Plaintiffs from depravation of property without due process or fair compensation. As a result of the Defendants conspiring to deprive Plaintiffs Ali and Kateeb of their property without Due Process, they have been damaged in the amount of approximately $2-3 million based on current Remax property values.

21. The District of Columbia's long-arm statute is codified under D.C. Code § 13-423, and provides a basis for jurisdiction under the conspiracy theory of personal jurisdiction against members of a civil conspiracy when the elements of a civil conspiracy have been pled. *See Second Amendment Found. v. United States Conf. of Mayors*, 274 F.3d 521 (D.C. 2001); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.ed 1020 (D.C. Cir. 1997). In order for the Court to exercise personal jurisdiction under conspiracy theory, "the plaintiff must plead with particularity "the conspiracy as well as the overt acts within the conspiracy." *Jungquist* at 1031 (internal citations omitted). Conspiracy jurisdiction has been further defined to be where an individual is deemed to have transacted business in the forum state directly, and as a consequence other conspirators who have never entered the forum state are deemed to transact business there "by an agent." *Second Amendment Found.* at 523. Thus if one member of a conspiracy engaged in activities in the forum, every member of the conspiracy is subject to the forum's jurisdiction. Defendants are therefore also subject to personal jurisdiction in the District of Columbia under the conspiracy jurisdiction theory. For example, Defendant

Billet, Feit, and Price, P.C., as explained in more detail *supra*, is subject to conspiracy jurisdiction because of their role in the civil conspiracy complained of herein—i.e., routinely giving illegal advice to donors intent on settlement expansion through theft of private property and the commission of war crimes. *See* ¶¶ 86—110. If they had not rendered that advice to these donors, and therefore the donors could not secure tax write offs, settlement expansion would come to a screeching halt. They played therefore an important role in the civil conspiracy described herein.

## VENUE

22. Venue is proper in this District Court based on 28 U.S.C. 1391(f)(4). Venue is appropriate in this judicial district for a number of reasons:

i. IMD officials and Defendant Netanyahu routinely travel to America and sometimes this metropolitan area to meet with U.S. Congressional representatives or attend fundraising events sponsored by pro occupation tax-exempt entities. They meet with Congressional representatives in order to shut off all funding to the Palestinian government because it sought relief from the International Criminal Court based upon war crimes which have been thoroughly described by members of Breaking the Silence, as shown herein.

ii. Defendants Friedman, Friends of Bet El Institutions, and KFF all solicit funds in this metropolitan area and all over America to support the Israeli army and belligerent settlers engaging in theft of private property to ensure settlement expansion. For example, the FIDF in 2014 hosted fundraising galas in Hollywood and New York City, and as a result sent $104 million to the Israeli army. Wealthy donors like Defendant Friedman and members of the Kushner Family thought nothing of their largesse. In fact, the Kushner Foundation sent

$315,000 to the Israeli army between 2011 and 2013. The reason--they were able to take millions in illegal tax write-offs as a result. As all U.S. Defendants know, the U.S. tax code was not enacted to ensure that U.S. citizens could finance a permanent occupation or the operations of an overseas militia unit. Over the last 10 years, FIDF U.S. donors have sent approximately $1 billion to the Israeli Army, knowing exactly what army officials would do with those funds—order line soldiers to maim and murder Palestinians, burn down valuable olive groves, and churches and mosques.

iii. Pro-occupation tax-exempt entities and their donors work with AIPAC officials who are located in this jurisdiction, to *inter alia* preserve the practice of taking illegal tax deductions. They have also worked with AIPAC officials in this district to revise Treasury Department regulations so that pro-occupation tax-exempt entities no longer have to disclose the country [Israel], which is receiving billions of dollars from them every year. The reason—they were afraid that U.S. Treasury Department officials and Congress would actually discover the massive amount of funds [$2 billion+] sent by U.S. citizens to finance settlement expansion, arms trafficking, and war crimes like ethnic cleansing and genocide.

iv. Defendants Netanyahu, Livni, and IMD officials have come to DC to meet with Newt Gingrich, AIPAC officials, the Israeli ambassador, and U.S. Congressional officials. Netanyahu also came here to address the US Congress, invited by former House Speaker John Boehner.

v. Defendant accounting firm BFP principals, on behalf of their clients, have applied for 501(c)(3) tax-exempt status here in Washington D.C., and have also filed fraudulent annual charity tax returns here—Form 990's. The reason these

returns can be deemed to be fraudulent is that they are intentionally incomplete and do not disclose the true nature of the charitable activities engaged in overseas—arms trafficking, genocide, and theft of private property.

vi. IMD officials and Defendant Livni frequently come to this judicial district to meet with Department of Defense and State Department officials to negotiate various financial aid packages. Just recently they signed a massive financial assistance agreement that will start in 2019.

vii. AIPAC has its annual dinner and convention in Washington D.C. and numerous IMD officials and other government officials, like Defendant Netanyahu, attend along with pro-occupation tax-exempt entity officials like Defendant Friedman.

viii. Senior IMD officials and Defendant Livni have been coming to this jurisdiction for at least 30 years to meet with DOD officials re: the purchase of military hardware. As a result, they have engaged in "commercial activity," as defined in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1605-07.

23. Venue is appropriate for all tax-exempt entity Defendants because they: a) have conspired on U.S. soil with their Israeli based NGO counterparts to engage in money-laundering activity and secure the necessary funding to forcibly expel all non-Jews from the OPT; b) solicited funds in this jurisdiction destined for illegal settlements, the Israeli army and Israeli NGOs intent on permanently colonizing the West Bank; c) attended various AIPAC events here; and d) have also engaged in commercial activities with the Treasury Department. For example, Defendant accounting firm BFP filed for tax-exempt status here in Washington, D.C. for FOBI. They requested and received special tax treatment from the Treasury Department for Friends of Bet El Institutions and a number of other U.S. based tax-exempt entities. Friends of Bet El Institutions officials have consistently abused that tax-exempt

status as detailed herein. One reason—its function is to act as a "pass-through" charity set up specifically to fund violence abroad. They hold charitable donations for 24 hours in their bank accounts so that their donors can take illegal tax write-offs for funding "charitable activities." The problem is that these activities include money laundering, arms trafficking [buying 20,000 M16's or Kalashnikovs and millions of rounds of ammunition], stealing thousands of acres of private property, and financing ethnic cleansing and genocide so that belligerent settlers can permanently colonize the West Bank.

## RELEVANT STATUTES

24. Justice Against Sponsors of Terrorism Act, (hereinafter "JASTA") Pub. L. 114-222, §2(a)(6) "Persons, entities, or countries that knowingly or recklessly contribute to material support or resources, directly or indirectly, to persons [settlement officials and Israeli army soldiers] or organizations [settlements, Israeli based NGOs, and the Israeli Army or Air Force] that pose a significant risk of committing acts of terrorism that threaten the United States' foreign policy, or the economy of the United States, necessarily direct their conduct at the United States, and *should reasonably anticipate being brought to court in the United States to answer for such activities.*" As explained herein, all Defendants have engaged in conduct which have threatened the U.S. economy and frustrated U.S. foreign policy objectives in the Middle East [the two state solution]. They damaged the U.S. economy by soliciting funds on U.S. soil to promote the $2 billion money laundering scheme described in the introduction.

25. JASTA § 2(b): "The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, [the Israeli Defendants named herein, U.S. tax-exempt entity officials, belligerent settlers], entities, [illegal settlements, the Israeli Army and the Air Force, and the Israeli based NGOs who receive funding from U.S. based pro-occupation tax-exempt entities to expand

settlements], and foreign countries, *wherever acting and wherever they may be found*, that have provided material support, directly or indirectly, to foreign organizations [Israeli-based NGOs intent on permanently colonizing the West Bank, hundreds of illegal settlements, and Israeli Armed Forces] or persons [individual Defendants named herein, belligerent settlers or IMD officials] that engage in terrorist activities against the United States." As explained herein, the U.S. Defendants have provided material support [$1.7 billion in 2007, and $2 billion+ in 2015] to foreign organizations [Israeli Armed Forces, 100+ illegal settlements, and Israel based NGOs intent on permanently colonizing the west bank] or persons [belligerent settlers, Israeli army personnel, and senior IMD officials] who engage in or finance acts of international terrorism which threaten both U.S. foreign policy objectives and its economy.

26. 18 U.S.C. § 1952, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises (the "Travel Act"), criminalizes interstate or foreign travel to promote unlawful activity. Defendant Friedman and members of the Kushner family, as well as other FOBI, KFF, and FIDF officials and IMD officials travel all over America to either solicit or make tax-deductible contributions to promote wholesale violence, arms trafficking, theft and malicious property destruction in violation of this statute.

27. 18 U.S.C. § 960, Expedition Against a Friendly Nation: Prohibits U.S. citizens from financing the operations of a foreign militia unit whose members commit war crimes in order to violently subjugate and intimidate a civilian population. David Friedman and members of the Kushner family have been financing the operations of illegal settlements and the Israeli army for at long time—in Friedman's case approximately 40 years. If President Trump has made donations to FIDF, KFF, or FOBI, he has also violated this statute.

28. 18 U.S.C. § 371, Conspiracy to Commit Offense or to Defraud the United States, is a statute intended to protect all U.S. government agencies from being defrauded. The IRS, for example, should not be deprived of normal tax revenues owed by U.S. taxpayers like donors to pro-occupation tax-exempt entities. As detailed herein, however, Defendants KFF, FOBI, and Friedman have conspired with U.S. taxpayers to do precisely that. Their U.S. donors have taken illegal deductions for at least twenty years. The reason is that Treasury Department tax-exempt regulations make it clear that a donor cannot take a charitable deduction which is based on expenses incurred by officials or entities located overseas who are engaged in criminal activity like arson, arms trafficking and war crimes.

29. All Defendants named herein have aided and abetted the violation of the American Convention on Human Rights, Article 20 [“no one shall be arbitrarily deprived of his nationality”], and the European Convention on Nationality [“No one shall be arbitrarily deprived of his or her nationality”], Article 4(a). They have done so by the arbitrary de-nationalization of the Palestinian population based on ethnicity and religion. *See* South African Apartheid litigation, 617 F. Supp. 2d. 228 (S.D.N.Y. 2009). In the process they have also violated Hague Convention principles which mandate that “individuals have a right to retain their citizenship, even in the face of a hostile invasion.” Fourth Hague Convention Article 45, October 18, 1907, 36 Stat. 2277, 2306.

30. All Defendants have violated Israel’s criminal statute known as “Combating Criminal Organization’s Law” 5763-2003, which was formally enacted in 2003. A “criminal organization” is defined therein to mean a body of persons acting in an organized, systematic, and continuous format for the commission of felony offenses under the laws of Israel. By engaging in or financing classic felony 1 offenses under Israeli law, [arson, arms

trafficking, money laundering, ethnic cleansing, theft of private property], all Defendants named herein have been violating this statute for years, and are still doing so today.

31. The statute is applicable to Defendant Netanyahu. In chapter 2 the statute provides that "a public servant who abuses his office or powers in a manner that could promote the criminal activity of a criminal organization shall be liable to imprisonment for 10 years." As detailed herein, Defendant Netanyahu, while serving as Prime Minister and Deputy Prime Minister during the last twenty years, has been abusing his office and his powers by promoting extensive criminal activity engaged in by IDF personnel, IMD officials, and belligerent settlers.

32. Israel's Prohibition on Money Laundering Law, 5760-2000 (August 2000). There are a number of first schedule offenses listed in this law that have application to the allegations made herein. Listed under "specification of offenses" is (2) offenses of illegal trading in arms under § 144 of the penal law. Listed as number (7) is offenses of murder and attempted murder. Listed as (8) is offenses against the person. Number (9) is offenses against property. The last one listed is a conspiracy to commit any of the first schedule offenses specified herein. Plaintiffs have alleged herein that Defendants have conspired to forcibly expel all non-Jews from the OPT – offences against the person. *See* Count I. That conduct violates both U.S. and Israel war crimes statutes.

33. They have also alleged offenses of arms trafficking, murder and attempted murder, offenses against the person, and offenses against property owned by Palestinians and Palestinian Americans. IMD officials have conspired with Defendants Netanyahu and Livni to make sure that Israeli army personnel and belligerent settlers could murder and maim innocent civilians with impunity and engage in arms trafficking, arson, genocide, theft and malicious destruction of private property. Defendants Netanyahu and Friedman have encouraged this

criminal activity because it advanced their personal agenda, i.e., have the settlers—including Netanyahu's brother in law—permanently colonize the OPT after all non-Jews have been forcibly expelled courtesy of U.S. taxpayer financial assistance.

34. With respect to the four different Geneva conventions, article 3 pertains to the allegations made herein. That is a specific convention against torture. The international covenant on civil and political rights, as well as customary international law are both referenced in the war crimes act, 18 U.S.C. § 2441 (d)(1)(B). Cruel and inhumane treatment is barred pursuant to 18 U.S.C. 2441 (d)(1)(B). The intentional infliction of serious bodily injury comes under 18 U.S.C. 2441 (d)(1)(E). As alleged herein, these acts were encouraged by Defendant Netanyahu and committed by IDF personnel and belligerent settlers against Palestinian civilians who were unarmed and taking no active part in any hostilities. Plaintiff Abu Amer for example, lost 14 members of her family due to: (a) the under the table financing provided by Defendant Netanyahu; (b) the war crimes authorized by senior IMD officials and Defendant Netanyahu and engaged in by the Israeli armed forces; and (c) the substantial financial assistance provided by Defendants KFF and FOBI, and the Friends of the Israeli Defense Forces (FIDF).

35. The acts financed by the Israeli defendants and U.S. tax-exempt entities, committed by belligerent settlers and Israeli army soldiers were intended to cause the Plaintiffs serious physical and mental pain and suffering. For example, in the case of Plaintiff Al Tamimi, he has been arrested at least 10 times on orders from senior IMD officials, and endured serious physical and mental pain and suffering while he was under the control and custody of the IDF. His sister was murdered by Israeli army personnel in order to teach him a lesson. He was trying to stop settlement encroachment near his village by organizing weekly demonstrations, which frustrated Defendant Netanyahu's personal agenda, and embarrassed

him in the international community. For at least 20 years, Defendant Netanyahu has encouraged and financed illegal encroachment on those Palestinian villages. He has ordered that Al-Tamimi and his family members be repeatedly arrested to convince them to stop their weekly demonstrations and abandon their 100 year old family homes.

## PARTIES

**PLAINTIFFS:**

36. The Plaintiff's are victims of a $2 billion money laundering scheme which results in 150+ illegal settlements and the Israeli armed forces receiving $2 billion a year—income that they do not report to any authority. These funds were not allocated by the Israeli government because it's illegal to do so per the 1993 ban on settlements and the 1992 Baker/Samir Accord [see infra]. The beauty of these funds is that the recipients, [settlements, Defendant Netanyahu, and Israeli armed forces] can do anything they want with this funding. Turns out that the funding mostly goes to illegal pursuits like murdering and maiming Palestinian farmers, demolishing their homes, buying Kalashnikovs and M16's for belligerent settlers [arms trafficking] and to bribe area military commanders so they issue more illegal military orders of confiscation. As a result of those orders, belligerent settlers get to steal thousands of acres of Palestinian real property. That is the reason why homes are so affordable in the OPT—no land acquisition costs.

37. All of the Plaintiffs named herein have been injured by the aforementioned $2 billion money laundering scheme and the illegal criminal activity which has been committed in the OPT on a daily basis. In the case of Plaintiff Linda Kateeb, criminal activity which has damaged her is theft of private property. She has lost valuable property in the OPT valued at $1 million at least based on Remax property values. She has in her possession recorded deeds to six parcels of land in the OPT, two of which have been stolen as she has been informed by her

Palestinian attorney. Those properties are now occupied by belligerent settlers and Israeli army barracks. The settlers claim that they own her property, courtesy of forged deeds. This a common practice in the OPT, along with bribing area military commanders to issue bogus military property confiscation orders. These orders have allowed settlers to steal thousands of acres of private Palestinian real estate. It is the most efficient way to steal private property in order to permanently colonize the West Bank. *See* the Israeli government's 1992 report cited herein, re: diversion of funds from the Israeli budget, theft of private property, and recording forged deeds. There are three other official government reports which made the same findings. The Israeli Defendants were well aware of these government reports, but continued to expand settlements and engage in ethnic cleansing and genocide.

38. Plaintiff Ali Ali, a U.S. citizen, has also lost real property in the OPT valued at $750,000 as a direct result of the criminal activity including war crimes financed and committed by the Defendants, including the theft and malicious destruction of private property. Settlers, protected by the Israeli army, now claim that they own his family's property based on forged deeds. Preparing and recording forged deeds constitutes real estate fraud, and that activity violates a number of Israeli criminal statutes. As a result, all Israeli Defendants and settlement officials can be indicted in Israel. It appears that Defendant Livni has already been indicted in Belgium and in the UK for war crimes.

39. Mahmoud Mohammed Ali Shaalan was a 16-year old American citizen. IDF soldiers, encouraged by settlers, shot him five times from behind from a very short distance. They then stripped his body and left him to bleed out for hours while settlers stopped Palestinian ambulances at nearby checkpoints until he died. That type of conduct has been specifically referenced in UN rapporteur reports and U.S. State Department's annual reports going back to 1990 which compiled the crimes committed by belligerent settlers and Israeli army

personnel. He is represented by his next of kin – his father – Mohammed Ali Shaalan, a Palestinian citizen.

