UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MIKO PELED, *et al.*, )<br>    )<br>    Plaintiffs, )<br>    )<br>    v. )<br>    )<br>BENJAMIN NETANYAHU, *et al.*, )<br>    )<br>    Defendants. )<br>_____) | Docket No: 1:17-cv-00260<br>Hon. Reggie B. Walton |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT KUSHNER FAMILY FOUNDATION'S MOTION TO DISMISS**

COMES NOW Plaintiffs herein and hereby oppose the motion to dismiss filed by the Kushner Family Foundation, hereinafter KFF. The motion should be denied for a number of reasons, including the fact that its main argument centers on the application of the political question doctrine. As numerous authorities have held, including Judge Collyer in this judicial district, (*see Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004) ("*Biton I*"); *Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005) ("*Biton II*")), the political question doctrine has no application on our facts. Besides relying on the political question doctrine, Defendant's other erroneous assertion is that the Act of State doctrine similarly bars this lawsuit from going forward.

As explained herein, the Act of State Doctrine is based on the fact that no Court can ignore the public policy of a foreign country or its statutes. As detailed in the memorandum in opposition, however, the Israeli government has condemned the settlement enterprise for at least 30 years, and even *banned charitable deductions made*

1

*to settlements* since 1992. That is the primary function of a 501(c)(3) entity like KFF that operates like a funnel. The reason why it operates as a "funnel," is that it only holds donor funds for 24 hours so that they can secure a tax deduction. The Kushner Family has been taking illegal tax deductions through the KFF for at least 20 years. The funds are then sent by the funnel to the Israeli army and numerous settlements in order to finance the maiming and murdering of Palestinian civilians—a war crime as defined under both the U.S. and the Israeli war crimes statute. Thus, the Act of State Doctrine cannot serve as a basis to dismiss this suit, because *inter alia*, the Israeli government has condemned settlement expansion.

Besides ignoring the relevant case law in this judicial district, the Defendant has also failed to address a number of serious issues. First, as explained herein, an entity that collects funds with the purpose of sending them overseas to intimidate a civilian population is guilty of a 18 U.S.C. 2339(C) violation. Just by collecting funds for the settlements and for rogue soldier sin the Israeli army. Second, that no charity in America can send money overseas to fund a foreign army. *See* 18 U.S.C. § 960. KFF has been doing that for approximately 20 years by sending millions of dollars to the 501(c)(3) known as the Friends of the Israeli Army. Unfortunately for KFF, that's not the only criminal statute it has violated.

Both U.S. and Israeli money laundering statutes, as explained herein, criminalize the operations of a U.S. charity that decides to send money abroad to promote and finance criminal activities like arms trafficking and ethnic cleansing. *See* 18 U.S.C. § 1956, U.S. money laundering statute. For at least 20 years, KFF has been making contributions to Israeli settlements like the one owned by Defendant Friedman, Bet El.

Bet El has been financed by the Kushner Family, and the activities it has financed includes building firing ranges, setting up sniper schools, and funding a "Jewish only" military academy whose graduates learn how to maim and murder innocent Palestinian civilians.

The third, a 1992 Israeli government report about settlement activity known investigated settlement activity for over a decade, and specifically details and confirms that criminal activity. *See* Compl. ¶ 127. Bet El and other settlements that the family supports all have local militia units who are armed with Kalashnikovs, M16s, stun grenades, body armor, and sniper scopes. Every year, the Kushner family takes charitable deductions based on expenditures for the purchase of military hardware, (arms trafficking), which obviously cannot be deemed to be a charitable activity. Thus the Kushner family members have been committing tax fraud every April 18 when they write off contributions to the Bet El settlement and the Israeli army as charitable deductions.

Besides violating 18 U.S.C. § 960 funding a foreign army and 18 U.S.C. § 1956. money laundering statute, the Kushner Family has also ignored numerous Treasury Department regulations governing their alleged charitable activities. For example, one cannot use charitable donations to promote discriminatory housing or educational facilities, yet that is exactly what the Kushner family has done by making contributions to Bet El, i.e. erecting "Jewish only" housing projects, "Jewish only" highways, and "Jewish only" schools—that is impermissible conduct that a valid 501(c)(3) can engage in. *See Bob Jones University v. United States*, 461 U.S. 574 (1983).

As pointed out in Section I below, KFF officials have also violated 18 U.S.C. 2339C, and President Clinton's 1995 Executive Order 12947. That statute and executive

order both provide that monies cannot be sent overseas to promote or finance terrorist activity, including the intimidation of a local civilian population. Both the Israeli army and the irate settlers coming from Bet El and other settlements seeking revenge for the killing of an IDF soldier (aka "price tag[1]" killings) in an effort to convince them to leave the Occupied Territories (also known as the "OPT"). In fact, irate settlers coming from the Bet El settlement and other nearby settlements have been accused of engaging in these price tag attacks. These are the same settlements which the Kushner family through the KFF have supported with its funding for at least 20-30 years.

The KFF's funding to these irate settlers have enabled them to intimidate Palestinian farmers, with settlers maiming and murdered them in an effort to convince those who remain to leave the occupied territories. The Kushner family, through the KFF entity, has been very successful, because 400,000 Palestinians no longer live in the OPT, and no longer own the 49,000 homes that they used to occupy before settlements sprung up about 40 years ago—that's when the Bet El settlement was founded. Violation of these criminal statutes is all detailed in this lawsuit, *see* i.e. Compl. at ¶¶ 112, 116, 126, 128.

The issue of proximate cause in the context of similar facts has been litigated in this judicial district, and it appears that the Plaintiffs have satisfied their burden of prof. Their obligation of course is to link up contributions made to pro settlement U.S. based 501(c)(3) entities like the KFF, which funds are then transferred through the funnel entity to the Israeli army and to settlements like Bet El to fund the criminal conduct described herein. As explained herein, Bet El and the other hundred settlements in the West Bank

---

[1] http://www.nbcnews.com/news/world/what-price-tag-behind-israeli-extremist-movement-n401896

couldn't have survived without these funds, especially after the government in 1992 banned all charitable donations to settlements. Treasury regulations provide that no transfers can occur overseas if they violate a country's public policy or legislation like Israel's money laundering statute.

The flow of funds starts with contributions to the 501(c)(3)'s based in the U.S., which proceeds are then sent to the Israeli army, and to settlements. Jewish only citizens in the settlements are then armed with sophisticated military hardware, and after stealing Palestinian property, Israeli army members hired by the settlements surround and protect the new settlements, thus condoning the theft of Palestinian private property. Based on Treasury regulations, it is obvious that charitable donations cannot be sent abroad to steal or confiscate private property, or to finance arms trafficking, ethnic cleansing, and genocide. In stark contrast, the Justice Department has repeatedly indicted local armed militia groups located in Western United States intent on occupying private U.S. private property.

The records relied upon by the Plaintiffs are the annual income tax forms filed by 501(c)(3) entities like the Friends of the Israeli army or the Friends of Bet El and KFF. In sum, there is no basis to grant this motion to dismiss, and in the words of Judge Collyer in *Biton II* "Defendants argue that the Court would be required ot assess the Israeli Palestinian conflict and the illegality of Israeli's oppressive actions in its occupation of the West Bank and Gaza." 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005)  She thoroughly rejected that argument—on the basis that "*the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*" *Id*. The motion to dismiss can be denied based solely on Judge Collyer's opinions in *Biton I* and *Biton II*, and that of course is what the

Plaintiffs are requesting that this Court do at this juncture. *See "Biton I" (Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004)) *and "Biton II" (Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005)).

