Case 1:16-cv-00445-TSC   Document 120   Filed 08/29/17   Page 1 of 23

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BASSEM AL-TAMIMI, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 16-cv-0445 (TSC) |
| | ) |
| SHELDON ADELSON, *et al.*, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiffs—Palestinians and Palestinian-Americans from East Jerusalem, the West Bank, the Gaza Strip, and five Palestinian village councils—bring this lawsuit against forty-nine Defendants, including individuals, multi-national corporations, non-governmental organizations, banks, and the United States.[1]  (ECF No. 77 ("Am. Compl.") pp. 1–10 & ¶¶ 29, 32–77). Plaintiffs allege that Defendants: (1) engaged in a civil conspiracy to expel all non-Jews from East Jerusalem, the West Bank, and the Gaza Strip (Count I); (2) committed war crimes, crimes against humanity, and genocide in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), and the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) ("TVPA") (Count II); (3) aided and abetted the commission of war crimes (Count III); and (4) engaged in a 30-year pattern of aggravated and ongoing trespass (Count IV).  (*Id.* ¶¶

---

[1]  Plaintiffs sued former Deputy National Security Advisor Elliott Abrams in his individual capacity.  As discussed further below in Section III(B)(1)(a), the United States subsequently substituted itself as a Defendant pursuant to the Westfall Act, 28 U.S.C. § 2679.

118–255).  They seek $1 billion in damages.  (*Id.* at ¶¶ 180, 227, 233, 255).

Pursuant to this court's Order, the United States and all other Defendants filed motions to dismiss raising jurisdictional arguments under Federal Rule of Civil Procedure 12(b)(1).  (ECF Nos. 104 ("USA Mot."), 107 ("Defs. Mot.")).[2]  As more fully explained below, upon careful review of the Amended Complaint and the parties' filings, the court concludes that it lacks jurisdiction to hear Plaintiffs' claims against the United States, as Congress has not waived sovereign immunity for such claims.  The court further concludes that it lacks subject matter jurisdiction to adjudicate the claims against all Defendants because they are replete with non-justiciable political questions.  Accordingly, the court will GRANT both motions to dismiss and will dismiss Plaintiffs' claims against all Defendants.

## I.      BACKGROUND

Plaintiffs bring their claims under the Alien Tort Claims Act, 28 U.S.C. § 1350, also referred to as the "Alien Tort Statute" or "ATS."  (Am. Compl. ¶ 1).  Those Plaintiffs who are U.S. citizens also assert their claims of war crimes and genocide under the Torture Victims Protection Act of 1991 ("TVPA"), which amends the ATS, 28 U.S.C. § 1350.  (*Id.* ¶ 3).[3]

Plaintiffs divide the Defendants into five categories: "Donor Defendants,"[4] "Settlement

---

[2]  Numerous Defendants have not entered an appearance in this case and thus apparently do not join the Motion to Dismiss.  They include Norman Braman, Daniel Gilbert, Lev Leviev, American Friends of Har Homa, Karnei Shomron Foundation, G4S PLC, G4S North America, G4S Israel, RE/MAX Israel – Impact Property Developers Ltd., Africa Israel Investments, Ltd., AFI USA, Danya Cebus Ltd., CRH PLC, Heidelberg Cement AG, Veolia Environmental Services (Israel), Volvo Group, Volvo Bussar AB, Merkavim Transportation Technologies, and Israel Chemicals Ltd.  Nevertheless, the court will address the jurisdictional grounds for dismissal as if raised by all Defendants.

[3]  Plaintiffs also cite to numerous federal criminal statutes in their Amended Complaint, including 18 U.S.C. §§ 1956(b)(2), 981, and 371.  However, Plaintiffs do not describe how these criminal statutes provide the court with jurisdiction in this case.

[4]  Donor Defendants include Sheldon Adelson, Norman Braman, Lawrence Ellison, Daniel Gilbert, John Hagee, Lev Leviev, Irving Moskowitz, Haim Saban, and the Irving I. Moskowitz

and [Israel Defense Forces] Advocate/Promoter,"[5] "Pro-Settlement Tax-Exempt Entity

Defendants,"[6] "Defendant Banks,"[7] and "Defendant Construction/Support Firms."[8]  Plaintiffs

allege that the Donor Defendants provide financial support, which helps "promote the growth of

settlements" in the West Bank, Gaza, and East Jerusalem—what Plaintiffs refer to as the

Occupied Palestinian Territories ("OPT")—that "would necessarily [lead to] the ethnic cleansing

of all Palestinian families living near OPT settlements."  (Am. Compl. ¶ 32).  Plaintiffs allege

that Elliott Abrams "encouraged classic ethnic cleansing" by "urg[ing] senior aides to former

Prime Ministers Sharon, Barack, and Olmert and settlement officials to continue annexing

privately-owned Palestinian property knowing that settlement expansions would necessarily

entail the violent expulsion of the local Palestinian population."  (*Id.* ¶ 41).

