UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIKO PELED, *et al.*,                )
                                     )
              Plaintiffs,            )
                                     )
        v.                           )    Docket No: 1:17-cv-00260
                                     )    Hon. Reggie B. Walton
BENJAMIN NETANYAHU, *et al.*,        )
                                     )
              Defendants.            )
_____)

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT BILLET FEIT & PREIS, P.C.'S MOTION TO DISMISS THE AMENDED COMPLAINT

COMES NOW Plaintiffs herein and hereby oppose the motion to dismiss filed by

Defendant Billet, Feit, & Preis, (hereinafter "BFP"). The motion should be denied for a

number of reasons, including: a) the firm has aided and abetted income tax fraud for

approximately 10 years, (which illegal activity aided and abetted the commission of war

crimes that caused in the Plaintiffs' injuries as described herein, allowing them to file a

tort claim despite Defendant's attempted arguments to the contrary), and because b) its

main argument centers on the application of the political question doctrine, which as

described herein is not applicable to the case at bar. As numerous authorities have held,

including Judge Collyer in this judicial district, (*see Biton v. Palestinian Interim Self-*

*Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004) ("*Biton I*"*); Biton v.*

*Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005)

("*Biton II*")), the political question doctrine has no application on our facts. Besides

relying on the political question doctrine, Defendant's other erroneous assertion is that

the Act of State doctrine similarly bars this lawsuit from going forward.

As explained herein, the Act of State Doctrine is based on the fact that no Court can ignore the public policy of a foreign country or its statutes.  As detailed in the memorandum in opposition, however, the Israeli government has condemned the settlement enterprise for at least 30 years, and even *banned charitable deductions made to settlements* since 1992. As alleged in the Complaint, Defendant BFP provides its clients like Co-Defendant Kushner Family Foundation with illegal tax advice that it can use charitable donations to provide funding for violence in the middle east.

That is the primary function of a 501(c)(3) entity like Defendant Kushner Foundation, which utilizes the advice and aide of BFP to operate as a funnel for funds. The reason why it operates as a "funnel," is that it only holds donor funds for 24 hours so that they can secure a tax deduction. The Kushner Family Foundation's donors have been taking illegal tax deductions as a result of BFP's accounting advice for years. The funds are then sent by the funnel to the Israeli army and numerous settlements in order to finance the maiming and murdering of Palestinian civilians—a war crime as defined under both the U.S. and the Israeli war crimes statute. Thus, the Act of State Doctrine cannot serve as a basis to dismiss this suit, because *inter alia*, the Israeli government has condemned settlement expansion.

Besides ignoring the relevant case law in this judicial district, the Defendant has also failed to address a number of serious issues. First, as explained herein, an entity that collects funds with the purpose of sending them overseas to intimidate a civilian population is guilty of violating 18 U.S.C. 2339(c), which BFP's clients have done just by collecting funds for the settlements and for rogue soldier sin the Israeli army through their advice (why Defendants like the Kushner Family Foundation seek out and hire BFP

to provide them with the knowledge and means to provide funding for settlement expansion and violence in the middle east). The second important fact Defendant BFP ignores, is that no charity in America can send money overseas to fund a foreign army. *See* 18 U.S.C. § 960. Defendant Kushner Family Foundation has been doing that for years by sending millions of dollars to the 501(c)(3) known as the Friends of the Israeli Army as a direct result of BFP's advice. Unfortunately for the Kushner Family Foundation that's not the only criminal statute it has violated with the help and advice of Defendant BFP.

Both U.S. and Israeli money laundering statutes, as explained herein, criminalize the operations of a U.S. charity that decides to send money abroad to promote and finance criminal activities like arms trafficking and ethnic cleansing. *See* 18 U.S.C. § 1956, U.S. money laundering statute. Based on BFP's advice, Defendants like the Kushner Family Foundation have made contributions to Israeli settlements like Bet El. Through funding received as a result of BFP's advice, settlements like Bet El have been able to greatly expand on stolen land, with the funds providing for the building of firing ranges, setting up sniper schools, and funding a "Jewish only" military academy whose graduates learn how to maim and murder innocent Palestinian civilians.

Third, a 1992 Israeli government report [the *Spiegel Report* as discussed infra specifically detailed and confirmed the criminal activity engaged in by settlers funded by BFP's clients. That activity included forged deeds and seizure of private property. This is the exact conduct complained of the Plaintiffs herein. Compl. ¶ 127. Bet El and other settlements that receive their funding as a result of illegal advice BFP provides its clients all have local militia units who are armed with Kalashnikovs, M16s, stun grenades, body

armor, and sniper scopes. Every year, based on the advice of Defendant BFP principals, the Kushner family takes charitable deductions based on expenditures for the purchase of this military hardware, (arms trafficking), which obviously cannot be deemed to be a charitable activity. Thus BFP principals have been encouraging and advising their clients to commit tax fraud every April 15th when they tell their clients to write off contributions to the Bet El settlement and the Israeli army as "charitable deductions."

Besides providing clients like Defendant Kushner Family Foundation a basis for violating 18 U.S.C. § 960, funding a foreign army, and 18 U.S.C. § 1956, money laundering statute, the BFP has also ignored numerous Treasury Department regulations governing the advice that they give to their clients concerning alleged charitable activities they engaged in, for example the funding of the acquisition military hardware. For example, 501(c)(3)'s cannot use charitable donations to promote discriminatory housing or educational facilities, yet that is exactly what the Kushner family has done by making contributions to Bet El, i.e. erecting "Jewish only" housing projects, "Jewish only" highways, and "Jewish only" schools. That is conduct that a 501(c)(3) cannot engage in, and can result in revocation of tax exempt status. *See Bob Jones University v. United States*, 461 U.S. 574 (1983).

The advice BFP principals give to their clients like the Kushner Family Foundation also violates 18 U.S.C. § 2339(c), President Clinton's 1995 Executive Order 12947, and numerous other statutes. (Violation of these criminal statutes is all detailed in this lawsuit, *see* i.e. Compl. at ¶¶ 112, 116, 126, 128). Defendant BFP attempts to discredit Executive Order 12947's application to the case at bar by incorrectly arguing that it only applies the specific groups cited without mentioning "anyone claimed in the

Amended Complaint to have engaged in terrorism." Contrary to BFP's assertions, however, an Executive Order issued by a President is an evolving document, and circumstances concerning international terrorism can take a different meaning over the years. At the time Executive Order 12947 went into effect, charitable giving and financing settlement activity by pro Israel 501(c)(3)'s were not on the President's radar screen, but the same principals apply—you're funding violence in the Middle East. In fact, based upon Executive Order 12947, approximately 1,000 different individuals have been designated in the last ten years by the Office of Foreign Assets Control at the Treasury Department.

18 U.S.C.§ 2339(c) and Executive Order 12947 both provide that monies cannot be sent overseas to promote or finance terrorist activity, including the intimidation of a local civilian population. For example, both Israeli army personnel and the irate settlers coming from Bet El and other settlements seeking revenge for the killing of an IDF soldier engage in "price tag[1]" killings. That is part of an effort to convince Palestinian civilians to leave the Occupied Territories (also known as the "OPT"). These are the same settlements which the Kushner family through the Kushner Family Foundation as well as the American Friends' of Bet El Institutions' have supported with major funding premised on the advice given to them by BFP principals.

