UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MIKO PELED, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No: 1:17-cv-00260 |
| | ) | Hon. Reggie B. Walton |
| BENJAMIN NETANYAHU, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ‎ | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT AMERICAN FRIENDS OF BET EL INSTITUTIONS' MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1), (b)(2) and (b)(6)

COMES NOW Plaintiffs herein and hereby oppose the motion to dismiss filed by the

Defendant American Friends of Bet El Institutions', hereinafter "American Friends." The

motion should be denied for a number of reasons, including the fact that its main

argument centers on the application of the political question doctrine. As numerous

authorities have held, including Judge Collyer in this judicial district, (*see Biton v.

Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004)

("*Biton I*")*; Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-

6 (D.D.C. 2005) ("*Biton II*")), the political question doctrine has no application on our

facts. Besides relying on the political question doctrine, Defendant's other erroneous

assertion is that the Act of State doctrine similarly bars this lawsuit from going forward.

As explained herein, the Act of State Doctrine is based on the fact that no Court

can ignore the public policy of a foreign country or its statutes.  As detailed in the

memorandum in opposition, however, the Israeli government has condemned the

settlement enterprise for at least 30 years, and even *banned charitable deductions made to settlements* since 1992. That is the primary function of a 501(c)(3) entity like American Friends that operates like a funnel. The reason why it operates as a "funnel," is that it only holds donor funds for 24 hours so that they can secure a tax deduction. The funds are then sent by the funnel to the Israeli army and the Bet El Settlement in order to finance the maiming and murdering of Palestinian civilians—a war crime as defined under both the U.S. and the Israeli war crimes statute. Thus, the Act of State Doctrine cannot serve as a basis to dismiss this suit, because *inter alia*, the Israeli government has condemned settlement expansion.

Besides ignoring the relevant case law in this judicial district, the Defendant has also failed to address a number of serious issues. First, as explained herein, an entity that collects funds with the purpose of sending them overseas to intimidate a civilian population is guilty of a 18 U.S.C. 2339(C) violation. Just by collecting funds for the settlements and for rogue soldiers in the Israeli army. Second, that no charity in America can send money overseas to fund a foreign army. *See* 18 U.S.C. § 960.

Both U.S. and Israeli money laundering statutes, as explained herein, criminalize the operations of a U.S. charity that decides to send money abroad to promote and finance criminal activities like arms trafficking and ethnic cleansing. *See* 18 U.S.C. § 1956, U.S. money laundering statute. By providing funds to the Bet El Settlement, American Friends has financed activities including building firing ranges, setting up sniper schools, and funding a "Jewish only" military academy whose graduates learn how to maim and murder innocent Palestinian civilians. That conduct specifically violates numerous Treasury Department 501(c)(3) regulations. For example, no 501(c)(3) can

finance discriminatory practices whether it be Jewish only housing complexes, Jewish only roads, or Jewish only Hospitals. *See Bob Jones University v. United States*, 461 U.S. 574 (1983).

Third, a 1992 Israeli government report about settlement activity known as the "Spiegel Database" investigated settlement activity for over a decade, and specifically details and confirms that criminal activity. *See* Compl. ¶ 127. The "Spiegel Database" found that settlers had "made false affidavits, misused the absentee property law, and received illegal transfers of private property, and tens of millions of shekels of public funds." Thanks to American Friends' funding, Bet El has a local militia unit that is armed with Kalashnikovs, M16s, stun grenades, body armor, and sniper scopes that they use to confiscate property like this. Every year, donors to American Friends such as co-Defendant Friedman take charitable deductions based on expenditures for the purchase of military hardware, (arms trafficking), which obviously cannot be deemed to be a charitable activity. Thus American Friends officials and their donors have been committing tax fraud every April 18th when they deduct contributions for purchasing military hardware, body armor and sniper scopes for the Bet El settlement and the Israeli army as "charitable deductions."

Besides violating 18 U.S.C. § 960 funding a foreign army and 18 U.S.C. § 1956. money laundering statute, American Friends has also ignored numerous Treasury Department regulations governing their alleged charitable activities. For example, one cannot use charitable donations to promote discriminatory housing or educational facilities, yet that is exactly what American Friends has done in providing funding to the Bet El settlement, i.e. erecting "Jewish only" housing projects, "Jewish only" highways,

and "Jewish only" schools—that is impermissible conduct that a valid 501(c)(3) can engage in. *See Bob Jones University v. United States*, 461 U.S. 574 (1983).

As pointed out in Section I below, American Friends officials have also violated 18 U.S.C. 2339C, and President Clinton's 1995 Executive Order 12947. That statute and executive order both provide that monies cannot be sent overseas to promote or finance terrorist activity, including the intimidation of a local civilian population. Both the Israeli army and the irate settlers coming from Bet El and other settlements seeking revenge for the killing of an IDF soldier (aka "price tag[1]" killings) in an effort to convince them to leave the Occupied Territories (also known as the "OPT"). In fact, irate settlers coming from the Bet El settlement and other nearby settlements supported by American Friend's funding have been accused of engaging in these price tag attacks.