40. Plaintiff Abu Amer, a Palestinian lost 14 members of her family, including parents and siblings as a direct result of the war crimes financed and committed by the Defendants named herein. She was outside of the family home and was talking on her cell phone with one of her siblings when their home was demolished by a 1-ton cluster bomb dropped by the Israeli Air Force. As alleged herein, Senior Pilot Shapiro author of the Pilot's letter, has labeled his employer, the Israeli Air Force, a "terrorist organization" for forcing him to drop 1-ton cluster bombs on innocent civilians. In the book "Our Harsh Logic," Veteran IDF soldiers have similarly labeled the Israeli Army as a "terrorist organization" because senior officers have similarly forced them to commit war crimes. [Throw hand grenades to blind Palestinian civilians and "fill their bodies with bullets."]

41. Palestinian Plaintiff Ahmed Al-Zeer, while cultivating his own land, which abutted the segregated settlement of Ofra near Bet El, settlers for no reason set upon him and viciously beat him. As a result, he suffered a skull fracture, broken bones, bleeding in the brain and other internal bleeding, and is confined to a wheelchair for the rest of his life. On orders from Defendant Netanyahu, Defendant Livni, and senior IMD officials named herein, Israeli army personnel made no attempt to stop the settlers even though they observed what they were doing to Plaintiff Al-Zeer. As usual, they did not report this criminal incident to local police authorities.

42. Other Plaintiffs and the injuries that they have suffered include: a) Plaintiff Bassim Al-Tamimi who has been arrested, incarcerated, and tortured at least 10 times, and his sister was murdered by IDF forces; b) Being shot at while settlers in Defendant Friedman's settlement Bet El were taking target practice [Plaintiff Emad Shujaia]; c) dying while ambulances are

detained at security check points [Mahmoud Mohammed Ali Shaalan]; d) home demolitions—sometimes with family members inside [Nour Safwat Abd Abu-Teer]; e) destruction of valuable agricultural property [Mina Ishaq]; f) the loss of loved ones [Safwat Abd Abu-Teer]; and g) the loss of their cultural heritage and nationality [all Palestinian Plaintiffs]. The Palestinian and Palestinian-American Plaintiffs herein and their children will never be able to visit the birthplace of their parents. They are a "lost generation."

43. There are a number of U.S. citizens named herein as Plaintiffs, including Miko Peled, a Jewish American Plaintiff. He has lost a family member, a 12 year old niece, as a result of Defendant Netanyahu's determination that there will always be a permanent occupation of the OPT. That 50-year old occupation, just like France's occupation of Algeria and the Third Reich's occupation of Paris, promotes intense hatred on the part of Palestinians. Thus the permanent occupation that Defendant Netanyahu has brought about is promoting violence in the Middle East on a daily basis, which is prohibited by JASTA and President Clinton's 1995 Executive Order. The U.S. Plaintiffs share General Petraeus' concern that giving Israel $10 million a day promotes "Arab anger over the Palestinian question [and] limits the strength and depth of U.S. partnership with governments and peoples [in the region]." The injuries described herein in this section are not comprehensive in any nature by any means. They are simply illustrative of the type of injuries that the Plaintiffs have sustained as a result of the $2 billion money laundering scheme described herein, and the financial support received from U.S. Defendants named herein.

## DEFENDANTS

44. Defendant American Friends of Bet El Institutions, hereinafter "FOBI", is a tax-exempt entity having secured 501(c)(3) status from the Treasury Department approximately 40 years go. When it filed for tax-exempt status with Treasury, it never disclosed that it would

function as a pass through charitable entity, i.e. all of the funds raised would be immediately transferred to the Bet El settlement and Israeli based NGOs intent on the permanent colonization of the West Bank. It also never disclosed that it would be sending money overseas to: a) finance war crimes by arming Bet El settlers with M16's or Kalashnikovs, night vision goggles, percussion grenades, and sniper scopes; b) construct and operate a Jewish-only military academy, firing ranges and sniper schools; c) promote settlement expansion by encroaching on private Palestinian property in the area and; d) maiming and murdering Palestinian landowners who refused to abandon their homes after being threatened by belligerent settlers.

45. FOBI officials like Defendant Friedman have also funded the Israeli army courtesy of charitable donations made to the tax-exempt entity FIDF. The reason why their officials sent donations to FIDF is because they knew that FIDF officials had a close symbiotic working relationship with belligerent settlers all over the OPT. That relationship insured rapid settlement expansion, 24-hour protection, and vital assistance with the expulsion of all non-Jews. That has been Defendants Netanyahu's and Friedman's personal agenda for at least 30 years, courtesy of funding coming from approximately one hundred pro-Occupation U.S. tax-exempt entities.

46. Although frequently referenced herein, the Friends of the Israeli Defense Forces [Hereinafter "FIDF] is not named as a defendant herein. That organization has sent $1 billion to the Israeli army over the last ten years, which funds were used to support extensive criminal activity, i.e. arson, arms trafficking, murdering and maiming Palestinians, theft of private property, ethnic cleansing, and genocide. FOBI, KFF, and FIDF officials, besides engaging in money laundering activity, also knowingly transferred funds [KFF - $315,000 between 2011 and 2013] to the IDF in violation of 18 U.S.C. § 960 "Expedition Against a

Friendly Nation." That statute prohibits furnishing money to a military unit engaged in conflict overseas with a civilian population at peace with the U.S. They have also violated 18 U.S.C. § 1621, the perjury statute by not disclosing the fact that they would be funding a foreign militia unit engaging in criminal activity.

47. Although these officials knew that some of the funds they were sending overseas would be used to finance criminal activity, they never told IRS officials about that. Donor funds, of course, cannot be used to finance acts of international terrorism and, as this Court knows, money is a fungible item. *See Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008). For example, sending $104 million to the Israeli army in 2014 enabled senior army officials to allocate other funds in order to finance acts of international terrorism—ethnic cleansing and genocide.

48. Defendant Friedman has his own 501(c)(3) entity, i.e. FOBI, which finances settlement expansion in Bet El, theft of private property, and setting up sniper schools and firing ranges. Based on the criminal activity he finances or engages in to support and expand the Bet El settlement, Defendant Friedman has violated nine separate federal criminal statutes. They include money laundering, arms trafficking, wire and mail fraud, financing a foreign army, conspiring to defraud a U.S. government agency, income tax fraud, engaging in interstate or foreign travel to solicit funds to promote criminal activity abroad, and perjury. Besides that criminal activity, he has financed ethnic cleaning and genocide abroad for at least twenty years. He supports Manhigut Yehudit, which is an ideological movement that advocates "the conquest and annihilation of the entire Gaza Population." That is defendant Lieberman's mantra as well.

49. FOBI has committed millions of dollars in charitable donations to organizations like Ateret Cohanim, which espouses the violent expulsion of all non-Jews in the OPT and especially

East Jerusalem. It has worked with Moskowitz Foundation officials to remove at least 200 Palestinian families from East Jerusalem. It has funded theft of Palestinian private property, which was specifically confirmed by Israeli army veterans who are members of "Breaking the Silence" movement. Under oath, they admitted that our "actions have systematically led to the de facto annexation of large sections of the West Bank [theft of private property] through the displacement of Palestinian residents [ethnic cleansing] by tightening control over them and instilling fear." Our Harsh Logic Pg. 1. Instilling fear is one form of intimidating a civilian population in an occupied territory—a separate war crime.

50. The Kushner Family Foundation, hereinafter "KFF," a 501(c)(3) tax-exempt entity, has been raising vast sums of money for years for Israeli settlements, Israeli-based NGOs committed to the anhelation of the Palestinian population, and the Israeli army. That funding violates U.S. and Israeli anti-settlement public policy and Israeli criminal statutes and international law conventions. Between 2011 and 2013, KFF provided $315,000 to Friends of the Israeli Army, on whose board Jared Kushner serves. By funding the Israeli army with $315,000, it has permitted senior army officials to allocate other funds to criminal activity like maiming and murdering Palestinian farmers. As explained herein, the Israeli army is now so out of control that it has been characterized by Shinbet [Israeli intelligence] officials as a "killing machine" that does not represent the values of the Israeli public. KFF, FOBI, and FIDF officials have worked with Hebron Fund officials like Noam Arnon. He embraces Defendants Friedman's and Netanyahu's personal agenda to have the settlers permanently colonize the West Bank. He also works with Hebron's chief Rabbi Dove Lior, who is a featured participant in fund raising events held by the U.S. tax-exempt entity the Hebron Fund.

51. Rabbi Lior has recently suggested that it is permissible for Jews to kill Palestinian civilians. According to the Israeli based human rights Organization B'Tselem, at a 2009 Hebron Fund dinner, Mr. Noam Arnon called three Jewish terrorists "heroes." Those "heroes" were convicted of killing Palestinians and maiming two Palestinian mayors. Hebron Fund's specific appeal to donors, much like FOBI's, is revealing—that courtesy of their tax-deductible charitable contributions, "dozens of new Jewish families can now come live in Hebron....waiting for you to become their partners in the redemption of Hebron." Defendant Friedman appeals for charitable funds on the identical basis—redeem Bet El Settlement and take tax deductions in the process.

52. Redemption of Hebron or Bet El of course means theft of private property, settlement expansion, murdering and maiming Palestinian civilians, the violent expulsion of all non-Jews, and the importation of more settlers.[9] As a result of fundraising events and statements made by Hebron Fund and FOBI officials, both tax exempt entities end up playing a substantial role in fueling the Middle East conflict and the demise of the two state solution. This is a major U.S. foreign policy objective, which according to Secretary of State Kerry is frustrated by settlement expansion. *See* Washington Post, Dec. 12, 2016, p. 10. The Hebron Fund and FOBI have made substantial contributions to a number of Israeli based organizations, which have financed the violent expulsion of all non-Jews from the OPT and East Jerusalem for years. FOBI, KFF and at least 50 similar U.S. tax-exempt entities are in the forefront of financing Jewish settlers desirous of taking over the OPT and East Jerusalem, consistent with Defendant Netanyahu's personal agenda. *See* The Guardian November 5, 2015, "The U.S. Cash Behind Extremist Settlers."

[9] Abdulhadi Hantash, 2015 Hebron District, West Bank Special Report: Crimes Committed against Palestinians by the Israeli Occupation Forces and Settlers [Cartography Report prepared for the Palestinian Authority].

53. Defendant Netanyahu is the Prime Minister of Israel, and is in charge of all ministries, including the Israeli Ministry of Defense (hereinafter IMD). As already referenced herein, he never has, and never will support a two state solution, because that would frustrate his personal agenda, i.e. permanent colonization of the West Bank. He controls government revenues and ultimately decides: a) what new settlements are going to be built; b) what settlements will receive electric and water hookups; c) what existing settlements are going to expand courtesy of "under the table" financing; d) how much money is going to be allocated to settlement officials in order to colonize the West Bank; and e) how much government funding will be officially allocated to the IMD and the Israeli army; and f) which of his colleagues will serve as military commanders who will willingly issue bogus military confiscation orders.

54. By covertly diverting funds from his government's budget, he has violated Israeli criminal law, including theft of private property. He, along with the other Israeli defendants, provides "under the table" financing to at least 50 illegal settlements. *See* "Combating Criminal Organizations Law," 5763-2003. This covert financing was confirmed by former Justice Minister and Defendant Tzipi Livni—"money meant to build settlement construction is given under the table with no transparency or oversight." (*See* http://www.reuters.com/article/us-palestinian-israeli-settlements-idUSKBN0EZ0JA20140624). That's exactly the same conclusion that was reached by members of a commission who rendered four separate Israeli reports on illegal settlement activity. Thus it is clear that Netanyahu has been providing settlements with covert financing for at least 25 years [most of which is U.S. financial aid]. Secretary of State Baker banned him in 1992 from the State Department since he was violating the agreement he had negotiated with Prime Minister Shamir, re: funding settlement expansion.

55. Concerned about sufficient funding being made available for the Israeli army, and settlement expansion, Defendant Netanyahu, Senior IMD officials, and settlement officials, urged U.S. pro occupation tax-exempt entities to raise and send billions of dollars to the Israeli army and to 100+ illegal settlements located in the OPT. No settlement would have been able to expand, nor could the Israeli army and belligerent settlers have engaged in the war crimes detailed herein without: (a) the 'under the table' financing arranged by Defendant Netanyahu and senior IMD officials; and (b) the $2 billion in laundered funds sent to them every year by U.S. pro-occupation tax-exempt entities like the Defendants named herein.

56. The law is very clear that a foreign leader can be held liable if he directed, ordered, conspired with, or engaged in torture or extrajudicial killings, or *if he had knowledge of that conduct and failed to use his power to prevent it. See Hilao v. Estate of Marcos*, 103 F.3d 767, 779 (9th Cir. 1996). As alleged herein, all Israeli Defendants received daily intelligence briefings, and therefore knew about the extensive pattern of war crimes being engaged in the OPT. They failed to do anything to stop that criminal activity, i.e. forcible expulsion of a civilian population. That is classic war crime activity [ethnic cleansing] for which hundreds of senior Gestapo military officials were indicted at the 1945 Nuremburg tribunal. Just as is the case today in the OPT, Gestapo officials were forcibly deporting Jews [Palestinians in this case] from occupied territories and replacing them with German citizens [Jewish settlers] intent on permanently colonizing the occupied territory. The Israeli Defendants [Livni, Lieberman, and Barak] have perfected this strategy into a science.

57. Defendant Israeli Ministry of Defense (IMD) is an agent or instrumentality of the State of Israel as that term is defined in section 28 U.S.C. § 1603 (b). Plaintiffs allege herein that the Israeli Defendants encouraged, planned, approved, prepared for, financed, and participated in the violent subjugation of the Palestinian population, including their de-nationalization.

Senior IMD officials and Defendants Livni, Barak, and Lieberman made sure that Netanyahu's personal goal to have the settlers permanently colonize the OPT and East Jerusalem would be achieved. The problem was that lots of "beasts," AKA Palestinians still live there.

58. Accomplishing that goal would entail: a) the cleansing of all non-Jews from the OPT and East Jerusalem; b) eventually inserting 1,000,000+ Jewish settlers into the OPT, *See* "Taking Over the West Bank: The Israeli's Irreversible Settlements," Leslie Hazleton, The Nation, Dec. 18, 1982; and c) using U.S. military equipment in offensive military operations to maim and murder Palestinian civilians. That conduct is a clear violation of the U.S. Department of Defense regulations specifically written into military hardware purchase agreements to make sure that Israeli Air Force personnel did not drop phosphorus or cluster bombs in areas populated by civilians. Evidence that IMD officials ignored those regulations is the fact that the Gaza Strip is littered with bomb fragments with the marking "made in Akron Ohio." During the third Gaza invasion, "Operation Cast-Lead," senior IMD officials and Defendant Livni authorized the Israeli Air Force to drop approximately 500 cluster bombs in areas like the Gaza Strip, which they knew was populated by Palestinian civilians, to ensure maximum civilian casualties.

59. The Israeli Defendants [Livni, Lieberman, and Barak] have been very successful in deporting Palestinians from the OPT, i.e. 49,000 Palestinian homes have been demolished, and 400,000 Palestinians have been forcefully expelled from the OPT. In addition, 57,000 new homes were constructed for Jewish only families. *See Abulhawa v. Treasury*, Civil Action No. 1:15-cv-2186 (D.DC 2015)). Those new homes were built with funds provided by U.S. tax-exempt entities and the Israeli Defendants courtesy of military slush funds. They made sure that $17 billion in American financial aid would be illegally diverted from the Israeli government

budget in order to provide funds to construct new housing accommodations for "Jewish only" settlers. (*See* "Bankrolling Colonialism," pg. 32).

60. During all three Gaza invasions, IMD senior officials, with Israeli Defendants' approval, made sure that Israeli soldiers and Israeli Air Force pilots would intentionally and systematically use strategies ["fill Palestinian bodies with bullets"] designed to maximize harm to civilian life. They financed and encouraged the demolition of homes, hospitals, schools and mosques, which activity is deemed to be "collective punishment" under the both the Geneva and Hague Conventions. They knew that these strategies violated: the law of armed conflict, Israel's military code of ethics, war crime statute, crimes against humanity, and the international convention on genocide. By deliberately targeting the Palestinian civilian population as part of a widespread and systematic policy of denationalization, the Israeli Defendants violated customary norms recognized by both America and Israel, the Law of Nations (*See* U.S. Constitution Art. I sec. 8 Cl. 10), Israel's War Crimes statute, and the Law of Armed Conflict. The Israeli military and intelligence officials have lamented the fact that under the Netanyahu regime, the Israeli army has morphed into a "killing machine."

61. Defendant Tzipi Livni is a former foreign affairs minister in the Netanyahu government. Last year she was indicted in Belgium for aiding and abetting the commission of war crimes, which is the mirror image of the second cause of action pled herein. There is an outstanding warrant for her arrest if she steps foot in Belgium. She is accused herein, much like the senior IMD officials of recklessly supervising the conduct of the Israeli army which is now viewed as a killing machine. All Israeli Defendants, including her colleagues Barak and Lieberman, have to share responsibility for the reckless supervision of Israeli army senior officials and the severe injuries that the Plaintiffs have sustained as a result of the war crimes

they have directed to be committed by Israeli army officials. Defendant Livni is sometimes referred herein as part of the Israeli Defendants group.