TABLE OF CONTENTS

Introduction .................................................................................................................1

Table of Contents .........................................................................................................7

Index of Authorities .....................................................................................................8

Legal Standard ...........................................................................................................11

Argument ...................................................................................................................12

I.      Defendant Kushner Family Foundation Apparently Does Not Understand the Legislative Initiatives Passed by Congress to Deal with the Concept of "Financing Terrorism" ..............................................................................................12

II.     This District Has Rejected Application of the Political Question Doctrine as a Bar to Hearing Similar Claims ....................................................................................15

III.    Other Federal Courts Have Also Held that Claims Based on the ATA or the ATS Do Not Bar a Federal Judge From Hearing Claims Involving Violation of International Norms ........................................................................................20

IV.     Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over 40 Years ............................................................................................................24

V.      The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S. Soil, and Thus There is Sufficient Contact with the United States to Provide Jurisdiction in This Court. ........................................................................................26

VI.     The Complaint Lays Out a Clear Basis for KFF's Liability to the Plaintiffs and its Proximate Cause of Their Injuries ..............................................................30

VII.    The Complaint is Not Predicated Upon Traditional "Acts of War" as Defendants Assert. The Underlying Claim is Based on Fundamental Principals of Tort Law ........................................................................................................38

VIII.   The Act of State Doctrine is Not Applicable to the Case at Bar ....................40

IX.     This Court Has Personal Jurisdiction Over Defendant KFF ..........................41

X.      Plaintiffs Have Standing to Bring This Complaint Against the Defendants, Including KFF ..................................................................................................42

Conclusion ................................................................................................................44

# INDEX OF AUTHORITIES[2]

**CASES:**

Abbas v. Foreign Policy Group, LLC.,
    783 F.3d 1328 (D.C. Cir. 2015)..............................................................................12

Abdullahi v. Pfizer, Inc.,
    562 F.3d 163 (2d Cir. 2009) ..................................................................................25

Abecassis v. Wyatt.,
    704 F.Supp. 2d 623 (S.D. Tex. 2010).....................................................................34

Almog v. Arab Bank, PLC,
    471 F.Supp.2d 257 (E.D.N.Y. 2007) ......................................................................22

Alperin v. Vatican Bank,
    410 F.3d 532 (9th Cir. 2005) ..................................................................................19

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ...............................................................................................11

*Atkins v. Fed. Election Comm'n*
    101 F. 3d 731 (D.C. Cir. 1996)...............................................................................43

*Baker v. Carr,
    369 U.S. 186 (1962) ...................................................................................16, 18, 19

Balintulo v. Daimler AG,
    727 F.3d 174 (2d Cir. 2013) ...................................................................................27

*Biton v. Palestinian Interim Self-Government Authority,
    310 F. Supp. 2d 172 (D.D.C. 2004) ("Biton I") ..................................1, 5, 6, 15, 17, 44

*Biton v. Palestinian Interim Self-Government Authority,
    412 F. Supp. 2d 1 (D.D.C. 2005) ("Biton II")..........................1, 5, 6, 15, 16, 17, 24, 44

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................11, 12

Beneficial Nat'l Bank v. Anderson,
    539 U.S. 1 (2003) ...............................................................................................11,

Cf. hinder v. Portocarrero,
    963 F.2d 332, 332 (11th Cir. 1992) .........................................................................23

---

[2]    *Asterisks identify those authorities on which Plaintiffs chiefly rely.

Doe I v. State of Israel,
    400 F. Supp. 2d 86 (D.D.C. 2005) ..............................................................17

*Doe v. Exxon Mobil Corporation,
    69 F.supp3d 75 (D.D.C. 2014) ................................................20, 28, 29, 40

Estate of Klieman v. Palestinian Auth.,
    424 F. Supp. 2d 153, 162 (D.D.C. 2006)....................................................16

Filartiga v. Pena-Irala,
    630 F. 2d 876 (2d Cir. 1980) ..............................................................21, 26

Halberstam v. Welch,
    705 F.2d 472 (D.C.Cir. 1983)....................................................................42

*In re: South African Apartheid Litigation,
    617 F. Supp.2d 228 (S.D.N.Y. 2009) .......................................21, 24, 25, 26

Japan Whaling Ass'n v. American Cetacean Society,
    478 U.S. 221 (1986) ...................................................................................19

Kadic v. Karadzic,
    70 F.3d 232 (2d Cir. 1995) ..................................................................19, 21

*Kiobel v. Royal Dutch Petroleum Co.,
    133 S.Ct. 1659 (2013) ...........................................................26, 27, 28, 29

Klinghoffer v. S.N.C. Achille Lauro,
    937 F.2d 44 (2d Cir. 1991) ........................................................................24

*Linde v. Arab Bank
    97 F.Supp.3d 287 (E.D.N.Y. 2015) .......................................12, 13, 21, 22

Louisville & Nashville R. Co. v. Motely
    211 U.S. 149 (1908) ...................................................................................12

Mamani v. Berzain,
    654 F. 2d 1148, (11th Cir. 2011) .............................................................23

Morris v. Khadr,
    415 F. Supp. 2d 1323 (D.U. 2006) ............................................................39

Oneida Indian Nation of N.Y. v. County of Oneida,
    414 U.S. 661 (1974) ...................................................................................12

Owens v. BNP Paribas S.A.,
   2017 WL 394483 (D.D.C. Jan. 27, 2017)......................................13, 33, 34, 35, 36, 37

Public Citizen v. National Highway Traffic Safety Society,
   489 F. 3d 1279 (D.C. Cir. 2007)...................................................................................43

*Sokolow v. Palestine Liberation Organization,
   583 F.Supp.2d 451 (S.D.N.Y. 2008) .....................................................................24, 38

Sosa v. Alvarez-Machain,
   542 U.S. 692 (2004) ..............................................................................................25, 26, 27

Steel Co. v. Citizens for a Better Env't,
   523 U.S. 83 (1998) ........................................................................................................12

Strauss v. Credit Lyonaise S.A.
   925, F.supp.2d 414, 433-34, (EDNY 2013) ..........................................................31, 32

Whiteman v. Dorotheum GmbH & Co. KG,
   369 U.S. 186 (1962) ...................................................................................................18, 19

Wultz v. Islamic Republic of Iran,
   755 F. Supp. 2d 1, 22 (D.D.C. 2010)......................................................................30, 31

**STATUTES AND RULES:**
18 U.S.C. § 960..........................................................................................................2, 3, 14
18 U.S.C. § 1952.................................................................................................................14
18 U.S.C. § 1956..........................................................................................................2, 3, 30
*18 U.S.C. § 2331.............................................................................................14, 35, 36, 37, 38
18 U.S.C. § 2336.................................................................................................................38
18 U.S.C. § 2339A.............................................................................................................34
18 U.S.C. § 2339B.............................................................................................................34
*18 U.S.C. § 2339C .........................................................................2, 3, 12, 13, 14, 15, 32

**Legal Standard**

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Plausibility requires pleading facts, as opposed to conclusory allegations, and must rise above the mere conceivability or possibility of unlawful conduct that entitles to pleader to relief. *Id*. at 678-79. A complaint must be "factually suggestive." *Twombly*, 550 U.S. at 557 n.5. A claimant must provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007) (citations and ellipsis omitted). The Court emphasized that a complaint must contain a "statement of circumstances, occurrences, and events in support of the claim presented" and not mere conclusory statements. *Id*. at 556 (citing 5 Wright & Miller, Federal Practice and Procedure § 1202, at 94-95 (2004)). Although a claimant need not set out in detail the facts underlying his claim, Fed. R. Civ. P. 8(a)(2) "still requires a 'showing' . . . of entitlement to relief." *Id*.

When determining whether a claim arises under federal law, a court will "examine the 'well pleaded' allegations of the complaint and ignore potential defenses: '[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution.'" *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) (quoting

*Louisville & Nashville R. Co. v. Motely*, 211 U.S. 149, 152 (1908). A federal court lacks

jurisdiction over a claim involving federal law "only when the claim is 'so insubstantial,

implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid

of merit as to not involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 89 (1998) (citing *Oneida Indian Nation of N.Y. v. County of Oneida*, 414

U.S. 661, 666 (1974)). "The test for dismissal is a rigorous one and if there is any

foundation or plausibility to the claim, federal jurisdiction exists." 13D Wright & Miller

§ 3654, pp. 244-45.

The D.C. Circuit has recognized that "[a] well-pleaded complaint 'may proceed

even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'"

*Abbas v. Foreign Policy Group, LLC*, 783 F. 3d 1328 (D.C. Cir. 2015) (quoting *Twombly*

at 556). One of the reasons why, is that the Defendant always has an additional remedy to

pursue before trial, i.e. if the complaint survives a motion to dismiss, a defendant may

still move before trial for summary judgment under Rule 56. *Id*. Thus, it is difficult for

the Defendant to assert prejudice at this early stage in the litigation.

## **ARGUMENT**

I.   **Defendant Kushner Family Foundation Apparently Does Not Understand
     the Legislative Initiatives Passed by Congress to Deal with the Concept of
     "Financing Terrorism"**

As detailed in *Linde v. Arab Bank PLC*, 384 F. Supp 2d 771, 582 (E.D.N.Y.

2005), 18 U.S.C. § 2339(a) provides that "whoever provides material support or

resources knowing or intending that they are to be used in preparation or in carrying out

various federal crimes, or attempts or conspires to do such an act shall be guilty of a

crime." *Linde* at 582. What the KFF fails to appreciate is that section 18 U.S.C. § 2339(c)

specifically addressed the concept of "financing of terrorism" and what that actually can

entail. It appears that KFF officials are oblivious to the means and methods of financing

terrorism. The *Linde* Court noted that a financier of terrorism is an individual or

organization who

> "by any means, directly or indirectly, unlawfully and willfully provides or *collects*
> *funds with the intention that such funds be used*, or with the knowledge that such
> funds are to be used in full or in part in order to carry out . . .  (B) any other act
> intended to cause death or serious bodily injury to a civilian, or to . . .  intimidate
> a population . . . shall be [guilty of a crime]."