Plaintiffs claim the Tax-Exempt Entity Defendants violated customary international law;

committed perjury, money laundering, and tax fraud; and "knew, like their donors, that the local

---

Foundation.  (Am. Compl. ¶¶ 32–40).

[5]  Plaintiffs include just one Defendant, former Deputy National Security Advisor Elliott
Abrams, in this category.  (*Id.* ¶ 41).  As stated above, *supra* n.1, the United States has
substituted itself as a party in the place of Abrams.

[6]  Pro-Settlement Tax-Exempt Entity Defendants include American Friends of Ariel, American
Friends of Bet El Yeshiva, American Friends of Har Homa, American Friends of Ulpana Ofra,
Christian Friends of Israeli Communities, Efrat Development Foundation, Falic Family
Foundation, Friends of Israel Defense Forces, Gush Etzion Foundation, Honenu National Legal
Defense Organization, Karnei Shomron Foundation, The Hebron Fund, and The Jewish National
Fund.  (*Id.* ¶¶ 42–54).

[7]  Defendant Banks include Bank Leumi Le-Israel B.M., Bank Leumi USA, and Bank Hapoalim
B.M.  (*Id.* ¶¶ 55–56).

[8]  Defendant Construction/Support Firms Defendants are G4S PLC, G4S North America, G4S
Israel, RE/MAX, RE/MAX Israel – Impact Property Developers Ltd., Africa Israel Investments
Ltd., AFI USA, Danya Cebus Ltd., Access Industries, CRH PLC, Veolia Environment S.A.,
Veolia North America, Veolia Environmental S.A. (Israel) Ltd., Volvo Group, Volvo Bussar
AB, Merkavim Transportation Technologies, Hewlett Packard Enterprise Co., Hewlett-Packard
Enterprise Services of Israel (EDS), Motorola Solutions Inc., Motorola Solutions Israel Ltd., and
Orbital ATK, Inc.  (*Id.* ¶¶ 57–77).

Palestinian population would be maimed and murdered by violence-prone settlers with those funds" they received. (*Id.* ¶ 42). Plaintiffs allege that the Defendant Banks "transferred millions of dollars every year to various settlements knowing . . . the funds would be used to expand OPT settlements by arming the settler population, who in turn would attack (and sometimes kill) their Palestinian neighbors." (*Id.* ¶ 55). Finally, Plaintiffs claim that the Defendant Construction/Support Firms: (1) "supplie[d] equipment to Israeli prisons;" (2) "worked with" other firms operating in settlements; (3) "market[ed] . . . Israeli real estate opportunities to Americans;" (4) "knew and encouraged the tax-exempt entities to continue funding the ongoing demolition of Palestinian homes;" (5) "list[ed] and s[old] settlement properties built on private Palestinian property," which "necessarily entailed the violent expulsion of Palestinian homeowners;" and (6) in various other ways supported the expansion of settlements in Gaza, the West Bank, and East Jerusalem. (*Id.* ¶¶ 57–77).

Plaintiffs further ask this court to "draw some big-picture conclusions." (*Id.* ¶ 78). These include that "the settlement enterprise has been an intentional, profitable, and ongoing activity for at least 40 years;" "it entailed the expulsion of approximately 400,000 Palestinians from the OPT;" and "it also resulted in the demolition or confiscation of 49,000 Palestinian homes." (*Id.*).

## II.  LEGAL STANDARD

Federal courts are courts of limited jurisdiction. *See Gen. Motors Corp. v. E.P.A*, 363 F.3d 442, 448 (D.C. Cir. 2004). The law presumes that "a cause lies outside [the court's] limited jurisdiction" unless the plaintiff establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When a defendant files a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v.*

*Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).

In evaluating a motion to dismiss under Rule 12(b)(1), the court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'" *Am. Nat'l Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). "Nevertheless, 'the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.'" *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)). Moreover, the court "is not limited to the allegations of the complaint," *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987), and "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. District of Columbia Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

## III.   DISCUSSION

### A.   Justiciability Under the Political Question Doctrine

All Defendants argue that this court lacks subject matter jurisdiction under the political question doctrine. In *Baker v. Carr*, the Supreme Court articulated six criteria to determine whether a case involves non-justiciable political questions. 369 U.S. 186, 217 (1962). These include: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) "a lack of judicially discoverable and manageable standards for resolving it," (3) the "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion," (4) "the impossibility of a court's undertaking independent

5

resolution without expressing lack of the respect due coordinate branches of government," (5) "an unusual need for unquestioning adherence to a political decision already made," and (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.* Courts are thus deprived of subject matter jurisdiction if any of the six *Baker* factors are present. *Id.* While "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid,' . . . [t]he political question doctrine constitutes a narrow exception to that rule, and, when properly invoked, deprives a court of authority to decide the issues before it." *Simon v. Republic of Hungary*, 812 F.3d 127, 149–150 (D.C. Cir. 2016) (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012)).