The issue of proximate cause in the context of similar facts has been litigated in this judicial district, and the Plaintiffs have satisfied their burden of proof. Their obligation of course is to link up contributions made to pro settlement U.S. based 501(c)(3) entities like the Kushner Family Foundation and American Friends of Bet El

---

[1] http://www.nbcnews.com/news/world/what-price-tag-behind-israeli-extremist-movement-n401896

Institutions because of advice given to them by BFP principals, which funds are then transferred through the funnel entity to the Israeli army and to settlements like Bet El to fund the criminal conduct described in the Amended Complaint. The Amended Complaint, despite Defendant BFP's assertions, clearly outlines that the funding provided by the Kushner Family Foundation and American Friends of Bet El Institutions' would not have occurred without the advice and aide of BFP principals in designating the funds and donations as tax deductible contributions under the tax code. *See* i.e. Compl. ¶¶ 86— 110, 135, 138, 175. As explained in the Amended Complaint, Bet El and other settlements in the West Bank could not have survived without these funds, especially after the Israeli government in 1992 banned all charitable donations to settlements. *Id*. Furthermore, Treasury regulations provide that no wire transfers can be sent overseas if they result in violating a country's public policy or legislation like Israel's money laundering statute, or its war crimes statute. As expected, it is a serious crime in Israel to finance the commission of war crimes.

 All of the elements needed for the Plaintiffs' claims against BFP are fully alleged and outlined in the Amended Complaint. As explained therein, the flow of funds starts with advice given by accounting firms such as Defendant BFP. BFP principals tell their 501(c)(3) clients (such as the Kushner Family Foundation in this instance), that they can take charitable contributions for money raised in the U.S. and sent to the Israeli army and settlements, even if that funding will be used to purchase military hardware. Jewish only citizens in the settlements are then armed with sophisticated military hardware, which they use to steal Palestinian property. After stealing Palestinian property, retired Israeli army personnel are hired and paid with funding coming from U.S. tax-exempt entities to

surround and protect the new settlements, thus ensuring the theft of Palestinian private property. Based on Treasury regulations, it is obvious that charitable donations cannot be sent abroad to fund individuals who steal or confiscate private property, or engage in arms trafficking, ethnic cleansing, and genocide. In stark contrast, the Justice Department has repeatedly indicted local armed militia groups located in Western United States intent on illegally occupying private U.S. government private property.

The records relied upon by the Plaintiffs include the annual income tax forms (990's) filed by 501(c)(3) entities like the Kushner Family Foundation on advice given to them by BFP principals. In sum, there is no basis to grant this motion to dismiss, and in the words of Judge Collyer in *Biton II* "Defendants argue that the Court would be required to assess the Israeli Palestinian conflict and the illegality of Israeli's oppressive actions in its occupation of the West Bank and Gaza." 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005). She thoroughly rejected that argument—on the basis that "*the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*" *Id*. The motion to dismiss can be denied based on Judge Collyer's opinions in *Biton I* and *Biton II*. *See "Biton I" (Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004)) *and "Biton II" (Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005)). An additional basis for denial is the fact that the State Department has not filed a declaration of interest opposing the continuance of this lawsuit. That Declaration of interest indicates to a sitting federal judge that adjudication of the Plaintiff's lawsuit would encroach on treaty agreements or raise broader foreign relations concerns.

<u>TABLE OF CONTENTS</u>

Introduction ....................................................................................................................1

Table of Contents ...........................................................................................................8

Index of Authorities .......................................................................................................9

Legal Standard ..............................................................................................................12

Argument ......................................................................................................................13
    I.    The Political Question Doctrine Does Not Bar Plaintiffs' Claims

               .....................................................................................................13
            a.   Applying the *Baker* Test Does Not Bar This Lawsuit

               .....................................................................................................16
    II.   The Act of State Doctrine Does Not Bar Plaintiffs' Claims

               .....................................................................................................19
    III.  Other Federal Courts Have Held that Claims Based on the ATA or the ATS
          Do Not Bar a Federal Judge From Hearing Claims Involving Violation of
          International Norms

               .....................................................................................................20
    IV.  Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over
          40 Years

               .....................................................................................................23
            a.   The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S.
                  Soil, and Thus There is Sufficient Contact with the United States to
                  Satisfy the Touch and Concern Test and Afford This Court Ample
                  Jurisdiction

               .....................................................................................................25


    V.   The Complaint Lays Out a Clear Basis for BFP's Liability to the Plaintiffs and
          its Proximate Cause of Their Injuries

               .....................................................................................................30
            a.   The Plaintiffs' Negligence Claims Against Defendant BFP are Well
                  Pled

               .....................................................................................................37
    VI.  This Court Has Personal Jurisdiction Over Defendant BFP

               .....................................................................................................38


Conclusion ....................................................................................................................39

# INDEX OF AUTHORITIES[2]

**CASES:**

Abbas v. Foreign Policy Group, LLC.,
    783 F.3d 1328 (D.C. Cir. 2015).................................................................13

Abdullahi v. Pfizer, Inc.,
    562 F.3d 163 (2d Cir. 2009) ..................................................................24

Almog v. Arab Bank, PLC,
    471 F.Supp.2d 257 (E.D.N.Y. 2007) ........................................................22

Alperin v. Vatican Bank,
    410 F.3d 532 (9th Cir. 2005) ..................................................................16

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ............................................................................12

*Baker v. Carr,
    369 U.S. 186 (1962) ................................................................14, 16, 18, 21

Balintulo v. Daimler AG,
    727 F.3d 174 (2d Cir. 2013) ...................................................................27

*Biton v. Palestinian Interim Self-Government Authority,
    310 F. Supp. 2d 172 (D.D.C. 2004) ("Biton I") ......................................1, 7, 13, 15, 39

*Biton v. Palestinian Interim Self-Government Authority,
    412 F. Supp. 2d 1 (D.D.C. 2005) ("Biton II")............................1, 7, 13, 14, 15, 24, 39

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................12, 13

Beneficial Nat'l Bank v. Anderson,
    539 U.S. 1 (2003) ...............................................................................12

Cf. hinder v. Portocarrero,
    963 F.2d 332, 332 (11th Cir. 1992) ...........................................................23

Doe I v. State of Israel,
    400 F. Supp. 2d 86 (D.D.C. 2005)............................................................15

*Doe v. Exxon Mobil Corporation,
    69 F.supp3d 75 (D.D.C. 2014) .........................................................18, 19, 27, 28, 29

---

[2]       *Asterisks identify those authorities on which Plaintiffs chiefly rely.

Estate of Klieman v. Palestinian Auth.,
    424 F. Supp. 2d 153, 162 (D.D.C. 2006)....................................................................14

Filartiga v. Pena-Irala,
    630 F. 2d 876 (2d Cir. 1980) .......................................................................20, 26

Halberstam v. Welch,
    705 F.2d 472 (D.C.Cir. 1983).......................................................................39

*In re: South African Apartheid Litigation,
    617 F. Supp.2d 228 (S.D.N.Y. 2009) ............................................21, 24, 25

Japan Whaling Ass'n v. American Cetacean Society,
    478 U.S. 221 (1986) .......................................................................17

Kadic v. Karadzic,
    70 F.3d 232 (2d Cir. 1995) .......................................................................16, 20

*Kiobel v. Royal Dutch Petroleum Co.,
    133 S.Ct. 1659 (2013) ......................................................25, 27, 28, 29

Klinghoffer v. S.N.C. Achille Lauro,
    937 F.2d 44 (2d Cir. 1991) .......................................................................24

*Linde v. Arab Bank
    97 F.Supp.3d 287 (E.D.N.Y. 2015) ...........................................................20, 21

Louisville & Nashville R. Co. v. Motely
    211 U.S. 149 (1908) .......................................................................13

Mamani v. Berzain,
    654 F. 2d 1148, (11th Cir. 2011) .......................................................22, 23

Oneida Indian Nation of N.Y. v. County of Oneida,
    414 U.S. 661 (1974) .......................................................................13

Owens v. BNP Paribas S.A.,
    2017 WL 394483 (D.D.C. Jan. 27, 2017)...............................................35

*Sokolow v. Palestine Liberation Organization,
    583 F.Supp.2d 451 (S.D.N.Y. 2008) ...................................................23, 24

Sosa v. Alvarez-Machain,
    542 U.S. 692 (2004) .......................................................................24, 26, 28