American Friends' provision of funding to these irate settlers have enabled them to intimidate Palestinian farmers, with settlers maiming and murdered them in an effort to convince those who remain to leave the occupied territories. American Friends has been very successful, because 400,000 Palestinians no longer live in the OPT, and no longer own the 49,000 homes that they used to occupy before settlements sprung up about 40 years ago—when the Bet El settlement was first founded. Violation of these criminal statutes is all detailed in this lawsuit, *see* i.e. Compl. at ¶¶ 112, 116, 126, 128.

The issue of proximate cause in the context of similar facts has been litigated in this judicial district, and it appears that the Plaintiffs have satisfied their burden of proof. Their obligation of course is to link up contributions made to pro settlement U.S. based 501(c)(3) entities like American Friends, which funds are then transferred through the

---

[1] http://www.nbcnews.com/news/world/what-price-tag-behind-israeli-extremist-

funnel entity to the Israeli army and to settlements (primarily Bet El) to fund the criminal conduct described herein. As further explained herein, Bet El and the other hundred settlements in the West Bank couldn't have survived without these funds, especially after the Israeli government in 1992 banned all charitable donations to settlements. Treasury regulations provide that no transfers can occur overseas if they violate a country's public policy or legislation like Israel's money laundering statute, or if they involve the theft of private property.

The flow of funds starts with contributions to 501(c)(3) "funnels" based in the U.S., in Defendant's case American Friends, which proceeds are then sent to the Israeli army, and to settlements like Bet El. Jewish only citizens in the settlements are then armed with sophisticated military hardware, and after stealing Palestinian property, Israeli army members hired by the settlements surround and protect the new settlements, thus ensuring the ongoing theft of Palestinian private property. Based on Treasury regulations, it is obvious that charitable donations cannot be sent abroad to steal or confiscate private property, or to finance arms trafficking, ethnic cleansing, and genocide. In stark contrast, the Justice Department has repeatedly indicted local armed militia groups located in Western United States intent on illegally occupying private U.S. private property.

The records relied upon by the Plaintiffs include the annual income tax forms (990's) filed by 501(c)(3) American Friends. In sum, there is no basis to grant this motion to dismiss, and in the words of Judge Collyer in *Biton II* "Defendants argue that the Court would be required to assess the Israeli Palestinian conflict and the illegality of Israeli's oppressive actions in its occupation of the West Bank and Gaza." 412 F. Supp. 2d 1, 5-6

(D.D.C. 2005). She thoroughly rejected that argument—on the basis that "*the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*" *Id*. The motion to dismiss can be denied based solely on Judge Collyer's opinions in *Biton I* and *Biton II*, and based on the fact that the State Department has not filed a declaration of interest in this case, explaining why the Court should dismiss this case. *See "Biton I" (Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004)) *and "Biton II" (Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005))*. Contrary to Defendant's contention, it is standard practice for the State Department to file declarations of interest in cases which they feel impact negatively the U.S. foreign policy objectives. That is another basis for denying the Motion to Dismiss. It is important to note that given Ambassador Friedman's status in this case, and attempts at service on him with the State Department, the Department has been on notice as to the filing of this case.

## TABLE OF CONTENTS

Introduction ...................................................................................................................1

Table of Contents ..........................................................................................................7

Index of Authorities ......................................................................................................8

Legal Standard ............................................................................................................11

Argument .....................................................................................................................12

    I.     The Political Question Doctrine Does Not Bar Plaintiffs' Claims
..........................................................................................................................12

           a.   Applying the *Baker* Test Does Not Bar This Lawsuit
..................................................................................................................15

    II.    The Act of State Doctrine Is Not Applicable to This Case
..........................................................................................................................18

    III.  The Amended Complaint Fully Outlines Claims Upon Which Relief May Be Granted
..........................................................................................................................19

           a.   The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S. Soil, and Thus There is Sufficient Contact with the United States to Satisfy the Touch and Concern Test and Afford This Court Ample Jurisdiction
..................................................................................................................21

           b.   The Complaint Lays Out a Clear Basis for American Friends' Liability to the Plaintiffs and its Proximate Cause of Their Injuries
..................................................................................................................24

    IV.   This Court has Personal Jurisdiction Over American Friends
..........................................................................................................................28

Conclusion ..................................................................................................................29

# INDEX OF AUTHORITIES[2]

**CASES:**

Abbas v. Foreign Policy Group, LLC.,
　　783 F.3d 1328 (D.C. Cir. 2015)......................................................................12

Alperin v. Vatican Bank,
　　410 F.3d 532 (9th Cir. 2005) ...................................................................15, 17

Ashcroft v. Iqbal,
　　556 U.S. 662 (2009) ......................................................................................11

*Baker v. Carr,
　　369 U.S. 186 (1962) ..........................................................................13, 14, 15, 18,

Balintulo v. Daimler AG,
　　727 F.3d 174 (2d Cir. 2013) ..........................................................................22

*Biton v. Palestinian Interim Self-Government Authority,
　　310 F. Supp. 2d 172 (D.D.C. 2004) ("Biton I") ................................1, 6, 12, 13, 14, 29

*Biton v. Palestinian Interim Self-Government Authority,
　　412 F. Supp. 2d 1 (D.D.C. 2005) ("Biton II")..............................1, 5, 6, 12, 13, 14, 29

Bell Atlantic Corp. v. Twombly,
　　550 U.S. 544 (2007) ......................................................................................11

Beneficial Nat'l Bank v. Anderson,
　　539 U.S. 1 (2003) ..........................................................................................12

Doe I v. State of Israel,
　　400 F. Supp. 2d 86 (D.D.C. 2005)................................................................14

*Doe v. Exxon Mobil Corporation,
　　69 F.supp3d 75 (D.D.C. 2014) ...............................................17, 18, 23, 24

Estate of Klieman v. Palestinian Auth.,
　　424 F. Supp. 2d 153, 162 (D.D.C. 2006)....................................................13

Filartiga v. Pena-Irala,
　　630 F. 2d 876 (2d Cir. 1980) ........................................................................21

Halberstam v. Welch,
　　705 F.2d 472 (D.C.Cir. 1983)......................................................................29

---

[2]　　*Asterisks identify those authorities on which Plaintiffs chiefly rely.