62. Defendant Avigdor Lieberman is a successful Israeli politician and a member of the Netanyahu cabinet. His mantra is the annexation of the West Bank and the ethnic cleansing of all Palestinians living in the area. Much like Defendant Livni, he has recklessly supervised the conduct of the Israeli army and has allowed them to commit multiple war crimes. He has no concern for the extra-judicial killing of Palestinian civilians. Like Defendant Livni, he has to bear responsibility for the severe injuries that Plaintiffs have sustained as a result of the war crimes he has directed to be committed by Israeli army officials. Defendant Lieberman is sometimes referred to herein as part of the group Israeli Defendants.

63. Defendant Ehud Barak has served in the IMD for approximately 9 years, and has supervised all activities engaged in by the Israeli Army in the OPT. He supports annexation of the West Bank and the ethnic cleansing of all non-Jews living there. He has recklessly supervised the conduct of the Israeli army, and has allowed them to commit multiple war crimes. He has no concern for the extrajudicial killing of Palestinian Civilians. Like Defendants Livni and Lieberman, he has to bear responsibility for the severe injuries Plaintiffs have sustained as a a result of the war crimes he has been directed to be committed by Israeli officials. He is sometimes referred to herein as part of the group Israeli Defendants.

64. Defendant Friends of Bet El Institutions has financially supported the expansion of Bet El, a settlement located in the West Bank near Ramallah. The settlement was built on private Palestinian property courtesy of forged deeds. *See* 2009 Spiegel Report. It was established in 1977 by Defendant Friedman and hundreds of belligerent settlers looking for cheap housing accommodations. The purpose in setting it up was to split the West Bank in half, and isolate and surround the Palestinian village of Ramallah. That was the identical strategy that the

South African apartheid regime adopted. One of Bet El's neighborhoods is Ulpana, which was evacuated recently when it was discovered that it was built on private Palestinian land courtesy of forged deeds. All Israeli Defendants knew that the World Zionist organization had to halt property transactions in that neighborhood and in Aleph because of the prevalence of forged deeds. Bet El settlement officials, including Defendant Friedman, admitted that some 250 buildings located in the settlement were constructed illegally and built on Palestinian property with financial assistance come from FOBI.

65. Even with that knowledge, Defendant Friedman has continued to financially support the expansion of the Bet El with millions of dollars in charitable donations. He has also associated with Rabbi Zalman Melamed, who advocates the confiscation of all Palestinian property in the West Bank and the forcible removal of all non-Jews. The Bet El settlement was cited in a secret government database known as the Spiegel Report which disclosed how many illegal settlements were built on private Palestinian property without construction permits, and without official government authorization. Disclosure of the Spiegel Report was a shock to most Israeli citizens, but not to Israeli Defendants named herein.

66. Defendant Friedman has financed, via charitable donations, a number of U.S. tax-exempt entities, for example the KFF, Friends of Bet El Institutions, and FIDF. He has also financed Israeli based NGOs whose mission is to arm belligerent settlers [arms trafficking], and promote the theft of private property to ensure settlement expansion. He has, like other Defendants named herein, financed war crimes like ethnic cleansing and genocide, and knew at all relevant times that this criminal conduct violated both U.S. and Israeli war crime statutes, anti-settlement public policy, and numerous criminal statutes like arms trafficking and money laundering.

67. For 40 years Defendant Friedman has violated: a) U.S. and Israeli anti-settlement public policy; b) federal perjury statutes by failing to inform IRS officials that charitable donations would be used to commit war crimes in Israel; c) 18 U.S.C. § 960, which bans U.S. citizens from sending funds overseas to finance a foreign militia unit's military operations; d) By engaging in money laundering 18 U.S.C. § 1956 and violating Israel's money laundering statute (*See Israel's Prohibition on Money Laundering Law*, 5760-2000 (August 2000)); e) President Clinton's 1995 executive order by financing wholesale violence in the OPT; f) the JASTA legislation by frustrating U.S. foreign policy objectives like the two state solution and damaging the U.S. economy courtesy of money laundering activity.

68. It appears that Defendant Friedman and his colleagues like President Trump's son-in-law have also committed federal income tax fraud by taking illegal tax deductions based on Israeli NGO's purchasing military hardware and setting up firing ranges and sniper schools. He has also violated Treasury regulations by funding tax-exempt entities [KFF, the Hebron Fund, Friends of Bet El Institutions] which have financed "Jewish-only" apartment complexes, hospitals, shopping malls, and even "Jewish-only" highways. Palestinians who drive on these highways are immediately arrested because they are affecting the sterile nature of the highway. "Jewish only" facilities violate fundamental tenants of U.S. public policy. (*See U.S. v. Jones University*, 615 F.3d 544 (2012)). These facilities were built with U.S. taxpayer funds and built on real property made available by the forceful expulsion of 400,000 Palestinians from the OPT.

69. When Defendant Friedman reviewed the FOBI annual 990 form with the assistance of BFP principals, he had an obligation to inform IRS officials about the nature of the "charitable" activities that he was raising funds for on U.S. soil. In the 990 form for 2014, he recited under oath that the $2.2 million sent overseas went exclusively to "aid students and faculty

of the Yashiva." The problem was that he did not tell the IRS, nor did the accounting firm named herein, that the $2.2 million also funded the construction of a "Jewish only" military academy, and multiple firing ranges and setting up sniper schools. He also did not inform the IRS that those funds would be used: a) to purchase expensive military hardware like M16's or Kalashnikovs; b) millions of rounds of ammunition for the settlement's 50-member militia unit; and c) pay the salaries of IDF soldiers who were training settlers in the use of sniper scopes. Apparently he, and members of the Kushner family, deem these criminal activities to be either "educational" or "charitable" in nature. As explained herein, the notorious pro-Settlement lobbyist Jack Abramoff took similar tax deductions for "educational activities" and was sentenced to six years in jail as a consequence.

70. Arming a 50 member militia unit with M16's or Kalashnikovs, ammunition, body armor, and night vision goggles would alone cost anywhere between $500,000 and $600,000. He also has not disclosed to the IRS that he has built and financed the operations of a West Point-type military academy, whose graduates move on to the IDF after learning how to maim and murder Palestinian civilians. He engaged in other activities which appear to be money making ventures—he owns a radio station, a newspaper, and an online news service.

## ALL DEFENDANTS HAVE VIOLATED ISRAEL'S STRICT ANTI-SETTLEMENT PUBLIC POLICY, WHICH PROHIBITS FUNDING SETTLEMENTS AND THE ILLEGAL CONFISCATION OF PRIVATE PROPERTY

71. As shown infra, Israel, like America, has consistently articulated a public policy[10] that condemns theft of private property and intentional illegal intrusions, i.e., outposts and settlements. This criminal conduct has been condemned by: (a) Former Prime Minister

[10] See also Haaretz December 16, 2006 "Making the Law a Laughingstock" (stating "the building spree in West Bank settlements [is] in blatant violation of the law and in complete contradiction to official government policy"). *See also* "this seizure of Palestinian property violates not only Israeli law, but also a fundamental principle of democracy—the protection of private property." Steven Erlanger, New York Times March 14, 2007, "West Bank Sites on Private Land, Data Shows". See also Haaretz March 14, 2007 Haaretz editorial "Legitimization of Land Theft".

Yitzhak Shamir; (b) former Defense Minister Shaul Mofaz; (c) Israeli Special Prosecutor Sasson, ordered by former Prime Minister Sharon to report on illegal settlements; (d) the Israeli Supreme Court (with different rotating members) for 40 years; and (e) by former Prime Minister Rabin, who banned settlements in 1993 and eliminated all tax deductions based on charitable donations made to settlements. Last year, former President Shimon Peres, who had once fervently supported the settlement enterprise deemed these violent settlers to be "monsters" based on the war crimes they committed in the OPT. *See* American Council for Judaism, August 2016, Special Interest Report Pg. 2.

72. Evidence of Israel's anti-settlement public policy was first articulated in 1991 when Prime Minister Yitzhak Shamir promised Secretary of State Baker that any funds received from America would "not be used in any manner to expand existing settlements or create new settlements in the West Bank." This is known as the Baker/Shamir 1992 Accord. *See* May 23, 1991 New York Times article; *See also* NYT article "Tax-Exempt Funds Aiding West Bank Settlements," July 5, 2010.[11] To advance his political career and placate the concerns of settlement leaders and belligerent settlers [his growing voting bloc], Defendant Netanyahu has ignored and violated this accord. He has intentionally diverted government funds ["under the table" financing] to establish new settlements or expand existing ones in the last decade. That's why Secretary of State Baker banned Netanyahu from the State Department in 1992. Netanyahu has also successfully diverted $17 billion in U.S. foreign aid to support the settlement enterprise. *See Bankrolling Colonialism*, MA'AN Development Center, p. 32.

73. In 2005, Shaul Mofaz, Former Israeli Defense Minister, succinctly identified what the problem was with settlement expansion—"the real problem is the *unauthorized seizure by private elements [belligerent settlers] of private and state land that is not theirs.* This [illegal]

---

[11] http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html

phenomenon must be combated." Defendant Netanyahu made sure that there was no effort undertaken to stop this illegal phenomenon—i.e., theft of private property by belligerent settlers. He did so for two reasons—since 1989, as shown herein, his personal agenda and his number one priority has been the forcible expulsion of all non-Jews from the OPT. The second reason was that he needed the support of the settler voting bloc in order to secure his original and re-election bids.

74. Defense Minister Mofaz found that these "private elements," the belligerent settlers, *going back to 1990*, had been illegally and repeatedly stealing Palestinian property. They did not fear criminal prosecution because of the protection afforded them by Defendants Netanyahu, Livni, and senior IMD officials. Thus, as early as 1990, the Israeli based Defendants were relying on U.S. tax-exempt entity officials like Defendant Friedman and Kushner family members to continue financing belligerent settlers intent on stealing more Palestinian property. Israeli Defendants knew that this criminal activity was going on, and did not stop it even though they had the necessary law enforcement tools to do so—a separate war crime. In the process, they violated Israeli criminal statutes, the Baker/Shamir Accord, 1993 OSLO Peace Accords, Israel's strict anti-settlement public policy, and the solemn oath that they took to uphold Israeli laws when they were being sworn into office.

75. Israel's anti settlement public policy was reaffirmed in 2005 by chief Prosecutor Sasson, who prepared and published a special government report on illegal settlements, which had been ordered by former Prime Minister Sharon. *She opined that the Israeli government, the attorney general, and the Israeli Supreme Court had consistently articulated and adhered to an anti-settlement public policy*. For example, Israeli tax-payers could no longer take tax deductions for funding settlement expansion or the theft of private property. Even though they knew that all new settlements built on private property required an official government resolution, the Israeli

Defendants continued setting up new settlements without the necessary resolutions. Defendants Netanyahu and Friedman knew they could no longer fund settlement expansion, yet they continued to do so to promote Netanyahu's political agenda. The reason—ensure that the West Bank would become permanently colonized by belligerent settlers—his new major voting block. Prosecutor Sasson also recommended that the Israeli citizens who provided the "under the table" financing [Defendant Netanyahu] or similar financing coming out of military slush funds be prosecuted. Defendant Netanyahu, of course, never allowed that to happen, because he could face serious jail time as a result of violating numerous Israeli criminal statues.

76. He knew that there was abundant evidence of forged deeds, and that it was Sasson's official conclusion that settlements would be deemed to be wholly illegal if they could not produce valid deeds of ownership rather than forged copies. Her conclusion - "There is no such thing as a semi-authorized outpost." That conclusion and abundant evidence of "under the table" financing and forged deeds is why Defendant Netanyahu buried the Sasson report[12]. It was prima facie evidence that belligerent settlers, courtesy of his "under the table" financial assistance and military slush funds were: a) stealing thousands of acres of real property owned by Palestinian farmers; b) preparing and recording forged deeds to justify ownership of that property; and c) continuing to maim and murder Palestinian civilians by demolishing their homes with armored caterpillar tractor trailers [whether occupied or not].

77. Further evidence of Israel's anti-settlement public policy are three other separate and embarrassing government reports on illegal settlements [The government's 1992 Report, Comptroller Goldberg's 2003 report, and the 2009 Speigel Report]. As reported in Haaretz, based on those reports, it is was clear that all Defendants named herein have been violating

[12] *See* Http://www.haaretz.com/gov-t-okays-sasson-report-panel-set-up-to-implement-it-1.152983

Israeli's formal government policy by financing settlement expansion and failing to secure formal government resolutions authorizing a new settlement. Spiegel 2009 report specifically cited "forged deeds," the "scandalous theft of Palestinian property by violent settlers," and the financial assistance subsidy coming from the Netanyahu government. His "under the table" financing, plus military slush fund monies and IMD officials' refusal to enforce Israeli criminal laws made settlement expansion and additional theft of private property possible.

78. Consistent with the unanimous Israeli Supreme Court 1979 ruling in the *Elon Moreh* case, construction of illegal settlements in the OPT was banned by the Rabin administration in 1993 to satisfy Secretary of State Baker's numerous concerns about the growing settler enterprise. Because of Defendant Netanyahu's encouragement, that ban did not deter Israeli based NGO officials from soliciting donations on U.S. soil and encouraging U.S. tax-exempt entity official to keep up their funding [$2 billion a year]. By requesting and accepting this financial assistance, they were engaging in classic money laundering activity. *See* 18 U.S.C. 1956 and the Israeli Money-Laundering Statute—"Prohibition on Money Laundering" as already cited herein. Thus at a minimum, Defendant Netanyahu has aided and abetted the violation of numerous Israel criminal statutes including money laundering and arms trafficking

79. The government not only banned settlement activity of any nature in 1993, it also took affirmative steps (no tax write-offs for settlements, no interest-free loans, no free land) to send a clear message to all of its citizens, including Defendant Netanyahu, government ministry officials, and NGOs operating in Israel that it did not support the settlement enterprise. Thus, at least 22 years ago, all Defendants had to know that funding, encouraging, or engaging in settlement expansion violated a number of Israeli criminal statutes, its 1948 Declaration, its 1992 Human Rights statute, the settlement ban imposed by

Prime Minister Rabin, the Baker/Shamir 1992 Accord, and 30 years of Israel's strict anti-settlement public policy. As an attorney, Defendant Friedman had to know that he was violating numerous U.S. and Israeli criminal statutes, and that he could face up to 10-25 years in jail. *See* 18 U.S.C. § 1956 [money laundering], 18 U.S.C. § 960 [providing financial assistance to a foreign army], and perjury 18 U.S.C. § 1621.

80. The Israeli Defendants all knew about the opinion rendered by attorney Theodore Meron, legal counsel to the Foreign Ministry. In 1967 it made news headlines in Haaretz because he had opined that "civilian settlements in the administered territories contravene the explicit provisions of the Geneva Convention." The Israeli Defendants have all ignored that opinion, even though it was official government policy as interpreted by the Israeli Supreme Court. That opinion is only one reason why Defendant Netanyahu detests the Israeli Supreme Court and has sought to curb its authority and ability to issue orders calling for settlement evacuation.

81. Because Geneva and Hague Convention Principles apply to settlement activity, all OPT based area military commanders [Netanyahu's colleagues] appointed by senior IMD officials had to conduct all Israeli army operations in the OPT consistent with Hague and Geneva Convention principles and keep ordering confiscation of Palestinian real estate. Those principles, *inter alia*, made it clear that they were supposed to act as "trustees" and protect all private property in the area, even that owned by Palestinians. To advance his personal agenda, Defendant Netanyahu instructed senior IMD officials to tell their field commanders to disregard these principles. As a result, IDF officials did not see any need to protect real property owned by non-Jews like Plaintiffs Kateeb and Ali. Thus, the Israeli Defendants have not only violated a number of Israeli criminal statutes, they have also violated Geneva and Hague Convention principles. As a result, they can be indicted in the international

criminal court. In fact, it appears that Defendant Livni has already been indicted for war crimes in Belgium and the United Kingdom.

82. As already referenced herein, Israeli Special Prosecutor Sasson, after reviewing twenty years of settlement activity, issued a report in 2005 on settlement activities, which all Israeli Defendants were well aware of. It also made headline news in Israel. She made a number of significant findings and recommendations [evacuation of all illegal settlements] which Defendant Netanyahu made sure were never implemented because that would frustrate his personal agenda and antagonize his largest voter base—the growing settler population. He also knew that 20,000 Jewish citizens were on waiting lists established by the 200 settlements in the OPT. That meant more votes for him when he was up for re-election if he advocated the annexation of the entire West Bank. Special Prosecutor Sasson's findings included:

(a) "Every Israeli Supreme Court (with different rotating members) has declared for over four decades that Israel's occupation violates international law". *See* June 2004, Israeli Supreme Court ruling, *Re: The West Bank.*

(b) "Geneva Convention, Article 49, explicitly prohibits the transfer of parts of the population from the occupying power to the occupied territory."[13]

(c) Consistent with Israel's Declaration, its 1992 Human Rights statute, and GCIV/Hague principles, "The occupying power bears an obligation to protect the population of civilians...living in the OPT."

(d) "*Establishment of outposts on private land may...constitute a criminal offense liable to lead to criminal prosecution.*" Veteran Prosecutor Sasson knew theft of private property was

[13] The legislative history of the Geneva Convention Article 49 makes it clear that paragraph (6) was written into the GCIV because of what the Japanese did in Manchuria and the Nazis did in Eastern Europe in terms of removing the indigenous populations of the territories they occupied and replacing them with their own citizens. This is the fundamental reason why the settlement enterprise has been viewed as illegal by most international scholars. *See* https://www.icrc.org/ihl/COM/380-600056.

specifically listed in Israel's criminal law statute known as "Combating Criminal Organizations Law" 5763-2003, and that it applies to government officials like Defendant Netanyahu.