*Linde v. Arab Bank* at 582, (quoting 18 U.S.C. 2339C(a)(1) (emphasis added). So

as is obvious, section 2339(c) specifically focuses on activity like "collecting funds" with

the intention to use that financing to intimidate a civilian population. What the KFF

similarly does not understand, is that based upon 18 U.S.C. 2339C(a)(1), a terrorist act

may "constitute an offense under the statute *without a showing that the funds were*

*actually used to carry out the predicate act of terrorism*." *Linde* at 582; *see also* 18

U.S.C. 2339(C)(a)(3). What this means in the context of the claims asserted herein, is that

since the Plaintiffs allege the Kushner Family Foundation collected funds with the

intention that the funds would be used by irate settlers or the Israeli army to intimidate

the Palestinian civilian population through illegal means, they can be found liable based

on a violation of 18 U.S.C. § 2339C, which is a predicate act in terms of financing

terrorism. Indeed, the Court in *Owens v. BNP Paribas S.A.* (D.D.C. 2017), a case which

Defendant KFF heavily relies upon in support of its motion, never analyzed 18 U.S.C. §

2339C in its decision—making Defendant's reliance on this case misplaced.

The statute further specifically condemns "any other act intended to cause death

or serious bodily injury to a civilian." Sending funds overseas to fund violence in the

middle east, as should be obvious to the Kushner family, violates 18 U.S.C. § 960, specifically you cannot fund a foreign army. Moreover, KFF apparently doesn't understand that 18 U.S.C. § 1952 bars individuals from traveling throughout America to raise funds to promote violence overseas. As pled herein, KFF officials solicited funds all over America, including in this District, with the intention that such funds would be used overseas by irate settlers and out of control army soldiers to maim and murder Palestinians. It can be assumed that engaging in arms trafficking and purchasing body armor, sniper scopes, M16's, would be used by the irate settlers to maim and murder their Palestinian neighbors. And again to repeat the obvious, even if the funds were not actually used to carry out the predicate acts of terrorism alleged (arms trafficking, money laundering, maiming and murdering civilians), the very act of providing the funding itself on the part of the KFF may constitute an offense under the statute.

So the Defendant's argument that the funds that were sent by the KFF were not actually used to carry out maiming and murdering Palestinians is irrelevant based un section 18 U.S.C. 2339(C)(a)(1). It also makes moot any issue about whether some of the funding that went to the Bet El settlement or the Israeli army were for charitable purposes. Of course, it is difficult to conceive how building firing ranges in the Bet El settlement, financing a "Jewish-only" military academy there, and the setting up of sniper schools can qualify under Treasury regulations as "charitable activity."

To reiterate, international terrorism, 18 U.S.C. § 2331 encompasses activity such as "providing material support to an organization" or individual that is hell bent on maiming innocent civilians, stealing their property, murdering them, and engaging in genocide and extra judicial killings. So this Court, in order to grant KFF's motion to

dismiss, has to conclude that the financing provided by the Kushner family did not satisfy

the requirements of section 2339(C). Moreover, the Plaintiffs in the lawsuit have

repeatedly identified why KFF officials had to know (*scienter*) that the funds they were

transferring overseas would be used to maim and murder Palestinian civilians. *See* i.e.

Compl. ¶¶ 22(ii), 46, 50, 68, 96, 100, 109, 112, 114, 116, 117, 128, 138. There have been

numerous articles written in the New York Times and Haaretz explaining how U.S. based

tax exempt entities abuse the tax code.

II.   **This District Has Rejected Application of the Political Question Doctrine as a Bar to Hearing Similar Claims**

Numerous Courts have held, contrary to the Defendant's memorandum, that the

political question doctrine has no application in similar circumstances. That is why

Defendant KFF has ignored a number of relevant opinions issued in this District that can

be used as a basis for denying their motion to dismiss. In *Biton I* and

*Biton II*, Judge Collyer opined that the Court was competent to rule on similar claims

made herein. 412 F.Supp.2d 1 (D.D.C. 2005). Judge Collyer analyzed both the political

question doctrine and act of state doctrine at length, and rejected the Defendant's

argument that having the case go forward would violate those doctrines.

Citations from her opinions significantly bear on the issue before the Court, i.e.

disposition of the Defendants' motion to dismiss for lack of subject matter jurisdiction.

As Judge Collyer pointed out in *Biton II*: "Defendants argue that the Court would be

required 'to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive

actions in its occupation of the West Bank and Gaza.'" Id. She rejected that argument

because, "Defendants misperceive the status of the case. Plaintiffs complain that

Defendants' actions caused them injury; while the ATA provides jurisdiction for the suit

in federal court, *the basic elements of the claim lie in tort, not in the relations between*

*Palestine and Israel*". Id. at 5-6. (emphasis added). In rejecting the identical argument

advanced in the Defendants' memorandum, Judge Collyer also explained in *Biton II*:

> "'This is a tort suit brought under a legislative scheme that Congress enacted for
> the express purpose of providing a legal remedy for injuries or death occasioned
> by acts of international terrorism.' There is no flaw in this Court's ability to
> address Plaintiff's claims: Congress explicitly committed these issues to the
> federal courts under the ATA. Similarly, the Court has access to 'judicially
> manageable standards for resolving the issues before it,' id., from both existing
> ATA caselaw and traditional tort caselaw.
>
> The 'initial policy determination' involved here has already been made by the
> U.S. Congress: Americans injured by terrorist acts can sue their attackers in U.S.
> courts and the Court can manage this case to resolution of Defendants' alleged
> liability without 'expressing lack of the respect due coordinate branches of
> government.' Baker, 369 U.S. at 217. The Fifth and Sixth factors from Baker v.
> Carr do not apply because a decision in this individual case will have no
> consequences concerning 'political decisions already made' and will raise only
> the question of Defendants' alleged liability regarding this single bombing of a
> bus. Thus, nothing in Baker v. Carr counsels against having this case proceed."

Biton II, 412 F. Supp. 2d at 6. Similar to the holding in *Estate of Klieman v.*

*Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006), the tortfeasors named herein

"have made no attempt to distinguish any of these prior decisions in their moving

papers." Just as in *Biton II*, a decision on Plaintiffs' claims alleged herein can be resolved

by this Court by deciding the liability of the Defendant tortfeasors, thus it would have no

consequences concerning "political decisions already made." *Biton II* at 6. As this Court

can take judicial notice of, the State Department reiterated the political decisions that

have been made by at least 12 Presidents, i.e. settlement activity is illegal, and has been

condemned by the U.S. State Department for decades. Thus, there should be no fear that

any political decisions already made would be contradicted by allowing this lawsuit to go

forward.

The Plaintiffs respectfully submit that the Motion to Dismiss can be denied based solely on the holdings in *Biton I* and *Biton II. See Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005)*. The bottom line is that it would be judicial error for this Court to grant the motion to dismiss based on Judge Bates' holding in *Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005). They are two entirely different cases—first, the *Doe* Plaintiffs actually sued the state of Israel itself, and they never alleged that Defendant tortfeasors like KFF were engaging in a money laundering scheme on U.S. soil designed to rid the West Bank of all non-Jews. *Id.* That is clear evidence of financing war crimes, for example, ethnic cleansing. Thus Kushner family members can properly be referred to as collaborators under both the U.S. and Israeli war crimes statute.

All Defendants, including Defendant KFF, know that the fulfillment of that goal—ridding the West Bank of all non-Jews—necessarily entailed massive ethnic cleansing and genocide. Without the funding provided by the Kushner Family Foundation, (for example, $315,000 from 2011 to 2013 to FIDF alone), U.S. based tax-exempt entities and donors such as the Kushner family members, belligerent settlers would never have had the financial resources to accomplish that job. *See* Compl. at ¶100. Evidence thereof is the fact that equipping a fifty-member militia unit with body armor or Kalashnikovs or M-16s is an expensive endeavor. None of the settlements have that amount of money lying around to purchase military hardware and fund a militia unit. Sniper scopes cost a fortune, along with body armor, which the settlements couldn't afford. The solution—secure the necessary funding for a local militia unit from pro occupation tax-exempt entities like KFF's financial backing.