A court "must conduct 'a discriminating analysis of the particular question posed' in the 'specific case' before [it] to determine whether the political question doctrine prevents a claim from going forward." *El-Shifa Pharm. Ind. Co. v. United* States, 607 F.3d 836, 841 (D.C. Cir. 2010) (quoting *Baker*, 369 U.S. at 211). If this case were permitted to go forward, resolution of Plaintiffs' claims for trespass, genocide, and other war crimes would require this Court to determine: (1) the limits of state sovereignty in foreign territories where boundaries have been disputed since at least 1967; (2) the rights of private landowners in those territories; (3) the legality of Israeli settlements in the West Bank, Gaza, and East Jerusalem; and (4) whether the actions of Israeli soldiers and private settlers in the disputed territories constitute genocide and ethnic cleansing. With respect to the Defendants in this case, the court would further have to decide whether contributing funds to or performing services in these settlements is inherently unlawful and tortious, as Plaintiffs allege that settlement expansion is inextricably tied to violence against Palestinians.

There is no question that the first *Baker* factor is implicated in this case. In general,

issues involving foreign policy are constitutionally committed to the political branches of the federal government, and therefore normally constitute non-justiciable political questions. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("[T]he conduct of foreign relations . . . [is] exclusively entrusted to the political branches . . . [and] immune from judicial inquiry or interference.") (quotations omitted); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 (D.C. Cir. 1984) ("Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied.").  Of course, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211.  However, Plaintiffs ask this court to wade into foreign policy involving one of the most protracted diplomatic disputes in recent memory.  As another judge of this court stated when deciding a similar case, "[i]t is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades." *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 111–12 (D.D.C. 2005).  Additionally, the Supreme Court recently noted, in a case involving Israel's sovereignty over the city of Jerusalem—an issue also central to this case—that "[q]uestions touching upon the history of the ancient city and its present legal and international status are among the most difficult and complex in international affairs.  In our constitutional system these matters are committed to the Legislature and the Executive, not the Judiciary." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2081 (2015).  Thus, this court concludes that *Baker*'s first factor is undeniably implicated here, and therefore Plaintiffs' claims are ultimately non-justiciable.

Moreover, given the centrality of the question of sovereignty over these disputed lands—and in particular the ongoing expansion of settlements on those lands—this case implicates not

only the first *Baker* factor, but also several others.  One factor is the need to avoid making "an initial policy determination of a kind clearly for nonjudicial discretion."  Another factor implicated in this case is the need to avoid the "potentiality of embarrassment" to the United States government, since this court's adjudication may conflict with the other branches' sensitive positions regarding the legality and implications of the settlements, broader questions of Israel's sovereignty, and the right to private ownership and control over the disputed lands in the region.  Where, as here, the court is asked to make a determination on issues at the forefront of global relations while the United States government continues to determine how best to approach these same issues, it should decline to weigh in on such sensitive diplomatic and geopolitical matters.

Another court in this district reached the same conclusion in *Doe I v. State of Israel*.  In the first of two opinions, the court evaluated similar claims brought by Palestinian and Palestinian-American plaintiffs seeking monetary damages from the President, the Secretary of State, and several corporations who contract with the U.S. government.  *See* ECF No. 42 ("Mem. Op."), *Doe I v. State of Israel*, Case No. 02-1431(D.D.C. Oct. 3, 2003).  As here, those plaintiffs asserted claims under the ATS, alleged violations of international law, and brought numerous tort claims against defendants for alleged harms committed in settlements.  *Id.* at 2.  Noting that "plaintiffs' claims here directly affect United States foreign policy," the court concluded that the issues involved in the Israel-Palestine conflict and sovereignty disputes "cr[y] out for unyielding deference to the political branches."  *Id.* at 12–13.  Ultimately, the court found that the claims brought against both the United States and the private defense contractors were non-justiciable political questions.  *Id.* at 14, 18.  Two years later, in a follow-up opinion, the court dismissed the remaining claims, holding that "[a] ruling on any of these issues would draw the Court into the foreign affairs of the United States, thereby interfering with the sole province of the Executive

Branch." *Doe I*, 400 F. Supp. 2d at 112. It also noted that the plaintiffs' tort claims "would require the Court to characterize the ongoing armed conflict in the West Bank as either 'genocide' or self-defense. Such a predicate policy determination is plainly reserved to the political branches of government, and the court is simply not equipped with 'judicially discoverable or manageable standards' for resolving a question of this nature." *Id.* at 112–13 (quoting *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 261–63 (D.D.C. 2004)). The issues presented here are not distinguishable in any significant or meaningful way from those considered by the court in *Doe I*, and this court likewise concludes that Plaintiffs' claims are non-justiciable.