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ...............................................................................................13

Whiteman v. Dorotheum GmbH & Co. KG,
    369 U.S. 186 (1962) ...........................................................................................16

Wultz v. Islamic Republic of Iran,
    755 F. Supp. 2d 1, 22 (D.D.C. 2010)...............................................................30, 31

**STATUTES AND RULES:**

18 U.S.C. § 960...........................................................................................................3, 4

18 U.S.C. § 1956....................................................................................................3, 4, 30

*18 U.S.C. § 2331....................................................................................................34, 36

18 U.S.C. § 2339....................................................................................................2, 35, 36

Executive Order 12947 ...............................................................................................4, 5

**Legal Standard**

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Plausibility requires pleading facts, as opposed to conclusory allegations, and must rise above the mere conceivability or possibility of unlawful conduct that entitles to pleader to relief. *Id*. at 678-79. A complaint must be "factually suggestive." *Twombly*, 550 U.S. at 557 n.5. A claimant must provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007) (citations and ellipsis omitted). The Court emphasized that a complaint must contain a "statement of circumstances, occurrences, and events in support of the claim presented" and not mere conclusory statements. *Id*. at 556 (citing 5 Wright & Miller, Federal Practice and Procedure § 1202, at 94-95 (2004)). Although a claimant need not set out in detail the facts underlying his claim, Fed. R. Civ. P. 8(a)(2) "still requires a 'showing' . . . of entitlement to relief." *Id*.

When determining whether a claim arises under federal law, a court will "examine the 'well pleaded' allegations of the complaint and ignore potential defenses: '[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution.'" *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) (quoting

*Louisville & Nashville R. Co. v. Motely*, 211 U.S. 149, 152 (1908). A federal court lacks

jurisdiction over a claim involving federal law "only when the claim is 'so insubstantial,

implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid

of merit as to not involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 89 (1998) (citing *Oneida Indian Nation of N.Y. v. County of Oneida*, 414

U.S. 661, 666 (1974)). "The test for dismissal is a rigorous one and if there is any

foundation or plausibility to the claim, federal jurisdiction exists." 13D Wright & Miller

§ 3654, pp. 244-45.

The D.C. Circuit has recognized that "[a] well-pleaded complaint 'may proceed

even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'"

*Abbas v. Foreign Policy Group, LLC*, 783 F. 3d 1328 (D.C. Cir. 2015) (quoting *Twombly*

at 556). One of the reasons why, is that the Defendant always has an additional remedy to

pursue before trial, i.e. if the complaint survives a motion to dismiss, a defendant may

still move before trial for summary judgment under Rule 56. *Id*. Thus, it is difficult for

the Defendant to assert prejudice at this early stage in the litigation.

## **ARGUMENT**

I.   **The Political Question Doctrine Does Not Bar Plaintiffs' Claims**

Numerous Courts have held, contrary to the Defendant's memorandum, that the

political question doctrine has no application in similar circumstances. That is why

Defendant American Friends has ignored a number of relevant opinions issued in this

District that can be used as a basis for denying their motion to dismiss. In *Biton I* and

*Biton II*, Judge Collyer opined that the Court was competent to rule on similar claims

made herein. 412 F.Supp.2d 1 (D.D.C. 2005). Judge Collyer analyzed both the political

question doctrine and act of state doctrine at length, and rejected the Defendant's

argument that having the case go forward would violate those doctrines.

Citations from her opinions significantly bear on the issue before the Court, i.e.

disposition of the Defendants' motion to dismiss for lack of subject matter jurisdiction.

As Judge Collyer pointed out in *Biton II*: "Defendants argue that the Court would be

required 'to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive

actions in its occupation of the West Bank and Gaza.'" *Id*. She rejected that argument

because, "Defendants misperceive the status of the case. Plaintiffs complain that

Defendants' actions caused them injury; while the ATA provides jurisdiction for the suit

in federal court, *the basic elements of the claim lie in tort, not in the relations between*

*Palestine and Israel*". *Id*. at 5-6. (emphasis added). In rejecting the identical argument

advanced in the Defendants' memorandum, Judge Collyer also explained in *Biton II*:

> "'This is a tort suit brought under a legislative scheme that Congress enacted for
> the express purpose of providing a legal remedy for injuries or death occasioned
> by acts of international terrorism.' There is no flaw in this Court's ability to
> address Plaintiff's claims: Congress explicitly committed these issues to the
> federal courts under the ATA. Similarly, the Court has access to 'judicially
> manageable standards for resolving the issues before it,' id., from both existing
> ATA caselaw and traditional tort caselaw.
>
> The 'initial policy determination' involved here has already been made by the
> U.S. Congress: Americans injured by terrorist acts can sue their attackers in U.S.
> courts and the Court can manage this case to resolution of Defendants' alleged
> liability without 'expressing lack of the respect due coordinate branches of
> government.' Baker, 369 U.S. at 217. The Fifth and Sixth factors from Baker v.
> Carr do not apply because a decision in this individual case will have no
> consequences concerning 'political decisions already made' and will raise only
> the question of Defendants' alleged liability regarding this single bombing of a
> bus. Thus, nothing in Baker v. Carr counsels against having this case proceed."

Biton II, 412 F. Supp, 2d at 6. Similar to the holding in *Estate of Klieman v.*

*Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006), the tortfeasors named herein

"have made no attempt to distinguish any of these prior decisions in their moving papers." Just as in *Biton II*, a decision on Plaintiffs' claims alleged herein can be resolved by this Court by deciding the liability of the Defendant tortfeasors, thus it would have no consequences concerning "political decisions already made." *Biton II* at 6. As this Court can take judicial notice of, the State Department reiterated the political decisions that have been made by at least 12 Presidents, i.e. settlement activity is illegal, and has been condemned by the U.S. State Department for decades. Thus, there should be no fear that any political decisions already made would be contradicted by allowing this lawsuit to go forward.

The Plaintiffs respectfully submit that the Motion to Dismiss can be denied based solely on the holdings in *Biton I* and *Biton II. See Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005). A ruling on this case would not require the Court to decide foreign policy, but rather—as repeatedly explained in the Amended Complaint and herein—Plaintiffs simply seek a remedy for the damages they have suffered as a result of specific, universally recognized war crimes that were committed as a result of the advice BFP gave its clients in how to finance them.

The bottom line is that it would be judicial error for this Court to grant the motion to dismiss based on Judge Bates' holding in *Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005). They are two entirely different cases—first, the *Doe* Plaintiffs actually sued the state of Israel itself, and they never alleged that Defendant tortfeasors like BFP were aiding and abetting a money laundering scheme on U.S. soil designed to rid the West Bank of all non-Jews by financing violence against Palestinian civilians. *Id*. That is clear evidence of financing war crimes, for example, ethnic cleansing. Thus BFP and its

principals can properly be referred to as collaborators under both the U.S. and Israeli war crimes statute.

a.   **Applying the *Baker* Test Does Not Bar This Lawsuit**

Defendant American Friends argues that having the Court decide the issues raised in the Complaint would violate the standards set forth in *Baker v. Carr* as to issues best left to the political branches of government. 369 U.S. 86 (1962). The Court pointed out in *Baker*, however, that "[a]n action does not lie beyond judicial cognizance solely because it raises questions touching upon foreign relations." 369 U.S. 186 (1962). The Second Circuit noted that "[w]ith respect to the first *Baker* test, while foreign policy is committed in the first instance to the Executive, tort claims against foreign countries and individuals under the law of nations, as well as issues of sovereign immunity, *are constitutionally committed to 'none other than our own Judiciary.'*" *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d. Cir. 2005) (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). *See also Alperin v. Vatican Bank*, 410 F.3d 532, 551 (9th Cir. 2005). Again, this application to the facts herein only require an adjudication of tort, and do not require the judiciary to infringe on the coordinate branches of government.