*In re: South African Apartheid Litigation,
    617 F. Supp.2d 228 (S.D.N.Y. 2009) ........................................................21

Japan Whaling Ass'n v. American Cetacean Society,
    478 U.S. 221 (1986) ........................................................16

Kadic v. Karadzic,
    70 F.3d 232 (2d Cir. 1995) ........................................................15, 16

*Kiobel v. Royal Dutch Petroleum Co.,
    133 S.Ct. 1659 (2013) ........................................................21, 22, 23, 24

Louisville & Nashville R. Co. v. Motely
    211 U.S. 149 (1908) ........................................................12

Oneida Indian Nation of N.Y. v. County of Oneida,
    414 U.S. 661 (1974) ........................................................12

Sosa v. Alvarez-Machain,
    542 U.S. 692 (2004) ........................................................21, 22,

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ........................................................12

Strauss v. Credit Lyonaise S.A.
    925, F.supp.2d 414, 433-34, (EDNY 2013) ........................................................26

Whiteman v. Dorotheum GmbH & Co. KG,
    369 U.S. 186 (1962) ........................................................15, 16

Wultz v. Islamic Republic of Iran,
    755 F. Supp. 2d 1, 22 (D.D.C. 2010)........................................................25

**STATUTES AND RULES:**

18 U.S.C. § 960...................................................................................................2, 3

18 U.S.C. § 1956..............................................................................................2, 3, 25

*18 U.S.C. § 2339C ...........................................................................................4, 26

**Legal Standard**

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Plausibility requires pleading facts, as opposed to conclusory allegations, and must rise above the mere conceivability or possibility of unlawful conduct that entitles to pleader to relief. *Id*. at 678-79. A complaint must be "factually suggestive." *Twombly*, 550 U.S. at 557 n.5. A claimant must provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007) (citations and ellipsis omitted). The Court emphasized that a complaint must contain a "statement of circumstances, occurrences, and events in support of the claim presented" and not mere conclusory statements. *Id*. at 556 (citing 5 Wright & Miller, Federal Practice and Procedure § 1202, at 94-95 (2004)). Although a claimant need not set out in detail the facts underlying his claim, Fed. R. Civ. P. 8(a)(2) "still requires a 'showing' . . . of entitlement to relief." *Id*.

When determining whether a claim arises under federal law, a court will "examine the 'well pleaded' allegations of the complaint and ignore potential defenses: '[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution.'" *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) (quoting

*Louisville & Nashville R. Co. v. Motely*, 211 U.S. 149, 152 (1908). A federal court lacks jurisdiction over a claim involving federal law "only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citing *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)). "The test for dismissal is a rigorous one and if there is any foundation or plausibility to the claim, federal jurisdiction exists." 13D Wright & Miller § 3654, pp. 244-45.

The D.C. Circuit has recognized that "[a] well-pleaded complaint 'may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" *Abbas v. Foreign Policy Group, LLC*, 783 F. 3d 1328 (D.C. Cir. 2015) (quoting *Twombly* at 556). One of the reasons why, is that the Defendant always has an additional remedy to pursue before trial, i.e. if the complaint survives a motion to dismiss, a defendant may still move before trial for summary judgment under Rule 56. *Id*. Thus, it is difficult for the Defendant to assert prejudice at this early stage in the litigation.

## **ARGUMENT**

I.   **The Political Question Doctrine Does Not Bar Plaintiffs' Claims**

Numerous Courts have held, contrary to the Defendant's memorandum, that the political question doctrine has no application in similar circumstances. That is why Defendant American Friends has ignored a number of relevant opinions issued in this District that can be used as a basis for denying their motion to dismiss. In *Biton I* and *Biton II*, Judge Collyer opined that the Court was competent to rule on similar claims made herein. 412 F.Supp.2d 1 (D.D.C. 2005). Judge Collyer analyzed both the political

12

question doctrine and act of state doctrine at length, and rejected the Defendant's argument that having the case go forward would violate those doctrines.