83. Based on Israel's anti-settlement public policy and Hague and Geneva Convention principles cited herein, IMD and IDF military commanders knew they could not: (a) deport or murder Palestinian civilians for any reason; (b) incarcerate Palestinian political prisoners in Israel proper; or (c) allow Israeli citizens to enter the OPT who were intent on becoming permanent settlers and stealing private Palestinian property. IMD officials looking to buy affordable new homes in the OPT, per Defendant Netanyahu's instructions, had informed area military commanders to ignore Geneva Convention principles. As a result, they continued deporting Palestinian inhabitants and arresting thousands of Palestinian political prisoners. They welcomed the arrival of thousands of new settlers every day who were looking for affordable homes--Netanyahu's new and growing constituency. His brother in law found his ideal home in Defendant Friedman's Bet El settlement.

84. As is obvious, whether you look to the 1992 Baker/Shamir Accord, or to 40 years of Israeli Supreme Court precedent, or the four official government reports declaring settlements to be illegal [invalid military confiscation orders, forged deeds, no construction permits or approved architectural plans], or Attorney General Meron's opinion that all settlement activity in the OPT is subject to the Hague and Geneva Convention, one thing is clear: all Defendants had to know that condemnation of the settlement enterprise has been official Israeli government public policy for at least 25 years.

85. Thus, the Israeli Defendants could not authorize the theft of private property or the removal of non-Jews from the West Bank. As a result, they cannot now claim when they were financing or engaging in war crimes that they were advancing the official policies of the

Israeli government. They had no official authority to: a) ignore Hague and Geneva Convention principles, or b) kill innocent civilians; or c) steal their private property; or d) engage in money laundering and arms trafficking. Therefore, they are not entitled to immunity for the horrendous war crimes that they committed [IMD officials], authorized [Defendants Livni or Lieberman] or financed [Defendant Netanyahu and senior IMD officials].

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS: CIVIL CONSPIRACY TO ARM AND TRAIN FOREIGN MILITIA UNITS WHOSE MEMBERS ENGAGE IN ARMS TRAFFICKING, ETHNIC CLEANSING, AND GENOCIDE SO THAT SETTLERS CAN PERMANANTLY COLONIZE THE WEST BANK**

86. Plaintiffs repeat and re-allege as if fully recited herein the allegations pled in paragraphs 1 – 85.

87. As referenced in JASTA, the case of *Halberstam v. Welch*, 705 F.2d 472 (DC Cir. 1983), is a well-recognized authority approved by Congressional leadership and the Supreme Court. That case laid out the elements of a civil conspiracy as follows: a) An agreement between two or more persons [U.S. and Israeli Defendants/Netanyahu and IMD officials/Kushner family and Friedman], b) to participate in an unlawful act [theft of private property, money laundering, arms trafficking, ethnic cleansing and genocide], or lawful act [setting up a tax exempt entity] in an unlawful manner [used to finance criminal activity—stealing private property and maiming and murdering Palestinians], c) an injury [loss of life, loss of home, loss of cultural heritage bodily injury], which is caused by an unlawful overt act [ethnic cleansing, genocide, money laundering, arms trafficking, and theft of private property], performed by one of the parties to the agreement [Defendants Netanyahu, Livni, Lieberman, Friedman, senior IMD officials], d) which overt act was done pursuant to and in furtherance of the common scheme of the conspiracy [rid the West Bank of all non-Jews, ethnic

cleansing, by arming settlers with M16s or Kalashnikovs and percussion grenades so they could permanently colonize the West Bank].

88. Defendant Netanyahu had a number of significant roles to play in the conspiracy, besides stealing government funds and providing "under the table" financing to settlements. His most important job was intentionally deceiving U.S. leadership into thinking that he actually supported the two state solution. That would keep billions in U.S. financial aid flowing to Israel. As shown herein, he never has, and he never will support the two state solution, because that would frustrate his personal agenda—permanent colonization of the West Bank.

89. Evidence thereof is plentiful, including the policy that Netanyahu adopted 20 years ago, courtesy of his close relationship with former Prime Minister Sharon. He strictly adhered to Sharon's policy as confirmed by his chief assistant Dove Weissglass: "which supplies the formaldehyde that is necessary so that we'll not be in the political process with the Palestinians. By doing so you prevent the establishment of a Palestinian state, and any discussion of Palestinian refugees, the borders, and Jerusalem. This whole package called the Palestinian state has therefore been removed form our agenda indefinitely." *Palestine Inside Out*, Pg. 91. Additional evidence includes a number of the statements he has made as reported on in the New York Time Article "Netanyahu and the Settlements." January 30th, 2015. As explained herein, Defendant Netanyahu admitted 25 years ago that his real agenda then and now today is the violent expulsion of all non-Jews from the OPT. As the whole world knows he has been very successful in that endeavor.

90. Very few Americans other than former Secretary of State Baker know who the real Netanyahu is on the issue of Jewish settlements. Secretary of State Baker banned Netanyahu from the State Department in 1992 because he was covertly financing settlement expansion

and frustrating the creation of a two-state solution. Netanyahu has not hidden his criminal agenda when it comes to settlement expansion well known. In 1989, at the time of the Tiananmen Square protests in China, he said unequivocally that "Israel should have taken advantage of the suppression of the demonstrations in China when the world's attention was focused on what was happening in China to carry out mass expulsion of the Arabs on the territories." He explained why he was so upset: "*to my regret, they did not support that policy which I proposed, and which I still propose should be implemented.*" *See* "Apartheid in Palestine," Ghada Ageel, University of Alberta Press. In other words, get rid of all the Muslims and Christians living in the OPT by violence if necessary in order to permanently colonize the West Bank.

91. Further confirmation thereof as to who the real Netanyahu is, is a statement reported in the article made by settlement advocate Gilead Sher, who heads up Blue White Future. He explained how Netanyahu operates: "*he speaks about the two state solution, but he does whatever there is in his capability to de-legitimize the two-state solution.*" In 1996, while visiting the illegal settlement known as Eli, he pledged "that the settlements will be here permanently forever." He also promised he would establish hundreds of new Jewish communities in the land that Palestinians planned as their future state—the death knell of the two state solution. While searching for votes in the illegal settlement Ariel, he inspected the new shopping complex which he and U.S. tax-exempt entities [American friends of Ariel] and donors like Sheldon Adelson financed. It's a $3.8 million, 300,000 square foot community center. These are the facilities that Defendant Netanyahu repeatedly refers to as "temporary structures" to convince naïve U.S. officials like Senator Graham that there won't be a permanent occupation of the OPT. Elliot Abrams, a settlement advocate, has confirmed in a number of articles that the occupation will never end.

92. The reporters concluded that "an analysis of planning, construction, population and spending data over the past 20 years shows that Mr. Netanyahu was an aggressive settlement builder." And of course, he continues to be an aggressive builder today. For example, at least 50 new illegal settlements like Har Homa would never have expanded without Mr. Netanyahu's "under the table" financial assistance. Twenty years ago he stated "I do not intend to evacuate any settlements." To seal his election as the Prime Minister in 1996, he vowed that he would immediately reverse the four year freeze on settlements, and ramp up settlement expansion. He repeatedly lies in order to keep U.S. dollars coming to Israel, saying that "I have no intention of building new settlements, or of expropriating new land for additional settlements." That is a complete fabrication.

93. Former Ambassador to Israel Martin Indyk had confirmed in that article that Netanyahu has engaged in "rampant settlement activity," which has had a dramatically damaging impact on the two-state solution. Hagit Ofran, director of Peace Now's settlement watch project summed up the situation, i.e. "the official policy of Israel was we are not building new settlements we are heading for peace." The Netanyahu government of course has ignored this official Israeli government policy, and is certainly not "heading for peace." To secure the permanent colonization of the West Bank, he spends at least $250 million annually to advance settlement expansion.

94. Based on that article, he has been very successful in terms of promoting settlement expansion all over the OPT, because as of today 20,000 Jewish-only families are listed on settlement waiting lists to move into new affordable homes. That of course is music to Defendant Netanyahu's ears. The reason he is so protective of the settlers is a political reality—the pro settlement party won 87% of the vote in the illegal settlement Eli. He was responsible for financing with Defendant Friedman, the "Jewish-only" military academy that

was built with U.S. taxpayer funds in the Bet El settlement. Both Friedman and Netanyahu anticipate that graduates of the academy will go on to serve in the Israeli army after having learned how to maim and murder Palestinian farmers trying to harvest their olive groves or escorting their kids to school.

95. Each U.S. based conspirator played a vital role in financing or committing the acts of international terrorism intended to permanently colonize the West Bank an East Jerusalem. Every year, 100+ U.S. tax-exempt entities [KFF, FOBI, and FIDF], at the request of officials [Defendants Friedman and Kushner family members], send $2 billion+ in laundered funds to the Israeli army, illegal settlements, and a hundred Israeli based NGOs intent on permanently colonizing the West Bank and East Jerusalem. That conduct violates at least eight U.S. federal criminal statutes, including money laundering, perjury, arms trafficking, and mail and wire fraud [filing fraudulent tax returns]. According to Defendant Friedman and Kushner family members, these are all "charitable" activities.

96. Based on advice rendered by the Defendant accounting firm BFP, U.S. tax exempt entities like the Kushner foundation, Friends of the Israeli Army [FIDF], and Friends of Bet El continue to solicit contributions from unsuspecting American citizens. They don't tell them that their funds would be used to finance ethnic cleansing, genocide and arms trafficking. These officials deceive donors into thinking that their charitable contributions are legitimate, would be used exclusively for charitable purposes, and that the beneficiaries are all located in Israel, not Palestine. Based on the same advice, Defendant Friedman and Kushner family members continue to solicit funds for KFF, FOBI, FIDF, and other tax-exempt entities. All Defendants had to know, especially Defendant accounting firm BFP principals and Attorney Friedman, that IRS rulings prohibit taking charitable deductions based on expenses incurred in funding "Jewish only" facilities or criminal activity here or abroad. Thus all U.S.

Defendants have not only violated at least eight federal criminal statutes, they have also violated U.S. Treasury Department Tax exempt regulations, and IRS rulings.

97. On the Israeli side, once the funds arrive, the Israeli Defendants continue to finance settlement expansion and the permanent colonization of the West Bank by belligerent settlers. They continue to violate Israel's anti-settlement public policy by establishing new settlements and financing the expansion of existing ones. Based on the 2005 official government Sasson Report [discussed herein] they have diverted government funds from the Israeli annual budget and, military slush funds to provide settlements with "under the table" financing. The goal—promote settlement expansion and the ethnic cleansing of all Palestinian landowners. Senior IMD officials continue to make sure that the settlers will be able to drive out another 250,000 Palestinians [the remaining Palestinian population] from the OPT in the next couple of years.

98. Senior IMD officials make sure that not a single settler sees the inside of a jail even if they murdered a Palestinian in cold blood. They also deploy soldiers to Palestinian villages who look the other way when the settlers go on violent rampages. In violation of the oaths that they took when they became government officials, they continue to instruct law enforcement authorities and IDF officials not to arrest or prosecute belligerent settlers who have engaged in criminal activity. Defendant Netanyahu, on the recommendation of IMD officials, will shortly pardon an Israeli soldier who literally executed a Palestinian civilian who was bleeding out on the street. The Israeli Defendants purposefully cover up these extra judicial killings which both Senator Leahy and Sweden's Foreign Minister Margot Wallstrom have complained about repeatedly.

99. Settlement officials with the $2 billion in annual funding coming from the U.S. continue to build firing ranges and set up sniper schools with the assistance of senior IMD officials in

hundreds of settlements in the OPT. For example, they arm the settlers in Bet El and Ofra with M16's or Kalashnikovs, body armor, bullet proof vests, night vision goggles, and percussion grenades. The reason—settlers need sophisticated military hardware to threaten and forcibly expel Palestinian landowners in the area with the assistance of Israeli Army soldiers. Defendant Friedman, with the assistance of IMD officials, even has set up a military academy whose graduates go on to serve in the Israeli army after learning how to kill Palestinian farmers.

100. All Defendants knew what their funding would achieve; i.e. permanent colonization of the West Bank by the forcible expulsion of all non-Jews. The amount of funding going to the Israeli army alone is staggering, i.e., in 2014, FIDF officials like President Trump's son in law Jared Kushner, helped to raise $104 million in charitable donations to be transferred to the Israeli army. His family helped him out by giving the Israeli army $315,000 between 2011 and 2013. As all Defendants know, money is fungible, (*See Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008)), and a $100 million annual subsidy allows Israeli army senior officials to allocate those funds to other activities, for example maiming and murdering Palestinian farmers. As confirmed by *Boim*, even donors with good intentions can be sued for sponsoring criminal activity.

101. The results of this conspiracy have been nothing short of remarkable. The results include: a) 400,000 Palestinians have been forcibly removed from the OPT; b) 57,000 new homes have been built in the OPT for Jewish settlers; c) 49,000 Palestinian homes have been demolished or confiscated and 400,000 Palestinians no reside in refugee tents designed at most to house 100,000 refugees. *See Abulhawa v. Treasury*, Civil Action No. 1:15-cv-2186 (D.DC 2015). Settlements and Israeli based NGOs intent on murdering and maiming Palestinians continue to receive $2 billion a year from U.S. based tax exempt entities courtesy of money laundering

activity. And, with the assistance of senior IMD officials, Palestinian farmers continue to be shot at when trying to secure medical care or while they escort their kids to school.

102. Other results are that: Israeli Defendants still continue to cover up extrajudicial killings committed by Israeli army personnel, and belligerent settlers and settlers continue running down and murdering Palestinian farmers—vehicular homicide. See Ex. A. IMD officials continue to refuse entry into the OPT by UN and amnesty international officials to investigate war crimes. The Israeli Defendants continue to come up with new policies to restrict movement of Palestinians in the OPT. For example, ignoring Supreme Court rulings calling for settlement evacuations [for example Amona] establishing more flying or mobile checkpoints and revoking legitimate residential permits held by Palestinians living in East Jerusalem.

103. As a direct result of the laundered funds that settlers and Israeli army soldiers receive every year from U.S. tax-exempt entities, Israeli line soldiers with the blessing of all Israeli Defendants, have been able to commit war crimes with impunity [ethnic cleansing, torture, genocide] for at least 20 years. In 2003, 700 veteran IDF soldiers admitted under oath how the permanent occupation of the West Bank came to be. They "filled Palestinian bodies with bullets" and maimed and murdered Palestinian landowners in the OPT on a daily basis, forcing their family's departure from the OPT. These are the same soldiers who execute Palestinian civilians that Defendant Netanyahu pins medals on for Defending Israel. One soldier now suffering from constant nightmares and post-traumatic stress disorder stated that "I killed 40 Palestinians for you." *See Our Harsh Logic.* He was one of the young recruits who senior army officials told to put a gun in the mouth of wounded Palestinian civilians and blow their brains out.

104. The Israeli Defendants knew that senior army officials had told line soldiers to: a) fill Palestinian bodies with bullets; b) adopt a shoot to kill policy; c) deem all Palestinian whether armed or not to be legitimate targets; d) intentionally shoot at eyes in order to blind Palestinians; e) kill 12-year-olds for sport; f) protect belligerent settlers when they murder and maim their Palestinian neighbors; g) keep track of all the Palestinians they murdered in order to secure a promotion. They were told that their priorities were maiming and murdering Palestinian landowners, ridding the West Bank of all non-Jews, and protecting belligerent settlers so they could permanently colonize the West Bank.

105. They were also told by superior officers to disregard Hague and Geneva Convention principles, Israel's military code of ethics, and Israel's war crime statute. They were told to protect the settlers when they went on rampages and assist them in poisoning water wells and livestock. They also educated settlers in the use of percussion grenades and sniper scopes. They explained what their mission was in the OPT—*not to defend Israel, but rather to protect belligerent settlers when they went out on violent rampages against their Palestinian neighbors.* They intentionally looked the other way when settlers armed with M16s and sniper scopes used Palestinian farmers as targets during a military training session. When asked about what control they had over belligerent settlers the IDF soldiers laughed and stated that "they are out of control." As already referenced, because of the Israeli Defendants' instructions not to arrest or prosecute settlers, settlers can literally get away with murder.

106. As a result of these Defendants participating in this civil conspiracy, the Plaintiffs and their relatives have been injured and murdered, crushed during home demolitions, and in some cases paralyzed for the rest of their life. Their homes have been demolished, [sometimes with deaf relatives inside], and they have lost valuable agricultural property, i.e. 200 year old olive groves. In the case of Plaintiffs Ali and Kateeb, they have lost approximately $2-3

million in property based on Re-Max property values. Plaintiffs would not have suffered these injuries without: a) the full cooperation of Senior IMD officials and Defendant Livni; b) the financial assistance arranged by Defendant Netanyahu; c) the funding provided by 100+ U.S. tax-exempt entities; d) the collaboration of Israeli based Defendants, including Netanyahu and Livni, in the financing and commission of war crimes; and e) the pro-occupation tax advice given by the Defendant accounting firm BFP principals.