Defendant urges this Court to accept the argument that suing organizations like Defendant KFF that are financing war crimes abroad including arms trafficking in this manner will somehow impact the ability of the political branches to function. Besides being an absurd argument to embrace based on relevant case law in this District, such a decision would likely violate provisions contained in the *International Covenant on Civil and Political Rights*. As this Court surely realizes, foreign plaintiffs should be able to access U.S. court to have legitimate property and war crimes claims adjudicated, especially where they complain about ethnic cleansing and genocide. These are classic war crimes, which violate international norms recognized by the world at large. Thus, if foreign plaintiffs are denied that right, this Court could possibly be violating relevant provisions contained in the International Covenant on Civil and Political Rights, a treaty that both Israel and the U.S. are parties to. The irony is that by doing so, they would be protecting U.S. citizens who every April 15th defraud the IRS of significant revenues.

Defendant KFF further argues that having the Court decide the issues raised in the Complaint would violate the standards set forth in *Baker v. Carr* as to issues best left to the political branches of government. 369 U.S. 86 (1962). The Court pointed out in *Baker*, however, that "[a]n action does not lie beyond judicial cognizance solely because it raises questions touching upon foreign relations." 369 U.S. 186 (1962). The Second Circuit noted that "[w]ith respect to the first *Baker* test, while foreign policy is committed in the first instance to the Executive, tort claims against foreign countries and individuals under the law of nations, as well as issues of sovereign immunity, *are constitutionally committed to 'none other than our own Judiciary.'*" *Whiteman v. Dorotheum GmbH &*

*Co. KG*, 431 F.3d 57 (2d. Cir. 2005) (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). *See also Alperin v. Vatican Bank*, 410 F.3d 532, 551 (9th Cir. 2005).

As for the second and third *Baker* tests, just like in *Whiteman*, they are met by applying not only the traditional adjudication process, but also through "the universally recognized norms of international law [invoked by the Plaintiff]." *Whiteman*. at 77. The Second Circuit noted, for example, that the "FSIA "'provide[s] judicially … manageable standards for adjudicating suits' and 'obviate[s] any need to make policy decisions of the kind normally reserved for non judicial discretion.'" *Id*. (citing *Kadic*, 70 F.3d at 249). As further outlined in *Whiteman*, "[t]he fourth and sixth tests are basically coterminous with the fifth, that they involve cases where an exercise of jurisdiction, although not *per se* outside the judiciary's authority, would somehow contradict actions taken by the political branches; [the Court] will therefore discuss them together." *Id*.

It is important to reiterate that a ruling in this case would in no way contradict prior decisions taken by the other political branches—executive or legislative. *Id*.; *see also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221 (1986) (the Supreme Court for example unanimously declined to dismiss as non-justiciable a claim that the Secretary of Commerce had violated federal statutory law by refusing to certify that Japan's whaling practices were undermining the effectiveness of an international fishing conservation program). If anything, this case serves to reinforce fundamental principles of international law approved by 12 American Presidents and at least 10 Secretaries of State and the United Nations—fundamental principals of international law have criminalized ethnic cleansing, genocide, and the denationalization of a civilian population as horrific war crimes. Both the Justice and State Departments have made it

abundantly clear that U.S. individuals who finance war crimes and/or arms trafficking abroad should be criminally prosecuted to the full extent of the law. That should include members of the Kushner family who, through the KFF, have financed the Israeli army and belligerent settlers intent on ethnically cleansing the OPT of all Palestinians.

As noted by this Court in *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 35, 75 (D.D.C., 2014), when determining if the political question doctrine bars a suit from moving forward, "[e]vidence of the State Department's views as to this issue are accorded 'substantial weight' because the effect of litigation on the foreign policy interests of the nation is 'at the heart of the Department's expertise.'" *Doe v. Exxon* at 92. Exxon did not succeed on its motion to dismiss on political question doctrine grounds for the same reason KFF's motion should fail here—"[i]n short, there is an insufficiently recent and definite statement from the Executive that this case interferes with the foreign policy of the United States." *Id*. If anything, the case for denying KFF's motion to dismiss is stronger here than it was in *Doe v. Exxon*, as the Executive branch, including the State Department, and even Israeli official government policy have all condemned the settlement enterprise described in the complaint.[3] Moreover, the State Department has not filed a declaration of interest to register its opposition to this lawsuit with this Court.[4]

III. **Other Federal Courts Have Also Held That Claims Based on the ATA or the ATS Do Not Bar a Federal Judge From Hearing Claims Involving Violation of International Norms**

It is not just Judge Collyer and the D.C. Circuit that have decided to reject the argument that Courts lack subject matter jurisdiction to entertain claims based on

---

[3] *See* Compl. ¶¶ 52, 67, 68, 75.
[4] (Through Plaintiffs' attempts to serve Ambassador Friedman, the State Department's legal department has been put on notice of this lawsuit).

violation of international norms. Other Courts have decided to reject the application of the Political Question doctrine based on similar allegations made herein. For example, in *Linde v. Arab Bank*, Judge Gershon of the Eastern District of New York rejected the invocation of the political question to bar her from hearing similar claims made herein. *Linde v. Arab Bank*, *PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005).

She analyzed the political question doctrine at length, and rejected the Defendant's argument for dismissal premised on the fact that the ATS statute empowers courts to hear a dispute between foreign nationals concerning extra territorial conduct. *Id.* As Judge Gershon observed, this argument was unavailing to the Defendant. Foreign plaintiffs sued foreign defendants for extra territorial conduct in both *Filartiga v. Pena-Irala*, 630 F. 2d 876 (2d Cir. 1980) and *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995). *Id.* And Judge Gershon remarked further that indeed "a recent 2nd Circuit case upheld the availability of aiding and abetting liability for conduct of foreign defendants in South Africa." Judge Gershon was referring to the case known as *In re S. Apartheid Litigation*, 56 F. Supp. 3d 331 (S.D.N.Y. 2014).

In *Linde*, just like the Plaintiffs herein, the Defendant Bank had, through the provision of financial services to groups that engaged in terrorist activity, knowingly and intentionally aided and abetted violent criminal attacks on civilians in Israel in violation of international law. The only difference between those allegations and the allegations pled herein is that instead of a bank providing financial support for terrorist activity (intimidating a civilian population), it is Defendant KFF's donations and provision of funds that enable violent settlers and militia groups to engage in attacks on civilians and steal private property, among other crimes. In fact, a horrific arson incident which killed

an entire Palestinian family occurred in in the OPT, and violent settlers have been criminally prosecuted for that terrorist act. *See* Compl. at ¶ 5(a). The Plaintiffs herein, just like the Plaintiffs in *Linde*, have alleged that they've been injured by the Defendant KFF providing substantial financial assistance to various settlements and to the Israeli Army to promote that criminal activity.

Defendants rely significantly on the *Baker v. Carr* holding to justify dismissing the lawsuit based on non-justiciable political questions. Much like the Defendants herein, the Defendant in *Linde v. Arab Bank* laid out the elements that identify a non-justiciable political question. Judge Gershon then concluded, however, that "these elements do not exist in this case, in particular no action by a coordinate branch of the us government is involved here." *Id*. She also pointed out that "it ignores government concerns that charitable donations purportedly for humanitarian services are being funneled to terrorist entities." *Id*. That's exactly what the KFF has been doing for the last 20 years, i.e. financing irate settlers and rouge Israeli army soldiers from maiming and murdering innocent Palestinian civilians.

Judge Gershon went on to point out that as set forth in *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), the three theories of international law violations asserted in the case were all based upon principles to which the United States has expressed strong adherence. *Id*. at 318. Just as the Plaintiffs alleged in *Almog*, U.S. senior officials like Senator Leahy have expressed strong adherence to international law conventions, like the Geneva Convention. Senator Leahy has, among others, specifically condemned the extra judicial killings (the Dawabshe family was literally burned to death by irate settlers like those described in this complaint). *See* Compl. at ¶ 5(a). And senior

State Department officials have repeatedly condemned not only extra judicial killings, but settlement expansion and the violence it promotes. A recent State Department report reveals that entities like the Kushner Family Foundation are still financing wholesale violence in the Occupied Territories. The Court should take judicial notice of the fact that President Clinton criminalized this activity 22 years ago. *See* President Clinton's 1995 Executive Order 12947.

Moreover, successful prosecution of this lawsuit will, if anything, reinforce U.S. public policy concerns about settlement expansion, the frustration of U.S. foreign policy objectives, (see JASTA legislation), and encouraging criminal activity like money laundering, arson and arms trafficking. As this Court knows, money-laundering and arms trafficking are prosecuted on a daily basis by the Justice Department. As recited in *Mamani v. Berzain*, 654 F. 2d 1148 (11th Cir. 2011), the claims alleged therein simply required the court to evaluate the lawfulness of the conduct of the Defendants/tortfeasors named therein. For example, the claims in *Mamani*, such as extra judicial killings (*see* i.e. reference to the arson attack that murdered the entire Dawabshe family) occurring in Bolivia by government officials, did not require the Court to decide the legitimacy of U.S. executive branch foreign policy decisions. *Mamani* at 1151 (quoting *Cf. hinder v. Portocarrero*, 963 F.2d 332, 332 (11th Cir. 1992)).