The cases cited by Plaintiffs in their Opposition do not compel a different conclusion or otherwise persuade the court that these issues are justiciable. First, Plaintiffs cite just one decision from the D.C. Circuit: *Simon v. Republic of Hungary*. In *Simon*, the court considered claims brought by fourteen Jewish survivors of the Holocaust in Hungary, twelve of whom had been forcefully transported to Auschwitz, who alleged that the Republic of Hungary, a state-owned Hungarian railway, and an Austrian freight-rail company all committed the torts of false imprisonment, torture, assault, and unjust enrichment by playing an integral role in the attempted extermination of Hungarian Jews. 812 F.3d at 134. The court found that neither a 1947 treaty nor a 1973 agreement between Hungary and the United States "raise[d] any significant risk that judicial consideration of this case could undermine Executive Branch actions," including "the Executive's negotiated resolution [of World War II] in [the 1947 treaty]." *Id.* at 150. The same conclusion cannot be reached here, where the resolution of the Israel-Palestine conflict, including questions of sovereignty in the West Bank, Gaza, and East Jerusalem, is still very much at the forefront of the Executive's ongoing diplomatic efforts in the region.

Moreover, the court in *Simon* noted that "[t]he Executive Branch . . . has given no indication that adjudication of the plaintiffs' lawsuit would encroach on those agreements or raise any broader foreign relations concerns.  The Executive often files a statement in court if it believes that judicial consideration of a case would interfere with the operation of the United States' treaties and agreements or would otherwise impinge on the conduct of foreign relations." *Id.* at 150–51 (citing *Alperin v. Vatican Bank*, 410 F.3d 532, 556–57 (9th Cir. 2005)); *see also Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 92 (D.D.C. 2014) (concluding that the political question doctrine did not bar the plaintiffs' claims because the Executive had not filed such a statement).  Here, however, unlike in *Simon* and *Doe*, the United States has filed such a statement in its motion to dismiss.

Plaintiffs also cite to *Biton I* and *Biton II*, in which the plaintiffs sued the Palestinian Interim Self-Government Authority and several other Palestinian entities and officials under the Antiterrorism Act of 1991 ("ATA"), 18 U.S.C. § 2333, "for their alleged involvement in the bombing of a school bus in the Gaza Strip on November 20, 2000, that killed two passengers . . . and wounded nine others."  *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 175 (D.D.C. 2004) ("*Biton I*"); *see also Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1 (D.D.C. 2005) ("*Biton II*").  However, in *Biton*, the claims were brought under the ATA, which "created a federal cause of action for acts of 'international terrorism,' a precisely-defined term. . . . By enacting the ATA, both the Executive and Legislative have 'expressly endorsed the concept of suing terrorist organizations in federal court.'"  *Biton I*, 310 F. Supp. 2d at 184 (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991)).[9]  Therefore,

---

[9]  Plaintiffs cite several other district court cases that found the claims before them were not non-justiciable political questions because they were brought under the ATA rather than the ATS. *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153 (D.D.C. 2006); *Sokolow v. Palestine*

while the court in *Biton I* noted that "the backdrop for this case—i.e., the Israeli-Palestinian

conflict—is extremely politicized," *id.*, it ultimately determined that there were no political

questions (1) for which there were no judicially manageable standards or (2) that would require

the court to make foreign policy determinations that might conflict with, undermine, or

embarrass the political branches.  While the *Biton* cases and this case involve claims arising out

of the Israeli-Palestinian conflict, the former cases involved a statute and claims that are not

implicated here, and are therefore inapplicable here.

Finally, Plaintiffs cite *In re South African Apartheid Litig.*, which involved claims

brought under the ATS.  617 F. Supp. 2d 228 (S.D.N.Y. 2009).  The Defendants argued that the

court would have to "second-guess decisions made by the political branches to permit and

encourage commerce with apartheid-era South Africa." *Id.* at 284.  The court disagreed and

concluded that—despite the United States also filing a Statement of Interest—it was still

"speculative at best" that continuation of the apartheid litigation would have a chilling effect on

doing business with South Africa and would "compromise a valuable foreign policy tool." *Id.*

However, Plaintiffs' claims here are notably different, as they would require the court to weigh

in on issues with which the political branches are still grappling—i.e., sovereignty over disputed

lands in the West Bank, Gaza, and East Jerusalem, and the diplomatic response to activities in

those lands, including the continued expansion of settlements.

Ultimately, this court agrees with the court's reasoning in *Doe I* and finds that Plaintiffs'

claims—against both the United States and the remaining Defendants—raise non-justiciable

political questions, which deprive this court of subject matter jurisdiction.  Accordingly, the

---

*Liberation Org.*, 583 F. Supp. 2d. 451 (S.D.N.Y. 2008); *Linde v. Arab Bank, PLC*, 384 F. Supp.
2d 571 (E.D.N.Y. 2005).  Because these courts considered a different statutory basis for those
plaintiffs' claims, the court finds them to be unpersuasive.

motions to dismiss will be GRANTED.