As for the second and third *Baker* tests, just like in *Whiteman*, they are met by applying not only the traditional adjudication process, but also through "the universally recognized norms of international law [invoked by the Plaintiff]." *Whiteman*. at 77. The Second Circuit noted, for example, that the "FSIA "'provide[s] judicially ... manageable standards for adjudicating suits' and 'obviate[s] any need to make policy decisions of the kind normally reserved for non judicial discretion.'" *Id*. (citing *Kadic*, 70 F.3d at 249). As further outlined in *Whiteman*, "[t]he fourth and sixth tests are basically coterminous with

the fifth, that they involve cases where an exercise of jurisdiction, although not *per se* outside the judiciary's authority, would somehow contradict actions taken by the political branches; [the Court] will therefore discuss them together." *Id*.

It is important to reiterate that a ruling in this case would in no way contradict prior decisions taken by the other political branches—executive or legislative. *Id*.; *see also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221 (1986) (the Supreme Court for example unanimously declined to dismiss as non-justiciable a claim that the Secretary of Commerce had violated federal statutory law by refusing to certify that Japan's whaling practices were undermining the effectiveness of an international fishing conservation program). If anything, this case serves to reinforce fundamental principles of international law approved by 12 American Presidents and at least 10 Secretaries of State and the United Nations—fundamental principals of international law have criminalized ethnic cleansing, genocide, and the denationalization of a civilian population as horrific war crimes. Both the Justice and State Departments have made it abundantly clear that U.S. individuals who finance war crimes and/or arms trafficking abroad should be criminally prosecuted to the full extent of the law. That should include BFP and its principals, who have enabled the financing of the Israeli army and belligerent settlers intent on ethnically cleansing the OPT of all Palestinians through its accounting and tax advice to 501(c)(3)'s like Defendant Kushner Family Foundation.

As noted by this Court in *Doe v. Exxon Mobil Corp*., 69 F. Supp. 35, 75 (D.D.C., 2014), when determining if the political question doctrine bars a suit from moving forward, "[e]vidence of the State Department's views as to this issue are accorded 'substantial weight' because the effect of litigation on the foreign policy interests of the

nation is 'at the heart of the Department's expertise.'" *Doe v. Exxon* at 92. Exxon did not

succeed on its motion to dismiss on political question doctrine grounds for the same

reason American Friends' motion should fail here—"[i]n short, there is an insufficiently

recent and definite statement from the Executive that this case interferes with the foreign

policy of the United States." *Id*. If anything, the case for denying BFP's motion to

dismiss is stronger here than it was in *Doe v. Exxon*, as the Executive branch, including

the State Department, and even Israeli official government policy have all condemned the

settlement enterprise described in the complaint.[3] Moreover, the State Department has not

filed a declaration of interest to register its opposition to this lawsuit with this Court.[4] If

any of the *Baker* factors were invoked, as Defendant BFP alleges, as to this lawsuit's

affect or interference on the political branches, the State Department would have filed a

declaration or statement of interest against the suit, something it has not done here:

> "[t]he Executive Branch ... has given no indication that adjudication of the
> plaintiffs' lawsuit would encroach on those agreements or raise any broader
> foreign relations concerns. The Executive often files a statement in Court if it
> believes that judicial consideration of a case would interfere with the operation of
> the United States' treaties and agreements or would otherwise impinge on the
> conduct of foreign relations."

*Alperin v. Vatican Bank*, 410 F.3d 532, 556-57 (9th Cir. 2005); *see also Doe v.*

*Exxon Mobil Corp.*, 69 F.Supp.3d 75, 92 (D.D.C. 2014) (concluding that the political

question doctrine did not bar the plaintiffs' claims because the Executive had not filed

such a statement). Here, however, the United States has not filed such a statement in

order to educate the Court as to why letting this case go forward would negatively impact

U.S. foreign policy objectives. This is clear evidence that the *Baker* factors are not

---

[3] *See* Compl. ¶¶ 52, 67, 68, 75.
[4] (Through Plaintiffs' attempts to serve Ambassador Friedman, the State
Department's legal department has been put on notice of this lawsuit).

applicable to this case, as the coordinate branches of government would be unaffected by a decision herein. Defendant BFP's Motion to Dismiss should therefore be denied.

II.   **The Act of State Doctrine Does Not Bar Plaintiffs' Claims**

In *Doe v. Exxon Mobil Corp*., this Court provided a detailed analysis of the inapplicability of the Act of State Doctrine to facts quite similar to the case at bar. 69 F. Supp. 3d 75 (D.D.C., 2014). As noted by Judge Lamberth, "The type of official act that implicates the act of state doctrine is that which is 'by nature distinctly sovereign, i.e., conduct that cannot be undertaken by a private individual or entity . . .An illustrative list of such public acts includes 'pass[ing] a law, issu[ing] an edict or decree, or engag[ing] in formal governmental action taking [plaintiff's] property.'" *Doe* v. *Exxon* at 88 (internal citations omitted). The Court's analysis in *Doe* v. *Exxon* can be applied directly to the Complaint herein:

> "No such sovereign public act is at issue in this suit. Plaintiffs do not allege that Exxon's security forces [the belligerent settlers and rogue Israeli Army personnel funded by KFF], while admittedly soldiers in the Indonesian military, injured them pursuant to official policies of the GOI [Israeli government] or orders from military commanders. Indeed, this fact about plaintiffs' allegations is the key point distinguishing these cases from those upon which Exxon [KFF] bases its argument . . . Exxon [KFF] has made no showing that plaintiffs were injured pursuant to official military orders as required by the act of state doctrine. Because Exxon [KFF] possesses the burden of proof as the party invoking the defense, this failure to so demonstrate is fatal to their invocation of the doctrine."

*Doe* v. *Exxon* at 88 (internal citations omitted). The Complaint implicates no Israeli government act that is "by nature distinctly sovereign." Furthermore, "[i]t is not sufficient under the act of state doctrine that a court's factual findings would 'impugn' the foreign state's actions; the claims must call for the invalidation of those actions." *Id*. BFP has not shown that the claims made herein would call for invalidation of a foreign state's action, as the Amended Complaint is not implicating any specific state actions. As is

obvious to this Court, the Israeli government has not yet issued an executive order that condones and promotes ethnic cleansing, genocide, arms trafficking, and the theft of private property. As BFP "has made no showing that Plaintiffs were injured pursuant to official military orders," the Act of State doctrine is not applicable here to bar the Plaintiffs' claims.

III.   **Other Federal Courts Have Held That Claims Based on the ATA or the ATS Do Not Bar a Federal Judge From Hearing Claims Involving Violation of International Norms**

It is not just Judge Collyer and the D.C. Circuit that have decided to reject the argument that Courts lack subject matter jurisdiction to entertain claims based on violation of international norms. Other Courts have decided to reject the application of the Political Question doctrine based on similar allegations made herein. For example, in *Linde v. Arab Bank*, Judge Gershon of the Eastern District of New York rejected the invocation of the political question to bar her from hearing similar claims made herein. *Linde v. Arab Bank*, *PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005).

She analyzed the political question doctrine at length, and rejected the Defendant's argument for dismissal premised on the fact that the ATS statute empowers courts to hear a dispute between foreign nationals concerning extra territorial conduct. *Id.* As Judge Gershon observed, this argument was unavailing to the Defendant. Foreign plaintiffs sued foreign defendants for extra territorial conduct in both *Filartiga v. Pena-Irala*, 630 F. 2d 876 (2d Cir. 1980) and *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995). *Id.* And Judge Gershon remarked further that indeed "a recent 2nd Circuit case upheld the availability of aiding and abetting liability for conduct of foreign defendants in South

Africa." Judge Gershon was referring to the case known as *In re S. Apartheid Litigation*, 56 F. Supp. 3d 331 (S.D.N.Y. 2014).