Citations from her opinions significantly bear on the issue before the Court, i.e. disposition of the Defendants' motion to dismiss for lack of subject matter jurisdiction. As Judge Collyer pointed out in *Biton II*: "Defendants argue that the Court would be required 'to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza.'" *Id*. She rejected that argument because, "Defendants misperceive the status of the case. Plaintiffs complain that Defendants' actions caused them injury; while the ATA provides jurisdiction for the suit in federal court, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*". *Id*. at 5-6. (emphasis added). In rejecting the identical argument advanced in the Defendants' memorandum, Judge Collyer also explained in *Biton II*:

> "'This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism.' There is no flaw in this Court's ability to address Plaintiff's claims: Congress explicitly committed these issues to the federal courts under the ATA. Similarly, the Court has access to 'judicially manageable standards for resolving the issues before it,' id., from both existing ATA caselaw and traditional tort caselaw.
>
> The 'initial policy determination' involved here has already been made by the U.S. Congress: Americans injured by terrorist acts can sue their attackers in U.S. courts and the Court can manage this case to resolution of Defendants' alleged liability without 'expressing lack of the respect due coordinate branches of government.' Baker, 369 U.S. at 217. The Fifth and Sixth factors from Baker v. Carr do not apply because a decision in this individual case will have no consequences concerning 'political decisions already made' and will raise only the question of Defendants' alleged liability regarding this single bombing of a bus. Thus, nothing in Baker v. Carr counsels against having this case proceed."

> Biton II, 412 F. Supp, 2d at 6. Similar to the holding in *Estate of Klieman v.*

*Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006), the tortfeasors named herein

"have made no attempt to distinguish any of these prior decisions in their moving papers." Just as in *Biton II*, a decision on Plaintiffs' claims alleged herein can be resolved by this Court by deciding the liability of the Defendant tortfeasors, thus it would have no consequences concerning "political decisions already made." *Biton II* at 6. As this Court can take judicial notice of, the State Department reiterated the political decisions that have been made by at least 12 Presidents, i.e. settlement activity is illegal, and has been condemned by the U.S. State Department for decades. Thus, there should be no fear that any political decisions already made would be contradicted by allowing this lawsuit to go forward.

The Plaintiffs respectfully submit that the Motion to Dismiss can be denied based solely on the holdings in *Biton I* and *Biton II. See Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005). Defendant American Friends' tries to distract the Court away from the underlying fact that this case does lie in tort by arguing that the Court's decision would require it to "pick[] a side on a matter of foreign policy," but as repeatedly explained herein such as under an analysis of *Baker v. Carr*, 369 U.S. 86 (1962), below, this is not true—Plaintiffs simply seek a remedy for the damages they have suffered as a result of specific, universally recognized war crimes. Defendant's Motion to Dismiss at 16. The bottom line is that it would be judicial error for this Court to grant the motion to dismiss based on Judge Bates' holding in *Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005). They are two entirely different cases—first, the *Doe* Plaintiffs actually sued the state of Israel itself, and they never alleged that Defendant tortfeasors like American Friends were engaging in a money laundering scheme on U.S. soil designed to rid the West Bank of all non-Jews by financing violence

against Palestinian civilians. *Id*. That is clear evidence of financing war crimes, for example, ethnic cleansing. Thus American Friends' and its officials can properly be referred to as collaborators under both the U.S. and Israeli war crimes statute.

a.   **Applying the *Baker* Test Does Not Bar This Lawsuit**

Defendant American Friends argues that having the Court decide the issues raised in the Complaint would violate the standards set forth in *Baker v. Carr* as to issues best left to the political branches of government. 369 U.S. 86 (1962). The Court pointed out in *Baker*, however, that "[a]n action does not lie beyond judicial cognizance solely because it raises questions touching upon foreign relations." 369 U.S. 186 (1962). The Second Circuit noted that "[w]ith respect to the first *Baker* test, while foreign policy is committed in the first instance to the Executive, tort claims against foreign countries and individuals under the law of nations, as well as issues of sovereign immunity, *are constitutionally committed to 'none other than our own Judiciary.'" Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d. Cir. 2005) (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). *See also Alperin v. Vatican Bank*, 410 F.3d 532, 551 (9th Cir. 2005). Again, this application to the facts herein only require an adjudication of tort, and do not require the judiciary to "decide the core issues" of a political conflict. Defendant's Motion to Dismiss at 16.

As for the second and third *Baker* tests, just like in *Whiteman*, they are met by applying not only the traditional adjudication process, but also through "the universally recognized norms of international law [invoked by the Plaintiff]." *Whiteman*. at 77. The Second Circuit noted, for example, that the "FSIA "'provide[s] judicially … manageable standards for adjudicating suits' and 'obviate[s] any need to make policy decisions of the

15

kind normally reserved for non judicial discretion.'" *Id.* (citing *Kadic*, 70 F.3d at 249). As further outlined in *Whiteman*, "[t]he fourth and sixth tests are basically coterminous with the fifth, that they involve cases where an exercise of jurisdiction, although not *per se* outside the judiciary's authority, would somehow contradict actions taken by the political branches; [the Court] will therefore discuss them together." *Id.*

It is important to reiterate that a ruling in this case would in no way contradict prior decisions taken by the other political branches—executive or legislative. *Id.*; *see also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221 (1986) (the Supreme Court for example unanimously declined to dismiss as non-justiciable a claim that the Secretary of Commerce had violated federal statutory law by refusing to certify that Japan's whaling practices were undermining the effectiveness of an international fishing conservation program). If anything, this case serves to reinforce fundamental principles of international law approved by 12 American Presidents and at least 10 Secretaries of State and the United Nations—fundamental principals of international law have criminalized ethnic cleansing, genocide, and the denationalization of a civilian population as horrific war crimes. Both the Justice and State Departments have made it abundantly clear that U.S. individuals who finance war crimes and/or arms trafficking abroad should be criminally prosecuted to the full extent of the law. That should include American Friends' and its officials, who have financed the Israeli army and belligerent settlers intent on ethnically cleansing the OPT of all Palestinians.