107. Defendant Friedman and the Kushner family have been funding the growth of the Bet El settlement and spin-off settlements located nearby like Ofra and Ulpana with charitable donations. In Friedman's case, as far back as 1977 when the settlement was founded. His goal was to split the West Bank in half, and surround and isolate the Palestinian village of Ramallah. That was the same strategy employed by officials in the South African Regime. He has worked with senior Rabbi Melamed who advises young fanatical settlers that killing Palestinians is a religious duty. The result—more civilian Palestinians are murdered in cold blood. See Washington Post "In a Split Israel, soldier convicted of killing Palestinians" A8, January 5, 2017.

108. As explained herein, Attorney Friedman hired the accounting firm Defendant Billet, Feit, & Preis (hereinafter "BFP"), to advise him and his colleague Jared Kushner on tax-exempt regulations, and specifically compliance with those regulations. Based on 990 annual forms, the accounting firm appears to have a number of pro-occupation tax-exempt entities as clients, including FOBI. As a result, it is presumed that members of the firm had an expertise, i.e. advising tax-exempt entities and their donors about Treasury Department regulations, and specifically compliance with those regulations.

109. As a result of their valuable expertise, members of this accounting firm had to know that their clients could not: a) engage in or finance discriminatory practices of any kind, like a

"Jewish only" hospital or educational facility; b) finance criminal activity of any nature, i.e. theft of private property, money laundering or arms trafficking; or c) lie to IRS officials about the nature of educational or charitable activities they are sponsoring—perjury. The principals also knew that their clients had to engage in substantial charitable activity on U.S. soil like setting up soup kitchens or homeless shelters. It appears, except for KFF, that the only charitable activity that their clients engage in is to hold fundraising events on U.S. soil. Hence they are "pass through" tax-exempt entities, which every year raise $2 billion to be sent to illegal settlements and the Israeli army.

110. Their role in the civil conspiracy was to render friendly, pro-occupation professional advice that their clients were looking for in case of an IRS audit. That advice basically condoned engaging in money laundering or financing arms trafficking and other criminal activity abroad like arson. The Dawabshe Family's house was burned down by belligerent settlers in 2014, and the parents and their 18 month old daughter were murdered.[14] Discovery will show which specific U.S. tax-exempt entity [probably the Hebron Fund] financed that criminal incident. Not surprisingly, not a single settler has been indicted for this horrendous criminal activity—i.e., burning three civilians alive. They also prepared and filed fraudulent 990 annual tax forms for two reasons. First, they did not want their wealthy clients to hire an alternative tax firm which would advise them that they could not take charitable deductions on the basis of financing criminal activity. And second, they didn't want the IRS to discover that the alleged charitable activity being engaged in was actually criminal in nature. That of course would result in revocation of FOBI's tax-exempt status and the indictment of Defendant Friedman, Kushner family members, and the accounting firm principals.

---

[14] *See* https://www.theguardian.com/world/2015/jul/31/death-18-month-old-in-arson-attack-heightens-tensions-west-bank-israel; *see also* http://mondoweiss.net/2016/03/arsonist-set-ablaze-house-of-witness-in-duma-arson-attack/

WHEREFORE, Plaintiffs hereby request that the Court enter judgment against all Defendants named herein in the amount of $40 million for participating in the civil conspiracy. As detailed herein, the Plaintiffs have been damaged as a result of the criminal conduct financed or engaged in by all Defendants.

## SECOND CAUSE OF ACTION
## AIDING AND ABETTING THE COMMISSION OF WAR CRIMES, CRIMES AGAINST HUMANITY, AND GENOCIDE IN VIOLATION OF THE LAW OF NATIONS BY ALL DEFENDANTS

111. Plaintiffs repeat and re-allege as if fully recited herein the allegations pled in paragraphs 1–110.

112. There are two separate categories of collaborative war criminals which the Plaintiffs are complaining of herein. The first category is the U.S.-based pro-occupation tax-exempt entities like FOBI and KFF, FIDF, and officials like Kushner family members, and Defendant Friedman. They all have funded, promoted, encouraged, assisted, and facilitated wholesale violence, genocide, arson, ethnic cleansing, arms trafficking, malicious wounding of Palestinian civilians, and theft and destruction of private property. In doing so they have violated 18 U.S.C. § 960, Expedition Against Friendly Nation, as well as the U.S. money laundering statute 18 U.S.C. § 1956. They have also conspired to commit tax fraud, and have violated 18 U.S.C. § 1621, the perjury statute.

113. The second category of war criminals are Israeli army commanders, Defendants Netanyahu, Lieberman, Livni, and Senior IMD officials serving in the OPT who collaborated with senior IDF officials who gave orders to shoot to kill Palestinian civilians and to "fill Palestinian bodies with bullets." *See* "Our Harsh Logic." Senior military commanders on advice received from the Israeli Defendants told impressionable 18-year-olds just out of high school that

promotion was dependent on the number of Palestinian kills they recorded.[15] Defendant IMD officials, with the approval of the Israeli Defendants condoned this barbaric criminal activity because they, among other things, despised the Palestinian population. That is made clear by various statements made by Netanyahu's supporters. For example Deputy Defense Minister Ben-Dahim has stated that "Palestinians are beasts, they are not human beings." His colleague Minister of Defense Yaalon refers to Palestinian children as "snakes."

114. U.S. tax-exempt entity officials, like Defendants Friedman and Kushner family members, knew Palestinian civilians were being murdered and maimed on a daily basis. Nevertheless, they continued making significant monetary contributions to the Israeli army, and to settlement leaders and Israeli based NGOs [$2 billion a year] in order to arm members of the militia unit and to finance settlement expansion. As a result they have violated the following statutes and conventions: (a) The 1945 Nuremberg Principles; (b) U.S. War Crimes Statute; (c) Israel's Anti-Nazi Statute, also known as Israel's War Crimes Statute; (d) Genocide Convention; (e) Article 73 of the UN Charter, which requires that occupiers act as trustees over the occupied population's property; (f) Israel's military code of ethics; and (g) America's 1862 Lieber Code, which is the military code that the Geneva Convention is based on.

115. "War crimes" and "crimes against humanity" are defined in Section VI of the Nuremberg Principles, in 18 U.S. Code § 2441 (the "War Crime Statute") as modified by the U.S. Military Commission Act of 2006. They have also been codified in Israel's Anti-Nazi Law of 1950—its war crime statute. The definitions include murder, *ill treatment of a civilian population*

---

[15] Unfortunately, these criminal commands are put into actual practice on a daily basis in the OPT. On February 21, 2016, Mohammed Abu Khalaf attacked two Israeli border guards with a knife. He was shot, disarmed, and incapacitated. While he lay on the cobblestones in the vicinity of the Damascus gate, the border police continued to fire rounds into him, shocking his body with the wave of bullets. Witnesses were "astonished by the quantity of live-fire shot into the downed Palestinian." http://mondoweiss.net/2016/02/video-israeli-police-continue-firing-after-palestinian-attacker-is-incapacitated/.

*in occupied territory*, pillage,[16] destruction of private property, and persecution based upon religious or racial grounds. The Nuremberg Principles and its charter were adopted by all UN members. Both Israel and the U.S. consider the Nuremberg Principles to be part of their domestic Customary International Law and the Law of Nations,[17] see *Israel v. Eichmann* (Jerusalem District Court 1961, case no. 40/61).

116. *Most importantly, Nuremberg Principle VII provides that complicity in the commission of a war crime or a crime against humanity is a crime itself under International Law.* Thus, all of the Defendants named herein have committed a separate crime under International law because they have been complicit in denationalizing a civilian population. Defendants Friedman, FOBI, and KFF officials and their relatives have been funding settlement expansion and offensive Israeli army operations with at least $20 billion during the past ten years), and/or collaborated [Israeli Defendants] in the criminal activities described herein [maiming and murdering Palestinians].

117. As detailed in the book *Our Harsh Logic*, 700 veteran IDF soldiers who have actually served in the OPT while Defendant Netanyahu was prime minister admitted under oath that they repeatedly committed heinous criminal activities as ordered by senior officials. Defendant IMD senior officials, encouraged by Defendant Netanyahu, funded the commission of these heinous criminal activities with his approval by diverting government funds to the Israeli army and a number of settlements. The senior IDF military officers who ordered line soldiers to commit these heinous war crimes were simply following orders given to them by senior IMD officials and the Israeli Defendants named herein. This activity could not have occurred without the Israeli Defendant's approval and the financial assistance provided by

---

[16] Article 4(2)(g) Additional Protocol II of 1977, which governs "armed conflicts not of an international character" explicitly prohibits pillage.

[17] America's founding fathers took specific recognition of the "Law of Nations" doctrine, and it is the only one referenced in the Constitution, see Art. I Sec. 8 Cl. 10

U.S. tax-exempt entities like FOBI, KFF and FIDF. He encouraged commission of these heinous war crimes because it advanced his personal agenda, i.e. rid the West Bank of all non-Jews and have belligerent settlers [his growing voting bloc] permanently colonize the OPT.

118. All Israeli Defendants knew that Senior IDF Officials were encouraging line soldiers to shoot to kill unarmed Palestinians in order to drive Palestinian land owners out of the OPT. As the 700 veteran soldiers made clear, their main job was not to protect Israel, but to protect the settler population while they were terrifying their Palestinian neighbors. As recited in the book *Our Harsh Logic*, the IDF soldiers' mission was to "protect the settlers' rampaging," i.e., maiming and murdering their Palestinian neighbors.[18] A sampling of these war crimes and atrocities financed by U.S. tax-exempt entities like FIDF and committed by IDF personnel are listed below:

(a) Soldiers ordered by their commanders to "fill Palestinian bodies with bullets" did so, resulting in needless civilian deaths.[19] Even children weren't spared. For example, Plaintiff Barghouthi lost her brother while he was back from the U.S. to visit family, and Plaintiff Abu Amer lost 14 family members as a result of the war crimes repeatedly committed in Gaza;

(b) Impressionable 18-year-old recruits were told by commanding officers and clearly understood that moving up in the ranks was dependent on the number of "Palestinian kills" that they accumulated.[20]

(c) Soldiers laughed at traumatized Palestinian children seeing their mothers' body parts smeared all over the living room wall as the result of a percussion grenade exploding;[21]

(d) They saw young, traumatized Palestinian children urinating or defecating in their pants as a result of either witnessing demolition of their homes or violent attacks

[18] Id. p. 79-80, 288.
[19] Our Harsh Logic p. 79
[20] Id.
[21] Id. p. 40.

on their parents;[22]

(e) Young recruits, fresh out of high school, were told by their commanding officers to put the "rifle barrel between the teeth [of wounded Palestinians] and then shoot."[23] That's why Israeli soldiers who have served in the OPT suffer from constant nightmares and post traumatic stress disorder. There is a reason why these Israeli veterans have such a high suicide rate;

(f) They often observed their colleagues, encouraged by senior officials, killing horses, sheep, and other livestock—needless and wanton slaughter of farm animals.[24] The soldiers knew that Palestinian shepherds and farmers depended on their livestock for their livelihood;

(g) The teenage recruits were told to delay and sometimes prevent emergency vehicles and ambulances from going through checkpoints, virtually ensuring that any wounded Palestinians lying on the street would bleed to death.[25] In terms of vicious activity which have, in certain cases, caused IDF soldiers to have post-traumatic stress disorder, persistent nightmares, and commit suicide,[26] they were ordered to "throw grenades and then shoot bullets in to the head [of Palestinians]."[27] They were also told to inflict serious bodily harm, including the loss of eyesight—"through grenades and aim for the eyes to take out an eye."[28]

119. When asked about protecting settlers who would go on violent rampages against their Palestinian neighbors, the IDF soldiers responded "stopping the settlers? The army can't do a thing."[29] "The settlers do whatever they want."[30] In fact, their "overall mission is not to

---

[22] Id. The extent of the mental and physical distress on children goes back to the late 1980s. The Swedish Branch of Save the Children released in May 1990 a thousand-page report that detailed the effects of the conflict on the children in the OPT. Between 23,600 and 29,900 children required medical treatment for their injuries received from IDF beatings during 1987-1988. Almost one third of the children were ten years or under. One fifth were five and under. One third suffered broken bones, including multiple fractures. Israel Lobby p. 100. Another example of such violence occurred when IDF soldiers, taking target practice, shot ten-year-old Abir Aramin in the head while she was walking home from school, holding hands with her older sister. Her sister describes how she "suddenly flew out of her hand and lay bleeding on the ground." General's Son p. 148.

[23] Id.

[24] Our Harsh Logic p. 186.

[25] Id.

[26] Terrorist attacks are not the most common cause of death for Israeli soldiers, whether committed by farmers or otherwise. These days, suicide is. From 1992 to 2005, more than 450 soldiers committed suicide, averaging more than one every two weeks. http://www.ifamericansknew.org/stat/suicideidf.html.

[27] Our Harsh Logic p. 77.

[28] Id. p. 102.

[29] Id. p. 324.

[30] Id. p. 344.

defend Israel, but to 'provide security' for the settlers' rampages."[31] Protecting settlers [Netanyahu's major voting bloc], and financing settlement expansion was, and is today, the number one priority of all Israeli Defendants. They all knew that without them, the OPT could not be permanently colonized. And without their political support, Netanyahu wouldn't be re-elected.

120. All Israeli Defendants encouraged Senior IMD Officials to play a critical role in the commission of war crimes directed at Palestinian farmers living near settlements. These officials knew what the settlers were capable of, and knew that they coveted their Palestinian neighbors' property. Based on instructions they received from Defendant Netanyahu, they continued supplying 'under the table' financing to make sure that settlement leaders had the necessary funds to arm members of the militia unit with expensive military hardware. A new Kalashnikov, sniper scopes, and body armor costs somewhere between $7,000 and $12,000, and therefore it would have cost $500,000 to $600,000 just to arm the typical 50-member militia unit.

121. That amount, however, does not include bulletproof vests, body armor, night vision goggles, percussion grenades and ammunition. The reality was that not a single settlement had those funds available to spend on military hardware. In order to defray the expenses for the settlements, IMD officials ordered and paid for nearly 47 million rounds of ammunition from the U.S. Department of Defense, some of which they gave to belligerent settlers. The obvious solution for obtaining more expensive military hardware—encourage U.S. tax exempt entity officials to keep sending $2 billion+ in laundered funds every year. The donors think nothing of their largess, as they can write off these expenses as "charitable activity."

[31] Id. p. 288.

122. One of the jobs that IMD officials had was protecting belligerent settlers who were engaging in live target practice against Palestinian farmers—a distinct and separate war crime. That criminal activity has been encouraged by the Israeli Defendants for at least 20 years. Besides teaching settlers how to maim and murder Palestinian farmers, IMD officials had another job—look the other way when rampaging settlers armed with sniper scopes were maliciously wounding Palestinian farmers and leaving them to bleed out like Plainitff Ali Shalaan. Neither the settlers nor IDF personnel feared arrest or criminal prosecution because of the Israeli Defendants support and their instructions to the settlers to continue ethnically cleansing the OPT.

123. By collaborating with and encouraging settlement security coordinators and/or armed settlers to commit a host of violent criminal acts, e.g., theft of private property, arson, ethnic cleansing, genocide, and malicious destruction of property, the IMD Senior officials named herein, along with the other Israeli Defendants, have intentionally encouraged and facilitated acts of terrorism which resulted in the de-nationalization of a civilian population. Thus they acted as friendly and supportive collaborators by working with settlement officials on a daily basis to confiscate additional Palestinian property and cleanse the neighborhood of all non-Jews. They have been very successful in doing so because 400,000 Palestinians no longer reside in the OPT courtesy of the $2 billion they receive every year in laundered funds.

124. Prime Minister Netanyahu has similarly encouraged and applauded this criminal behavior because he was concerned about his re-election bid. He courted the vote of the settler population and the 20,000 Jews who were on settler waiting lists to secure a home. Even today he laments the fact that the land that the settlers want for a Jewish state is still unfortunately populated with "beasts," i.e. Palestinians. His solution, and that of IDM officials and Defendant Friedman, is to get rid of them—by violent means if necessary. He

and IDM officials have done an excellent job getting rid of them. For example, 400,000 Palestinians no longer live in the OPT because they were driven out of their homes by belligerent settlers and Israeli army personnel. *See Abulhawa v. Treasury*, Civil Action No. 1:15-cv-2186 (D.DC 2015).

125. Besides the UN Charter and International Conventions on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), U.N.T.S. 277, that activity violated America's Lieber Code [Geneva Convention predecessor] and Nuremberg Charter principles. The convention defined "genocide" to mean:

> Any of the following acts *committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group,* as such:[32]
>
> (a) *Killing members of the group* (atrocities admitted by members of the Breaking the Silence movement; atrocities committed against Gaza fishermen; atrocities (murdering 12-year-olds) witnessed by NY Times Pulitzer Prize winner Chris Hedges as recorded in his "Gaza Diary", and Amnesty international reports[33], 2003 Pilots' Letter: 27 pilots refused to engage in war crimes, i.e., carpet bombing in Gaza, which killed Plaintiff Abu Amer's 14 family members during the third Gaza invasion in 2014. Pilot Yonatan Shapira, the main author, specifically remarked about a Palestinian family of 9 people living in Gaza and having to hide out in a hospital so that they would not be murdered. According to him, "this is a war crime—ongoing slaughter of innocent people"[34]); or
>
> (b) *Causing serious bodily or mental harm* to members of the group (the 2003 Pilots' Letter, UN Rapporteur and Amnesty International reports, Save the Children

[32] Based on vicious racially-motivated comments made by Israeli government officials and military leaders, the acts described herein were certainly engaged in with the intent to destroy the Palestinian population. For example: "The Palestinian threat harbors cancer-like attributes"—current Minister of Defense Yaalon; "Palestinians should go, as should the physical homes in which they raise the snakes"—current Justice Minister Shaked (encouraging "destruction of Palestine's elderly, women, cities, villages, property, and infrastructure"); "Palestinians are beasts…they are not human"—current Deputy Defense Minister Ben-Dahan; and "Preventing the spread of Palestinian citizens is a national duty"—Former Housing Minister Atias. http://imeu.org/article/extremism-incitement-to-racial-hatred-senior-israeli-officials-in-their-own, http://www.haaretz.com/news/housing-minister-spread-of-arab-population-must-be-stopped-1.279277.