Just like here, the claims asserted by the Plaintiffs (genocide, denationalization of a civilian population and ethnic cleansing) do not require this court to decide the propriety of the U.S. executive branch's foreign policy decisions as they pertain to the Middle East. Moreover, Congressional concern, as is evident by the passage of the JASTA legislation, focused on international terrorist activity and the funding thereof,

which frustrates U.S. foreign policy objectives. Every time the Kushner Family, through the KFF, sends millions of dollars overseas to fund settlement expansion and arms trafficking, they are specifically frustrating U.S. foreign policy objectives and promoting violence in the Middle East.

IV.    **Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over 40 Years**

A case remarkable on its facts to the case *sub judici*, is *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008). The *Sokolow* plaintiffs alleged that the defendants therein have carried out and inflicted violent physical attacks on an innocent civilian population in order to terrorize and intimidate them. That is the identical claim which has been alleged herein. The court in *Sokolow*, quoting *Estates of Ungar v. Palestinian Authority*, 315 F. Supp. 2d 15 (D.R.I. 2004), noted that "[t]he [Defendants] PA and PLO repeatedly fail to realize that the nonjusticiability doctrine is one of political questions and not political cases." *Id*. at 456.

The Defendants raise many of the same foreign policy concerns as the PLO did in *Sokolow* and *Klinghoffer,* with the Second Circuit observing that "[*t]he fact that the issues before [the court] arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question*." *Id.* (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)). *See also Biton* at 6, noting that "the ATA provides jurisdiction for suits in federal courts, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*."

In addition, federal courts, such as the Second and Ninth Circuits have recognized tort liability for torture, genocide, and war crimes committed by both state and non-state actors. *In re S. African Apartheid Litig*, 617 F. Supp, 2d 228, 248-49 (S.D.N.Y. 2009)

The Court has also in *Apartheid Litig.* held "that a court's jurisdiction to hear claims under the ATCA is not limited by 'the focus of the injury.'" *Id*. at 247 (quoting *In re Marcos*, 978 F. 2d 493, 500 (9th Cir. 1992). A tort that violates customary international law will be recognized under the ATS if "the norm alleged (1) is defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*. (2) is based upon a norm of international character accepted by the civilized world, and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Apartheid Litig.* At 248 (quoting *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009). As this Court knows, genocide and ethnic cleansing are classic war crimes, and violate norms of international character accepted by the civilized world, specifically including Israel.

Plaintiffs also allege the international crime of denationalization, which has been recognized as an actionable tort basis for jurisdiction under the ATCA. *See Apartheid Litig.* at 252 ("A state actor commits arbitrary denationalization if it terminates the nationality of a citizen either arbitrarily or on the basis of race, religion, ethnicity, gender, or political beliefs"); *see also* the 1907 Hague Convention Respecting the Laws and Customs of War on Land (individuals have a right to retain their citizenship, even in the fact of a hostile invasion). The Plaintiffs have alleged herein that state actors like out of control Israeli soldiers and belligerent settlers have committed arbitrary denationalization based on race, religion, ethnicity, and political beliefs; all made possible by Defendant KFF's donations and funding. *See* i.e. Compl. ¶116, 117, 126, 128.

V.   **The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S.
     Soil, and Thus There is Sufficient Contact with the United States to
     Provide Jurisdiction in This Court**

Defendant KFF argues the Plaintiffs' ATS claim lacks sufficient contact with the

United States Under *Kiobel*, making essentially the same arguments as the Defendants

did in *Apartheid Litigation*, re: that the Court does not have jurisdiction to address tort

claims based on extraterritorial events. Although the physical injuries complained of

herein, i.e. maiming and murdering Palestinian civilians, occurred outside the U.S., this is

no bar to jurisdiction. *See Apartheid Litig.* at 246. As detailed in the Complaint, pro-

occupation U.S. donors and 501(c)(3) officials such as Defendants KFF have conspired

on U.S. soil for approximately 30 years to finance horrific criminal activity—maim and

murder Palestinians, steal their property, engage in ethnic cleansing and genocide. "It is

not extraordinary for a court to adjudicate a tort claim arising outside of its territorial

jurisdiction." *Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980). And the reality is

that even today the Kushner Family is financing acts of international terrorism. *See State

Department's Country Report on Terrorism for 2016*.

As referenced by Defendant KFF, the ATS "permits federal courts to 'recognize

private claims [for a modest number of international law violations] under federal

common law.'" KFF's Motion to Dismiss at 28, *quoting Sosa v. Alvarez-Machain*, 542

U.S. 692, 732 (2004). The Supreme Court in *Sosa* noted "that no development of law in

the last two centuries has categorically precluded federal courts from recognizing a claim

under the law of nations as an element of common law," but that "there are good reasons

for a restrained conception of the discretion a federal court should exercise in considering

such a new cause of action." *Sosa* at 692. In explaining what it meant, the Court further

elaborated that "[w]e think it is correct, then, to assume that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Sosa* at 725. In its ruling the Court added that "we think courts should require any claim based on present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized[5]" as what constitutes the law of nations. *Id.*

Indeed, Plaintiffs meet this burden laid out by the Court in *Sosa*, as they have clearly alleged with great specificity the present-day law of nations violations in the Complaint that rest on a norm of international character accepted by the civilized world, such as genocide, ethnic cleansing, arms trafficking, and murder. *See, i.e.*, Compl. at ¶¶ 46, 50. Plaintiffs thus clearly meet the jurisdictional test of *Sosa* for claims brought under the ATS. In addition, defendant KFF wrongly asserts that Plaintiffs' ATS claims are barred by application of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) and *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013). As Defendant KFF points out, there is generally a "presumption against extraterritorial application of federal statutes," Defendant KFF acquiesces in the conclusion that "[t]he Supreme Court allowed that certain 'claims [may] touch and concern the territory of the United States . . . with

---

[5] The "18th century paradigms" referenced by the Court is that "the reasonable inference from history and practice is that the ATS was intended to have practical effect the moment it became law, on the understanding that the common law would provide a cause of action for the modest number of international law violations thought to carry personal liability at the time: offenses against ambassadors, violation of safe conducts, and piracy"—international norms that were specifically accepted throughout the civilized word at the end of the 18th century. *Sosa* at 692.

sufficient force to displace the presumption against extraterritorial application." Defendant's Motion to Dismiss at 28-29, *quoting Kiobel* at 1669.

Judge Lamberth noted in *Doe v. Exxon Mobil Corp.* that under *Kiobel*, "If plaintiffs have sufficiently alleged conduct within the United States that is actionable under the ATS, *their ATS claims are not defeated on the basis of the presumption against extraterritoriality.*" *Doe v. Exxon* at 96 (emphasis added). As the Court noted in denying Defendant Exxon Mobil Corp.'s motion to dismiss, the plaintiffs therein "allege that EMC officials based in the United States 'made and implemented the decision[s],"–in this case, whom KFF decided to provide funding to, such as the FIDF—with "Plaintiffs mak[ing] a number of allegations regarding support provided by Exxon . . . (alleging Exxon provided material support to its security personnel by, for example, constructing facilities, *providing funding for weapons, providing supplies and equipment, and paying for the services of consultants in training and equipping the personnel*)." *Id*. (emphasis added). This is t the identical conduct Plaintiffs allege against KFF—i.e. providing the funding for weapons, sniper scopes, supplies, training, equipment, and even establishing sniper schools and firing ranges.. *See* i.e. Compl. at ¶¶ 68, 69, 96, 100, 135.

The Complaint herein goes a step further than that of *Doe* v. *Exxon* in complying with the requirements of *Kiobel*. The Plaintiffs have alleged herein that: a) KFF's monetary support comes from the United States. *See Doe* v. *Exxon* at 96; b) that the donors involved are U.S. citizens; and c) there is an ongoing nationwide solicitation effort which aggregates to a $2 billion monetary transfer to illegal settlements every year. Finally, all 501(c)(3)'s like the KFF have to file annual reports with the IRS—they are called 990s. By failing to detail the criminal activities that they finance abroad,

specifically arms trafficking and money laundering, they have repeatedly committed income tax fraud. The Treasury Department has repeatedly condemned any and all charities that commit income tax fraud.