**B.   Alternative Jurisdictional Grounds for Dismissal**

Though the court concludes that the issues raised in this suit are non-justiciable political questions, it will nonetheless analyze the additional jurisdictional grounds for dismissal raised by both the United States and the remaining Defendants.

1.   <u>United States' Motion to Dismiss</u>

*a.   Substitution of the United States for Elliott Abrams*

Prior to filing its motion to dismiss, the United States filed a Notice of Substitution, indicating that pursuant to the Westfall Act, codified at 28 U.S.C. § 2679, the United States was substituting itself as a Defendant for Elliott Abrams on Counts I through III of Plaintiffs' Amended Complaint.  (ECF No. 103 ("United States' Notice")).  The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties."  *Osborn v. Haley*, 549 U.S. 225, 229 (2007).  This immunity is triggered if the Attorney General or his delegate certifies that "'the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'"  *Jacobs v. Vrobel*, 724 F.3d 217, 219–20 (D.C. Cir. 2013) (quoting 28 U.S.C. § 2679(d)(1)).  "Upon certification, the employee is dismissed from the action, [and] the United States is substituted as the defendant."  *Id.* at 220 (citing 28 U.S.C. § 2679(d)(1)–(2)).

The Attorney General's designee certified that Elliott Abrams was acting within the scope of his employment at the time of Plaintiffs' allegations.  (*See* ECF No. 103-2 ("Ex. 2 to United States' Notice")).  Accordingly, Plaintiffs' claims, particularly those that were brought against Abrams while he was a federal employee, are dismissed as to Abrams, and the United States is substituted as the Defendant.  As a result of this substitution, the Federal Tort Claims

Act ("FTCA"), 28 U.S.C. § 2679(b), applies to some of Plaintiffs' claims, as they are now

brought against the United States.  Subject to certain important and relevant limitations, the

FTCA waives sovereign immunity and grants courts jurisdiction to consider claims against the

United States for "money damages for injury or loss of property or personal injury or death

caused by the negligent or wrongful act or omission of any employee of the Government while

acting within the scope of his office or employment."  28 U.S.C. § 2675(a).

　　Plaintiffs raise two issues regarding the Attorney General's certification and the

substitution.  First, they argue that Abrams was not acting within the scope of his employment

during the eight-year period in which he served in the Bush Administration.  Second, Plaintiffs

argue that they have alleged *thirty* years of tortious activity by Abrams, and for most of this time

he acted as a private citizen, not as a federal employee.

　　A plaintiff is permitted to "contest the Attorney General's scope-of-employment

certification" under the Westfall Act.  *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009)

(citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995)).  "[T]he certification

'constitute[s] prima facie evidence that the employee was acting within the scope of his

employment.'"  *Id.* (quoting *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 662

(D.C. Cir. 2006) (per curiam)).  "To rebut the certification and obtain discovery, a plaintiff must

'alleg[e] sufficient facts that, taken as true, would establish that the defendant['s] actions

exceeded the scope of [his] employment.'"  *Id.* (quoting *Stokes v. Cross*, 327 F.3d 1210, 1215

(D.C. Cir. 2003).

　　"In determining whether an employee acted within the scope of his employment, [courts]

consider the substantive law of the jurisdiction where the employment relationship exists—here,

the law of the District of Columbia."  *Jacobs*, 724 F.3d at 221 (citing *Majano v. United States*,

469 F.3d 138, 141 (D.C. Cir. 2006)).  The test in this Circuit is whether the employee's conduct "is of the kind he is employed to perform," "occurs substantially within the authorized time and space limits," and "is actuated, at least in part, by a purpose to serve the master."  *Id.* (citing Restatement (Second) of Agency § 228 (1958)).  "The test is 'objective' and is 'based on all the facts and circumstances,'" *id.* (quoting *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986)), and has been "broadly interpreted." *Id.*

The Attorney General certified that Abrams acted within the scope of his employment in the White House based on allegations in the Complaint that he had met or had discussions with numerous Israeli government officials.  (*See* United States' Notice; *see also* Am. Compl. ¶¶ 41, 125).  Plaintiffs argue that Abrams acted outside the scope of his employment because he "encourag[ed]" both donors and entities to "raise and transfer to Israel substantial funds in order to finance war crimes," and encouraged "settlement leaders and rogue Israeli army personnel intent on the illegal confiscation of private Palestinian property."  (ECF No. 112 ("Pls. Opp.") at 7).  Plaintiffs further argue that Abrams exceeded the scope of his employment by engaging in "classic money laundering."  (*Id.*).  However, Plaintiffs have not alleged any facts to rebut the prima facie evidence of the Attorney General's certification.  For example, Plaintiffs do not allege that Abrams's alleged encouragement of private entities to "finance war crimes" was undertaken while he served at the White House; instead, Plaintiffs only refer to a thirty-year span of time during which the alleged conduct took place.  Additionally, Plaintiffs offer no factual assertion that Abrams's conversations with Israeli governmental officials were outside the scope of his job on the National Security Council.  Finally, their allegation that Abrams engaged in "classic money laundering" does not appear in their Amended Complaint.  The court therefore finds that Plaintiffs have failed to sufficiently rebut the Attorney General's certification, and that

the United States may be substituted as the proper party for claims against Abrams arising out of his eight years at the White House.