In *Linde*, just like the Plaintiffs herein, the Defendant Bank had, through the provision of financial services to groups that engaged in terrorist activity, knowingly and intentionally aided and abetted violent criminal attacks on civilians in Israel in violation of international law. The only difference between those allegations and the allegations pled herein is that instead of a bank providing financial support for terrorist activity (intimidating a civilian population), it is Defendant Kushner Family Foundation's donations and provision of funds as a result of BFP's advice that enable violent settlers and militia groups to engage in attacks on civilians and steal private property, among other crimes. In fact, a horrific arson incident which killed an entire Palestinian family occurred in in the OPT, and violent settlers have been criminally prosecuted for that terrorist act. *See* Compl. at ¶ 5(a). The Plaintiffs herein, just like the Plaintiffs in *Linde*, have alleged that they've been injured by the Defendant BFP principals enabling Defendant Kushber Family Foundation's provision of substantial financial assistance to various settlements and to the Israeli Army to promote that criminal activity.

Defendants rely significantly on the *Baker v. Carr* holding to justify dismissing the lawsuit based on non-justiciable political questions. Much like the Defendants herein, the Defendant in *Linde v. Arab Bank* laid out the elements that identify a non-justiciable political question. Judge Gershon then concluded, however, that "these elements do not exist in this case, in particular no action by a coordinate branch of the us government is involved here." *Id*. She also pointed out that "it ignores government concerns that charitable donations purportedly for humanitarian services are being funneled to terrorist

entities." *Id*. That's exactly what the KFF has been doing for years based on the advice of BFP principals, i.e. financing irate settlers and rouge Israeli army soldiers from maiming and murdering innocent Palestinian civilians.

Judge Gershon went on to point out that as set forth in *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), the three theories of international law violations asserted in the case were all based upon principles to which the United States has expressed strong adherence. *Id*. at 318. Just as the Plaintiffs alleged in *Almog*, U.S. senior officials like Senator Leahy have expressed strong adherence to international law conventions, like the Geneva Convention. Senator Leahy has, among others, specifically condemned the extra judicial killings (the Dawabshe family was literally burned to death by irate settlers like those described in this complaint). *See* Compl. at ¶ 5(a). And senior State Department officials have repeatedly condemned not only extra judicial killings, but settlement expansion and the violence it promotes. A recent State Department report reveals that entities like the Kushner Family Foundation are still financing wholesale violence in the Occupied Territories. The Court should take judicial notice of the fact that President Clinton criminalized this activity 22 years ago. *See* President Clinton's 1995 Executive Order 12947.

Moreover, successful prosecution of this lawsuit will, if anything, reinforce U.S. public policy concerns about settlement expansion, the frustration of U.S. foreign policy objectives, (see JASTA legislation), and encouraging criminal activity like money laundering, arson and arms trafficking. As this Court knows, money-laundering and arms trafficking are prosecuted on a daily basis by the Justice Department. As recited in *Mamani v. Berzain*, 654 F. 2d 1148 (11th Cir. 2011), the claims alleged therein simply

required the court to evaluate the lawfulness of the conduct of the Defendants/tortfeasors named therein. For example, the claims in *Mamani*, such as extra judicial killings (*see* i.e. reference to the arson attack that murdered the entire Dawabshe family) occurring in Bolivia by government officials, did not require the Court to decide the legitimacy of U.S. executive branch foreign policy decisions. *Mamani* at 1151 (quoting *Cf. hinder v. Portocarrero*, 963 F.2d 332, 332 (11th Cir. 1992)).

Just like here, the claims asserted by the Plaintiffs (genocide, denationalization of a civilian population and ethnic cleansing) do not require this court to decide the propriety of the U.S. executive branch's foreign policy decisions as they pertain to the Middle East. Moreover, Congressional concern, as is evident by the passage of the JASTA legislation, focused on international terrorist activity and the funding thereof, which frustrates U.S. foreign policy objectives. Every time the Kushner Family, through the KFF, sends millions of dollars overseas to fund settlement expansion and arms trafficking, they are specifically frustrating U.S. foreign policy objectives and promoting violence in the Middle East.

IV.   **Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over 40 Years**

A case remarkable on its facts to the case *sub judici*, is *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008). The *Sokolow* plaintiffs alleged that the defendants therein have carried out and inflicted violent physical attacks on an innocent civilian population in order to terrorize and intimidate them. That is the identical claim which has been alleged herein. The court in *Sokolow*, quoting *Estates of Ungar v. Palestinian Authority*, 315 F. Supp. 2d 15 (D.R.I. 2004), noted that "[t]he

[Defendants] PA and PLO repeatedly fail to realize that the nonjusticiability doctrine is one of political questions and not political cases." *Id*. at 456.

The Defendants raise many of the same foreign policy concerns as the PLO did in *Sokolow* and *Klinghoffer,* with the Second Circuit observing that "[*t*]*he fact that the issues before [the court] arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question*." *Id.* (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)). *See also Biton II* at 6, noting that "the ATA provides jurisdiction for suits in federal courts, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*."

In addition, federal courts, such as the Second and Ninth Circuits have recognized tort liability for torture, genocide, and war crimes committed by both state and non-state actors. *In re S. African Apartheid Litig*, 617 F. Supp, 2d 228, 248-49 (S.D.N.Y. 2009) The Court has also in *Apartheid Litig.* held "that a court's jurisdiction to hear claims under the ATCA is not limited by 'the focus of the injury.'" *Id*. at 247 (quoting *In re Marcos*, 978 F. 2d 493, 500 (9th Cir. 1992). A tort that violates customary international law will be recognized under the ATS if "the norm alleged (1) is defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*. (2) is based upon a norm of international character accepted by the civilized world, and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Apartheid Litig.* At 248 (quoting *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009). As this Court knows, genocide and ethnic cleansing are classic war crimes, and violate norms of international character accepted by the civilized world, specifically including Israel.

24

Plaintiffs also allege the international crime of denationalization, which has been recognized as an actionable tort basis for jurisdiction under the ATCA. *See Apartheid Litig.* at 252 ("A state actor commits arbitrary denationalization if it terminates the nationality of a citizen either arbitrarily or on the basis of race, religion, ethnicity, gender, or political beliefs"); *see also* the 1907 Hague Convention Respecting the Laws and Customs of War on Land (individuals have a right to retain their citizenship, even in the fact of a hostile invasion). The Plaintiffs have alleged herein that state actors like out of control Israeli soldiers and belligerent settlers have committed arbitrary denationalization based on race, religion, ethnicity, and political beliefs; all made possible by Defendant Kushner Family Foundation's donations and funding as a result of BFP's advice on how to take tax deductions for these funds. *See* i.e. Compl. ¶116, 117, 126, 128 135, 138, 173 – 175.

  a. **The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S. Soil, and Thus There is Sufficient Contact with the United States to Satisfy the Touch and Concern Test and Afford This Court Ample Jurisdiction**

Defendant BFP argues the Plaintiffs' ATS claim lacks sufficient contact with the United States Under *Kiobel*, making essentially the same arguments as the Defendants did in *Apartheid Litigation*, re: that the Court does not have jurisdiction to address tort claims based on extraterritorial events. Although the physical injuries complained of herein, i.e. maiming and murdering Palestinian civilians, occurred outside the U.S., this is no bar to jurisdiction. *See Apartheid Litig.* at 246. As detailed in the Complaint, pro-occupation U.S. donors and 501(c)(3) officials such as Defendant Kushner Family Foundation, with the help of BFP principals, have conspired on U.S. soil for years to finance horrific criminal activity—maim and murder Palestinians, steal their property,

engage in ethnic cleansing and genocide—with resulting U.S. tax deductions to boot. "It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." *Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980). And the reality is that even today the Kushner Family is financing acts of international terrorism. *See State Department's Country Report on Terrorism for 2016*.