As noted by this Court in *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 35, 75 (D.D.C., 2014), when determining if the political question doctrine bars a suit from moving forward, "[e]vidence of the State Department's views as to this issue are accorded

'substantial weight' because the effect of litigation on the foreign policy interests of the

nation is 'at the heart of the Department's expertise.'" *Doe v. Exxon* at 92. Exxon did not

succeed on its motion to dismiss on political question doctrine grounds for the same

reason American Friends' motion should fail here—"[i]n short, there is an insufficiently

recent and definite statement from the Executive that this case interferes with the foreign

policy of the United States." *Id*. If anything, the case for denying American Friends'

motion to dismiss is stronger here than it was in *Doe v. Exxon*, as the Executive branch,

including the State Department, and even Israeli official government policy have all

condemned the settlement enterprise described in the complaint.[3] Moreover, the State

Department has not filed a declaration of interest to register its opposition to this lawsuit

with this Court.[4] If any of the *Baker* factors were invoked, as Defendant American

Friends alleges, as to this lawsuit's affect or interference on the political branches, the

State Department would have filed a declaration or statement of interest against the suit,

something it has not done here:

> "[t]he Executive Branch ... has given no indication that adjudication of the
> plaintiffs' lawsuit would encroach on those agreements or raise any broader
> foreign relations concerns. The Executive often files a statement in Court if it
> believes that judicial consideration of a case would interfere with the operation of
> the United States' treaties and agreements or would otherwise impinge on the
> conduct of foreign relations."

> *Alperin v. Vatican Bank*, 410 F.3d 532, 556-57 (9th Cir. 2005); *see also Doe v.*

*Exxon Mobil Corp.*, 69 F.Supp.3d 75, 92 (D.D.C. 2014) (concluding that the political

question doctrine did not bar the plaintiffs' claims because the Executive had not filed

such a statement). Here, however, the United States has not filed such a statement in

---

[3] *See* Compl. ¶¶ 52, 67, 68, 75.
[4] (Through Plaintiffs' attempts to serve Ambassador Friedman, the State
Department's legal department has been put on notice of this lawsuit).

order to educate the Court as to why letting this case go forward would negatively impact U.S. foreign policy objectives. This is clear evidence that the *Baker* factors are not applicable to this case, as the coordinate branches of government would be unaffected by a decision herein. Defendant American Friends' Motion to Dismiss should therefore be denied.

II.    **The Act of State Doctrine Is Not Applicable to This Case**

In *Doe v. Exxon Mobil Corp*., this Court provided a detailed analysis of the inapplicability of the Act of State Doctrine to facts quite similar to the case at bar. 69 F. Supp. 3d 75 (D.D.C., 2014). As noted by Judge Lamberth, "The type of official act that implicates the act of state doctrine is that which is 'by nature distinctly sovereign, i.e., conduct that cannot be undertaken by a private individual or entity . . .An illustrative list of such public acts includes 'pass[ing] a law, issu[ing] an edict or decree, or engag[ing] in formal governmental action taking [plaintiff's] property.'" *Doe* v. *Exxon* at 88 (internal citations omitted). The Court's analysis in *Doe* v. *Exxon* can be applied directly to the Complaint herein:

> "No such sovereign public act is at issue in this suit. Plaintiffs do not allege that Exxon's security forces [the belligerent settlers and rogue Israeli Army personnel funded by American Friends], while admittedly soldiers in the Indonesian military, injured them pursuant to official policies of the GOI [Israeli government] or orders from military commanders. Indeed, this fact about plaintiffs' allegations is the key point distinguishing these cases from those upon which Exxon [American Friends] bases its argument . . . Exxon [American Friends] has made no showing that plaintiffs were injured pursuant to official military orders as required by the act of state doctrine. Because Exxon [American Friends] possesses the burden of proof as the party invoking the defense, this failure to so demonstrate is fatal to their invocation of the doctrine."

*Doe* v. *Exxon* at 88 (internal citations omitted). The Complaint implicates no Israeli government act that is "by nature distinctly sovereign." Furthermore, "[i]t is not

18

sufficient under the act of state doctrine that a court's factual findings would 'impugn' the foreign state's actions; the claims must call for the invalidation of those actions." *Id*. American Friends has not shown that the claims made herein would call for invalidation of a foreign state's action, as the complaint is not implicating any specific state actions. Instead, American Friends misreads the Amended Complaint by asserting that "Because the [Plaintiffs'] property was taken by the Israeli government officials in their capacity, there cannot be a violation of international law." Defendant's Motion to Dismiss at 17. This argument is akin to saying that the Nazi soldiers operating the gas chambers during the holocaust in WW2 did not violate international law because they were "government officials [acting] in their capacity"—it is a nonsensical proposition. The Complaint, also specifically notes for example that Plaintiffs Kateeb and Ali had their property taken by "belligerent settlers"—who by definition could not be operating in an official government capacity—funded  by the Defendants. *See i.e.* Compl. ¶¶ 174.

As is obvious to this Court, the Israeli government has not yet issued an executive order that condones and promotes ethnic cleansing, genocide, arms trafficking, and the theft of private property. As American Friends "has made no showing that Plaintiffs were injured pursuant to official military orders," the Act of State doctrine is not applicable here to bar the Plaintiffs' claims.