[33] Palestine Inside Out p. 183 (IDF use of Palestinians as human shields, torturing prisoners, blocking ambulances, wanton destruction of property meet definition of crimes against humanity). *See also* Chris Hedges, "A Gaza Diary," http://www.bintjbeil.com/articles/en/011001_hedges.html, *and* http://www.amnestyusa.org/research/reports/annual-report-palestinian-authority-2011?page=2.

[34] http://www.seruv.org.il/english/article.asp?msgid=55&type=news.

reports, Breaking the Silence, and various Haaretz articles, Addameer reports, B'tselem reports, and *Our Harsh Logic*;[35] the B'tselem and Addameer are both Israel-based NGOs which focus on settlement activity and prison conditions); or

(c) *Deliberately inflicting on the group conditions of life* calculated to bring about its physical destruction in whole or in part (deprivation of access to medical facilities by the placement of unauthorized checkpoint concrete barriers and destruction of ambulances, emergency vehicles, hospitals, agricultural property, demolition of 49,000 homes by armed settler militia and IDF personnel, poisoning water wells and livestock, incarcerating 50,000 political prisoners, and isolating and confining the preponderance of the Palestinian population to open-air prisons.[36]

126. In sum, all Defendants have violated UN Charter principles, the International Genocide Convention, Israel's Declaration of Independence, its military code of ethics and its war crime statute, GCVI, Hague, and Nuremberg Convention Principles. The reason—they all have "collaborated" or been "complicit" in war crimes committed by armed settlers and Israeli army personnel. For example, all Defendants have engaged in or financed "murder, ill treatment of the civilian population in the occupied territory, extermination (ethnic cleansing), persecutions based on political, racial, or religious grounds, and wanton destruction of villages." U.S. Defendants have also violated 18 U.S.C. § 960, which prohibits the funding of a foreign militia unit engaged in wholesale violence directed at a civilian population and 18 U.S.C. 2339C "Prohibitions against the Funding of Terrorism." 22 years ago, President Clinton and the Treasury Department issued an executive order calling for the designation of all individuals who promote violence in the Middle East. This is exactly what Defendant Friedman and Kushner family members have been doing for at least 20 years.

127. U.S. tax-exempt entities and the Israeli Defendants were willing partners for a long time, and

---

[35] Former Prime Minister Rabin infamously gave the order to "break the bones" of Palestinians participating in the 2001 uprising against the occupation. http://mondoweiss.net/2010/11/the-real-yitzhak-rabin, http://www.haaretz.com/news/broken-bones-and-broken-hopes-1.173283.

[36] *See generally* Our Harsh Logic.

are still engaged in the financing and commission of war crimes. Courtesy of a 1992 Israeli government report on settlements, they had to know as early as 1992 that war crimes were being committed by aggressive settlers (literally their partners in crime) who were stealing private Palestinian property courtesy of forged deeds, setting up trailer parks with no building permits and violating municipal building codes in the process.[37] Based on four separate official government reports on settlement activity and numerous Haaretz articles and editorials, they also had to know as early as 1992 that war crimes were being committed by belligerent settlers and Israeli army personnel on a daily basis. Defendant Netanyahu and IMD officials, while employed by the Israeli government, in fact received daily intelligence briefings from officers in the field confirming the extensive criminal activity occurring in the OPT and the number of Palestinian citizens who had been forcefully expelled from the OPT.

128. For at least 20 years, Defendant Friedman, FOBI and KFF officials similarly collaborated in financing war crimes by continuing to raise and transfer massive amounts of funds to the Israeli army and to belligerent settlers. They knew what the army's mission was, i.e., protect rampaging settlers who were engaging in wholesale violence, including ethnic cleansing and the violent subjugation of the Palestinian population.[38] By doing so, they have repeatedly violated 18 U.S.C. § 960, *Expedition Against a Friendly Nation.* That statute prohibits U.S. citizens from furnishing money to a foreign military entity engaged in conflict overseas, whose members intimidate a civilian population at peace with the U.S. government.[39] For at least 10 years the U.S. tax-exempt entity officials have been violating that statute and 18

[37] According to the 1992 Israeli government investigation, http://imeu.org/article/elad-the-jewish-national-fund-the-us-taxpayer-subsidized-judaization-of-sil.
[38] http://www.fidf.org/page.aspx?pid=285.
[39] In December 2014 alone, FIDF officials like Jared Kushner raised $60 million in financial assistance for the IDF. *See* http://www.hollywoodreporter.com/news/haim-saban-helps-raise-31m-837947 *and* http://www.hollywoodreporter.com/news/haim-saban-raises-34m-support-747379.

U.S.C. § 371 [conspiracy to harm foreign nationals and their property]. Count I herein lays out the criminal activity engaged in by U.S. and Israeli Defendants.

129. FIDF officials, including President Trump's son in law, and donors like Defendant Friedman and Kushner family members have been knowingly funding a foreign army whose members condoned, facilitated, and in some cases encouraged and participated in the commission of comprehensive war crimes. For example, KFF sent $315,000 to the Israeli army between 2011 and 2013. Those war crimes included senior officers issuing orders to "shoot to kill" Palestinians and "fill their bodies with bullets" or to "take out an eye" if possible.[40] Members of Breaking the Silence and the author of the famous Pilots' Letter, Air Force senior pilot Yonatan Shapira, both confirmed that they were being ordered to commit war crimes on a daily basis. All Israeli Defendants knew this to be the case, courtesy of numerous Haaretz editorials and articles and daily intelligence briefings they received from IDF officials serving in the West Bank or the Gaza Strip.

130. Defendant IMD's very lenient rules of engagement, authorized by the Israeli Defendants made that possible. *See* "Israeli Veterans say Permissive Rules of Engagement Fueled Gaza Carnage." Washington Post, May 4th, 2016. According to the soldiers, the rules of engagement implemented in Gaza by IMD senior officials with the approval of Israeli Defendants named herein was the "most permissive" they had ever seen. As a result, the Israeli Defendants can be indicted in the international criminal court for ordering and facilitating the commission of war crimes. Defendant Livni, in fact, has already been indicted for war crimes in both the UK and Belgium.

---

[40] Based on *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008), money sent to groups that have both "charitable" and criminal elements is fungible. Thus, Defendant tax-exempt entities cannot assert a defense herein that they intended that their contributions only went to fund, for example, college scholarships for Israeli war veterans. The tax-exempt entities knew of and are therefore liable for funding the IDF's criminal acts, including assisting armed settlers with home demolition activities after they committed physical attacks on Palestinian homeowners and farmers, and in some cases murdering them.

131. As the founder of the Breaking the Silence movement stated, he had been ordered to engage in the "ongoing slaughter of innocent people." He knew, just like his comrades and senior IMD officials named herein that this was a war crime.[41] All pro-occupation U.S. tax-exempt entity officials and their donors had to know that funding a foreign army's military operations, which necessarily involved the violent subjugation and the ethnic cleansing of a civilian population,[42] violated the U.S. Lieber Code [Geneva Code predecessor] and the aforementioned 18 U.S.C. § 960, as well as 18 U.S.C. § 1621 [perjury].

132. All Defendants herein had to know about the heinous criminal activity being engaged in by armed settlers and IDF personnel in the OPT, for any number of reasons. As early as 1990, ethnic cleansing, wanton property destruction, heavy civilian casualties, incarceration, and torture of political prisoners as well as children, were all common knowledge in Israel. Haaretz and New York Times articles and editorials repeatedly reported on these criminal activities and the ethnic cleansing which resulted from settlement expansion. Even the U.S. State Department issued annual reports and cited these criminal activities taking place in the OPT.

133. Besides funding IDF's brutal criminal activity in the OPT, U.S. Defendants have also partially financed three separate Gaza invasions, the latest in 2014. During these invasions, IDF forces, with the Israeli Defendants' approval murdered approximately 3,500 civilians[43] including women and children, for example the 14 family members of Plaintiff Abu Amer.

---

[41] http://www.democracynow.org/2014/7/24/amidst_brutal_operation_in_our_name.
[42] *See* Our Harsh Logic.
[43] If Kushner family members or Defendant Friedman had any doubts about what they were funding, they should watch the video-recorded admissions of former IDF commando Ido Gal Razon, now suffering from PTSD because of the many atrocities he committed. He states: "I killed more than 40 people for you." https://youtu.be/6TkKm2eEV1A.

They effectuated "collective punishment"[44] against the Gazan population, i.e. destruction of electric grids, power plants, water purification plants, and the only airport in Palestine to punish them for living on Jewish holy land.

134. This criminal conduct also violated Article 73 of the UN Charter, which imposes a trusteeship duty upon the occupying power and its agents. They have a fiduciary responsibility to protect the civilian population and their property, even Palestinians. That conduct also violates Israel's own domestic law regarding the sanctity of property ownership[45] and affording protection of civil rights to "all inhabitants" (not just Jewish citizens) as provided for in its own 1948 Declaration and its 1992 Basic Human Rights Statute.

135. As alleged herein, Defendant BFP partners have advised pro-occupation tax-exempt entities like FOBI, the KFF, and the FIDF on the ability to take tax write-offs on their annual 990 tax return form. The Kushner Foundation, along with FOBI, FIDF, and hundreds of pro-occupation 501(c)(3) officials have taken millions of dollars in illegal tax deductions so that Israeli based NGO's can build "Jewish only" schools, housing complexes, hospitals, and even "sterile" highways. Palestinians are routinely arrested for driving on this "sterile" highway. Members of the accounting firm BFP knew that FOBI, KFF, and other tax exempt entities were engaging in money laundering by sending approximately $2 billion in laundered funds every year to their sister educational facilities which adhere to discriminatory policies violate numerous Treasury Department regulations. (*See U.S. v. Jones University*, 615 F.3d 544 (2012)). Also, members of the firm, being well acquainted with their clients' financial

---

[44] Collective punishment is prohibited by GCIV, and it is defined as a general penalty, pecuniary or otherwise, inflicted on the population on account of the acts of individuals for which it cannot be regarded as collectively responsible. https://www.icrc.org/customary-ihl/eng/docs/v2_rul_rule103.

[45] Israel lobby p. 91 ("Illegal seizure of Palestinian property violates not only Israeli law but also a fundamental principle of democracy, i.e., the protection of private property.") *See also* Sasson Report, statement by Defense Minister Mofaz para. 275(d).

operations knew that FOBI, KFF, and other tax exempt entities like FIDF were engaging in money-laundering by sending approximately $2 billion every year to their sister Israeli-based NGOs and to the Israeli army.

136. Based on numerous New York Times and Haaretz articles and State Department Amnesty International annual reports, the firm partners also had to know that the $2 billion sent overseas every year was being used to finance arms trafficking, ethnic cleansing, genocide, theft of private property, and the denationalization of a civilian population. As already referenced herein, this pattern of war crimes was confirmed under oath by 700 veteran Israeli army soldiers in the book known as "Our Harsh Logic." They served in the OPT during 2000-2010 when Defendant Netanyahu was Prime Minister. Their honest admission as to war crimes is the reason why the Israeli Defendants are trying to delegitimize the "Breaking the Silence" movement.

137. There are two reasons why Defendants Friedman and Kushner family members have engaged in pro-occupation charitable activities. First, they are fervent supporters of Defendant Netanyahu, and want to see a Jewish-only state established in Palestine. Second, they are very wealthy, and their income puts them in a 40% tax bracket. They have understandably financed charitable activities because they have the right to deduct expenses incurred by legitimate tax-exempt organizations that they work with. The problem is that BFP partners have been rendering friendly pro-occupation advice to Defendants Friedman and Kushner family members so that they could take tax deductions based on financing criminal activity abroad. Thus, they have aided and abetted the commission of war crimes overseas and have engaged in income tax fraud.

138. As a result of the advice that members of the accounting firm BFP have given to their pro-occupation clients, Defendants Friedman and Kushner family members have taken illegal tax

write offs every April 15th, saving them huge sums in tax obligations. More importantly, as it concerns this case, had Defendants Friedman and KFF officials been informed that donations to the Israeli army and the Bet El settlement constituted income tax fraud, they never would have considered financing the Israeli army or the Bet El settlement for two reasons. First, they could go to jail because they were participating in a $2 billion money laundering scheme and financing genocide, arms trafficking, and ethnic cleansing. Second, there are at least 1,000 legitimate tax-exempt entities located in New York City, including Friends of Lincoln Center. All Defendants knew that, without those funds, the settlements would have been abandoned thirty years ago.

WHEREFORE, the Plaintiffs named herein request damages in the amount of $40 million, premised on the fact that they have been subjected to daily wholesale violence (settlers taking live target practice at them), forcibly evicted from their ancestral homes, have witnessed the murder of spouses and children, have suffered the loss of eyesight, the demolition of homes with relatives inside, the destruction of olive groves, grazing land, and fertile agricultural property, the poisoning of water wells and livestock, and the intentional destruction of mosques, hospitals, and schools. They have seen how terrified their children were after escaping physical injury at the hands of fanatical settlers financed by Defendants named herein. The belligerent setters were attacking them on the way home from school simply because they were "snakes," as Minister of Defense Yaalon called them. The Plaintiffs would never have suffered the injuries they allege herein without the funding provided by U.S. tax-exempt entities, the tax advice rendered by BFP partners, the "under the table" financing arranged by Prime Minister Netanyahu, and the reckless supervision of IDF personnel by senior IMD officials.

## THIRD CAUSE OF ACTION AGAINST ALL ISRAELI DEFENDANTS, INCLUDING MINISTRY OF DEFENSE OFFICIALS BASED ON THEIR RECKLESS SUPERVISION OF SENIOR IDF PERSONNEL

139. Plaintiffs hereby repeat and re-allege paragraphs 1-138 as if fully recited herein.

140. The Israeli army today, as a result of adhering to Defendant Netanyahu's personal agenda, unfortunately is now viewed by senior Israeli intelligence officials [Shinbet] as a "killing machine," which is thoroughly documented herein. I n 2005 these same officials labeled senior military officers as "totally immoral."[46] The military's philosophy says it all: "Israeli military actions must be evaluated from the prospective of Jewish superiority tO the Arab, moral and otherwise." Commanding Officer General Dan Halutz.[47] That philosophy is what now drives Netanyahu's army—outright hatred and contempt for Palestinians, AKA "beasts." He shares Justice Minister Shaked's agenda—destruction of Palestinian villages and any infrastructure [see page 32 herein].

141. The Israeli Defendants, like all employees of Israeli agencies, are bound by Israeli statutes and Hague and Geneva Conventions. That means IMD officials are bound by a) Israel's 1948 Declaration of Independence, which protects all of its inhabitants, including Palestinians, from infringement of civil rights; b) Israel's 1992 Human Rights Statute, which forbids discriminatory treatment of all inhabitants; c) Israeli Army War Manual and its military code of ethics, which forbids the inhumane treatment of a civil population and the commission of war crimes i.e. wanton destruction of property; d) UN Charter Principles because Israel agreed to them when joining the UN; e) Universal Declaration of Human Rights as adopted by the UN and its International Convention on Genocide;

---

[46] John Mearsheimer, Steven Walt, The Israeli Lobby and U.S. Foreign Policy, pg. 100-101 (2012).
[47] Robert Hirschfeld, *Yonatan Shapira: Israel's Pilot Refusenik*, available at: http://www.wrmea.org/2005-april/special-report-yonatan-shapira-israels-pilot-refusenik.html

142. They are also bound by: f) Hague and Geneva Conventions and Protocols, to which Israel is a signatory party; and g) UN Resolutions because Israel is a member of the UN. As detailed herein, IMD senior officials in charge of supervising IDF personnel have repeatedly ignored all of these statutes, conventions, and principles. As a result, they have breached the duty of care that they owed to the Palestinian-Plaintiffs named herein to: a) properly supervise Israeli army personnel during the 50 year occupation, and b) make sure they did not commit war crimes or engage in other criminal activity intended to intimidate a civilian population. For example, using Palestinian farmers as targets during a military training session supervised by IDF personnel. They have also breached their duty as "trustees" under the UN Charter to protect all property, even if it's owned by Palestinians or Palestinian Americans like Plaintiffs Kateeb and Ali.