What Defendant further ignores in its brief, is that KFF's conduct directly provided the funding and support required for the violation of numerous present-day laws of nations, and thus satisfy the requirements of international acceptance outlined in *Sosa* right here on U.S. soil. These include: Money laundering, providing financing for the commission of internationally accepted crimes like genocide, ethnic cleansing, denationalization, murdering and maiming, theft of private property, and arms trafficking. *See* Compl. ¶¶ 22, 34, 46, 50, 96, 100, 112, 116, 117, 169, 171. All of these actions financed by the KFF, as alleged in the Complaint, constitute violations of international law that occurred on U.S. soil—sufficiently meeting the "touch and concern" requirements of *Kiobel*, as explained in great detail by the Court in *Doe* v. *Exxon Mobil Corp.*, 69 F. Supp. 3d at 96. Defendant's arguments to the contrary are thus unavailing to warrant dismissal of the claims brought under the ATS.

Re: the "touch and concern test," Defendant KFF engaged in conduct on U.S. soil approximately 30 years ago, when it initially filed for 501(c)(3) status right here in Washington, D.C. Securing that tax exempt status made it possible for KFF to solicit funds on U.S. soil destined to be sent overseas to promote criminal activity. Pro occupation donors not only made settlement expansion ant he theft or private Palestinian property possible, they actually got a bonus—tax deductions.

VI.    **The Complaint Lays out a Clear Basis for KFF's Liability to the Plaintiffs and its Proximate Cause of Their Injuries**

Defendant KFF argues that the complaint should be dismissed because "there is no allegation that KFF itself participated in or made *direct* transfers to enable any terrorist activity," and that there is thus no proximate cause for Plaintiffs' injuries. Defendant's Motion to Dismiss at 23. This, however, is a misreading of the complaint. *See* Compl. ¶50: "Between 2011 and 2013, KFF provided $315,000 to Friends of the Israeli Army [FIDF], on whose board Jared Kushner serves."; ¶46: FIDF uses its funds "to support extensive criminal activity, i.e. arson, arms trafficking, murdering and maiming Palestinians, theft of private property, ethnic cleansing, and genocide."; ¶100: "All Defendants knew what their funding would achieve..."; ¶128: "KFF officials similarly collaborated in financing war crimes by continuing to raise and transfer massive amounts of funds to the Israeli army and to belligerent settlers"; ¶171: without KFF's funding "the criminal activities described herein [money laundering, arms trafficking, genocide, theft of private property] would never have taken place."

As recited in the Complaint, the U.S. based 501(c)(3)'s, that receive these donations, including KFF, hold the funds for 24 hours before sending them off in order for their donors to receive favorable tax write-offs. As explained earlier, 501(c)(3)'s who engage in such activity act as temporary custodians of these funds, which entities have been deemed by the Treasury Department to be "funnels," i.e. they're not engaged in charitable conduct—they simply collect funds and send them overseas to promote criminal conduct. That is classic money laundering activity, see 18 U.S.C.§ 1956.

Although Defendants cite *Wultz v. Islamic Republic of Iran* in support of their motion, its application in fact has the opposite effect than KFF intends. In *Wultz*,

proximate causation was found because the complaint "alleged a flow of money *directly* into the coffers of PIJ." 755 F. Supp. 2d 1, 22 (D.D.C. 2010). The Complaint herein meets this same requirement as the Complaint in *Wultz*, noting that KFF directly provided funding to the Friends of the Bet El Settlement and the FIDF. KFF officials knew that those recipients would be "unlikely to use wired moneys for any other purpose" besides financing the war crimes alleged in the Complaint, such as maiming and murdering Palestinians. *See Wultz* at 22; Compl. at ¶¶ 34, 46, 50.

An application of *Wultz* to the Complaint herein therefore warrants denial of Defendant's Motion. These sections of the Complaint also clearly allege that KFF had the requisite knowledge and actus reus required for both the ATS and ATA claims, despite KFF's attempted arguments to the contrary. *See* Compl. at ¶¶ 34, 46, 50, 96, 100, 117, 138, 171; ("This activity [violations of international law] could not have occurred without . . . the financial assistance provided by" KFF; "All Defendants knew that, without those funds [provided by Defendants], the settlements would have been abandoned thirty years ago."). Defendant's arguments that these facts are not adequately pled in the complaint are thus unavailing. Plaintiffs however have demonstrated that these tax-exempt entities finance criminal activities abroad, consistent with the report that the State Department issued in January 2016. *See State Department's Country Report on Terrorism for 2016.*[6]

KFF's repeated arguments against a finding of proximate cause for Plaintiffs' injuries are akin to saying there should be a requirement imposed on the Plaintiffs to trace specific wire dollar transfers to specific physical attacks on innocent Palestinian civilians. That requirement has been repeatedly rejected by our federal courts. *See Strauss v. Credit*

---

[6] https://www.state.gov/j/ct/rls/crt/2016/index.htm

*Lyonnais S.A*, 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013). ("Plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter.") Similarly, it would be impossible to trace specific dollars to specific attacks on our facts for two reasons: First, Defendant KFF has been executing wire transfers for at least several decades—that probably means we are looking at 10,000 wire transfers. Second, it is obvious that KFF has no control over how their funds are used—for example, purchasing sniper scopes and M16s. As pointed out earlier, section 2339(C) doesn't even require that the funds are actually used for these purposes. Failing to control funds sent overseas violates a number of Treasury Department regulations, and homeland security regulations, i.e. funds transferred overseas should not fall into the hands of individuals who plan to harm the U.S.

Based on the allegations made herein, a reasonable juror could conclude that the significant amount of money sent by KFF overseas was a substantial reason why those intent on ridding the West Bank of all non-Jews, belligerent settlers, and rogue Israeli army soldiers were able to finance the horrific terrorist attacks described herein. In fact, the KFF gave the FIDF $315,000 between 2011 and 2013, and over 20 years such continued donations would amount to $3,150,000 to the FIDF. *See* Compl ¶ 22. It also would be obvious to any juror hearing this case, that an annual subsidy provided by the KFF of $100,000+ to the Bet El settlement quite a staggering sum. *See* i.e. Compl. ¶ 107.

Besides the amount of the subsidy, another reason why those funds were so crucial is that the Israeli government as of 1992 had prohibited charitable donations to settlements, which cut off a significant source of income. Likewise, Secretary of State

Baker was assured by Prime Minister Shamir in 1992 [the Baker/Shamir Accord], that no

part of American financial aid would be used to set up new settlements or finance

expansion of existing settlements. As is obvious, the Kushner Family has been violating

that accord every time they wire money overseas to the Bet El settlements to promote

criminal violence. Thus, without the funding from Defendant KFF, the belligerent settlers

and rogue Israeli army personnel described in the Complaint would not have a source of

funding to: a) properly arm and equip local Israeli militia units; b) afford or conduct

training such as that done at sniper schools used to commit the war crimes alleged in the

complaint; and c) build vital infrastructure improvements like electric power grids and

sewage hookups needed for settlement expansion necessitating the theft of private

Palestinian property.

Defendant KFF also relies heavily on the recent case of *Owens v. Paribas S.A.* in

its motion to dismiss. No. Cv 15-1945 (JDB), 2017 WL 394483 (D.D.C. Jan. 27, 2017).

*Owens*, however, has several very key distinctions *vis-à-vis* the present case, which KFF

fails to point out. The *Owens* Plaintiffs were all U.S. nationals injured in 1998 embassy

bombings who sued defendant banks that allegedly processed financial transactions for

terrorist entities. In *Owens*, the defendant bank BNPP was engaging in bank-to-bank

financial transactions. In the present case, we do not have bank to bank transactions or

banks processing transactions, but rather American 501(c)(3)'s like Defendant KFF who

have been directly funding war crimes. The Court dismissed the *Owens* case because it

found that:

> "Even assuming that these facts alone establish that BNPP was illegally
> processing dollar-denominated transactions for Sudan between 1997 and 1998,
> this only establishes BNPP's connection to Sudan, not a connection to any

terrorist group or terrorist activity prior to August 1998—the latter being
necessary to show a predicate violation of § 2339A or § 2339B.
… 'Unlike the fronts . . . [Sudan] [is] not merely a funnel of funds to terrorists.
[Sudan] [is] a recognized sovereign nation with a variety of responsibilities and
pursuing a variety of interests.'"

*Owens* at pg. 22-23 (quoting *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 666 (S.D.

Tex. 2010). Judge Baker found that the *Owens* plaintiffs did not allege "that defendants

knew the ultimate beneficiaries of the financial services would be a terrorist organization

or terrorist," *Id*. at 22 (internal citation omitted). Unlike the *Owens* plaintiffs, the

Plaintiffs named herein have specifically allege that Defendant KFF is a "funnel"

501(c)(3) which finances settlements and organizations like the Israeli Army. They

further allege that they use those funds to commit war crimes such as ethnic cleansing,

genocide, and the maiming and murdering of innocent civilians. *See* Compl. ¶¶ 96, 100,

112, 114, 117.