With regard to Plaintiffs' argument that the United States cannot be substituted as a party for *all* claims against Abrams because they allege thirty years of tortious activity in the years before and after his federal employment, the United States argues that Plaintiffs' "operative allegations" against Abrams involve actions that took place during his tenure in the White House.  The acts alleged during the remaining twenty-two years, which include speeches, meetings, and other activity before and after his White House employment, on the other hand, are alleged simply to add context.  Plaintiffs do not directly address the United States' operative/contextual distinction in their Opposition.  However, the allegations in their Complaint clearly include conduct that occurred both before and after Abrams's time at the White House.  Therefore, while the court will permit the United States' substitution for Abrams, it does so only for those claims arising from his eight-year tenure at the White House.  With respect to the remaining twenty-two years of allegations, the court finds that Abrams must be considered as an individual Defendant in his personal capacity.  However, given that this court has already concluded above in Section III(A) that Plaintiffs' claims against both the United States and the individual Defendants must be dismissed, that decision applies also to the claims against Abrams in his individual capacity, and those claims will also be dismissed.

### b.  FTCA Jurisdictional Grounds for Dismissal

The United States argues that Plaintiffs' FTCA claims against it should be dismissed for four independent reasons: (1) failure to exhaust administrative remedies as required by the FTCA, (2) lack of a sovereign immunity waiver in the FTCA for claims brought under international law, (3) application of the foreign-country exception, and (4) application of the

discretionary-function exception.[10]

    i.   Exhaustion of Administrative Remedies

      The FTCA expressly bars jurisdiction "unless the claimant[s] . . . have first presented the claim to the appropriate Federal agency and [their] claim shall have been finally denied by the agency in writing and sent by certified or registered mail."  28 U.S.C. § 2675(a).  If the agency has not made its "final disposition of a claim within six months after it is filed," then that lack of action "shall . . . be deemed a final denial of the claim."  *Id.*  The Supreme Court has held that the "FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."  *McNeil v. United States*, 508 U.S. 106, 113 (1993).  This requirement is "jurisdictional."  *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 370–71 (D.C. Cir. 1997).  Plaintiffs have not indicated whether they have complied with this requirement, and do not address it in their Opposition.  The court therefore finds that this would additionally serve as grounds for dismissal of their claims against the United States.

    ii.   Lack of Waiver of Sovereign Immunity

      The United States argues that because Congress has not waived sovereign immunity under the ATS for claims based on violations of customary international law, and the FTCA likewise does not waive sovereign immunity for such claims, this court lacks subject matter jurisdiction.  The court agrees.

      The United States may not be sued without an express waiver of sovereign immunity.

---

[10]  The United States also argues that the court lacks jurisdiction over Plaintiffs' Torture Victims Protection Act claims because the United States was not acting "under actual or apparent authority, or color of law, of any foreign nation" as required by that statute, and further that the court lacks jurisdiction over Plaintiffs' ATS claims because the claims do not sufficiently touch and concern the United States as required by *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013).  Because the court finds that the United States has not waived sovereign immunity for Plaintiffs' claims, it need not consider these additional jurisdictional arguments.

*See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  The ATS, under which Plaintiffs purport to

bring their claims, neither creates a new cause of action against the United States, *Sosa v.*

*Alvarez–Machain*, 542 U.S. 692, 713 (2004), nor waives sovereign immunity for claims for

money damages.  *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985).  Therefore,

the court has no jurisdiction to hear ATS claims against the United States.  As discussed above,

Plaintiffs' tort claims may instead be analyzed as if brought under the FTCA.  However, under

that approach Plaintiffs encounter the same problem: the FTCA similarly does not waive

sovereign immunity for their claims.  This is because the United States has not waived sovereign

immunity under that statute for violations of customary international law.  *See Al Janko v. Gates*,

831 F. Supp. 2d 272, 283 (D.D.C. 2011).  The FTCA waives sovereign immunity for cases in

which the United States "'would be liable to the claimant' as 'a private person' 'in accordance

with the law of the place where the act or omission occurred.'"  *Meyer*, 510 U.S. at 477 (quoting

28 U.S.C. § 1346(b)).  The Supreme Court has "consistently held that [this] reference to the 'law

of the place' means law of the State," *id.* at 478, meaning domestic state tort law.  Because

Plaintiffs bring their claims under customary international law, rather than state tort law, their

claims are not covered by the FTCA's waiver of sovereign immunity, and this court lacks

jurisdiction to consider them.  *See Al Janko*, 831 F. Supp. 2d at 283.