The ATS permits federal courts to "recognize private claims . . . under federal common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). The Supreme Court in *Sosa* noted "that no development of law in the last two centuries has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law," but that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering such a new cause of action." *Sosa* at 692. In explaining what it meant, the Court further elaborated that "[w]e think it is correct, then, to assume that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Sosa* at 725. In its ruling the Court added that "we think courts should require any claim based on present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized[5]" as what constitutes the law of nations. *Id.*

---

[5] The "18th century paradigms" referenced by the Court is that "the reasonable inference from history and practice is that the ATS was intended to have practical effect the moment it became law, on the understanding that the common law would provide a cause of action for the modest number of international law violations thought to carry personal liability at the time: offenses against ambassadors, violation of safe conducts, and piracy"—international norms that were specifically accepted throughout the civilized word at the end of the 18th century. *Sosa* at 692.

Indeed, Plaintiffs meet this burden laid out by the Court in *Sosa*, as they have clearly alleged with great specificity the present-day law of nations violations in the Complaint that rest on a norm of international character accepted by the civilized world, such as genocide, ethnic cleansing, arms trafficking, and murder. *See*, i.e., Compl. at ¶¶ 46, 50. Plaintiffs thus clearly meet the jurisdictional test of *Sosa* for claims brought under the ATS. In addition, defendant BFP wrongly asserts that Plaintiffs' ATS claims are barred by application of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) and *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013). While there is generally a presumption against extraterritorial application of federal statutes, the Supreme Court has allowed that certain "claims [may] touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Kiobel* at 1669.

Judge Lamberth noted in *Doe v. Exxon Mobil Corp.* that under *Kiobel*, "If plaintiffs have sufficiently alleged conduct within the United States that is actionable under the ATS, *their ATS claims are not defeated on the basis of the presumption against extraterritoriality.*" *Doe v. Exxon* at 96 (emphasis added). As the Court noted in denying Defendant Exxon Mobil Corp.'s motion to dismiss, the plaintiffs therein "allege that EMC officials based in the United States 'made and implemented the decision[s],'–in this case, whom 501(c)(3)'s like the Kushner Family Foundation decided to provide funding to based on the advice of BFP principals, such as the FIDF—with "Plaintiffs mak[ing] a number of allegations regarding support provided by Exxon . . . (alleging Exxon provided material support to its security personnel by, for example, constructing facilities, *providing funding for weapons, providing supplies and equipment, and paying*

*for the services of consultants in training and equipping the personnel*).” *Id*. (emphasis added). This is the identical conduct Plaintiffs allege the advice of BFP Principals enabled Defendant Kushner Family Foundation to engage in—i.e. providing the funding for weapons, sniper scopes, supplies, training, equipment, and even establishing sniper schools and firing ranges.. *See* i.e. Compl. at ¶¶ 68, 69, 96, 100, 135.

The Complaint herein goes a step further than that of *Doe* v. *Exxon* in complying with the requirements of *Kiobel*. The Plaintiffs have alleged herein that: a) Defendant Kushner Family Foundation’s monetary support comes from the United States. *See Doe* v. *Exxon* at 96; b) that the donors involved are U.S. citizens; c) there is an ongoing nationwide solicitation effort which aggregates to a $2 billion monetary transfer to illegal settlements every year; and d) that Defendant Kushner Family Foundation’s support is a result of the advice given to it by Defendant BFP Principals. Finally, all 501(c)(3)’s like the Kushner Family Foundation have to file annual reports with the IRS—they are called 990s. These 990 forms are prepared and filed by BFP principals. By failing to detail the criminal activities that they finance abroad, specifically arms trafficking and money laundering, BFP has repeatedly advised for and aided committed income tax fraud. The Treasury Department has repeatedly condemned any and all charities that commit income tax fraud.

What Defendant further ignores in its brief, is that BFP’s conduct and advice to their clients like Defendant Kushner Family Foundation enabled those clients to directly provide the funding and support required for the violation of numerous present-day laws of nations, and thus satisfy the requirements of international acceptance outlined in *Sosa* right here on U.S. soil. These include: Money laundering, providing financing for the

commission of internationally accepted crimes like genocide, ethnic cleansing, denationalization, murdering and maiming, theft of private property, and arms trafficking. *See* Compl. ¶¶ 22, 34, 46, 50, 96, 100, 112, 116, 117, 135, 138, 169, 171, 173 – 175. All of this criminal activity was financed based on the advice given by BFP principals to their tax exempt clients regarding legitimate charitable tax deductions. As alleged in the Complaint, the criminal activity abroad constitute violations of international law that are linked to conduct engaged in by BFP clients on U.S. soil. Their clients solicited donations on U.S. soil, filed for tax-exempt status on U.S. soil, and have continued to file 990s on U.S. soil which do not disclose the activity which these tax-exempt entities are financing. The conduct engaged in by these 501(c)(3)'s sufficiently meet the "touch and concern" requirements of *Kiobel*, as explained in great detail by the Court in *Doe* v. *Exxon Mobil Corp.*, 69 F. Supp. 3d at 96. One of the reasons why Exxon Mobil Corp. was accused of financing war crimes was that it was funding a local militia unit abroad, and actually providing military hardware to that unit. That of course is the exact conduct complained of herein. Thus Defendant's arguments to the contrary are unavailing to warrant dismissal of the claims brought under the ATS.

Re: the "touch and concern test," Defendant BFP engaged in conduct on U.S. soil years ago, when it initially filed for its clients' 501(c)(3) status's right here in Washington, D.C. This conduct continues each year when BFP principals file their clients' annual tax returns and updated 990s. Securing this tax-exempt status with the aide of BFP principals made it possible for Defendants like the Kushner Family Foundation to solicit funds on U.S. soil destined to be sent overseas to promote criminal activity. Defendant BFP, by aiding and abetting income tax fraud, not only made

settlement expansion and the theft of private Palestinian property possible, they actually got their clients an incredible bonus for doing so, which is why they continue to work with BFP. The bonus of course is the right to take millions of dollars in tax write offs while at the same time supporting their number one priority—the growth of settlements, which necessarily results in ethnic cleansing and genocide.

<p style="padding-left: 2em">V.    **The Complaint Lays out a Clear Basis for the Plaintiffs' Standing and BFP's Liability to the Plaintiffs and its Proximate Cause of Their Injuries**</p>

As recited in the Complaint, the U.S. based 501(c)(3)'s like the Kushner Family Foundation who receive donations destined to finance war crimes and settlement expansion, use BFP principals' advice to hold the funds for 24 hours before sending them off in order for their donors to receive favorable tax write-offs. As explained earlier, 501(c)(3)'s who engage in such activity act as temporary custodians of these funds, which entities have been deemed by the Treasury Department to be "funnels," i.e. they're not engaged in charitable conduct—they simply collect funds and send them overseas to promote criminal conduct. That is classic money laundering activity, and as alleged in the Amended Complaint, BFP principals have been encouraging and enabling this activity for years. *See* 18 U.S.C.§ 1956. *See i.e.* Compl. ¶¶ 135, 138, 173 – 175.

In *Wultz v. Islamic Republic of Iran*, proximate causation was found because the complaint "alleged a flow of money *directly* into the coffers of PIJ." 755 F. Supp. 2d 1, 22 (D.D.C. 2010). The Complaint herein meets this same requirement as the Complaint in *Wultz*, noting that Defendant Kushner Family Foundation directly provided funding to the Friends of the Bet El Settlement and the Friends of the Israeli Army based on advice given by BFP Principals. Those principals knew that Bet El settlement leaders would be

"unlikely to use wired moneys for any other purpose" besides financing the war crimes alleged in the Complaint, such as maiming and murdering Palestinians. *See Wultz* at 22; Compl. at ¶¶ 34, 46, 50, 135, 138, 175. An application of *Wultz* to the Complaint herein therefore warrants denial of Defendant's Motion. *See* Compl. at ¶¶ 34, 46, 50, 96, 100, 117, 138, 171; ("This activity [violations of international law] could not have occurred without . . . the financial assistance provided by" the Kushner Family Foundation and American Friends of Bet El Institutions as a result of BFP's advice and accounting work; "All Defendants knew that, without those funds [provided by Defendants], the settlements would have been abandoned thirty years ago.").