III.   **The Amended Complaint Fully Outlines Claims Upon Which Relief May Be Granted**

The  Complaint  outlines  in  great  detail  the  injuries  suffered  by  the  Plaintiffs herein, including for example loss of private property and the death of family members. *See* Compl. ¶¶ 13, 19, ("Defendants participated in the denationalization" of the civilian

population, injuring every Palestinian Plaintiff); ¶¶20, 32 ("Defendants have conspired to forcible expel all non-Jews [the Palestinian Plaintiffs] from the OPT—a conspiracy to remove them from their homes and denationalize them); ¶37 ("All of the Plaintiffs named herein have been injured by the aforementioned $2 billion money laundering scheme," with the injuries described above including mental and physical suffering, loss of their homes, and denationalization). As the Court would probably recognize, it is not a coincidence that 400,000 Palestinians no longer live in the Occupied Territories.

The injuries alleged by the Plaintiffs are both actual and imminent according to Senior Israeli Air Force Pilot Shapiro. He alleges that he works for a terrorist entity, i.e. the Israeli air force, and has been instrumental in committing war crimes. *See* Compl. ¶ 40. Unfortunately this criminal activity has been ongoing thanks to the financing of the Defendants for 20-30+ years, and is still continuing to this day. *See State Department's Country Report on Terrorism for 2016*; *see also* i.e. Compl. ¶¶ 22, 35, 45, 103. As alleged in the Complaint, "As a direct result of the laundered funds" from American Friends, they "have been able to commit war crimes with impunity [ethnic cleansing, torture, genocide] for at least 20 years." The Plaintiffs have all therefore properly pled injuries that are both caused by Defendant's actions and still in most cases ongoing as explained already referenced herein. American Friends' Motion to Dismiss should therefore be denied, as all of the Plaintiffs have proper standing to sue the financiers of violent criminal activity abroad that has inflicted serious injury upon the Plaintiffs and their relatives.

    a.   **The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S.**
          **Soil, and Thus There is Sufficient Contact with the United States to**
          **Satisfy the Touch and Concern Test and Afford This Court Ample**
          **Jurisdiction**

Defendant American Friends argues that Plaintiffs' ATS claims fail under an analysis of *Kiobel*, making essentially the same arguments as the Defendants did in *Apartheid Litigation*, re: that the Court does not have jurisdiction to address tort claims based on extraterritorial events. Although the physical injuries complained of herein, i.e. maiming and murdering Palestinian civilians, occurred outside the U.S., this is no bar to jurisdiction. *See Apartheid Litig.* at 246. As detailed in the Complaint, pro-occupation U.S. donors and 501(c)(3) officials such as Defendant American Friends' officials have conspired on U.S. soil for at least 30 years to finance horrific criminal activity—maim and murder Palestinians, steal their property, engage in ethnic cleansing and genocide. "It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." *Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980). And the reality is that even today American Friends is financing acts of international terrorism. *See State Department's Country Report on Terrorism for 2016*.

The ATS permits federal courts to "recognize private claims [for a modest number of international law violations] under federal common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). The Supreme Court in *Sosa* noted "that no development of law in the last two centuries has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law," but that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering such a new cause of action." *Sosa* at 692. In explaining what it meant, the Court further elaborated that "[w]e think it is correct, then, to assume

that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Sosa* at 725. In its ruling the Court added that "we think courts should require any claim based on present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized[5]" as what constitutes the law of nations. *Id*.

Indeed, Plaintiffs meet this burden laid out by the Court in *Sosa*, as they have clearly alleged with great specificity the present-day law of nations violations in the Complaint that rest on a norm of international character accepted by the civilized world, such as genocide, ethnic cleansing, arms trafficking, and murder. *See*, i.e., Compl. at ¶¶ 46, 50. Plaintiffs thus clearly meet the jurisdictional test of *Sosa* for claims brought under the ATS. In addition, defendant American Friends wrongly asserts that Plaintiffs' ATS claims are barred by application of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) and *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013). While there is generally a "presumption against extraterritorial application of federal statutes. . . [t]he Supreme Court allowed that certain 'claims [may] touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." Defendant's Motion to Dismiss at 28-29, *quoting Kiobel* at 1669.

---

[5] The "18th century paradigms" referenced by the Court is that "the reasonable inference from history and practice is that the ATS was intended to have practical effect the moment it became law, on the understanding that the common law would provide a cause of action for the modest number of international law violations thought to carry personal liability at the time: offenses against ambassadors, violation of safe conducts, and piracy"—international norms that were specifically accepted throughout the civilized word at the end of the 18th century. *Sosa* at 692.