143. Defendant IMD officials in charge of OPT affairs during the last 20 years, and the other Israeli Defendants, without formal government authority to do so, have ordered senior army officials to instruct line personnel to engage in various criminal activities. That activity includes: (a) ordering line soldiers to "fill Palestinian bodies with bullets" and adopting a shoot first policy; (b) encouraging settlers to block ambulances and emergency vehicles so that wounded Palestinians will bleed out like Plaintiff Ali Shalaan; (c) deem any Palestinian, even if unarmed, as a legitimate military target; (d) arrest and incarcerate twelve year olds; (e) inflict collective punishment on a civilian population, such as intentional destruction of infrastructure - airports, electric grids, power plants, and water processing facilities; (f) torturing and beating Palestinians while being incarcerated; (g) after arresting a political prisoner, keep him confined, at a minimum to 180 days, without access to legal counsel or family members, and (h) ordering Israeli Air Force pilots like Major Shapiro to drop one ton cluster bombs in areas populated by civilians in order to flatten entire blocks and ensure

maximum civilian deaths. As all Defendants had to know, carpet bombing and dropping cluster bombs in areas occupied by civilians constitutes classic war crime activity because it results in a maximum number of civilian casualties. That activity specifically violates Israeli military code of ethics and DOD regulations which bar the use of American military hardware in areas occupied by civilians.

144. IMD officials and the other Israeli Defendants have also ordered IDF personnel to: (i) protect settlers when they go on a rampage to maim and murder Palestinians; (j) at all times refuse to arrest belligerent settlers, even those who have murdered their Palestinian neighbors; (k) refuse to enforce Israel's criminal laws against them; (l) train the settlers in military terror tactics and the use of sniper scopes; (m) protect settlers who steal and permanently occupy private Palestinian property by means of forged deeds; (n) illegally confiscate hospitals, mosques, churches, and schools to use as military barracks; (o) secure the denationalization of the Palestinian population; (p) violently subjugate the Palestinian population; and (q) work with settlement officials and Israeli military area commanders to record forged deeds to justify seizure of private property owned by Palestinian farmer. They also ignore and refuse to implement adverse rulings from the Israeli Supreme Court ordering the evacuation of illegal settlements, for example the Amona Settlement.

145. The type of inhumane treatment that has been inflicted on the Palestinian civilians all over the OPT for the last forty years has been detailed in the 2015 Hebron District, West Bank Special Report [See Ex. A]. It is an analysis of the ongoing criminal activity occurring in 2015 that has been engaged in by the Israeli Army and belligerent settlers in the Hebron district. The Israeli Defendants approved of this criminal activity and the laundered funds provided by the U.S. tax-exempt entity Hebron Fund. Defendant IMD officials issued lenient rules of

engagement approved by the Israeli Defendants. And they continue to refuse to enforce Geneva, Hague, and Genocide Convention principles, and Israeli criminal statutes.

146. A review of that special report reveals the following facts: 54 Palestinians were murdered during 2015; land confiscation and dredging operations were occurring; demolition of homes, bombing attacks, closure of shops, and seizure of private homes to be used as military barracks; 2598 raids by the Israeli army; a total of 1067 cases of shooting at homes and civilians, and theft of property; raiding schools and 1890 storming operations; 472 Palestinians were shot at; approximately 900 gas bombs and stun grenades were used against Palestinian civilians; 1600 Palestinian citizens were arrested and 367 citizens were beaten for no reason at all.

147. There were also attacks on farmers, journalists, and demonstrators; Palestinian citizens were used as human shields and kidnapped; 45 cases where emergency vehicles, like ambulances, were detained so that the wounded Palestinians would bleed out and die; 1000 closures of homes; 590 Palestinian vehicles were detained; 39 declarations of closed military zones; new military towers constructed on private Palestinian property; and, water and electricity networks were destroyed. *This criminal activity is only what occurred in the Hebron settlement area in the year 2015.* However, based on reports prepared by UN Rapporteurs, Amnesty International officials, the U.S. State Department officials, Save the Children officials, similar activity is going on all over the OPT.

148. The belligerent settlers [Defendant Netanyahu's major voting bloc], protected by IDF soldiers, on instructions given by IMD officials and government officials like Tzipi Livni, played a vital role in this pattern of violent criminal activity. For at least thirty years, all Israeli Defendants have been in the process of de-nationalizing the Palestinians – a recognized war crime. To accomplish de-nationalization, the settlers attacked homes, uprooted olive groves,

poisoned water wells and livestock, beat Palestinians, attacked farmers, students, shopkeepers, and ambulance crews, engaged in sexual provocation, blocked roads, made death threats, smashed solar cells, stormed villages and towns, and intentionally ran over Palestinian citizens on 18 separate occasions [vehicular homicide as defined under Israeli criminal statutes].

149. As explained in Count II, all Israeli Defendants have collaborated with war criminals, i.e. Israeli army soldiers and their commanding officers. These officials not only encouraged young recruits to blind Palestinian civilians by shooting at their eyes, they gave orders to shoot to kill and to "fill Palestinian bodies with bullets".[48] Said officers also told impressionable teenagers just out of high school that promotion was dependent on the number of Palestinian kills that they recorded.[49] Understandably, that order has resulted in increased civilian casualties—a separate war crime. Senior IMD officials have ignored that inhumane activity based on instructions received from the other Israeli Defendants. They were concerned that NGOs like Amnesty International would expose this criminal activity.

150. By not enforcing Israeli criminal laws or adhering to Israeli Supreme Court rulings requiring evacuation of settlements, and ignoring the Israeli War Crimes statute and its military code of ethics, the Israeli Defendants have aided and abetted the forcible expulsion of 400,000 Palestinians from the OPT, the demolition of 49,000 Palestinian homes, and the theft of thousands of acres of Palestinian property. *See Abulhawa v. Treasury*, Civil Action No. 1:15-cv-2186 (D.DC 2015). Along with issuing bogus military property confiscation orders, this criminal activity is an essential component of the Israeli Defendants' plan to have the settlers

[48] OUR HARSH LOGIC, *supra* note 29, at 79.

[49] Unfortunately, these criminal commands are put into actual practice on a daily basis in the OPT. On February 21, 2016, Mohammed Abu Khalaf attacked two Israeli border guards with a knife. He was shot, disarmed, and incapacitated. While he lay on the cobblestones in the vicinity of the Damascus gate, the border police continued to fire rounds into him, shocking his body with the wave of bullets. Witnesses were "astonished by the quantity of live-fire shot into the downed Palestinian." http://mondoweiss.net/2016/02/video-israeli-police-continue-firing-after-palestinian-attacker-is-incapacitated/.

permanently colonize the West Bank. That's why senior IMD officials did nothing to stop this criminal activity. These are classic war crimes because they involve the wanton destruction of private property, the de-nationalization of the civilian population living there, and massive ethnic cleansing.

151. Tzipi Livni's and IMD's reckless and indifferent supervision of IDF senior officials has resulted in belligerent settlers doing whatever they want, including murdering Palestinian civilians and torching their homes. By doing so, the Israeli Defendants have aided and abetted violations of the following statutes: (a) Nuremberg Principles; (b) U.S. War Crimes Statute; (c) U.S. Neutrality Act, 22 U.S.C. 441, (d) Israel's War Crime Statute, i.e Israel's Anti-Nazi Statute; (e) U.S. and Israeli money-laundering statutes, (f) the Genocide Convention; (g) Article 73 of the UN Charter, which requires that occupiers act as trustees over the occupied population's property; and (h) the UN Declaration of Human Rights. IMD officials have also aided and abetted multiple violations of the 1993 Oslo Accords, which called for a permanent and total settlement freeze.

152. As further recited in OUR HARSH LOGIC, the Army's mission in the OPT was not to defend Israel, but to "protect the settlers' rampaging."[50] IMD senior officials have encouraged and financed IDF personnel to protect the settlers when they are maiming and murdering their Palestinian neighbors. That conduct alone violates Israel's Declaration of Independence, the Nuremburg and Geneva Convention principles, and Israel's and America's War Crimes Statutes. Israeli Defendants authorized these war crimes and atrocities in order to assist settlers in permanently colonizing the OPT after all non-Jews had been forcibly expelled. The gruesome war crimes committed by Israeli army veterans which have been ignored for 20 years by the Israeli Defendants, include, but are not limited to:

[50] OUR HARSH LOGIC, *supra* note 29, at 79,80, 288.

(a) Soldiers ordered by their commanders to "fill Palestinian bodies with bullets," who did so, resulting in needless civilian deaths;[51]

(b) Impressionable 18-year-old recruits were told by commanding officers and clearly understood that moving up in the ranks was dependent on the number of "Palestinian kills" that they accumulated.[52] Thus, IMD senior officials were encouraging and incentivizing army soldiers to murder as many Palestinian civilians as they could with American manufactured ammunition;

(c) Some of these soldiers laughed at traumatized Palestinian children seeing their mothers' body parts smeared all over the living room wall;[53]

(d) They saw young, traumatized Palestinian children urinating or defecating in their pants as a result of either witnessing demolition of their homes or violent attacks on their parents;[54]

(e) They were told to delay and sometimes prevent emergency vehicles and ambulances from going through checkpoints, virtually ensuring that any wounded Palestinians lying on the street would bleed to death like Plaintiff Ali Shalaan.[55] In terms of vicious activity which have, in certain cases, caused IDF soldiers to have post-traumatic stress disorder,

---

[51] OUR HARSH LOGIC, *supra* note 29, at 79.
[52] *Id.*
[53] *Id.* at 40.
[54] *Id.* The extent of the mental and physical distress on children goes back to the late 1980s. The Swedish Branch of Save the Children released in May 1990 a thousand-page report that detailed the effects of the conflict on the children in the OPT. Between 23,600 and 29,900 children required medical treatment for their injuries received from IDF beatings during 1987-1988. Almost one third of the children were ten years or under. One fifth were five and under. One third suffered broken bones, including multiple fractures. John Mearsheimer, Stephen Walt, *The Israel Lobby and U.S. foreign policy*, P. 100 (2012). Another example of such violence occurred when IDF soldiers, taking target practice, shot ten-year-old Abir Aramin in the head while she was walking home from school, holding hands with her older sister. Her sister describes how she "suddenly flew out of her hand and lay bleeding on the ground." GENERAL'S SON p. 148.
[55] Id.

persistent nightmares, and commit suicide,[56] they were ordered to "throw grenades and then bullets in the head [of Palestinians]."[57] *They were also told to inflict serious bodily harm*, including the loss of eyesight—"aim for the eyes to take out an eye."[58]

153. IMD officials along with the Israeli Defendants knew that settlers had (a) become trained in the use of sophisticated military hardware including M16's or Kalashnikovs and sniper scopes, (b) had attended sniper school and were trained in military tactics by the settlement security coordinator, (c) would continue their efforts to permanently colonize the OPT, and (d) had always coveted their Palestinian neighbors' property considering such property to be a gift from God. For example, armed settlers in Hebron told British BBC camera crew that: "*We killed Jesus and we are proud of it. This is our land and you get the fuck out of here.*" They also screamed that they were "*going to kill you and the Palestinians, you Nazi, you son of a shit … this is my house, my land, god gave it to me.*"[59]

154. Confirming that IDF soldiers routinely murder children, Chris Hedges, New York Times Pulitzer Prize winner, in his "Gaza Diary" specifically corroborated the routine practice of murdering 13-year-olds by IDF soldiers ("never saw soldiers killing kids for sport").[60] That criminal activity would never have occurred, but for Defendant Friedman and Kushner family members, and Defendant Netanyahu's, and FIDF's financial assistance, and senior IMD officials reckless indifference to the horrendous war crimes being committed by IDF soldier and belligerent settlers on a daily basis.

155. Without the financial support provided and "under the table" financing arranged by the Israeli Defendants, the Israeli armed forces and the belligerent settlers would not have been

---

[56] Terrorist attacks are not the most common cause of death for Israeli soldiers, whether committed by farmers or otherwise. These days, suicide is. From 1992 to 2005, more than 450 soldiers committed suicide, averaging more than one every two weeks. http://www.ifamericansknew.org/stat/suicideidf.html.

[57] OUR HARSH LOGIC, *supra* note 29, at 77.

[58] *Id.* p. 102.

[59] PIO, *supra* note 28, at 138.

[60] Chris Hedges, *A Gaza Diary*, HARPER'S MAGAZINE, Oct.2001.

able to commit the horrendous war crimes detailed in Our Harsh Logic. The reason—settlements didn't have the requisite funds to spend $500,000 on M16's or Kalashnikovs and expensive ammunition and bulletproof vests to outfit the militia unit. As a direct result of Defendant IMD issuing lenient rules of engagement, and recklessly supervising senior IDF personnel, line soldiers and belligerent settlers have continued to inflict serious bodily harm on the Palestinians population. This criminal conduct has been engaged in with the full knowledge of the Israeli Defendants. They knew exactly what was going on, courtesy of briefings by intelligence officials and numerous Haaretz articles.

156. At all relevant times, IMD officials and Defendants Friedman and Netanyahu knew that their financial assistance would encourage and finance arms trafficking, wholesale violence like arson, and the theft and malicious destruction of private property. All of these criminal activities are additional and separate war crimes. Moreover, Defendant Friedman as an attorney knew that Israel was a signatory to the United Nations Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), U.N.T.S. 277. That Convention affirmed Nuremberg Charter principles adopted in 1945 which defined "genocide" to mean:

a. Any of the following acts *committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group,* as such:

   i. *Killing members of a group* – evidence thereof: a) atrocities admitted by members of the Breaking the Silence movement; b) murdering 12-year-olds as witnessed by NY Times Pulitzer Prize winner Chris Hedges as recorded in his "Gaza Diary"; c) Amnesty international reports[61]; and d) the 2003 Pilots' Letter: 27 pilots refused to

[61] PIO, *supra* note 28, at 183 (IDF use of Palestinians as human shields, torturing prisoners, blocking ambulances, wanton destruction of property meet definition of crimes against humanity). *See* Hedges, *supra* note 56,

engage in war crimes, i.e., carpet bombing in Gaza, which killed hundreds of civilian Palestinians (including Gaza native Ms. Abu Amer's who lost fourteen family members) during the third Gaza invasion in 2014. Pilot Yonatan Shapira, the main author, specifically remarked about a Palestinian family of nine people living in Gaza and having to hide out in a hospital so that they would not be murdered.

ii. According to him, "this is a war crime—ongoing slaughter of innocent people."[62] He also confirmed that a F-16 airplane dropped a one-ton bomb on the house of a Hamas commander living in Gaza which killed 14 people including nine children. His superior, Gen. Dan Hlutz justified the action and told him that "*Jewish actions must be evaluated from the perspective of Jewish superiority to the Arab, moral and otherwise*";[63] or

iii. *Causing serious bodily or mental harm* to members of the group: evidenced by the 2003 Pilots' Letter, UN Rapporteur and Amnesty International reports, Save the Children reports, and various Haaretz articles, Addameer reports, B'tselem reports, and OUR HARSH LOGIC;[64] B'tselem and Addameer are both Israel-based NGOs which focus on settlement violence and inhumane prison conditions); or

iv. *Deliberately inflicting on the group conditions of life* calculated to bring about its physical destruction in whole or in part (deprivation of access to medical facilities by the placement of unauthorized checkpoint concrete barriers and the construction of the separation wall; destruction of ambulances, emergency vehicles, hospitals, agricultural property, demolition of 49,000 homes by armed settler militia and IDF

---

http://www.bintjbeil.com/articles/en/011001_hedges.html; http://www.amnestyusa.org/research/reports/annual-report-palestinian-authority-2011?page=2.

[62] http://www.seruv.org.il/english/article.asp?msgid=55&type=news.

[63] Robert Hirschfeld, *Yonatan Shapira: Israel's Pilot Refusenik,* available at http://www.wrmea.org/2005-april/special-report-yonatan-shapira-israels-pilot-refusenik.html.

[64] Former Prime Minister Rabin infamously gave the order to "break the bones" of Palestinians participating in the 2001 uprising against the occupation. http://mondoweiss.net/2010/11/the-real-yitzhak-rabin, http://www.haaretz.com/news/broken-bones-and-broken-hopes-1.173283.

personnel, poisoning water wells and livestock, incarcerating 50,000 political prisoners, and isolating and confining the preponderance of the Palestinian population to open-air prisons).[65]

157. Senior IMD officials named herein have also knowingly facilitated the commission of war crimes by the Israeli Air Force, as evidenced by the letter of veteran Air Force pilot Yonatan Shapira. Twenty-seven veteran pilots who served with him and whose identity was confirmed by IMD officials, have admitted that war crimes were committed in the OPT on a regular basis. Pilot Shapira and members of Breaking the Silence even identified themsekves as a "member of a terrorist organization," i.e. the Israeli Air Force.[66] Pilot Shapira condemned war crime activity like dropping one ton cluster bombs in an area populated by civilians and the carpet-bombing routinely engaged in by his colleagues. Cluster bombs and carpet bombing resulted in a massive number of civilian deaths and the total devastation of the Gaza territory during three separate Gaza invasions.[67]

158. As the Court observed in *Sokolow v. Palestine Liberation Organization*, 583 F.2d 451, 459 (S.D.N.Y. 2008), "*The use of bombs under such circumstances is indicative of an intent to cause far reaching devastation amongst the masses. The benefit of such weaponry is its merciless capability of indiscriminately killing and maiming untold numbers in heavily populated civilian areas.*" The pilots had insured a maximum number of civilian deaths based on orders approved by Defendants Livni and Netanyahu. They were told not to leave a single building standing. They engaged in repeated carpet-bombing in order to destroy Gaza's only power plant and its only airport. That conduct would never have occurred without if being first approved by the Israeli Defendants.