Ultimately, Judge Baker dismissed the *Owens* plaintiffs' claims because they did

not allege "enough to sustain a sufficiently direct causal connection between defendants'

conduct and the embassy bombings that injured plaintiffs," holding that the complaint

"failed to plausibly allege that the defendant banks had the necessary *scienter* to support

plaintiffs' ATA claims, and because plaintiffs have failed to allege a sufficient causal

connection between the banks' conduct and plaintiffs' injuries, plaintiffs' complaint must

be dismissed." *Owens*. at 23-24. The Court noted that the "Plaintiffs have alleged very

few facts with respect to the time period between the imposition of sanctions against

Sudan in November 1997 and the 1998 embassy bombings." *Owens* at 20.

In the present case, the Plaintiffs have specifically alleged numerous facts to

support their claims, noting the alleged war crimes have not only been occurring for at

least the last several decades, but that they are still ongoing to this day. *See* i.e. Compl. at ¶¶ 125, 131, 145; *see also* the earlier referenced *State Department's Country Report on Terrorism for 2016*. Indeed, unlike the *Owens* plaintiffs, Plaintiffs herein specifically allege that KFF is not only a "funnel" who raises funds in American and then passes those funds on necessary to commit the alleged war crimes, but that KFF officials specifically knew and had the necessary *scienter* that its funds were being used to commit the war crimes in order to and subjugate the Palestinian civilian population by intimidating them through the use of violence. *See* Compl. ¶¶ 50, 68, 96, 100 129, 135. Furthermore, 18 U.S.C. § 2331 defines international terrorism to mean activities that:

> "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State; (B) *appear to be intended—(i) to intimidate or coerce a civilian population . . . and (C) occur primarily outside the territorial jurisdiction of the United States...*"

(emphasis added). The violations of the laws of nations alleged in the Amended Complaint (ethnic cleansing, genocide, theft of private property, murdering and maiming Palestinian civilians, etc.,) certainly fall within the definition of international terrorism as defined in 18 U.S.C. § 2331 above, as Plaintiffs have alleged these war crimes are being used to intimidate and subjugate the civilian population of Palestine in order to steal their private property, expand the settlement enterprise, and ultimately rid the Occupied Territories of all Palestinians. *See* Compl. ¶¶ 87, 117. Accordingly, these Plaintiffs allege facts that are wholly different than the facts relied upon by Judge Baker to reject an aiding and abetting theory in *Owens* (that Defendant bank processed funds in Sudan, and Sudan provided material support to Al Qaeda), but instead assert that KFF knowingly and

directly provided the funds used in the commission of terrorist activity. *See Owens* at 9-10.

Defendant KFF's use of *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), a case similar to *Owens*, is also not applicable to the facts alleged in the Amended Complaint. In *Rothstein*, the defendant bank was dealing with a "truly independent intermediary" to fully process the funds, the nation of Iran. *Owens* at 19. As noted by Judge Baker in his analysis of *Rothstein* in his *Owens* opinion, the Plaintiffs failed to allege "a more concrete connection to indicate that Iran did or was likely to use the money defendants processed to fund terrorist acts, [thus] plaintiffs' injuries were not necessarily a 'natural' consequence of defendant's conduct." *Id*. at 19. Again, here we are not dealing with banks processing financial transactions allegedly used to fund terrorist activities. Here, U.S. based 501(c)(3)'s like Defendant KFF, as clearly alleged in the Amended Complaint, directly provide funding to belligerent settlers and the Israeli Army, who are unlikely to use the funds for any other purpose but the commission of war crimes and terrorist acts as defined under 18 U.S.C. § 2331.

Unlike the ATA claims made against defendant banks in *Owens* and *Rothstein*, Plaintiffs herein allege that KFF has provided funds to FIDF—a charitable front, AKA "funnel" as alleged in Amended Complaint—making it foreseeable that the funds KFF sends them would likely be used in financing of terrorist activity. *See* i.e. Compl. ¶¶ 95, 96, 100, 107, 112. Thus there is a concrete connection between KFF and the Plaintiffs' injuries, which were a direct result of KFF financing arms trafficking, without which the war crimes complained of herein could not have occurred. Thus, neither *Rothstein* nor

*Owens* provide a basis to grant Defendant's motion when compared to the facts alleged herein.

Furthermore, as defined by Judge Baker in *Owens*, a finding of proximate cause under § 2333 "is defined as a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to have been foreseen in light of the circumstances . . . '[a]ny terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda.'" *Owens* at 20 (internal citations omitted). Because of the massive funds sent by KFF to groups like FIDF and settlements like Bet El that build sniper schools to train settlers and purchase sophisticated military equipment like M16s, stun grenades, and sniper scopes used for committing war crimes and subjugating the local civilian populations, the Plaintiffs have clearly alleged in the Complaint both that KFF had the necessary *scienter* to know its funds were being used to finance war crimes and terrorist activities as defined in 18 U.S.C. § 2331, and the funding provided by KFF was the proximate cause of Plaintiffs' injuries.

It is difficult to conceive how any settlement could afford spending $50,000 to $100,000 on a local militia unit. Concrete evidence thereof is provided by the One Israeli Fund. That Fund explicitly stated on its website: "in light of the recent budget cuts that have been made to the IDF and the cut back of checkpoints allocated to protected these communities, the security resources and training that we provide is paramount to the future of these areas." KFF officials have been funding security resources and training, which made it possible for these settlements to be maintained and expand in the last 30 years.

VII.    **The Complaint is Not Predicated Upon Traditional "Acts of War" as Defendants Assert. The Underlying Claim is Based on Fundamental Principals of Tort Law**

Defendant KFF asserts that the ATA claims should be dismissed under 18 U.S.C. § 2336(a), which notes that "[a]n ATA action may not be brought 'for injury or loss by reason of an act of war.'" *Sokolow v. PLO*, 583 F.Supp. 2d 451, 458 (S.D.N.Y. 2008) (*quoting* 18 U.S.C. §2336(a)). As noted by the Court in *Sokolow*, "[i]n pertinent part, 'the term 'act of war' means any act occurring in the course of . . . armed conflict between military forces of any origin." *Sokolow* at 458-59, (*quoting* 18 U.S.C. § 2331(4)(C)). The Defendants in *Sokolow*, as highlighted by the Southern District of New York, made very similar arguments as Defendant KFF at present—primarily asserting "that the persistence of violence, between Israelis and Palestinians in the West bank and Gaza Strip, constitute 'armed conflict,' under the ATA." *Sokolow* at 459.

The Court, however, rejected this argument in *Sokolow*, finding it had subject matter jurisdiction over the case when accepting the allegations in the amended complaint as true. The *Sokolow* Court noted in support of its decision that the "plaintiffs allege that the attacks were intentionally targeted at the civilian population," outlining within the amended complaint the "killing and maiming untold numbers in heavily populated civilian areas. Such claimed violent attacks upon non-combatant civilians, who were allegedly simply going about their everyday lives, do not constitute acts of war for purposes of the ATA." *Sokolow* at 459. Palestinian farmers are clearly non-combatant civilians who are intentionally targeted by irate settlers armed with M16's and sniper scopes.

Moreover, Plaintiffs herein allege the same violent attacks upon non-combatant

civilians stemming rom arms trafficking, which results in ethnic cleansing, genocide, and other violations of international law—funded by the "charitable" donations of Defendant KFF. *See* i.e. Compl. ¶¶ 34, 46, 50, 112, 117, 126, and 128 ("all Defendants have engaged in or financed 'murder, ill treatment of the civilian population in the occupied territory, extermination (Ethnic cleansing), persecutions based on political, racial, or religious grounds, and wanton destruction of villages.'") The defense of Acts of War asserted by the Defendant therefore has no application in terms of barring the Amended Complaint from moving forward, as Plaintiffs do not allege claims "occurring out of the armed conflict between military forces," but rather a one sided attack on innocent civilians and farmers. *See* i.e. Compl. at ¶ 94. These farmers, for the Court's edification, enter settlements in order to harvest their olive trees, which are now located in the expanded settlement.

Other Courts have also further defined "[a]n 'act of war,'" as "'mean[ing] any act occurring in the course of –(A) declared war; (B) armed conflict, *whether or not war has been declared, between two or more nations*; or (C) armed conflict between military forces of any origin." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1328 (D.U. 2006) (emphasis added). If this standard were applied to the Amended Complaint herein, Defendant KFF's arguments would still fail, as there is no "declared war" against the civilians in the complaint or Palestine, with no conflict between military forces, but rather attacks by armed belligerent settlers and rogue Israeli army personnel against the innocent civilian population. *See* i.e. Compl. at ¶¶22(ii), 62. The Motion to dismiss should therefore be denied, as the Plaintiffs' claims are not predicated upon "Acts of War," as Defendant KFF asserts.