Plaintiffs bring one state common law tort that may be included in the FTCA's immunity

waiver—civil conspiracy.  "Civil conspiracy, of course, is not actionable in and of itself but

serves instead 'as a device through which vicarious liability for the underlying wrong may be

imposed upon all who are a party to it, where the requisite agreement exists among them.'"  *Hall*

*v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002) (quoting *Riddell v. Riddell Wash. Corp.*, 866 F.2d

1480, 1493 (D.C. Cir. 1989)).  If the alleged underlying wrong is not actionable, then a

conspiracy to commit that wrong "is not actionable either." *Id.* at 83. Because the court has no jurisdiction over the underlying wrongs which form the basis of the civil conspiracy claim, the court similarly has no jurisdiction over an independent civil conspiracy claim against the United States under the FTCA.

### iii. FTCA's Foreign-Country Exception

The FTCA also contains an explicit exception to the United States' sovereign immunity waiver for "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). The Supreme Court has held "that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." *Sosa*, 542 U.S. at 712. The D.C. Circuit has further held that, following *Sosa*, a plaintiff "'cannot plead around the FTCA's foreign-country exception simply by claiming injuries . . . that are derivative of the foreign-country injuries at the root of the complaint.'" *Gross v. United States*, 771 F.3d 10, 12 (D.C. Cir. 2014) (quoting *Harbury v. Hayden*, 522 F.3d 413, 423 (D.C. Cir. 2008)). The United States therefore argues that because Plaintiffs allege that they were injured in the West Bank, Gaza, East Jerusalem, and/or other settlement areas, the foreign-country exception must bar these claims, regardless of whether Plaintiffs allege the tortious conduct occurred in the United States or abroad. Plaintiffs did not address this argument in their opposition. Given the directives of the Supreme Court and the D.C. Circuit, the court concludes that the FTCA's foreign-country exception bars all of Plaintiffs' claims against the United States.

### iv. FTCA's Discretionary Function Exception

The United States argues that Plaintiffs' claims are also barred by the FTCA's express exception for discretionary functions or duties, which bars:

> Any claim based upon an act or omission of an employee of the Government,
> exercising due care, in the execution of a statute or regulation, whether or not

> such statute or regulation be valid, or based upon the exercise or performance or
> the failure to exercise or perform a discretionary function or duty on the part of a
> federal agency or an employee of the Government, whether or not the discretion
> involved be abused.

28 U.S.C. § 2680(a).  This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals," *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984), and "'prevent[s] judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Loumiet v. United States*, 828 F.3d 935, 941 (D.C. Cir. 2016) (quotation marks omitted).  The Supreme Court has articulated a two-part test to determine whether the discretionary function exception applies.  *See United States v. Gaubert*, 499 U.S. 315 (1991); *Berkovitz v. United States*, 486 U.S. 531 (1988); *Varig Airlines*, 467 U.S. 797.  The first prong requires the court to consider whether the challenged acts "are discretionary in nature" and "'involve an element of judgment or choice.'"  *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536).  If this first prong is met, the court proceeds to the second prong, in which it must consider "'whether that [conduct] is of the kind that the discretionary function exception was designed to shield.'"  *Id.* at 322–23 (quoting *Berkovitz*, 486 U.S. at 536).

With respect to the first prong, the challenged acts are *not* discretionary if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Berkovitz*, 486 U.S. at 536.  Alternatively, an act is discretionary—as opposed to ministerial—"if it involves judgment, planning, or policy decisions."  *KiSKA Constr. Corp., U.S.A. v. WMATA*, 321 F.3d 1151, 1159 n.9 (D.C. Cir. 2003).  In other words, an action is discretionary unless the statute, regulation, or policy leaves "'no room for choice.'"  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1143 (D.C. Cir. 2015) (quoting *Gaubert*, 499 U.S. at

324).  Plaintiffs' claims involving Elliott Abrams's actions while he was a federal employee

largely involve communications between Abrams and Israel government officials.  (*See* Am.

Compl. ¶¶ 41, 125, 134).  Plaintiffs do not articulate any statute, regulation, or policy that leaves

"no room for choice" regarding how Abrams was to communicate and interact with foreign

officials in his role as Deputy National Security Advisor.  Instead, they argue only that "classic

money laundering . . . [is] well outside the scope of an official's discretionary funding function."