The Complaint clearly states that if it were not for BFP's advice to its clients, the funding would never have occurred, and as a direct result the Plaintiffs' injuries caused by the war crimes enabled by this funding would not have occurred. *See* Compl. at ¶ 138:

> As a result of the advice that members of the accounting firm BFP have given to their pro-occupation clients, Defendants Friedman and Kushner family members have taken illegal tax write offs every April 15th, saving them huge sums in tax obligations. More importantly, as it concerns this case, had Defendants Friedman and KFF officials been informed that donations to the Israeli army and the Bet El settlement constituted income tax fraud, they never would have considered financing the Israeli army or the Bet El settlement for two reasons. First, they could go to jail because they were participating in a $2 billion money laundering scheme and financing genocide, arms trafficking, and ethnic cleansing. Second, there are at least 1,000 legitimate tax-exempt entities located in New York City, including Friends of Lincoln Center. All Defendants knew that, without those funds, the settlements would have been abandoned thirty years ago.

*See also* Compl. at ¶ 175  Defendant's arguments that these allegations are not adequately pled in the Amended Complaint are thus unavailing. (*See i.e.* Defendant's Motion to Dismiss at 23, which ignores this allegation of the Amended Complaint). Plaintiffs however have demonstrated that these tax-exempt entities finance criminal

activities abroad, consistent with the report that the State Department issued in January

2016. *See State Department's Country Report on Terrorism for 2016.*[6]

Based on the allegations made herein, a reasonable juror could conclude that the

significant amount of money sent by Defendant Kushner Family Foundation overseas ($5

to $10 million every year) was a direct result of the advice and aide given by Defendant

BFP in preparing the Kushner Family Foundation's annual 501(c)(3) tax forms. The

Kushner family members intended that their funds would be used to rid the West Bank of

all non-Jews, and financially support belligerent settlers, and rogue Israeli army soldiers

in order to finance the horrific terrorist attacks described herein. As one stark example of

what the settlers are capable of, they literally burned down the home of the Dawabshe

family[7], intending to murder all members of that family.

Another reason why BFP principals' advice and aide regarding the provision of

those funds were so crucial is that the Israeli government as of 1992 had prohibited

charitable donations to settlements, which cut off a significant source of income.

Likewise, Secretary of State Baker was assured by Prime Minister Shamir in 1992 [the

Baker/Shamir Accord], that no part of American financial aid would be used to set up

new settlements or finance expansion of existing settlements, and necessarily include

ethnic cleansing and genocide. Since those financial sources were no longer available to

settlements, it was obvious that the funding coming from 501(c)(3)'s was critical in order

to continue settlement expansion and in the process rid the West Bank of all non-Jews.

---

[6] https://www.state.gov/j/ct/rls/crt/2016/index.htm
[7] *See* https://www.theguardian.com/world/2015/jul/31/death-18-month-old-in-arson-attack-heightens-tensions-west-bank-israel; *see also*
http://mondoweiss.net/2016/03/arsonist-set-ablaze-house-of-witness-in-duma-arson-attack/

As is obvious, besides financing war crimes, the Kushner Family has been violating the Baker/Shamir Accord every time they wired money overseas to the Bet El settlements to promote criminal violence. Sending significant amounts of money overseas to promote violence was a direct result of the advice rendered by BFP principals to their 501(c)(3) client base.

Had the Kushner Family Foundation and American Friends of Bet El Institutions not received the advice from BFP principals on filing the annual tax forms and using donations which financed arms trafficking as tax write offs, these 501(c)(3)'s would not have provided these funds, which would have meant the end of settlement expansion. As outlined in the Amended Complaint, without the funding from Defendant Kushner Family Foundation, the belligerent settlers and rogue Israeli army personnel described in the Complaint would not have a source of funding to: a) properly arm and equip local Israeli militia units; b) afford or conduct training such as that done at sniper schools used to commit the war crimes alleged in the complaint; or c) build vital infrastructure improvements like electric power grids, waste disposal units, and sewage hookups needed for settlement expansion necessitating the theft of private Palestinian property. Without those vital infrastructure improvements, settlement expansion would have come to a screeching halt, ending the theft of private Palestinian property.

In the present case, the Plaintiffs have specifically alleged numerous facts to support their claims, noting the alleged war crimes have not only been occurring for at least the last several decades, but that they are still ongoing to this day. *See* i.e. Compl. ¶¶ 125, 131, 145; *see also* the earlier referenced *State Department's Country Report on Terrorism for 2016*. Plaintiffs herein allege that BFP's advice to the Kushner Family

Foundation and American Friends of Bet El Institutions specifically included that they could legitimately run their charities to act as "funnels" which raises funds on American soil to transfer those funds overseas to finance the commission of war crimes. It is further alleged that BFP principals specifically had the necessary *scienter* to know how its advice was being used (re: to finance war crimes and subjugate the civilian Palestinian population through violence and intimidation), in order to retain and profit from these wealthy NGO's. *See* Compl. ¶ 135 (noting that BFP knew where and how their clients funds were being used due to their access to extensive accounting records):

> "Members of the accounting firm BFP knew that FOBI, KFF, and other tax exempt entities were engaging in money laundering by sending approximately $2 billion in laundered funds every year to their sister educational facilities which adhere to discriminatory policies violate numerous Treasury Department regulations. (*See U.S. v. Jones University*, 615 F.3d 544 (2012)). Also, members of the firm, being well acquainted with their clients' financial operations knew that FOBI, KFF, and other tax exempt entities like FIDF were engaging in money-laundering by sending approximately $2 billion every year to their sister Israeli-based NGOs and to the Israeli army."

Furthermore, 18 U.S.C. § 2331 defines international terrorism to mean activities that:

> "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State; (B) *appear to be intended—(i) to intimidate or coerce a civilian population . . . and (C) occur primarily outside the territorial jurisdiction of the United States...*"

(emphasis added). The violations of the laws of nations alleged in the Amended Complaint (ethnic cleansing, genocide, theft of private property, murdering and maiming Palestinian civilians, etc.,) certainly fall within the definition of international terrorism as defined in 18 U.S.C. § 2331 above, as Plaintiffs have alleged these war crimes are being used to intimidate and subjugate the civilian population of Palestine in order to steal their

private property, expand the settlement enterprise, and ultimately rid the Occupied

Territories of all Palestinians. *See* Compl. ¶¶ 87, 117. Accordingly, these Plaintiffs allege

facts that are wholly different than the facts relied upon by Judge Baker to reject an

aiding and abetting theory in *Owens* (that Defendant bank processed funds in Sudan, and

Sudan provided material support to Al Qaeda), but instead assert that BFP knowingly and

directly provided the advice and aide necessary to enable Defendant Kushner Family

Foundation to transfer their funds overseas to aide in the commission of terrorist activity.

*See Owens* at 9-10. That specifically violates 18 U.S.C. § 2339(c) and certain provisions

of the Justice Against Sponsors of Terrorist Activity.

 Furthermore, as defined by Judge Baker in *Owens*, a finding of proximate cause

under § 2333 "is defined as a test of whether the injury is the natural and probable

consequence of the negligent or wrongful act and ought to have been foreseen in light of

the circumstances . . . '[a]ny terrorist act, including the September 11 attacks, might have

been the natural and probable consequence of knowingly and intentionally providing

financial support to al Qaeda.'" *Owens* at 20 (internal citations omitted). It is alleged in

the lawsuit that massive funds have been sent by the Kushner Family Foundation

overseas based on advice given by BFP principals to groups like Friends of the Israeli

Army and settlements like Bet El. That settlement, much like other settlements, use those

funds to set up sniper schools and purchase sophisticated military equipment like M16s,

stun grenades, and sniper scopes used for committing war crimes and subjugating the

local civilian populations. Thus the Plaintiffs have clearly alleged in the Complaint that

BFP Principals had the necessary *scienter* to know that its advice for its clients' funds

was being relied upon to finance war crimes and terrorist activities as defined in 18

U.S.C. § 2331, and 18 U.S.C. § 2339(c). Thus the advice given to the Kushner Family

Foundation and American Friends of Bet El Institutions was the proximate cause of

Plaintiffs' injuries. *See* i.e. Compl. ¶¶ 86—110, 135, 138, 173 – 175. That advice of

course constitutes aiding and abetting income tax fraud.

Despite BFP's assertions otherwise, the linkage between pro-settlement

501(c)(3)'s financing ability and the violence committed overseas is crucial. For

example, it is difficult to conceive how any settlement could afford spending $50,000 to

$100,000 on a local militia unit. For the Court's edification, settlements are populated by

middle-income Israeli citizens looking for moderately priced housing not available in

Israel's major cities. Concrete evidence as to the importance of this funding is evidenced

by the solicitation made by the One Israeli Fund. That Fund explicitly stated on its

website: "in light of the recent budget cuts that have been made to the IDF and the cut

back of checkpoints allocated to protected these communities, *the security resources and*

*training that we provide is paramount to the future of these areas*."

Thus it is quite important to settlements like Bet El to have the support of the

Kushner Family Foundation and American Friends of Bet El Institutions. In sum,

Kushner Family Foundation officials and American Friends of Bet El Institutions

officials, based on the advice given to them by BFP principals, have been funding the

"security resources and training" which made it possible for these settlements to expand

in the last 30 years by illegally confiscating Palestinian private property. Thus it should

be obvious to the BFP principals that without the funding generated by their clients, the

settlement enterprise would come to a screeching halt, because that funding was

"paramount to the future of these areas." That is why the advice that these BFP principals

gives to their tax-exempt clients is so important.

It should also be pointed out that while BFP asserts that several of the Plaintiffs'

are deceased (*see* Defendant's Motion at 26 – 28), all Plaintiffs' asserting claims in the

Amended Complaint are properly represented by their proper estate representative where

this is in fact the case, making Defendant's arguments as to their standing moot.

Furthermore, the Amended Complaint clearly lays out the Plaintiffs' injuries, thus

providing them with standing to bring their claims despite BFP's attempted arguments to

the contrary. (*See i.e.* Compl. ¶¶ 13, 20: "Since Plaintiffs Ali and Kateeb have lost $2-3

million in real estate…")

a. **The Plaintiffs' Negligence Claims Against Defendant BFP Are Well Pled**

Defendant BFP correctly notes that a claim for negligence under District of

Columbia law requires a showing "'that (1) the defendant owed a duty to the plaintiff; (2)

the defendant breached its duty; and (3) the breach was the proximate cause of (4)

damages sustained by plaintiff.' *Jalevare v. Alpha Kappa Alpha Sorority, Inc.* 521 F.

Supp.2d 1, 14 (D.D.C. 2007)." Defendant's Motion to Dismiss at 33. Count V of the

Amended Complaint clearly alleges each of these elements against Defendant BFP,

noting that BFP had a duty of care "to render accurate professional advice . . . to any

individuals who would be impacted by the nature of that advice, including the Plaintiffs

herein." Compl. ¶ 175. That "Defendant BFP principals breached their duty of care

owed" by providing incorrect and illegal advice based on current Treasury regulations,

and that "For example, Plaintiffs Kateeb and Ali have lost $2-3 million worth of valuable

real estate because [of] BFP's clients, utilizing their advice . . ." with the other Plaintiffs

"injuries [] described in Counts I – IV.[8] Compl. ¶ ¶ 173 – 175. As all of the elements of a negligence claim against BFP have been properly pled, BFP's motion to dismiss should be denied as to Count V.

## VI.   This Court Has Personal Jurisdiction Over Defendant BFP

While it is the Plaintiffs' burden to make a *prima facie* showing that this Court has personal jurisdiction over the Defendant Defendant's motion to dismiss based on a lack of personal jurisdiction is a classic red herring argument when one examines the allegations pled in the Amended Complaint. As earlier referenced, without the tax-exempt status provided by its advice and filings sent to the IRS, BFP's clients like the Kushner Family Foundation could not solicit funds in America and would thus not hire BFP for its services. As alleged in the Amended Complaint:

> The District of Columbia's long-arm statute is codified under D.C. Code § 13-423, and provides a basis for jurisdiction under the conspiracy theory of personal jurisdiction against members of a civil conspiracy when the elements of a civil conspiracy have been pled. *See Second Amendment Found. v. United States Conf. of Mayors*, 274 F.3d 521 (D.C. 2001); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.ed 1020 (D.C. Cir. 1997). In order for the Court to exercise personal jurisdiction under conspiracy theory, "the plaintiff must plead with particularity "the conspiracy as well as the overt acts within the conspiracy." *Jungquist* at 1031 (internal citations omitted). Conspiracy jurisdiction has been further defined to be where an individual is deemed to have transacted business in the forum state directly, and as a consequence other conspirators who have never entered the forum state are deemed to transact business there "by an agent." *Second Amendment Found.* at 523. Thus if one member of a conspiracy engaged in activities in the forum, every member of the conspiracy is subject to the forum's jurisdiction. Defendants are therefore also subject to personal jurisdiction in the District of Columbia under the conspiracy jurisdiction theory. For example, Defendant Billet, Feit, and Price, P.C., as explained in more detail *supra*, is subject to conspiracy jurisdiction because of their role in the civil conspiracy complained of herein—i.e., routinely giving illegal advice to donors intent on settlement expansion through theft of private property and the commission of war

---

[8] ¶ 173 of the Amended Complaint, the first allegation of Count V, specifically notes that "Plaintiffs hereby repeat and re-allege paragraphs 1 – 172 as if fully recited herein, especially those allegations made in Count IV"

crimes. *See* ¶¶ 86—110. If they had not rendered that advice to these donors, and therefore the donors could not secure tax write offs, settlement expansion would come to a screeching halt. They played therefore an important role in the civil conspiracy described herein.

Compl. at ¶ 21; *See also* Compl. ¶ 87. Defendant's Motion to Dismiss fails to adequately address this allegation of the Amended Complaint, which clearly outlines BFP's role in the conspiracy, as well as its *scientor* and motivation. In addition as already noted, all 501(c)(3)'s have to file annual 990 forms with the Treasury Department. That is classic business activity engaged in with a U.S. regulatory body, i.e. the Treasury Department, which BFP regularly engages in here in this District through its necessary work with the Treasury Department and IRS in preparing and filing its clients' tax forms. Thus despite Defendant's arguments to the contrary, conspiracy jurisdiction over BFP is fully laid out and pled in the Amended Complaint. The elements of a civil conspiracy, as this court knows, have been laid out in the case *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983), which is cited as respected authority in the JASTA Act); Compl. at ¶ 87. Thus Plaintiffs have in addition adequately pled conspiracy-based jurisdiction over Defendant BFP.

**Conclusion**

Based on the authorities cited herein, especially those from this judicial district, *see Biton I and Biton* II, and the detailed allegations contained in the Complaint, this Court has ample precedent to rely on in denying the instant motion to dismiss based on subject matter jurisdiction.

Respectfully Submitted,

_____/s/_____
Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Managing Partner
Transnational Business Attorneys Group
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 – 4343
mm@martinmcmahonlaw.com

Attorney for the Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing and the text of the proposed order has been made through the Court's electronic transmission facilities on the 8th day of September, 2017.

Respectfully Submitted,

_____/s/_____
Martin F. McMahon, Esq.