Judge Lamberth noted in *Doe v. Exxon Mobil Corp.* that under *Kiobel*, "If plaintiffs have sufficiently alleged conduct within the United States that is actionable under the ATS, *their ATS claims are not defeated on the basis of the presumption against extraterritoriality.*" *Doe v. Exxon* at 96 (emphasis added). As the Court noted in denying Defendant Exxon Mobil Corp.'s motion to dismiss, the plaintiffs therein "allege that EMC officials based in the United States 'made and implemented the decision[s],'–in this case, whom American Friends decided to provide funding to, such as the Bet El Settlement's militia groups—with "Plaintiffs mak[ing] a number of allegations regarding support provided by Exxon . . . (alleging Exxon provided material support to its security personnel by, for example, constructing facilities, *providing funding for weapons, providing supplies and equipment, and paying for the services of consultants in training and equipping the personnel*)." *Id.* (emphasis added). This is the identical conduct Plaintiffs allege against American Friends—i.e. providing the funding for weapons, sniper scopes, supplies, training, equipment, and even establishing sniper schools and firing ranges. *See* i.e. Compl. at ¶¶ 44, 64, 66, 68, 95, 116, 135.

The Complaint herein goes a step further than that of *Doe* v. *Exxon* in complying with the requirements of *Kiobel*. The Plaintiffs have alleged herein that: a) American Friends monetary support comes from the United States. *See Doe* v. *Exxon* at 96; b) that the donors involved are U.S. citizens; and c) there is an ongoing nationwide solicitation effort which aggregates to a $2 billion monetary transfer to illegal settlements every year. Finally, all 501(c)(3)'s like American Friends have to file annual reports with the IRS— they are called 990s. By failing to detail the criminal activities that they finance abroad, specifically arms trafficking and money laundering, they have repeatedly committed

income tax fraud. The Treasury Department has repeatedly condemned any and all charities that commit income tax fraud.

The key factor in this case is that American Friends' conduct directly provided the funding and support required for the violation of numerous present-day laws of nations, and thus satisfy the requirements of international acceptance outlined in *Sosa* right here on U.S. soil. These include: Money laundering, providing financing for the commission of internationally accepted crimes like genocide, ethnic cleansing, denationalization, murdering and maiming, theft of private property, and arms trafficking. *See* Compl. ¶¶ 22, 34, 46, 96, 100, 112, 116, 117, 169, 170, 171. All of these actions financed by American Friends, as alleged in the Complaint, constitute violations of international law that occurred on U.S. soil—sufficiently meeting the "touch and concern" requirements of *Kiobel*, as explained in great detail by the Court in *Doe* v. *Exxon Mobil Corp.*, 69 F. Supp. 3d at 96. Defendant's arguments to the contrary are thus unavailing to warrant dismissal of the claims brought under the ATS.

Re: the "touch and concern test," Defendant American Friends engaged in conduct on U.S. soil approximately 30 years ago, when it initially filed for 501(c)(3) status right here in Washington, D.C. Securing that tax exempt status made it possible for American Friends to solicit funds on U.S. soil destined to be sent overseas to promote criminal activity. Pro occupation donors not only made settlement expansion ant he theft or private Palestinian property possible, they actually got a bonus—tax deductions.

b. **The Complaint Lays out a Clear Basis for American Friends' Liability to the Plaintiffs and its Proximate Cause of Their Injuries**

As recited in the Complaint, the U.S. based 501(c)(3)'s, including American Friends, that receive donations intended for settlement expansion and the funding of

violent settlers in Settlements like Bet El, hold the funds for 24 hours before sending them off in order for their donors to receive favorable tax write-offs. As explained earlier, 501(c)(3)'s who engage in such activity act as temporary custodians of these funds, which entities have been deemed by the Treasury Department to be "funnels," i.e. they're not engaged in charitable conduct—they simply collect funds and send them overseas to promote criminal conduct. That is classic money laundering activity, see 18 U.S.C.§ 1956.

In *v. Islamic Republic of Iran*, proximate causation was found because the complaint "alleged a flow of money *directly* into the coffers of PIJ." 755 F. Supp. 2d 1, 22 (D.D.C. 2010). The Complaint herein meets this same requirement as the Complaint in *Wultz*, noting that American Friends directly provided funding to the Bet El Settlement for use in expanding the settlement by violently subjugating its Palestinian neighbors. American Friends officials knew that those recipients would be "unlikely to use wired moneys for any other purpose" besides financing the war crimes alleged in the Complaint, such as maiming and murdering Palestinians. *See Wultz* at 22; Compl. at ¶¶ 34, 46, 50. Defendant American Friends argues in its Motion that *Wultz* does not apply because "American Friends only directs funds to charitable organizations for legitimate activities," and does not "direct any 'flow of money' to a terrorist organization," yet the Defendant's argument does not address how *Wultz* does not apply to the Plaintiffs' allegations when evaluating a 12(b)(6) Motion. Defendant American Friends' Motion to Dismiss at 28.

An application of *Wultz* to the Complaint herein warrants denial of Defendant's Motion. These sections of the Complaint clearly allege that American Friends had the

requisite knowledge and actus reus required for both the ATS and ATA claims, despite American Friends' attempted arguments to the contrary. *See* Compl. at ¶¶ 34, 44 – 46, 49, 64, 96, 100, 117, 138, 171; ("This activity [violations of international law] could not have occurred without . . . the financial assistance provided by" [American Friends]; "All Defendants knew that, without those funds [provided by Defendants], the settlements would have been abandoned thirty years ago."). Defendant's arguments that these facts are not adequately pled in the complaint are thus unavailing. Plaintiffs however have demonstrated that these tax-exempt entities, including American Friends, finance criminal activities abroad, consistent with the report that the State Department issued in January 2016. *See State Department's Country Report on Terrorism for 2016*.[6]

American Friends' repeated arguments against a finding of proximate cause for Plaintiffs' injuries are akin to saying there should be a requirement imposed on the Plaintiffs to trace specific wire dollar transfers to specific physical attacks on innocent Palestinian civilians. That requirement has been repeatedly rejected by our federal courts. *See Strauss v. Credit Lyonnais S.A*, 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013). ("Plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter.") Similarly, it would be impossible to trace specific dollars to specific attacks on our facts for two reasons: First, Defendant American Friends has been executing wire transfers for at least several decades—that probably means we are looking at 10,000 wire transfers. Second, it is obvious that American Friends has no control over how their funds are used—for example, purchasing

---

[6] https://www.state.gov/j/ct/rls/crt/2016/index.htm

sniper scopes and M16s. As pointed out earlier, section 2339(C) doesn't even require that the funds are actually used for these purposes. Failing to control funds sent overseas violates a number of Treasury Department regulations, and homeland security regulations, i.e. funds transferred overseas should not fall into the hands of individuals who plan to harm the U.S.

Based on the allegations made herein, a reasonable juror could conclude that the significant amount of money ($2 billion) sent by domestic 501(c)(3) pro-Israel entities overseas was a substantial reason why those intent on ridding the West Bank of all non-Jews, belligerent settlers, and rogue Israeli army soldiers were able to finance the horrific terrorist attacks described herein. It also would be obvious to any juror hearing this case, that an annual subsidy of $2+ million solely provided by American Friends to the Bet El settlement quite a large sum of money. *See* i.e. Compl. ¶¶ 23, 46, 49 (American Friends "has committed millions of dollars in charitable donations to organizations like Ateret Cohanim, which espouses the violent expulsion of all non-Jews in the OPT and especially East Jerusalem.")

Besides the amount of the subsidy, another reason why those funds were so crucial is that the Israeli government as of 1992 had prohibited charitable donations to settlements, which cut off a significant source of income. Likewise, Secretary of State Baker was assured by Prime Minister Shamir in 1992 [the Baker/Shamir Accord], that no part of American financial aid would be used to set up new settlements or finance expansion of existing settlements. As is obvious, American Friends' Officials have been violating that accord every time they wire money overseas to the Bet El settlements to promote criminal violence. Thus, without the $2 billion coming funding from American

Friends and other pro-Israel 501(c)(3)'s, the belligerent settlers and rogue Israeli army

personnel described in the Complaint would not have a source of funding to: a) properly

arm and equip local settler militia units; b) afford or conduct training such as that done at

sniper schools used to teach settlers as to how to commit war crimes as alleged in the

complaint; and c) build quite expensive vital infrastructure improvements like electric

power grids and sewage hookups needed for settlement expansion necessitating the

annexation of chunks of property owned by private Palestinians.

IV.   **This Court Has Personal Jurisdiction Over Defendant American Friends**

While it is true that "It is the Plaintiffs' burden to make a *prima facie* showing

that this Court has personal jurisdiction over the Defendant," Defendant's motion to

dismiss based on a lack of personal jurisdiction is a classic red herring argument when

one examines the allegations pled in the Amended Complaint. Defendant's Motion to

Dismiss at 18. Not only does American Friends "solicit funds in this metropolitan area,"

it takes "illegal tax write-offs" on IRS income tax forms (the 1040 and the 990) filed with

the IRS based in the District of Columbia. Compl. at ¶22(ii). As earlier referenced,

without the tax-exempt status provided by the IRS at least 20 years ago, the American

Friends entity could not solicit funds in America.

Furthermore, the American Friends "and their donors work with AIPAC officials

who are located in this jurisdiction, to *inter alia* preserve the practice of taking illegal tax

deductions. They have also worked with AIPAC officials *in this district* to revise

Treasury Department regulations…" Compl. at ¶22(iii) (emphasis added). *See also*

Compl. at ¶23 (noting American Friends has "solicited funds in this jurisdiction destined

for illegal settlements . . . attended various AIPAC events here; and d) have engaged in commercial activities with the Treasury Department" in this District, for example filing for tax exempt status 20+ years ago. *See also* Compl. at ¶¶ 7, 9. In addition as already noted, all 501(c)(3)'s have to file annual 990 forms with the Treasury Department. That is classic business activity engaged in with a U.S. regulatory body, i.e. the Treasury Department.

Despite Defendant's arguments to the contrary, conspiracy jurisdiction over American Friends is fully laid out and pled in the Complaint as well. *See* i.e. Compl. ¶ 87.The elements of a civil conspiracy, as this court knows, have been laid out in the case *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983), which is cited as respected authority in the JASTA Act); *Id*. Thus Plaintiffs have in addition adequately pled conspiracy-based jurisdiction over American Friends.

### Conclusion

Based on the authorities cited herein, especially those from this judicial district, *see Biton I and Biton* II, and the detailed allegations contained in the Complaint, this Court has ample precedent to rely on in denying the instant motion to dismiss.

Respectfully Submitted,


_____/s/_____
Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Managing Partner
Transnational Business Attorneys Group
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 – 4343
mm@martinmcmahonlaw.com

Attorney for the Plaintiffs

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that service of the foregoing and the text of the proposed order has been made through the Court's electronic transmission facilities on the 8th day of September, 2017.

Respectfully Submitted,

_____/s/_____

Martin F. McMahon, Esq.