---

[65] *See generally* OUR HARSH LOGIC.
[66] https://electronicintifada.net/content/i-was-part-terror-organization-says-israeli-pilot-turned-activist/14253, http://www.seruv.org.il/english/article.asp?msgid=55&type=news.
[67] http://www.theguardian.com/world/2014/aug/26/gaza-ceasefire-israel-palestinians-halt-fighting.

159. IMD officials in charge of OPT affairs knew or should have known about the well documented instances of the war crimes detailed in count II. Of course, these instances are only a sample of the war crimes that Israeli army personnel and belligerent settlers have actually inflicted on Palestinians as a direct result of the Israeli Defendants reckless and indifferent supervision of senior IDF personnel. Failure to properly supervise senior military officials is a direct violation of the laws of armed conflict, and the Geneva, Hague, and Genocide Conventions. It is a separate war crime which violated Israel's military code of ethics, war crime statute, and its own Declaration of Independence. As already stated, Defendant Livni was already indicted in the UL and Belgium for engaging in war crime activity in the OPT.

160. Recently, as authorized by the Israeli Defendants, the 24-year-old Palestinian activist Sireen Khudiri had her neighborhood invaded by 25 military jeeps, had her home ransacked by Israeli army personnel, and had all of her family's computers confiscated.[68] That is a typical day in the lives of Palestinians, all financed by FIDF donors like members of the Kushner Family. *Her crime—posting peaceful but pro-Palestine messages on Facebook*. Similarly, with IMD officials approval, settler extremists celebrated the murder of 18-month-old Ali Dawabshe at a wedding celebration by repeatedly stabbing a printed photograph of the toddler, who was burned to death in an arson attack on their West Bank home last summer. IDF soldiers were in attendance at the wedding, and even lent their rifles to the dancing revelers.[69] Soldiers from the same battalion, upon leaving Gaza, had t-shirts printed up which stated "one bullet, two kills," and an image of a pregnant Palestinian woman.

161. Due to IMD's refusal to enforce the Israeli Army's military code of ethics, and its decision to

---

[68] http://samidoun.net/2014/01/sireen-khudiri-released-report-from-solidarity-movement-for-a-free-palestine/.
[69] http://www.jpost.com/Arab-Israeli-Conflict/Soldier-whose-gun-was-used-in-extremist-wedding-celebration-sent-to-prison-439090.

issue lax rules of engagement, Israeli army senior officials know that they can order line soldiers to engage in criminal activity (war crimes) which will not be investigated at all. For example, shooting at the eyes of Palestinian civilians in order to blind them. Just like the belligerent settlers referenced herein, IMD officials and IDF senior officials know that line soldiers can literally get away with murder when it comes to Palestinian civilians. As a result, even today IDF line soldiers have continued to threaten Palestinian landowners and murdering and maiming them to convince them to abandon their 200-year old homes. As a direct result of the Israeli Defendants' reckless and indifferent supervision of senior IDF officials, Palestinian families have been confronted with raising traumatized children in desperate need of psychiatric counseling, and have lost family members, ancestral homes, valuable olive groves, valuable real estate and have been de-nationalized in the process, i.e., stripped of their Palestinian identity, culture and heritage.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in the amount of $40 million dollars against all Israeli Defendants, including the senior IMD officials named herein.

**FOURTH CAUSE OF ACTION AGAINST DEFENDANT ACCOUNTING FIRM BFP FOR AIDING AND ABETTING INCOME TAX FRAUD**

162. Plaintiffs hereby repeat and re-allege paragraphs 1- 161 as if fully recited herein.

163. It appears that BFP partners are excellent at deceiving IRS officials and providing minimum information to them, re: settlement operations described on the annual 990 form. For example, based on the funds raised by Defendant Friedman on U.S. soil, $2.2 million was sent to Bet El in 2014 to "aid[e] students, faculty, and administration of Bet El Yashiva." That's it in terms of explaining the "charitable" or educational activity engaged in the Bet El settlement. However, based on promos issued by FOBI and Bet El officials to publicize the annual fundraising dinner and the need to fund Bet El expansion, the $2.2 million actually accomplished a lot more than "aiding students and faculty."

164. For example, the firm's principals did not disclose on the 2014 annual 990 form that this funding actually went towards subsidizing its Jewish only military academy and promoting settlement expansion, theft of private property, the preparation of forged deeds, setting up Jewish-only schools, housing accommodations, and hospitals. That's the identical manner in which the French government occupied Algeria. Numerous articles in the New York Times and Haaretz confirmed that criminal activity. The firm's principals on the 990 form also did not disclose that some of the $2.2 million in funding actually resulted in the construction of a number of firing ranges and sniper schools where belligerent settlers can improve their shooting skills to maim and murder Palestinian farmers who intrude on the settlement to access their olive groves or walk near it while escorting kids to school. This is exactly what happened to Plaintiff Emad Shujaia when Bet El settlers maliciously wounded him. The bullet shattered his thigh bone and led to permanent disability. Not a single settler was arrested for this serious criminal activity on instructions from the Israeli Defendants named herein.

165. The firm's principals also deceived IRS officials by not disclosing that some of the funding went towards outfitting the settlement's militia unit with 40-50 M16's or Kalashnikovs, bulletproof vests, percussion grenades, night vision goggles and body armor. That's expensive military hardware, i.e. new M16's or Kalashnikovs can cost anywhere between $7,000 and $12,000. Thus it would cost approximately $500,000 to outfit the typical 50-member local militia unit, exclusive of body armor and expensive ammunition. The principals also did not disclose that the funding was used to set up a military academy like West Point. The graduates of that academy, after learning how to kill Palestinians, go on to serve in the IDF and maim and murder innocent Palestinian civilians all over the OPT.

166. Considering the wide scope of these activities, it appears that approximately $750,000 to $900,000 went towards non charitable [i.e. criminal] activity in 2014. Ammunition and body armor would probably cost at least $100,000. And of course it's quite expensive to operate an exclusive military academy, and that probably costs $250,000 just to pay the salaries of staff. As the firm's principals know, as well as Defendant Friedman, a tax-exempt entity will lose its tax-exempt status if a significant percentage of the "charitable donations" go to fund non-charitable activity like arms trafficking, theft of private property,s and genocide. As discovery herein will show, that's the case with FOBI. Also, the Jewish only Bet El settlement itself, like all settlements in the OPT, has an admissions committee whose members scrutinize applicants. Only Jewish citizens of course can apply for housing accommodations in all of these settlements which is a direct violation of tax-exempt regulations and American public policy. *See Bob Jones University,* supra.

167. Given their expertise, principals in BFP are presumed to know what Treasury regulations govern the financing of charitable activities engaged in by tax-exempt entities, both domestic and abroad. These regulations prohibit, inter alia, domestic tax exempt entities from financing here or abroad: a) criminal activity of any nature—i.e. arms trafficking with the purchase of M16's or Kalashnikovs, stun guns, bullet proof vests, and percussion grenades by settlement officials; b) educational and housing facilities that have adopted a discriminatory policy, i.e. admission restricted to Jewish residents only; c) militia units here or abroad; and d) activities which violate U.S. or the recipient country's public policy, for example financing theft of private property to facilitate settlement expansion which frustrates both U.S. and Israel anti-settlement public policy.

168. BFP principals and Attorney Friedman knew what requirements their clients and donors had to adhere to if they were financing charitable activities abroad. First, they have to make sure

that the overseas recipient [Bet El settlement] is qualified as a non-profit entity; i.e. it exclusively engages in "charitable" activity [that's impossible because of firing ranges, sniper schools, and a military academy]; b) that they have adopted a protocol which gives their U.S. donors authority to approve how the funds are spent [discovery will show that is not the case]; c) that the money sent overseas is not used to promote criminal activity of any nature [that's impossible to demonstrate]; and d) use of the funds that are sent overseas do not violate the recipient country's laws [money laundering or arms trafficking] or its public policy [that is also an impossibility, see section explaining Israel's anti-settlement public policy].

169. As detailed herein, both U.S. and Israel have adopted a strict anti-settlement public policy which FOBI, FIDF, and KFF officials violate every time they authorize a wire transfer to a settlement in the OPT. BFP principals have also violated U.S. criminal statutes including 18 U.S.C. § 960. They did so by authorizing their clients to send money abroad to finance the operations of a foreign militia unit, steal private property to expand settlement perimeters, and expel all non-Jews in the area, which is inherently discriminatory conduct. Their clients have also violated 18 U.S.C. § 1956, the money laundering statute, because they have transmitted millions of dollars overseas to promote criminal activity. As already referenced herein, FBI, State Department, Treasury Department, and Justice Department Officials have all condemned money laundering because it is a drain on the U.S. economy, which is prohibited by both President Clinton's 1995 Executive Order and JASTA. Thus, BFP principals have aided and abetted numerous violations of President Clinton's Executive Order, and JASTA provisions recited herein.

170. BFP principals have also violated 18 U.S.C. § 371 because they have conspired with numerous U.S. pro-occupation tax-exempt entities to finance belligerent settlers and Israeli soldiers so that they can damage private property abroad and injure the civilian population

living there. Besides violating 18 U.S.C. § 371, they have all violated the federal perjury statute 18 U.S.C. § 1621, which prohibits lying to a U.S. government agency. Every year as a result of BFP officials filing fraudulent 990 forms which do not disclose the nature of the criminal activities engaged in overseas, BFP principles violate the perjury statute. As should have been obvious to these BFP principals, when advising their clients and preparing annual 990 forms, taking charitable donations based on financing arson, arms trafficking, and numerous war crimes is prohibited by U.S. federal criminal statutes and the tax code. In fact, U.S. citizens who violate 18 U.S.C. § 371, if convicted, can end up being incarcerated in a federal prison for years. This is not just wild speculation because famous lobbyist Jack Abramoff was sentenced to six years in prison.

171. As a result of rendering friendly pro-occupation advice to tax-exempt entities [FOBI, FIDF, KFF] and their donors [Friedman and Kushner family members], the U.S. Treasury is deprived of $1 billion every year in lost revenues, which is a significant drain on the U.S. economy. More importantly, as it concerns this case, the Plaintiffs named herein have been injured as a direct result of their rendering friendly, pro-occupation tax advice, which is exactly what their donors wanted to hear—it is perfectly legal to take tax-write-offs based on funding criminal conduct overseas. Without the annual laundered funding [$2.2 billion] provided by their clients relying on their advice, the criminal activities described herein [money laundering, arms trafficking, genocide, theft of private property] would never have taken place. Once advised that they could be prosecuted for income tax fraud, FOBI, FIDF, and KFF donors would have located an alternative, legitimate tax-exempt entity instead.

172. Based on information and belief, and the 2014 FOBI 990 form, the accounting firm BFP has a number of pro-occupation tax-exempt entities who they advise. For at least 20 years, the pro occupation tax-exempt entity clients that the firm has have been funding settler violence,

arms trafficking, money laundering, theft of private property, and genocide. Without the friendly pro-occupation tax advice given by members of the firm, this criminal activity would never have occurred for two reasons. First, if their clients actually knew that they could face serious jail time [10-15 years] they would not risk trying to write off criminal activity that they financed abroad. As a result, belligerent settlers would never be armed with 20,000 expensive M16's or Kalashnikovs and other sophisticated military hardware. Nor would settlement leaders have the financial resources to build sniper schools, firing ranges, and military academies. Thus, 400,000 Palestinians would still be living in the OPT. Second, their clients could have instead funded one of the thousand legitimate 501(c)(3)'s operating in New York or elsewhere, like the Friends of the Metropolitan Opera.

WHEREFORE, Plaintiffs hereby request entry of judgment against the BFP accounting firm in the amount of $40 million.

## FIFTH CAUSE OF ACTION AGAINST BILLET, FEIT & PRICE, P.C., NEGLIGENCE

173. Plaintiffs hereby repeat and re-allege paragraphs 1- 172 as if fully recited herein, especially those allegations made in Count IV.

174. Defendant BFP principals not only owed a duty of care to their clients to render accurate professional advice, but to any individuals who would be impacted by the nature of that advice, including the Plaintiffs herein. For example, Plaintiffs Kateeb and Ali have lost $2-3 million worth of valuable real estate because BFP's clients, utilizing their advice, sent millions of dollars overseas to arm belligerent settlers who in turn stole the property owned by Plaintiffs Kateeb and Ali. If the firm's clients did not receive this friendly, pro-occupation tax advice, belligerent settlers would never have received the requisite funding to purchase M16's or Kalashnikovs and body armor. That expensive military hardware, including sniper scopes, enabled belligerent settlers to violently subjugate the Palestinian population and steal

thousands of acres of Palestinian real estate. They are still doing that today with the approval of the Israeli Defendants named herein.

175. Defendant BFP principals knew that the monies sent overseas by their clients would be used to maim and murder Palestinians, some of whom are named herein as Plaintiffs. They told their clients that tax deductions based on financing such criminal activity abroad are valid deductions on the 1040. However, BFP principals and Defendant Friedman knew that neither the tax code nor IRS regulations allow donations based on financing criminal activity. Based on the tax code, IRS rulings, IRS regulations, and case law like the *Bob Jones University* case cited herein, it is obvious that Defendant BFP principals breached their duty of care owed to both their clients and the Plaintiffs named herein, and in the process of doing so injured the Plaintiffs named herein. Their injuries are described in Counts I – IV. As a result of these BFP principals engaging in this negligent conduct, the Plaintiffs have been damaged in the sum of $40 million.

WHEREFORE, Plaintiffs hereby request entry of judgment against the BFP accounting firm in the amount of $40 million.

## SIXTH CAUSE OF ACTION: CONVERSION AGAINST ALL ISRAELI DEFENDANTS

176. Plaintiffs repeat and re-allege paragraphs 1- 175 as if fully recited herein.

177. As far back as 1989, Defendant Netanyahu, as well as former Prime Minister Sharon, was encouraging Jewish settlers and Israeli army soldiers to steal as much private Palestinian property as they could. The reason is that the Israeli army defendants intended to "deliberately inflict [on Palestinians] conditions of life calculated to bring about their physical destruction, in whole or in part." The process of stealing property entailed: a) five or six families in trailer caravans seizing a hill and planting an Israeli flag and calling it settlement "X"; b) they had no electrical or water hookups so the Israeli Defendants contacted their

colleagues in various ministries to send in utilities workers so that the settlers could have electric and water hookups. As detailed in four separate government reports on illegal settlements, that activity was criminal in nature; c) with money from the Israeli government's annual budget, defendant Netanyahu diverted funds to the settlers so that they could purchase military hardware to be used by belligerent settlers to cleanse the area of all non-Jews; d) they also needed substantial funds to start developing infrastructure projects like Jewish-only schools, hospitals and housing projects. The settlements today are very sophisticated cities, e.g., Ariel has 25,000 permanent citizens, a concert hall, a number of shopping malls, a hospital, a university, and numerous apartment projects for Jewish-only settlers. Recently with tax deductible funds provided by Sheldon Adelson, Ariel officials built a 350,000 square feet community center. Defendant Netanyahu refers to these facilities as "temporary," trying to deceive American officials into thinking there won't be a permanent occupation.

178. All of the settlements are of course illegal. *See* recent UN Security Council resolution 2334, and they violate both Israel's and the US's anti-settlements public policy. The settlements were built in violation of that public policy and without construction permits, formal state authorization, and approved state construction plans. All of this was detailed in four separate government reports, including the 2005 Sasson report. She recommended all settlements and outposts be evacuated and stated "there is no such things as a semi-authorized outpost."

179. Two Plaintiffs named herein, Kateeb and Ali, have owned with their families a number of parcels of real estate in the OPT. They believe the property is worth approximately $3-4 million based on ReMax property values and the fact that some homes in the OPT are now selling for $750,000. Plaintiff Kateeb has been informed by her Palestinian attorney that two of her properties are occupied by settlers who claim ownership of that property courtesy of

forged deeds. Plaintiff Ali has received similar confirmation that his family's property is now owned by extremist settlers with forged deeds. The only difference is that their properties are located in different villages.

180. The Defendants that now occupy or claim ownership of these properties, including the Israeli Army, had no authority to enter onto the property or make improvements thereon like military barracks, shopping malls or new homes. All Israeli Defendants knew that but continued to finance settlement expansion and conversion of private Palestinian real estate. Thus, they knowingly converted the properties of Plaintiffs Kateeb and Ali and thousands of other Palestinians, and have made an alternative profitable use of those properties. The occupation has been ongoing and permanent in nature, and in the case of Plaintiff's properties for not less than 25 years. Thus the conversion has been long standing and will be permanent in nature because of the massive funding provided by U.S. tax-exempt entities--$2 billion a year.

181. Plaintiffs Kateeb and Ali are claiming damages in the amount of $3-4 million and they have no remedy to pursue in Israeli. As a result of having their real property permanently confiscated by belligerent settlers and the Israeli army, members of the Kateeb and Ali family cannot visit their home and cannot sell their property. They are literally a lost generation as a result of being denationalized by the Israeli Defendants. As a result of the tortious conduct engaged in by the Israeli Defendants named herein, Plaintiffs request judgment in the sum of $3-4 million against the Israeli Defendants depending on ReMax property values to compensate them for the loss of valuable real estate.

WHEREFORE, Plaintiffs hereby request entry of judgment against the Israeli Defendants in the amount of $3-4 million.

## JURY TRIAL

Plaintiffs demand a jury trial.

Respectfully Submitted,

________/s/________________________

Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Managing Partner
Transnational Business Attorneys Group
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 – 4343

Attorney for the Plaintiffs