VIII.    **The Act of State Doctrine is Not Applicable to the Case at Bar**

In *Doe v. Exxon Mobil Corp.*, this Court provided a detailed analysis of the

inapplicability of the Act of State Doctrine to facts quite similar to the case at bar. 69 F.

Supp. 3d 75 (D.D.C., 2014). As noted by Judge Lamberth, "The type of official act that

implicates the act of state doctrine is that which is 'by nature distinctly sovereign, i.e.,

conduct that cannot be undertaken by a private individual or entity . . .An illustrative list

of such public acts includes 'pass[ing] a law, issu[ing] an edict or decree, or engag[ing] in

formal governmental action taking [plaintiff's] property.'" *Doe* v. *Exxon* at 88 (internal

citations omitted). The Court's analysis in *Doe* v. *Exxon* can be applied directly to the

Complaint herein:

> "No such sovereign public act is at issue in this suit. Plaintiffs do not allege that
> Exxon's security forces [the belligerent settlers and rogue Israeli Army personnel
> funded by KFF], while admittedly soldiers in the Indonesian military, injured
> them pursuant to official policies of the GOI [Israeli government] or orders from
> military commanders. Indeed, this fact about plaintiffs' allegations is the key point
> distinguishing these cases from those upon which Exxon [KFF] bases its
> argument . . . Exxon [KFF] has made no showing that plaintiffs were injured
> pursuant to official military orders as required by the act of state doctrine.
> Because Exxon [KFF] possesses the burden of proof as the party invoking the
> defense, this failure to so demonstrate is fatal to their invocation of the doctrine."

*Doe* v. *Exxon* at 88 (internal citations omitted). The Complaint implicates no

Israeli government act that is "by nature distinctly sovereign." Furthermore, "[i]t is not

sufficient under the act of state doctrine that a court's factual findings would 'impugn' the

foreign state's actions; the claims must call for the invalidation of those actions." *Id*. KFF

has not shown that the claims made herein would call for invalidation of a foreign state's

action, as the complaint is not implicating any specific state actions. As is obvious to this

Court, the Israeli government has not yet issued an executive order that condones and

promotes ethnic cleansing, genocide, arms trafficking, and the theft of private property.

As KFF "has made no showing that Plaintiffs were injured pursuant to official military orders," the Act of State doctrine is not applicable here to bar the Plaintiffs' claims.

IX.    **This Court Has Personal Jurisdiction Over Defendant KFF**

While it is of course true that for the "Court to maintain personal jurisdiction over KFF, jurisdiction must be proper under the District of Columbia's long-arm statute and the Due Process Clause," Defendant's motion to dismiss based on a lack of personal jurisdiction is a classic red herring argument when one examines the allegations pled in the Amended Complaint. Defendant's Motion to Dismiss at 38. Not only does KFF "solicit funds in this metropolitan area," it "sent $315,000 to the Israeli army [via Friends of The Israeli Army] between 2011 and 2013" in order to take "illegal tax write-offs" on IRS income tax forms (the 1040 and the 990) filed with the IRS based in the District of Columbia. Compl. at ¶22(ii). As earlier referenced, without the tax-exempt status provided by the IRS at least 20 years ago, the KFF  entity could not solicit funds in America.

Furthermore, the KFF "and their donors work with AIPAC officials who are located in this jurisdiction, to *inter alia* preserve the practice of taking illegal tax deductions. They have also worked with AIPAC officials *in this district* to revise Treasury Department regulations…" Compl. at ¶22(iii) (emphasis added). *See also* Compl. at ¶23 (noting KFF has "solicited funds in this jurisdiction destined for illegal settlements . . . attended various AIPAC events here; and d) have engaged in commercial activities with the Treasury Department" in this District, for example filing for tax exempt status 20+ years ago. *See also* Compl. at ¶¶7, 9. In addition as already noted, all 501(c)(3)'s have to file annual 990 forms with the Treasury Department. That is classic

business activity engaged in with a U.S. regulatory body, i.e. the Treasury Department.

Despite Defendant's arguments to the contrary, conspiracy jurisdiction over KFF is fully laid out and pled in the Complaint as well. KFF attempts to argue in a footnote that conspiracy-based jurisdiction is not applicable simply because "Plaintiffs have utterly failed to plausibly allege facts supporting their conspiracy claim," but this is simply untrue. Defendant's Motion to Dismiss at 39 n. 13. *See for example,* Compl. at ¶ 21 (describing in detail personal jurisdiction under conspiracy. The elements of a civil conspiracy, as this court knows, have been laid out in the case *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983), which is cited as respected authority in the JASTA Act); Compl. at ¶ 87 (laying out specifically each element of the conspiracy alleged against KFF); and Compl. at  ¶128, "For at least 20 years, Defendant Friedman, FOBI and KFF officials similarly collaborated in financing war crimes by continuing to raise and transfer massive amounts of funds…" Thus Plaintiffs have in addition adequately pled conspiracy-based jurisdiction over KFF.

X.   **Plaintiffs Have Standing to Bring This Complaint Against the Defendants, Including KFF**

The Complaint outlines in great detail the injuries suffered by the Plaintiffs herein, including for example loss of private property and the death of family members. *See* Compl. ¶¶ 13, 19, ("Defendants participated in the denationalization" of the civilian population, injuring every Palestinian Plaintiff); ¶¶20, 32 ("Defendants have conspired to forcible expel all non-Jews [the Palestinian Plaintiffs] from the OPT—a conspiracy to remove them from their homes and denationalize them); ¶35 (KFF's financing was "intended to cause the Plaintiffs serious physical and mental pain and suffering"); ¶37 ("All of the Plaintiffs named herein have been injured by the aforementioned $2 billion

money laundering scheme," with the injuries described above including mental and physical suffering, loss of their homes, and denationalization). As the Court would probably recognize, it is not a coincidence that 400,000 Palestinians no longer live in the Occupied Territories.

In its Motion, Defendant KFF insists that 23 plaintiffs should be dismissed because they "do not allege any particular injuries," arguing that "collective allegations of this nature do not suffice for Art. III standing; rather 'each [Plaintiff must] assert a distinct, individual injury,' *Atkins v. Fed. Election Comm'n*, 101 F. 3d 731, 737 (D.C. Cir. 1996), *vacated on other grounds*." Defendant's Motion to Dismiss at 40. This, however, is a misstatement of the citation, which actually reads: "The number of potential plaintiffs matters not *so long as each can* assert a distinct, individual injury," noting that a plaintiff can "suffer a particularized injury even if all other[s] [so similarly situated] also suffered an injury." *Atkins* at 737 (emphasis added). *See also Public Citizen v. National Highway Traffic Safety Society*, 489 F. 3d 1279, 1293 (D.C. Cir. 2007):

> "([S]tanding is not to be denied simply because many people suffer the same injury.") (internal quotation marks omitted).
>
> Even those Justices who have embraced a more robust view of constitutional standing requirements have not equated an injury suffered by a number of people to an impermissible generalized grievance. For example, a mass tort inflicts "widely shared" injury, and each victim "suffers a particularized and differentiated harm. One tort victim suffers a burnt leg, another a burnt arm—or even if both suffer burnt arms they are *different* arms. . . .

The injuries alleged by the Plaintiffs are both actual and imminent according to Senior Israeli Air Force Pilot Shapiro He alleges that he works for a terrorist entity, i.e. the Israeli air force, and has been instrumental in committing war crimes. *See* Compl. ¶ 40. Unfortunately this criminal activity has been ongoing thanks to the financing of the

Defendants for 20-30+ years, and is still continuing to this day. *See State Department's Country Report on Terrorism for 2016*; *see also* i.e. Compl. ¶¶ 22, 35, 45, 103. As alleged in the Complaint, "As a direct result of the laundered funds" from KFF, they "have been able to commit war crimes with impunity [ethnic cleansing, torture, genocide] for at least 20 years." The Plaintiffs have all therefore properly pled injuries that are both caused by Defendant's actions and still in most cases ongoing as explained already referenced herein. KFF's Motion to Dismiss should therefore be denied, as all of the Plaintiffs have proper standing to sue the financiers of violent criminal activity abroad that has inflicted serious injury upon the Plaintiffs and their relatives.

**Conclusion**

Based on the authorities cited herein, especially those from this judicial district, *see Biton I and Biton* II, and the detailed allegations contained in the Complaint, this Court has ample precedent to rely on in denying the instant motion to dismiss based on subject matter jurisdiction.


Respectfully Submitted,


_____/s/_____
Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Managing Partner
Transnational Business Attorneys Group
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 – 4343
mm@martinmcmahonlaw.com

Attorney for the Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing and the text of the proposed order has been made through the Court's electronic transmission facilities on the 7th day of August, 2017.

Respectfully Submitted,

_____/s/_____
Martin F. McMahon, Esq.