(Pls. Opp. at 7).  However, as noted above, Plaintiffs do not provide any factual allegations

supporting their claim of money laundering, but instead allege only that Abrams "promoted" or

"encouraged" the development of settlements.  Faced with such threadbare assertions, the court

concludes that the challenged acts were discretionary.

Next, the court considers in the second prong whether the discretionary function

exception applies based on whether the acts are "susceptible to policy judgment," *Banneker*

*Ventures*, 798 F.3d at 1139, or "whether the actions or decisions 'were within the range of choice

accorded by federal policy and law and were the results of policy determinations.'" *Loumiet*, 828

F.3d at 942 (quoting *Berkovitz*, 486 U.S. at 538).  The discretionary function exception therefore

"'insulates the Government from liability if the action challenged in the case involves the

permissible exercise of policy judgment,'" *id.* (quoting *Berkovitz*, 486 U.S. at 537), but "[a]n

employee of the government acting beyond his authority is not exercising the sort of discretion

the discretionary function exception was enacted to protect.'"  *Id.* (quoting *Red Lake Band of*

*Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986)).  As noted in Section

III(A), the United States has a complex, evolving, and sensitive relationship with the Israeli

government and the Palestinian authorities, and the tensions in the region have been the subject

of diplomatic maneuvering for decades.  Plaintiffs do not appear to argue, nor could they, that

Abrams's discussions with Israeli government officials in his role as a Deputy National Security Advisor were not the result of policy judgments and determinations.  Because such foreign policy discussions are certainly grounded in the United States' foreign policy decision-making in the region, Abrams's acts fall squarely within the discretionary function.  This exception provides yet another basis for dismissal of Plaintiffs' claims against the United States.

   2. <u>Remaining Defendants' Motion to Dismiss</u>

  As explained above, the court has concluded that the claims against the remaining Defendants must be dismissed because they raise non-justiciable political questions. Nonetheless, the court will also consider the remaining Defendants' argument that these claims are also non-justiciable under the act of state doctrine.

  The act of state doctrine "prevents federal courts from 'declar[ing] invalid . . . the official act of a foreign sovereign.'"  *Hourani v. Mirtchev*, 796 F.3d 1, 11 (D.C. Cir. 2015) (quoting *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990)).  Therefore, the doctrine is a "close cousin of the political question doctrine" and "prevents a court from deciding a case 'when the outcome turns upon the legality or illegality . . . of official action by a foreign sovereign performed within its own territory.'"  *Doe I*, 400 F. Supp. 2d at 113 (quoting *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 26 (D.D.C. 2005).  "[T]he act of state doctrine is based on prudential separation of powers concerns, as well as notions of sovereign respect and intergovernmental comity[,] [and] reflects the judiciary's reluctance to complicate foreign affairs by validating or invalidating the actions of foreign sovereigns."  *Id.* (citations omitted). However, "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.  When that question is not in the case, neither is the act of state doctrine."  *W.S. Kirkpatrick*, 493 U.S. at 406

(emphasis in original).  "The type of official act that implicates the act of state doctrine is that which is 'by nature distinctly sovereign, i.e., conduct that cannot be undertaken by a private individual or entity.'"  *Doe*, 69 F. Supp. 3d at 87 (quoting *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012)).

Here, Plaintiffs have not sued Israel or any Israeli government officials, only private individuals and entities.  However, they allege that these Defendants have encouraged or financed violent torts committed both by Israeli soldiers and individual settlers; indeed, for some Defendants, their alleged financial contributions to the Israel Defense Forces appear to form the entire basis for Plaintiffs' claims against them.  Therefore, Defendants argue that consideration of Plaintiffs' claims, with respect to at least some of the Defendants, would require this court to adjudicate whether Israel or its armed forces committed war crimes, genocide, trespass, and other tortious conduct.  Though Plaintiffs' allegations certainly involve numerous references to Israeli soldiers, it is not clear to the court at this stage to what extent it "*must decide*" the legality of Israeli official actions, particularly given that the Defendants themselves are private individuals or entities, and the acts they are alleged to have undertaken cannot be said to be "distinctly sovereign."  As a result, the court declines to find that the act of state doctrine warrants dismissal.

IV.    **CONCLUSION**

The Palestinian and Palestinian-American Plaintiffs in this lawsuit allege that they have experienced immense loss of life, liberty, and property over the last several decades, and they seek justice and compensation for violence they have experienced.  At the core of their Amended Complaint, however, is the request for this court to adjudicate and resolve the lawfulness of the development of Israeli settlements in Gaza, the West Bank, and East Jerusalem stretching over

thirty years into the past.  This issue, both close to the heart of the ongoing Israeli-Palestinian

conflict and central to the United States' foreign policy decision-making in the region, is simply

inappropriate for this court to resolve.  Instead, these issues must be decided by the political

branches.  As a result, for the foregoing reasons, this court will GRANT both motions to dismiss.

Date:  August 29, 2017

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge