# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MIKO PELED, *et al.*,

        Plaintiffs,

-against-

BENJAMIN NETANYAHU, *et al.*,

        Defendants.

Docket No: 1:17-cv-00260 (RBW)

Hon. Reggie B. Walton

**[Oral Argument Requested]**

 

## AMENDED MEMORANDUM OF LAW OF DEFENDANT KUSHNER FAMILY FOUNDATION IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

**AKERMAN LLP**
Donald David
Joshua Bernstein
*Attorneys for Defendant*
*Kushner Family Foundation*

666 Fifth Avenue, 20th Floor
New York, New York 10103
(212) 880-3800

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF EXHIBITS ...........................................................................................ix

PRELIMINARY STATEMENT ............................................................................... 1

THE ALLEGATIONS OF THE AMENDED COMPLAINT...................................... 4

LEGAL STANDARDS ............................................................................................ 5

STATUTORY BACKGROUND .............................................................................. 6

      A.  THE ANTI-TERRORISM ACT ............................................................ 6

      B.  THE ALIEN TORT STATUTE............................................................. 7

ARGUMENT ........................................................................................................... 8

I.      THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE
      CLAIMS ARE NON-JUSTICIABLE PURSUANT TO THE POLITICAL
      QUESTION DOCTRINE AND THE ACT OF STATE DOCTRINE .............. 8

      A.  The Act of State Doctrine Bars This Action ................................... 8

      B.  The Political Question Doctrine Bars This Action .................................... 10

      C.  The Al-Tamimi Decision Demonstrates Dismissal Is Appropriate ........................... 14

II.     THE ATA CLAIM MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT
      HAVE STANDING UNDER JASTA AND THERE IS NO SECONDARY
      LIABILITY UNDER § 2333 ............................................................... 16

      A.  The Statutory Framework of Civil Liability Under the Anti-Terrorism Act.............. 16

      B.  Secondary Liability under the ATA, Pre- and Post-JASTA ...................................... 17

      C.  JASTA Aiding and Abetting Liability Is Not Available Here.................................... 19

      D.  There Are No Civil Claims for Conspiracy or Aiding and Abetting Available
         Under § 2333 Other Than JASTA's Limited Provision for Secondary Liability....... 19

III.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE
      ATA BECAUSE IT DOES NOT ALLEGE AN INJURY THAT OCCURRED
      "BY REASON OF" ANY CONDUCT BY KFF .......................................... 22

      A.  The Amended Complaint Must Plausibly Plead That KFF's Actions
         Proximately Caused The Attacks.................................................................. 22

      B.  Without A Plausible Allegation That Funds Were Provided Directly to
         Persons Engaging In Terrorist Activity, the ATA Claim Must be Dismissed........... 22

IV.    THE ATA CLAIM MUST BE DISMISSED BECAUSE AN ATA CLAIM
      PREDICATED UPON "ACTS OF WAR" IS BARRED BY SECTION 2336(a)........... 26

V.    THE ALIEN TORT STATUTE CLAIM MUST BE DISMISSED BECAUSE
      THE CLAIM LACKS SUFFICIENT CONTACT WITH THE UNITED STATES
      UNDER *KIOBEL* AND CORPORATE LIABILITY IS BARRED................................. 27

      A.  The Claim Lacks Sufficient Contact With The United States ..................................... 27

      B.  There Is No Corporate Liability Under The Alien Tort Statute................................. 31

VI.     ALL CLAIMS AGAINST KFF MUST BE DISMISSED BECAUSE THE
        AMENDED COMPLAINT FAILS TO PROVIDE PLAUSIBLE
        ALLEGATIONS TO SUPPORT THEIR CLAIMS ......................................................... 33

      A.  ATA Claim....................................................................................................... 34

          1.  Plaintiffs Fail to Adequately Plead the Existence of an Agreement.................... 34

          2.  Plaintiffs Fail to Adequately Plead Knowledge or Intent ..................................... 35

      B.  ATS Claim ...................................................................................................... 37

          1.  Plaintiffs Fail to Adequately Plead The Requisite Knowledge ........................... 38

          2.  Plaintiffs Fail to Adequately Plead Actus Reus .................................................... 39

VII.    ALL CLAIMS MUST BE DISMISSED BECAUSE THIS COURT LACKS
        PERSONAL JURISDICTION OVER KFF ..................................................................... 39

VIII.   THE ATS AND ATA CLAIMS MUST BOTH BE DISMISSED AS TO
        CERTAIN PLAINTIFFS DEPENDING ON NATIONAL ORIGIN.............................. 41

IX.     MULTIPLE DEFENDANTS MUST BE DISMISSED FROM THE CASE
        BECAUSE THEY LACK ARTICLE III STANDING .................................................... 41

CONCLUSION.................................................................................................................... 43

CERTIFICATE OF SERVICE ............................................................................................ 44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. U.S. Dep't of State*,
　2013 WL 4579929 (D.D.C. July 10, 2013).....................................................17, 18

*Akins v. Fed. Election Comm'n*,
　101 F.3d 731 (D.C. Cir. 1996), *vacated on other grounds*, *Fed. Election*
　*Comm'n v. Akins*, 524 U.S. 11 (1998) ...................................................................42

*Al-Aulaqi v. Obama*,
　727 F. Supp. 2d 1 (D.D.C. 2010) .............................................................................5

\* *Al-Tamimi v. Adelson*,
　9 F.3d 1 (D.C. Cir. 2019) ...............................................................................14, 15

*Alperin v. Vatican Bank*,
　410 F.3d 532 (9th Cir. 2005) .................................................................................13

*Anza v. Ideal Steel Supply Corp.*,
　547 U.S. 451 (2006)............................................................................................7, 22

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)...................................................................................... passim

\* *Baker v. Carr*,
　369 U.S. 186 (1962)........................................................................................11, 13

*Balintulo v. Daimler AG*,
　727 F.3d 174 (2d Cir. 2013)............................................................................28, 29

*Balintulo v. Ford Motor Co.*,
　796 F.3d 160 (2d Cir. 2015)...................................................................................29

\* *Banco Nacional de Cuba v. Sabbatino*,
　376 U.S. 398 (1964)..................................................................................................8

*BCCI Holdings (Luxembourg), S.A. v. Khalil*,
　214 F.3d 168 (D.C. Cir. 2000) ...............................................................................22

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007)........................................................................................18, 37

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 554 (2007)................................................................................................35

*Blackwell v. SecTek, Inc.*,
  61 F. Supp. 3d 149 (D.D.C. 2014) ...................................................................6

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F. 3d 685 (7th Cir. 2008) (en banc) ........................................................22

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) .......................................................................33

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979)........................................................................................19

*Carmichael v. United Techs. Corp.*,
  835 F.2d 109 (5th Cir. 1988) ..........................................................................38

*Corrie v. Caterpillar, Inc.*,
  403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd,* 503 F.3d 974 (9th Cir. 2007) ....................41

*Corrie v. Caterpillar Inc.*,
  503 F.3d 974 (9th Cir. 2007) ..........................................................................13

\* *Doe I v. State of Israel*,
  400 F. Supp. 2d 86 (D.D.C. 2005) .................................................. passim

\* *Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds,* 527 F. App'x 7 (D.C. Cir. 2013) ..............................................................................7, 37, 38, 39

*Doe v. Exxon Mobil Corp.*,
  No. CV 01-1357(RCL), 2015 WL 5042118 (D.D.C. 2015) ....................................39

*EEOC v. Arabian American Oil Co.*,
  499 U.S. 244 (1991)........................................................................................28

*Giraldo v. Drummond Co.*,
  No. 2:09-CV-1041-RDP, 2013 WL 3873960 (N.D. Ala. July 25, 2013), *aff'd sub nom. Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015)................................29, 30, 31

*Gunn v. Minton*,
  568 U.S. 251 (2013)..........................................................................................8

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .......................................................................34

*Hemi Grp. v. City of New York*,
  559 U.S. 1 (2010)..............................................................................................7

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010).................................................................................35

*In re Interbank Funding Corp. Sec. Litig.*,
 629 F.3d 213 (D.C. Cir. 2010) ............................................................5

*In re S. African Apartheid Litig.*,
 56 F. Supp. 3d 331 (S.D.N.Y. 2014), *aff'd sub nom. Balintulo v. Ford Motor
 Co.,* 796 F.3d 160 (2d Cir. 2015) .......................................................28

*In re Terrorist Attacks*,
 349 F.Supp.2d at 831-34 ......................................................................36

*In re Terrori*st *Attacks*,
 714 F.3d 118 (2d Cir. 2013)............................................................26, 39

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
 478 U.S. 221 (1986)..............................................................................10

* *Jesner v. Arab Bank*,
 138 S.Ct. 1386 (2018).......................................................................32, 33

*Johnson v. U.S. Dep't of Hous. & Urban Dev. (HUD)*,
 911 F.2d 1302 (8th Cir. 1990) .............................................................21

*K Mart Corp. v. Cartier, Inc.*,
 486 U.S. 281 (1988)..............................................................................20

*Kiobel v. Royal Dutch Petroleum Co.*,
 133 S. Ct. 1659 (2013)................................................................. passim

* *Kiobel v. Royal Dutch Petroleum Co.*,
 621 F.3d 111 (2d Cir. 2010)..............................................................31, 32

*Liu v. Republic of China*,
 892 F.2d 1419 (9th Cir. 1989) .............................................................10

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)...........................................................................41, 42

*McClellan v. Cablevision of Connecticut, Inc.*,
 149 F.3d 161 (2d Cir. 1998)................................................................19

*Morrison v. National Australia Bank Ltd.*,
 130 S.Ct. 2869 (2010)...........................................................................27

*Ochre LLC v. Rockwell Architecture Planning & Design*,
 P.C., 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) .............................18

\* *Owens v. BNP Paribas S.A.*,
   No. CV 15-1945 (JDB), 2017 WL 394483 (D.D.C. Jan. 27, 2017) .............................. passim

*Philbrook v. Glodgett*,
   421 U.S. 707 (1975)..................................................................................................19

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ...............................................................................42

*Reedy v. Obama*,
   No. CV 14-2215 (ABJ), 2015 WL 120160 (D.D.C. Jan. 7, 2015) ...........................8

*Roe v. Unocal*,
   70 F. Supp. 2d 1073 (9th Cir. 1999) ...........................................................................9

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)...........................................................................23, 25, 39

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993).................................................................................................10

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974).................................................................................................10

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ........................................................................2, 10, 11

*Second Amendment Found. v. United States Conf. of Mayors*,
   274 F.3d 521 (D.C. 2001) .....................................................................................6, 40

*Siegel v. SEC*,
   592 F.3d 147 (D.C. Cir. 2010) .................................................................................22

*Sievarding v. U.S. Dep't of Justice*,
   693 F. Supp. 2d 93 (D.D.C. 2010) .........................................................................6, 39

*Sosa v. Alvarez–Machain*,
   542 U.S. 692 (2004)......................................................................................27, 31, 32

*Stutts v. De Dietrich Group*,
   2006 WL 1867060 (E.D.N.Y. June 30, 2006) .........................................................35

*Toumazou v. Turkish Republic of N. Cyprus*,
   71 F. Supp. 3d 7 (D.D.C. 2014) ..............................................................................18

*United States v. Ferrara*,
   54 F.3d 825 (D.C. Cir. 1995) ...................................................................................39

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ................................................................................42

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) ................................................................................11

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*,
  493 U.S. 400 (1990) ..............................................................................8, 9

*Walden v. Fiore*,
  134 S.Ct. 1115 (2014) .............................................................................40

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) ........................................7, 24, 36, 37

**Statutes**

18 U.S.C. § 2331(1) .....................................................................................16

18 U.S.C. § 2333(a) ............................................................................. passim

18 U.S.C. § 2333(d)(2) ...............................................................................19

18 U.S.C. § 2339A .................................................................................6, 17

18 U.S.C. § 2339C .................................................................................6, 17

28 U.S.C. § 1350 ....................................................................................7, 31

Anti-Terrorism Act ............................................................................. passim

Cable Communications Policy Act § 531(e) ..............................................20

Immigration and Nationality Act section 219.............................................19

JASTA amendment................................................................................20, 21

JASTA § 4(a) ...............................................................................................19

Justice Against Sponsors of Terrorism Act ........................................ passim

**Rules**

Fed. R. Civ. P. 12(b)(2) (2007) ..................................................................39

Rule 8 ....................................................................................................17, 18

**Other Authorities**

162 Cong. Rec. H5239-03 ............................................................................................20

162 Cong. Rec. H6023-02 ............................................................................................20

Congressional Research Service, US Foreign Aid to Israel (December 22, 2016)
    (attached hereto as Exhibit 2 to the Declaration of Donald David).........................14

# **TABLE OF EXHIBITS**

**Exhibit 1**:  Certificate of Incorporation of The Kushner Family Foundation, Inc.

**Exhibit 2**:  Congressional Research Service, <u>US Foreign Aid to Israel</u> (December 22, 2016).

## PRELIMINARY STATEMENT

Plaintiffs in this case are several U.S. citizens that reside in the United States, and a number of Palestinians who live in the Gaza Strip and the West Bank, areas that Israel has controlled since the 1967 "Six Day War."  The Amended Complaint – written essentially as a press release or political manifesto – when stripped of all its polemic alleges a conspiracy that stretches from the United States to Israel and then to the settlements of the West Bank, and involves hundreds of American NGOs, including Defendant Kushner Family Foundation ("KFF"), and a multitude of Israeli NGOs, as well as both Israeli and United States governmental entities and persons.  The alleged purpose of this conspiracy is to fund the expansion of settlements in the West Bank.  Specifically, Plaintiffs allege that KFF, by raising funds that they then allegedly transferred to Israeli groups that funded the IDF's (Israel's armed forces) activity in the West Bank and the Gaza Strip, should be held liable for violations of the Alien Tort Statute ("ATS") and the Antiterrorism Act ("ATA") in connection with the conflict over settlements in the West Bank.

Plaintiffs' theory is untenable, and their claims are non-justiciable and unsupported by fact or law.  First, and foremost, this Court should refuse to hear these claims based on the act of state and political question doctrines.  In fact, this Court has already done so, holding that:

> It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli–Palestinian conflict.  Plaintiffs would have this Court adjudicate the rights and liabilities of the Palestinian and Israeli people, making determinations on such issues as to whom the land in the West Bank actually belongs. Plaintiffs ask this Court to declare that Israel's self-defense policies are tantamount to terrorism . . . .The Court can do none of this. . . . [T]he character of those claims is, at its core, the same: peculiarly volatile, undeniably political, and ultimately nonjusticiable. A ruling on any of these issues would draw the Court into the foreign affairs of the United States, thereby interfering with the sole province of the Executive Branch.  Our government's foreign relations are 'committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be

1

> done in the exercise of this political power is not subject to judicial inquiry or
> decision.

*Doe I v. State of Israel*, 400 F. Supp. 2d 86, 111–12 (D.D.C. 2005).

Plaintiffs' claims here raise identical concerns.  Plaintiffs' claims would impose liability on a U.S. NGO for donating money to Israeli NGOs, which money is, allegedly, then provided, either directly or through Israeli government intermediaries, to the Israeli Defense Force (the "IDF"), which then allegedly uses that money to, *inter alia*, buy weapons and train militias, which armed militias then allegedly promote the expansion of settlement of the West Bank.  This theory of liability must be rejected because it is at complete loggerheads with the act of state doctrine, which precludes courts in this country from judging the validity of a foreign sovereign's official acts.  Moreover, Plaintiffs' claims attack the policy of the executive branch, which has approved of billions of dollars a year in appropriations to Israel for arms purchases and other military aid.  Thus, Plaintiffs are seeking a remedy for alleged economic activity that the executive branch has itself conducted and promoted, and are asking this Court to second-guess the foreign policy decisions of the executive branch.  Whether or not, and in what manner, to provide aid to Israel is one of those "political decisions that are by their nature committed to the political branches to the exclusion of the judiciary."  *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (quoting *Antolok v. United States*, 873 F.2d 369, 379 (D.C. Cir. 1989)).  And any finding that the alleged activity of the United States NGOs renders them complicit in war crimes or terrorist activity – findings that would be required to provide relief to these Plaintiffs in this case – would be a finding that the United States government has been and is complicit and war crimes and terrorist activity.   For obvious reasons, the case implicates sensitive issues of foreign policy and the claims should be dismissed on these bases.

The claims must also be dismissed on the merits.  The Amended Complaint, despite over a hundred plus pages of shotgun argument, utterly fails to describe how the facts as pled state a claim under any of statutory provisions of the ATA or the ATS.  The Amended Complaint alleges injuries that fall into two categories: (1) economic injuries attributable to alleged misappropriation of land in the West Bank (i.e., lost property value), and (2) personal injuries attributable to the conflict between Israelis and Palestinians in the West Bank.  The Amended Complaint makes voluminous allegations regarding the IDF and the Israeli government and their activity in connection with the West Bank.  The Amended Complaint makes conclusory allegations that United States NGOs launder money to fund that conflict.  But, the only non-conclusory allegation that the Amended Complaint makes regarding KFF is that it has donated money to Israeli NGOs.

Given this paucity of factual support for its broad claims as to KFF's complicity in purported war crimes, both the ATA and ATS claims must be dismissed.  First, with regard to the ATA claim, the Amended Complaint does not come close to plausibly alleging that any of the specific injuries complained of by any individual Plaintiff were proximately caused by KFF, as is required by the ATA.  Lawsuits like this one – where a corporation provides some service or money to some other entity that is itself connected in some way to a conflict between two ethnic or national groups, and then a member of one of those groups brings suit in federal court naming the corporation as a defendant – are not new.  Many civil ATA claims have been brought against international banks relying on the same suspect chain of unsupported inferences as is laid out in this Amended Complaint.  In these prior ATA cases based on allegations of an <u>indirect</u> causal connection between a bank's transactions and a terrorist act – a similar set of allegations to the attenuated chain of causation alleged here – courts have uniformly dismissed the ATA

claims for failure to state a claim as a matter of law.   The same result should follow here. Second, the ATA claim must be dismissed on the independent basis that the conspiracy and aiding and abetting theories of secondary liability on which the Amended Complaint relies, are not cognizable under the ATA.

Similarly, with regard to the ATS claim, the Amended Complaint does not come close to plausibly alleging that KFF knowingly aided and abetted war crimes that were allegedly committed by the IDF, as would be required for a finding of liability under the ATS.   As such, the claim must be dismissed.   The ATS claim must also be dismissed because the causes of action do not sufficiently "touch and concern" the United States and, thus, under the Supreme Court's holding in *Kiobel*, this Court does not have jurisdiction under the ATS over these claims. And, the ATS claims are barred because there is no specific, universal and obligatory norm of international law that imposes liability on a corporate entity, such as KFF, for the alleged conduct set forth in the Amended Complaint.

For these reasons, as well as those set forth below, this Court should dismiss the Amended Complaint in its entirety.

## THE ALLEGATIONS OF THE AMENDED COMPLAINT

The Amended Complaint – over a hundred pages long, and spanning decades – does not make many allegations specifically about KFF.   Boiled down to its essence, it alleges that KFF solicited funds from American donors, and then transferred those funds to Israeli groups that then funneled those funds to the IDF, which then used those funds to promote settlement expansion.   The alleged torts that underlie Plaintiffs' claims (the theory goes) were part and parcel of that settlement expansion, and thus KFF is secondarily liable for their commission. Thus, it is alleged that KFF's donations are part of a money-laundering scheme that supports acts of war and war crimes.

4

There is not one supported, non-conclusory allegation to support any of this.  Indeed, it is telling how many times Plaintiffs allege that KFF "had to know" that their charitable collections and donations were being used for purposes that were allegedly criminal or terroristic or tortious in nature – which terms by their very nature are both political and conclusory in this context. Plaintiffs offer only their own say-so and their own political agenda on this point, because they have no other facts at their disposal.  At bottom, the Amended Complaint lacks any well-pled allegations sufficient to support the conclusion that KFF had knowledge that its donations were being used to any illegal end; that, in fact, any illegal end was pursued; or that KFF's donations proximately caused any of Plaintiffs' alleged injuries.  There are simply no well-pled facts that give rise to a legally cognizable claim under any of Plaintiffs' theories.  For the reasons above and described more fully below, the Amended Complaint must be dismissed.

## LEGAL STANDARDS

To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010).  *Iqbal*'s plausibility standard requires more than a "sheer possibility" that a defendant is liable.  *Iqbal*, 556 U.S. at 678.  Instead, to survive a motion to dismiss, the Amended Complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

In applying *Iqbal*, this Court employs a "'two-pronged approach,' under which [it] first identifies the factual allegations that are entitled to an assumption of truth and then determines 'whether they plausibly give rise to an entitlement to relief.'"  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 14 (D.D.C. 2010) (quoting *Iqbal*, 556 U.S. at 679).  Under the first prong, "labels and

conclusions," and "legal conclusion[s] couched as . . . factual allegation[s]," and "naked assertions devoid of further factual enhancement," all must be disregarded. *Sievarding v. U.S. Dep't of Justice*, 693 F. Supp. 2d 93, 99-100 (D.D.C. 2010) (internal quotations omitted).

Under the second prong, assessing the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Blackwell v. SecTek, Inc*., 61 F. Supp. 3d 149, 155 (D.D.C. 2014) (quoting *Iqbal*, 556 U.S. at 679). Courts "need not accept inferences drawn by Plaintiffs" if they are unsupported by the facts in the complaint. *Sieverding v. U.S. Dep't of Justice,* 693 F. Supp. 2d 93, 100 (D.D.C. 2010), *aff'd,* No. 13-5060, 2013 WL 6801184 (D.C. Cir. Dec. 11, 2013) (internal quotations omitted).

## STATUTORY BACKGROUND

### A.    THE ANTI-TERRORISM ACT

The ATA is largely comprised of criminal prohibitions relating to terrorism, but Section 2333(a) of the ATA, which the Amended Complaint invokes, creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism." As relevant here, Section 2333(a) requires that the Amended Complaint properly plead several indispensable elements.

First, each Plaintiff must be a U.S. citizen. 18 U.S.C. § 2333(a).

Second, Plaintiffs must plausibly allege that KFF provided material support and resources knowing that such support and resources would be used in preparation for, or to carry out, terrorist acts in violation of U.S. criminal law, 18 U.S.C. § 2339A, or that KFF provided or collected funds with the intention or knowledge that such funds would be used for such terrorist acts, 18 U.S.C. § 2339C; *see also* 18 U.S.C. § 2333(a).

<u>Third</u>, the Amended Complaint must plausibly allege that Plaintiffs were injured "by reason of" KFF's actions. This element requires plausible, non-conclusory allegations that KFF's actions proximately caused Plaintiffs' alleged injuries. *See* 18 U.S.C. § 2333(a); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 22 (D.D.C. 2010). As the Supreme Court has confirmed, proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[T]he central question [with respect to proximate cause] . . . is whether the alleged violation led directly to the plaintiff's injuries."). As demonstrated, the Amended Complaint's failure to make plausible factual allegations that satisfy the element of proximate causation requires dismissal.

## B.     THE ALIEN TORT STATUTE

To assert a private cause of action under the ATS, a plaintiff must plead that: (1) the plaintiff is an alien; (2) the claimed damages stem from a tort; and (3) a defendant committed the tort in violation of the law of nations or a treaty of the United States. 28 U.S.C. § 1350.

Plaintiffs here claim that KFF is liable under the ATS for aiding and abetting violations of the law of nations. "[A]iding and abetting liability [  ] under the ATS [  ] involves . . . a 'knowledge' *mens rea* and a showing for *actus reus* of acts that have a substantial effect in bringing about the violation." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 39 (D.C. Cir. 2011), *vacated on other grounds,* 527 F. App'x 7 (D.C. Cir. 2013). Thus, the claim that KFF is secondarily liable under the ATS requires: (1) a well-pled allegation of a *primary* violation of the law of nations; and (2) that the Amended Complaint plead a *secondary* violation of the law of nations, by pleading the requirements for aiding and abetting liability. The Amended Complaint fails to meet these requirements because it contains no well-pled allegations supporting a

7

plausible inference that KFF possessed the requisite *scienter* or that any donations by KFF had a substantial effect in bringing about the alleged violations.

Additionally, the Supreme Court in *Kiobel* held that the presumption against extraterritoriality applies to claims brought under the ATS, and that it is only rebuttable where "claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application" of the ATS. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013).

As described below, the claims here fail this test, and for this independent reason, the claims must be dismissed.

## ARGUMENT

I.   **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE CLAIMS ARE NON-JUSTICIABLE PURSUANT TO THE POLITICAL QUESTION DOCTRINE AND THE ACT OF STATE DOCTRINE**

Federal courts are "courts of limited jurisdiction." *Gunn v. Minton,* 568 U.S. 251, 256 (2013). They possess "only that power authorized by the Constitution and statute." *Id.* "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Reedy v. Obama*, No. CV 14-2215 (ABJ), 2015 WL 120160, at *2 (D.D.C. Jan. 7, 2015) (internal citations omitted). Because this case implicates sensitive foreign policy prerogatives of the executive, it must be dismissed based on the political question doctrine and the act of state doctrine.

### A.   The Act of State Doctrine Bars This Action

This action should be dismissed under the act of state doctrine. The act of state doctrine precludes United States courts from judging the validity of a foreign sovereign's official acts. *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990). The act of state doctrine is based upon the need to respect the separation of powers. *Banco Nacional de Cuba v.*

*Sabbatino*, 376 U.S. 398, 423 (1964).   A claim is barred by the act of state doctrine if it (1) involves an official act of a foreign sovereign; (2) is performed within that sovereign's own territory; and (3) it seeks relief that would require the court to sit in judgment on the sovereign's official acts.  *Kirkpatrick*, 493 U.S. at 405.

Because "[t]he actions challenged by Plaintiffs are classic acts of state," the claims must be dismissed.  *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005).  Plaintiffs claim that the Israeli government has adopted an official policy that violates international law in dealing with Palestinians.  *See Roe v. Unocal*, 70 F. Supp. 2d 1073, 1079 (9th Cir. 1999) ("Military orders are official acts of the sovereign.").  Any determination in favor of Plaintiffs here would be a direct attack on Israel's official policies and their governance of their own territory.  Sound precedent precludes such a holding, as "the federal courts have long recognized that the exploitation of natural resources and land within a nation's own borders is, by legal definition, an act of state.  Even if, as Plaintiffs allege, the Israeli defendants have taken land or possessions for the use of Israel and its people, such actions are only possible by virtue of the fact that the Israeli defendants are vested with the powers and resources of the Israeli government."  *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 114 (D.D.C. 2005) (*quoting Sabbatino,* 376, U.S. at 424-25).

Furthermore, "[t]o permit the validity of the acts of [Israel] to be reexamined and perhaps condemned by the courts of [the United States] would very certainly imperil the amicable relations between [those] governments and vex the peace of nations."  *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 114 (D.D.C. 2005) (brackets in original) (citing *Sabbatino,* 376 U.S. at 415, 84 S.Ct. 923).   And, any holding in favor of Plaintiffs' claims here would be completely

inconsistent with the executive's position on arms sales, and such a decision would threaten to undermine the United States/Israel relationship.

When deciding whether an action is barred by the act of state doctrine, courts also consider whether the foreign state was acting in *its'* public's interest. *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989). Whatever one thinks of thinks of the ongoing conflict in the West Bank, it is beyond dispute that the Israeli government's policies are undertaken for military and security purposes intended to redound to the benefit of its people. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) (whether or not the police power is abused, it is peculiarly sovereign in nature).

In sum, the act of state doctrine bars Plaintiffs' claims.

## B.      The Political Question Doctrine Bars This Action[1]

Additionally, this action is barred by the political question doctrine. The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" by the executive and legislative branches. *Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 230 (1986). Thus, the doctrine makes nonjusticiable those "political decisions that are by their nature committed to the political branches to the exclusion of the judiciary." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (quoting *Antolok v. United States*, 873 F.2d 369, 379 (D.C. Cir. 1989)). Two considerations guide a court's testing for nonjusticiable political questions: (i) "the appropriateness under our system of government of attributing finality to the action of the political departments;" and (ii) "the lack of satisfactory criteria for a judicial

---

[1] The Supreme Court has held that disputes involving political questions lie outside of the Article III jurisdiction of federal courts. *See Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 215 (1974) ("[T]he concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies ... the political question doctrine [ ].").

determination." *Baker v. Carr*, 369 U.S. 186, 210 (1962) (citing *Coleman v. Miller*, 307 U.S. 433 (1939)).

Based on those considerations, the Supreme Court in *Baker* identified "six independent tests for the existence of a political question":

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (quoting *Baker*, 369 U.S. at 217) (quotation marks removed).   Under the *Baker* analysis, "[t]o find a political question . . . [a court] need only conclude that one factor is present, not all." *Schneider*, 412 F.3d at 194.

An analysis of the *Baker* factors and relevant case law demonstrate that this case is violative of those circumscribed bounds.  This Court has already held that nearly identical claims implicate multiple *Baker* factors and must be dismissed.  In *Doe I v. State of Israel*, Plaintiffs brought claims against United States and Israeli officials and the IDF, and against a religious corporation located in New Jersey and organized under the laws of New Jersey.  400 F. Supp. 2d 86, 112 (D.D.C. 2005).  The complaint in *Doe I*, like the Amended Complaint here, "broadly alleg[ed] that Plaintiffs, or their loved ones, have been personally and financially injured by the actions of the Israeli defendants—and those acting under their command or policies—regarding settlement activities in the West Bank." *Doe I*, 400 F. Supp. 2d at 97.  With regard to the religious corporation defendants specifically, the Court noted that the Plaintiffs'

> claims rest on Plaintiffs' assertion that the [corporate defendants] actively solicited financial contributions that were applied to purchase various types of protective gear that was, in turn, used in the West Bank by Israeli settlers.

> Plaintiffs allege that the settlement activities have caused them to suffer physical, emotional, or financial injury because: (1) the financial interest or personal property was located in the West Bank; (2) the Plaintiffs themselves were located in the West Bank; or (3) the actions taken by the settlers in the West Bank harmed a close relative located there, and upon learning of this harm, a plaintiff suffered injury in the United States.

*Doe I,* 400 F. Supp. 2d at 98–99.  The similarity of the allegations in *Doe* to those before this Court cannot be overstated.

In *Doe I,* this Court dismissed Plaintiffs' claims because this Court determined it could not hold that Plaintiffs had stated a claim

> unless the Court implicitly determines that the Israeli settlement activities are illegal or tortious. That, as discussed above, is a foreign relations determination to be made by the Executive or Legislative Branches, and the Court would usurp the roles of those coordinate branches if it were to intrude. Such a conclusion would also implicitly condemn American foreign policy by suggesting that the support of Israel is wrongful. Conclusions like these present a potential for discord between the branches that further demonstrates the impropriety of a judicial decision on these quintessential political issues.

*Doe I,* 400 F. Supp. 2d at 112.

This Court's opinion in *Mahorner v. Bush* is similarly instructive. 224 F. Supp. 2d 48 (D.D.C. 2002*), aff'd,* No. 02-5335, 2003 WL 349713 (D.C. Cir. Feb. 12, 2003).  In *Mahorner,* the plaintiff sought a declaratory judgment that the appropriation of funds to Israel by President Bush and defendant Secretary of the Treasury Paul H. O'Neill violated the Constitution's Establishment Clause. *Id.,* 224 F. Supp. at 50.  The Court observed that "among the areas which the courts have traditionally deemed to involve political questions is the conduct of foreign relations, which 'is committed by the Constitution to the executive and legislative 'the political' departments of the government[.]'" *Id.,* 224 F. Supp. at 53.  The Court then found that the Plaintiff's

> challenge to the constitutionality of the Congressional Acts in question is a challenge to the power of the President and Congress to conduct the foreign affairs of the United States. Both the Congress and the President have determined

12

that military and economic assistance to the State of Israel is necessary ... **[and] a determination of whether foreign aid to Israel is necessary ... is a 'question uniquely demand[ing] [of a] single-voiced statement of the Government's views,' and a decision 'of a kind for which the Judiciary has neither aptitude, facilities nor responsibility ...**

*Id.* (quoting *Dickson v. Ford,* 521 F.2d 234 (5th Cir. 1975)) (emphasis added); *see also Corrie v. Caterpillar Inc.*, 503 F.3d 974 (9th Cir. 2007) ("[a]llowing this action to proceed would necessarily require the judicial branch of our government to question the political branches' decision to grant extensive military aid to Israel. It is difficult to see how we could impose liability on Caterpillar without at least implicitly deciding the propriety of the United States' decision to pay for the bulldozers which allegedly killed the Plaintiffs' family members").

Finally, "Plaintiffs' action also runs head-on into the [third], fourth, fifth, and sixth *Baker* tests because whether to support Israel with military aid is not only a decision committed to the political branches, but a decision those branches have already made." *Id.; see also Alperin v. Vatican Bank,* 410 F.3d 532, 544 (9th Cir. 2005) ("[T]hese tests are more discrete in theory than in practice, with the analyses often collapsing into one another.").

As the cases above demonstrate, courts in this district and elsewhere have wisely steered clear of adjudicating such disputes. Those decisions are based on sound precedent and policy. Plaintiffs' lawsuit, which essentially asks this Court to declare that the United States' and Israel's governments are at fault in the commission of war crimes, seeks to transfer the political branches' foreign policy responsibility to this Court. The political question doctrine precludes that result, and Plaintiffs' claims should therefore be dismissed. Plaintiffs' claims would impose liability on a United States NGO for donating money to Israeli NGOs, which allegedly then fund the IDF, which itself, allegedly, then takes that money and uses it to buy weapons and train troops and uses those weapons and troops to expand the settlement of the West Bank. But the policy choices of the executive branch – which has not only not prohibited direct sales of arms to

13

Israel despite the Israeli government's alleged conduct, but has approved of billions of dollars of appropriations for Israeli arms purchases and other military aid[2] – undeniably support aid to Israel.

By attacking KFF's donations to Israeli NGOs in this lawsuit (which the Israeli NGOs then allegedly use to support the IDF and settlement expansion generally), Plaintiffs are seeking a remedy for economic activity the executive branch has itself conducted and promoted, and are asking this Court to second-guess the foreign policy decisions of the branch of government that is charged with the responsibility for the conduct of that foreign policy.  This Court should affirm its precedents and decline to do so.

## C.   The Al-Tamimi Decision Demonstrates Dismissal Is Appropriate

The D.C. Circuit's recent decision in *Al-Tamimi v. Adelson*, 9 F.3d 1 (D.C. Cir. 2019) confirms that dismissal of the Amended Complaint is proper and does not alter the analysis set forth above.

As an initial matter, the *Al-Tamimi* Court did not address, consider or resolve the application of the act of state doctrine to the claims there. *Id.*  And, as set forth above, the act of state doctrine bars Plaintiffs' claims in the Amended Complaint.

Nor does *Al-Tamimi* alter the analysis on the political question doctrine as the facts of that case, though also alleging liability for alleged crimes committed against Palestinians in the West Bank and Gaza Strip, are materially different than the allegations here.  Specifically, in *Al-*

---

[2] "Israel is the largest cumulative recipient of U.S. foreign assistance since World War II. As of December 2016, the United States had provided Israel $127.4 billion (current, or non-inflation-adjusted, dollars) in bilateral assistance. Almost all U.S. bilateral aid to Israel is in the form of military assistance.  At a signing ceremony at the State Department on September 14, 2016, representatives of the U.S. and Israeli governments signed a new ten-year Memorandum of Understanding (MOU) on military aid covering FY2019 to FY2028.  Under the terms of the MOU, the United States pledged to provide $38 billion in military aid ($33 billion in FMF grants plus $5 billion in missile defense appropriations) to Israel.  This new MOU will replace the current $30 billion 10-year agreement, which runs through FY2018."  Congressional Research Service, US Foreign Aid to Israel, (December 22, 2016) (attached hereto as Exhibit 2 to the Declaration of Donald David).

*Tamimi*, the plaintiffs alleged that the defendants funneled millions of dollars through tax-exempt entities and banks directly "to Israeli villages called 'settlements.'" *Id.* at 4. And, armed with that financial assistance, the plaintiffs alleged that the settlement leaders hired their own private security forces that trained settlement militias. *Id.* In the face of those allegations, the *Al-Tamimi* Court found that the complaint posed a classic political question "*who has sovereignty over the disputed [West Bank and Gaza] territory*." *Id.* at 10 (emphasis in original). However, the Court denied dismissal because it found that the issue over sovereignty could be separated from other bases of liability and "the plaintiffs…waived any theory of liability based on the conduct of the Israeli military." *Id.* at 13.

Here, by contrast, Plaintiffs have not waived any theory of liability based on the conduct of the Israeli military or its government. Nor could they. As is evident from both the caption and the claims in the Amended Complaint here, Plaintiffs' claims are inextricably intertwined with all of the theories of liability in this case. Plaintiffs allege that KFF aided and abetted acts of the Israeli government and the IDF against Palestinian settlers in the disputed territories. They allege that KFF did so by directly funding the IDF as well as Israeli NGOs that they knew would fund the IDF's activities in the disputed territories. Indeed, Plaintiffs assert direct causes of action against Prime Minister Netanyahu, Israeli Ministry of Defense Officials Ehud Barak and Avigdor Lieberman, Knesset Member Tzipi Livni, as well as David Friedman, the United States Ambassador to Israel. As such, unlike *Al-Tamimi*, here the political questions raised by the Amended Complaint are inextricably intertwined with the political questions of, among others, sovereignty of the West Bank and Gaza Strip. As such, dismissal is appropriate under both the act of state and political question doctrines.

## II.   THE ATA CLAIM MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT HAVE STANDING UNDER JASTA AND THERE IS NO SECONDARY LIABILITY UNDER § 2333

### A.   The Statutory Framework of Civil Liability Under the Anti-Terrorism Act

18 U.S.C. § 2333(a) provides that "[a]ny national of the United States injured in his or her person ... by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold ... damages."  Thus, on its face, the ATA requires Plaintiffs to plead three elements: (1) an injury to a United States national; (2) an act of international terrorism; and (3) causation. Whether or not a Plaintiff has suffered an injury cognizable under the ATA thus depends in part on the definition of "international terrorism."  That term is defined as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended–
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum ....

18 U.S.C. § 2331(1).

The civil liability provision thus incorporates by reference a broad range of state and federal crimes that may constitute "acts of international terrorism," if a plaintiff can show both that a defendant committed the criminal violation and that the crime satisfies the additional criteria listed above (i.e., injury and causation).

16

Plaintiffs in this case allege, *inter alia*, that KFF's conduct violated the "material support" provisions of the ATA: 18 U.S.C. §§ 2339A and 2339C.[3]  Section 2339A(a) makes it a crime to "provide [ ] material support or resources [to terrorists] ... knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" various criminal statutes.[4]  Section 2339C(a)(1) makes it a crime to "by any means, directly or indirectly, unlawfully and willfully provide[ ] or collect[ ] funds ... with the knowledge that such funds are to be used" to carry out an act intended to cause death or serious bodily injury, where the purpose of the act "by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

Plaintiffs' theory of civil liability under the ATA is that KFF participated in a conspiracy to violate sections of the criminal code (e.g., 2339A and 2339C), and, therefore, KFF is civilly liable to Plaintiffs because Plaintiffs were injured "by reason of" the related acts of international terrorism.  Plaintiffs' theory of liability is untenable for the several reasons below.

## B.    Secondary Liability under the ATA, Pre- and Post-JASTA

The Amended Complaint (presumably)[5] bases its ATA claims on theories of aiding and abetting and conspiracy liability.[6]  However, as explained below, if there ever was a cognizable

---

[3] Plaintiffs also allege that KFF has violated various provisions of the criminal code related to tax fraud and money laundering.  These allegations are of a piece with the section 2339 allegations.  The gravamen of Plaintiffs' claim is, essentially, that KFF's donations are not what KFF says they are, and thus KFF is liable under the ATA based on predicate offenses under the various statutes.

[4] With respect to Section 2339A, Plaintiffs allege that "18 U.S.C. § 2339(A) prohibits the provision of material support or resources to persons or entities which have committed acts of international terrorism, and … [a]ll Defendants named herein have actually participated in . . .acts of international terrorism[.]"  But Section 2339A does *not* say that.  It does *not* mention the term "international terrorism," but lists predicate statutory bases upon which liability under 2339A may attach.  It is thus impossible for KFF to determine the basis for the ATA claim against it, and thus the allegation fails to provide the requisite notice and the ATA claim must be dismissed.  See *infra*, n.5.

[5] It is nearly impossible to untangle which allegations support which causes of action, and which causes of action proceed under which specific statutory bases.  The purpose of Rule 8 is to "give fair notice to the defendants of the claim being asserted, sufficient to prepare a responsive answer, [and] to prepare an adequate defense."  *Adams v. U.S. Dep't of State*, 2013 WL 4579929, at *1 (D.D.C. July 10, 2013).  "A complaint that is excessively long, rambling, disjointed, incoherent, or full of irrelevant and confusing material does not meet the Rule's pleading

claim based on secondary liability under the ATA, now that Congress has spoken on the issue with the recent passage of the Justice Against Sponsors of Terrorism Act ("JASTA"), which amended the ATA to explicitly address the issue of secondary liability, there is no longer any viable theory of liability upon which Plaintiffs can proceed.

"Much ink has [ ] been spilled on the question of secondary liability under the ATA." *Owens v. BNP Paribas S.A.,* No. CV 15-1945 (JDB), 2017 WL 394483, at *5 (D.D.C. Jan. 27, 2017). Prior to the passage of JASTA, "courts and the litigants [ ] debate[d] whether a plaintiff can recover against a defendant who aided and abetted a violation of the ATA, or conspired to violate the ATA, without having committed an underlying criminal violation." *Id.* As the *Owens* Court explained, "Section 2333 itself is silent on this issue . . . .. Courts initially split on this question[.]" *Id.* (collecting cases). After an extensive analysis of the state of the law, Judge Bates concluded that "the now-previous version of the ATA applicable to this case does not provide for civil aiding and abetting liability under § 2333." *Id.* at *7.

> In coming to this conclusion, Judge Bates noted that the
>
> silence [of the pre-amendment statutory text] as to civil aiding and abetting liability under § 2333 is [ ] significant. Indeed, the fact that Congress just months ago amended the ATA [with the passage of JASTA] to specifically include aiding and abetting liability [ ] further underscores that Congress recognizes the import of its statutory silence and does indeed know how to provide for such liability when it chooses to do so.

*Id.* at *7.

---

requirements[.]" *Id.* Furthermore, a complaint cannot "lump [ ] all the defendants together in each claim" without providing "each defendant with fair notice of each claim and its basis." *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (internal quotations omitted). The Complaint fails to provide notice under these standards consistent with Rule 8. Plaintiffs' impermissible grouping of defendants also "supports dismissal under the standards set forth in *Twombly* and *Iqbal*," as such allegations are, by their nature, vague and conclusory. *Ochre LLC v. Rockwell Architecture Planning & Design,* P.C., 2012 WL 6082387, at *7 (S.D.N.Y. Dec. 3, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants."). The Complaint should thus be dismissed for these additional reasons.

[6] *See, e.g.,* Am. Compl , ¶¶ 86-109.

### C.     JASTA Aiding and Abetting Liability Is Not Available Here

Congress chose to provide for secondary liability under the ATA only in limited circumstances.  JASTA provides that civil "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."  JASTA § 4(a), *codified at* 18 U.S.C. § 2333(d)(2).  However, the plain text of the statute is fatal to Plaintiffs' claims, because the injury the plaintiff seeks to remedy must arise "from an act of international terrorism committed, planned, or authorized ***by an organization that had been designated as a foreign terrorist organization*** under section 219 of the Immigration and Nationality Act."  *Id.* (emphasis added).  As such, Plaintiffs have not and cannot state an "aiding and abetting" claim under JASTA, because neither Israel nor the IDF is or has ever been so designated.

### D.     There Are No Civil Claims for Conspiracy or Aiding and Abetting Available Under § 2333 Other Than JASTA's Limited Provision for Secondary Liability

Even if this Court were to determine that the statutory text does not end this inquiry, the history of judicial interpretation of the pre-JASTA ATA and the legislative history of JASTA together demonstrate that there is no civil secondary liability of any kind under the ATA, aside from that provided for by JASTA.

A court's duty "is to ascertain the congressional intent and give effect to the legislative will."  *Philbrook v. Glodgett,* 421 U.S. 707, 713 (1975).  An important index of congressional intent is that Congress would have expected courts to interpret new amendments based on Congress's knowledge of how courts had interpreted the statute before the amendment.  *See, e.g., Cannon v. Univ. of Chicago,* 441 U.S. 677, 702-03 (1979) (finding significant, in holding that Title IX creates an implied private right of action, the fact that courts had consistently found implied private rights of action in the statute prior to congressional revisitation); *McClellan v.*

*Cablevision of Connecticut, Inc.*, 149 F.3d 161, 166 (2d Cir. 1998) (finding congressional intent to imply a private cause of action under § 531(e) of the Cable Communications Policy Act when three district courts had found an implied private right of action under § 531(e) and Congress, in amending the statute, did not explicitly reject their interpretation).

Here, when the final draft of JASTA was being considered for passage, the majority opinion – and the better view – among the Circuit Courts was that the ATA did not provide for secondary liability.  *See Owens,* 2017 WL 394483, at *5.  As such, it is logical to conclude that Congress intended for the courts, post-passage of JASTA, to construe the ATA as providing for only the limited secondary liability explicitly granted by the JASTA amendment.

Additionally, analysis of the "legislative history" of a statute is among the "traditional tools of statutory construction" to which this Court should look "for clues of congressional intent." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 300 (1988).  As Mr. Goodlatte of the House of Representatives noted when voting to pass JASTA:

> In particular, I have worked to make sure that JASTA's extension of secondary liability under the Anti-Terrorism Act closely tracks the common law standard for aiding and abetting liability ***and is limited to State Department-designated foreign terrorist organizations.***  Secondary liability should *only* attach to persons who have actual knowledge that they are directly providing substantial assistance to a designated foreign terrorist organization in connection with the commission of an act of international terrorism.  ***JASTA, as revised in the Senate Judiciary Committee, ensures that aiding and abetting liability is limited in this manner.***

162 Cong. Rec. H5239-03, 162 Cong. Rec. H6023-02, H6029 (comments of House Mem. Robert Goodlatte) (emphasis added).  House Member Mr. Smith echoed this view, noting that JASTA "corrects conflicting case law" regarding secondary liability, and that the ATA, as amended by JASTA, does not provide for secondary liability "except in the cases where someone knowingly aids, abets, or conspires with a State Department-designated foreign terrorist organization."  162

Cong. Rec. H6023-02, 162 Cong. Rec. H6023-02, H6029 (comments of House Mem. Christopher Smith).

In comparison, "the legislative history of the ATA [as originally enacted] provides little concrete insight into the precise scope of liability contemplated in the civil liability provision." *Owens,* 2017 WL 394483, at *7. Where a clarifying amendment addresses an issue on which the original statute was silent, the amendment is "particularly persuasive evidence" of Congress' intent. *See Johnson v. U.S. Dep't of Hous. & Urban Dev. (HUD),* 911 F.2d 1302, 1308–09 (8th Cir. 1990) ("The clarifying amendment cannot override the 'unmistakable intent of the enacting [Congress],' but is particularly persuasive evidence when that intent is ambiguous or obscure.") (citing *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596 (1980)).

In light of the forgoing, there is no civil liability under the ATA in the nature of secondary liability beyond the limited textual grant in JASTA. The legislative history of both the originally enacted ATA and the JASTA amendment, considered together and in light of the intervening interpretative conflict in the courts, supports that view. Because Congress has spoken and explicitly clarified the law as to aiding and abetting liability under the ATA, *see Johnson,* 911 F.2d at 1308 ("[w]e also have the benefit of a clarifying amendment which purports to answer the very question presented by this litigation."), any previous interpretation that provided for civil liability in the nature of secondary liability is no longer viable, and Plaintiffs' ATA claim must be dismissed.

## III.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATA BECAUSE IT DOES NOT ALLEGE AN INJURY THAT OCCURRED "BY REASON OF" ANY CONDUCT BY KFF

### A.   The Amended Complaint Must Plausibly Plead That KFF's Actions Proximately Caused The Attacks

Even if secondary liability were available here, Plaintiffs' claim still must be dismissed. Section 2333(a) requires that the Amended Complaint plausibly allege that Plaintiffs' injuries occurred "by reason of" KFF's donations to Israeli NGOs.  The phrase "by reason of" requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168, 173 (D.C. Cir. 2000) (quoting *Holmes*, 503 U.S. at 258).

Thus, the Amended Complaint must properly plead that KFF's actions "led directly to the [Plaintiffs'] injuries." *See Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S. Ct. 1991 (2006) ("[T]he central question [with respect to proximate cause] . . . is whether the alleged violation led directly to the plaintiff's injuries."); *Siegel v. SEC*, 592 F.3d 147, 159 (D.C. Cir. 2010) ("[P]roximate causation . . . is normally understood to require a direct relation between conduct alleged and injury asserted.") (internal quotations omitted) (citing *Holmes*, 503 U.S. at 258); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F. 3d 685, 698 (7th Cir. 2008) (en banc) ("*Boim III*") (defendants' **direct** provision of funds to **Hamas** satisfied proximate cause because it "significantly enhanced the risk of terrorist acts [committed by Hamas] and thus the probability that the plaintiff's decedent would be a victim") (emphasis added).

### B.   Without A Plausible Allegation That Funds Were Provided Directly to Persons Engaging In Terrorist Activity, the ATA Claim Must be Dismissed

Under the *Anza* standard, the Amended Complaint's allegations are insufficient to establish the necessary proximate causal link between KFF's actions and the injuries alleged. The Amended Complaint can satisfy the ATA's proximate causation requirement only by

making plausible allegations that funds provided by KFF <u>actually were transferred</u> to the perpetrators of the alleged acts that gave rise to Plaintiffs' alleged harm, or that those funds were otherwise a "but for" cause of such harm.   But the Amended Complaint lacks any allegations of any transfers directly to perpetrators of alleged terrorist activities, let alone persons who allegedly caused the injuries alleged in this case.

First, there is no allegation that KFF itself participated in or made ***direct*** transfers to enable any terrorist activity.   *See Rothstein v. UBS AG,* 708 F.3d 82, 97 (2d Cir. 2013). Similarly, there are no allegations that donations made to Israel by KFF were "necessary" or in any way essential to any terrorism.   *Id.*   Here, there are no non-conclusory allegations that, if KFF had not made the charitable donations to Israeli NGOs, the IDF would not have taken the actions alleged in the Amended Complaint, or that the settlement expansion as alleged in the Amended Complaint would not have occurred – which together allegedly resulted in Plaintiffs' injuries.   *See id.*   The conclusory statements that "KFF sent $315,000 to the Israeli army between 2011 and 2013," and that "Friedman and Kushner family members" have made "significant monetary contributions" to Israeli-based NGOs do not suffice under the ATA (or any claim). Such allegations offer, at best, an indirect causal chain.   *See* Am. Compl., ¶¶ 78, 69-70. Moreover, even if true, the Israeli army has substantial, legal, non-terroristic purposes that involve, for example, self-defense, which activities have no connection to the settlements, thereby further attenuating any causal connection that could be alleged between KFF donations and the injuries alleged.[7]

The distinction between permissible civil ATA claims based on <u>direct</u> causation and impermissible claims based on <u>indirect</u> causation is underscored by ATA rulings in this District.

---

[7] The court's observation in *Rothstein* with respect to Iran is *a propos* here:   As that court noted, "[t]he fact remains that [Israel] is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Rothstein,* 708 F.3d at 97.

*Wultz v. Islamic Republic of Iran* concerned allegations that defendant Bank of China ("BOC") transferred funds directly from Palestinian Islamic Jihad ("PIJ") operatives to an account BOC maintained for a PIJ agent. 755 F. Supp. 2d 1, 22 (D.D.C. 2010). Accordingly, the *Wultz* Court held that the Amended Complaint adequately pled proximate causation because BOC "allegedly knew that it was providing financial services to an agent of the PIJ, and that the PIJ would use those funds for the sole purpose of engaging in terroristic violence against Jewish civilians in Israel." *Id.* at 53. The Court in *Wultz* found that proximate cause had been adequately pled because the *Wultz* complaint "alleged a flow of money *directly* into the coffers of the PIJ—an organization entirely devoted to terrorist activity, and thus one that is unlikely to use wired moneys for any other purpose." *Id.* at 22 (citations omitted).

*Wultz* therefore demonstrates that, in an indirect causation case such as this one, a plaintiff cannot satisfy the ATA's proximate causation requirement where he or she fails to plausibly allege that funds provided by the defendant actually were transferred to the perpetrator of the attack, or that those funds were otherwise a "but for" cause of that attack. Plaintiffs have not and cannot adequately plead proximate cause on this standard, because their theory of liability involves multiple chains of inference and transfers of funds between KFF, other organizations, and then to the alleged perpetrators of the underlying alleged terrorist activity.

This Court recently rejected a theory of causation nearly identical to that offered by Plaintiffs here, finding that Section 2333 required proximate causation and that Plaintiffs had not and could not meet it. *Owens v. BNP Paribas S.A.*, No. CV 15-1945 (JDB), 2017 WL 394483, at *10 (D.D.C. Jan. 27, 2017) (providing a thorough examination of the law). In *Owens*, this Court held that allegations like those here amount to a "post hoc, ergo propter hoc proposition that would mean that any provider of U.S. currency to a state sponsor of terrorism would be strictly

liable for injuries subsequently caused by a terrorist organization associated with that state. Section 2333, however, does not impose this kind of liability." *Owens,* 2017 WL 394483, at \*10 (internal citation omitted) (*quoting Rothstein*, 708 F.3d at 96).

Decisions from other federal courts are in accord.  In a recent case from the Second Circuit, victims and families of victims of bombings in Israel committed by terrorist organizations (Hezbollah or Hamas) brought suit against UBS, alleging that bank aided and abetted international terrorism and aided and abetted violations of customary international law. *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013).  The *Rothstein* Plaintiffs alleged that UBS "provided Iran with hundreds of millions of dollars in cash" knowing that: (1) Iran "promot[ed] terrorism to injure and intimidate the Jewish residents of Israel"; (2) Iran "provided Hamas and Hizbollah with hundreds of millions of dollars to fund terrorist attacks"; and (3) Iran "conditioned that funding on agreement by those organizations to conduct terrorist attacks on Israel and its residents." *Rothstein,* 708 F.3d at 92.  In other words, UBS allegedly provided funding to a known state sponsor of terrorism (in violation of federal law) that, in turn, provided funding to Hezbollah and Hamas.

These allegations – far more robust than those Plaintiffs offer in the Amended Complaint – were insufficient to establish proximate causation.  *Id.*  Similarly, in *In re Terrorist Attacks on Sept. 11, 2001*, certain defendants were alleged to have provided funding to purported charitable organizations allegedly known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations.  The Second Circuit, citing *Rothstein* approvingly, held that:

> [T]hese allegations are insufficient for proximate causation purposes for the same reasons the allegations in *Rothstein* fell short. Simply put, Plaintiffs do not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported

charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks.

*In re Terrorist Attacks*, 714 F.3d 118, 124 (2d Cir. 2013).

The weight of authority in this District and elsewhere is clear and convincing: where there is no **direct** theory of causation, and no factually supported allegations that specific funds were transferred and used in furtherance of specific terrorist acts, there is no proximate cause under the ATA.  Plaintiffs' ATA claim thus fails for this additional reason.

## IV.  THE ATA CLAIM MUST BE DISMISSED BECAUSE AN ATA CLAIM PREDICATED UPON "ACTS OF WAR" IS BARRED BY SECTION 2336(a)

Section 2336(a) of the ATA also mandates dismissal of the ATA claim because the Amended Complaint alleges injuries caused by "acts of war" over which the ATA does not extend jurisdiction.  Section 2336(a) of the ATA provides that "[n]o action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war."  Section 2331(4), in turn, defines "act of war" as "any act occurring in the course of—(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin."

The statutory definition of act of war in section 2331(4)(C) is broad.  It covers 'any act' without limit or qualification and requires, in relevant part, only that the act be one occurring in the course of armed conflict between military forces of any origin.[8]  It is beyond dispute that there is an ongoing conflict between the Israeli military and Palestinian military forces surrounding Israel, the West Bank and Gaza.  The Amended Complaint focuses on the activities of the IDF in supporting the settlement of the West Bank.  The IDF is of course a military force.

---

[8] There is little in the way of legislative history regarding the definition of act of war in section 2331 or section 2336(a) itself.  But from a policy standpoint it makes sense that the bar of section 2336(a) should be widely applied to ATA cases arising from armed conflict.  By excluding "acts of war" from the ATA, Congress sought to avoid having the courts of the United States be arbiters of war damages among populations in a conflict on foreign soil.

The IDF has troops and tanks and other armored vehicles, as well as helicopters, jet aircraft and missiles.  The IDF protects settlements and settlers throughout the occupied territories.  The Israeli government and the Palestinian Authority have consistently characterized the conflict as armed conflict.  Accordingly, because the allegations of the Amended Complaint fall within the statutory definition of "act of war," the claims are not cognizable under the ATA.

A holding to that effect would comport with the purpose and intended scope of the ATA. The ATA is intended to deter international terrorism against United States nationals.  But where an alleged injury arises from an ongoing armed conflict between two foreign groups on foreign soil, the ATA has no such deterrent effect.  The violence alleged in the Amended Complaint, based on a conflict in the West Bank, like all acts in such an ongoing armed conflict, was not directed at persons targeted as citizens of the United States.

## V. THE ALIEN TORT STATUTE CLAIM MUST BE DISMISSED BECAUSE THE CLAIM LACKS SUFFICIENT CONTACT WITH THE UNITED STATES UNDER *KIOBEL* AND CORPORATE LIABILITY IS BARRED

### A. The Claim Lacks Sufficient Contact With The United States

The Alien Tort Statute ("ATS") is a jurisdictional statute that creates no causes of action. It permits federal courts to "recognize private claims [for a modest number of international law violations] under federal common law."  *Sosa v. Alvarez–Machain,* 542 U.S. 692, 732 (2004). The Supreme Court in *Kiobel* held that the presumption against extraterritoriality applies to claims brought under the ATS and that nothing in the statute's text, history, or purposes rebutted that presumption.  *Kiobel v. Royal Dutch Petroleum Co.,* 133 S. Ct. 1659, 1665 (2013).  The Supreme Court's holding in *Kiobel* precludes Plaintiffs' ATS claim on the facts of this case.

The statutory canon against extraterritoriality provides that "'[w]hen a statute gives no clear indication of an extraterritorial application, it has none.'"  *Kiobel*, 133 S. Ct. at 1664; *Morrison v. National Australia Bank Ltd*., 130 S.Ct. 2869, 2878 (2010).  This presumption

27

against extraterritorial application of federal statutes "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC v. Arabian American Oil Co*., 499 U.S. 244, 248, 274 (1991). The Supreme Court observed that this concern is even more pronounced in the context of the ATS, since "the question is not what Congress has done but instead what courts may do." *Kiobel v. Royal Dutch Petroleum Co.,* 133 S. Ct. 1659, 1664 (2013). As such, "[t]he Supreme Court's decision in *Kiobel II* drastically limits the viability of ATS claims based on conduct occurring abroad." *In re S. African Apartheid Litig.,* 56 F. Supp. 3d 331, 336 (S.D.N.Y. 2014), *aff'd sub nom. Balintulo v. Ford Motor Co.,* 796 F.3d 160 (2d Cir. 2015).

The Supreme Court allowed that certain "claims [may] touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application" of the ATS. *Kiobel,* 133 S. Ct. at 1669. But the "Supreme Court expressly held that claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States." *Balintulo v. Daimler AG*, 727 F.3d 174, 189 (2d Cir. 2013). That is, the presumption against extraterritorial application can be rebutted only if conduct within the United States is itself sufficient to violate an international law norm. *Kiobel,* 133 S. Ct. at 1670 (Alito, J., concurring).

Following the Supreme Court's decision in *Kiobel,* courts have rejected aiding and abetting ATS liability for defendants on more robust allegations than those here. The Second Court, interpreting and applying the new standard laid down by the Supreme Court, rejected Plaintiffs' argument that defendants' "affirmative steps in this country to circumvent the [South African] sanctions regime," including "continu[ing] to supply the South African government with their products, notwithstanding various legal restrictions against trade with South Africa,"

are sufficient to "tie[ ] the relevant human rights violations to actions taken within the United States." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 169 (2d Cir. 2015). The situation here 'touches and concerns' the United States to a far lesser degree, in that there is no American sanctions regime implicated by KFF's donations, and KFF does not control the charitable corporations to which it donates in Israel (which corporate domination and control was at issue and alleged in *Balintulo*).

Other courts agree that the reach of the ATS to conduct outside United States' borders is limited. The Eleventh Circuit, in *Cardona v. Chiquita Brands Intern., Inc.*, determined that the federal courts had no jurisdiction over ATS claims where the tort that allegedly violated the ATS occurred on foreign soil. 760 F.3d 1185, 1189-90 (11th Cir. 2014). Other courts have similarly held that the "touch and concern" standard is not met where, as here, the events or actions that would trigger primary liability under the ATS do not occur in the United States. *See Giraldo v. Drummond Co.,* No. 2:09-CV-1041-RDP, 2013 WL 3873960, at *8 (N.D. Ala. July 25, 2013), (holding that "where a Complaint alleges activity in both foreign and domestic spheres, extraterritorial application of a statute arises only if the event on which the statute focuses did not occur abroad") *aff'd sub nom. Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015); *accord Kiobel,* 133 S. Ct. at 1670 (Alito, J., concurring) (the presumption against extraterritorial application can be rebutted only if conduct within the United States is itself sufficient to violate an international law norm).

*Drummond* is instructive. In *Drummond*, the decedents of Colombians killed by the Autodefensas Unidas de Colombia ("AUC"), sued Drummond Co. ("Drummond"), a U.S. coal mining company based in Alabama. *Drummond,* 2013 WL 3873960, at *2. Plaintiffs alleged that Drummond aided and abetted the AUC so that the AUC would protect Drummond's

corporate interests in Colombia.  *Id.*  The *Drummond* Plaintiffs claimed that the AUC committed extrajudicial killings, war crimes, and crimes against Plaintiffs on behalf of Drummond Co. to fulfill this mission.  *Id.*

Plaintiffs argued that the presumption against extra-territoriality did not apply because the case involved United States defendants who committed acts in the United States in furtherance of human rights abuses in Colombia.  As to the conduct touching and concerning the United States, Plaintiffs argued that the Defendant contractor, Drummond, made executive decisions,[9] ran its Columbian operations out of the United States,[10] and had extensive contacts with the primary Columbian paramilitary perpetrators by way of an intermediary appointed by the CEO in the United States.[11]

The Court, dismissing the ATS claim, held that even if it were to credit these allegations, the Plaintiffs' "theory on extraterritorial reach still does not hold water based on the most logical and unstrained reading of Kiobel."  *Drummond,* 2013 WL 3873960, at *8 (N.D. Ala. July 25, 2013).  The *Drummond* Court held that:

> where a Complaint alleges activity in both foreign and domestic spheres, an extraterritorial application of a statute arises *only* if the event on which the statute *focuses* did not occur abroad. Of course, the ATS *focuses* on the torts of extrajudicial killings and war crimes (violations of the law of nations), and in the *Balcero* case, the tort at issue occurred abroad, in Colombia, and *not* in the United States.

*Id*. (emphasis in original).

---

[9] "Drummond's decision to provide material support to the AUC and commissioning others to engage in war crimes and extrajudicial killings was made by DCI's CEO, Garry Drummond, in Alabama."  *Drummond*, 2013 WL 3873960, at *5.

[10] "Drummond controls operations in Colombia from its headquarters in Alabama and that Garry Drummond met regularly regarding security in Drummond's Colombian operations."  *Id.* at *6.

[11] "Jim Adkins acted as Drummond's agent when he implemented the plan for Drummond to support the AUC's war effort in the area of Drummond's operations."  *Id.*

The allegations here are again a far cry from those that did not suffice in *Drummond*. The essence of the *Drummond* Plaintiffs' allegations was that the United States corporate contractor specifically directed the predicate torts that were themselves violations of international law.  Here, even if Plaintiffs' allegations were credited in full – and they should not be, as they are entirely conclusory – *Kiobel* and its progeny require dismissal of the Plaintiffs' ATS claim on these facts because the actions by KFF that took place on U.S. soil were not themselves violations of international law, and the alleged harm occurred on foreign soil.  There is simply nothing here that "touches and concerns" the United States sufficient to sustain an action under the ATS.  As such, Plaintiffs' claim must be dismissed.

**B.    There Is No Corporate Liability Under The Alien Tort Statute**

As noted above, the ATS provides district courts with jurisdiction over a tort, brought by an alien only, alleging a "violation of the law of nations or a treaty of the United States."  28 U.S.C. §1350.  As such, jurisdiction under the ATS "is limited to those cases alleging a violation of an international norm that is 'specific, universal, and obligatory."  *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 148 (2d Cir. 2010), quoting *Sosa*, 542 U.S. at 732.  Thus, federal courts will only entertain claims under the ATS "based upon the present-day law of nations" provided that the claims rest on "norm[s] of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms recognized."  *Sosa*, 542 U.S. at 725.  "[A] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation of an individual."  *Id.* at 732 n. 20.  In *Kiobel*, the Second Circuit, after an extensive review of international law, treaties and norms, held that the law of nations did not support the imposition of liability on corporate entities, such as KFF

here, under the ATS. *Kiobel*, 621 F.3d at 148 (holding that "[n]o corporation has ever been subject to *any* form of liability…under customary international law of human rights).

Largely adopting the Second Circuit's holding in *Kiobel*, the Supreme Court recently issued its decision in *Jesner v. Arab Bank*, 138 S.Ct. 1386 (2018). While *Jesner* concerned the liability of a foreign corporation under the ATS, the *Jesner* Court, just as the Second Circuit in *Kiobel*, held that "[t]he international community's conscious decision to limit the authority of…international tribunals to natural persons counsels against a broad holding that there is a specific, universal, and obligatory norm of corporate liability under currently prevailing international law." *Id.* at 1401. Indeed, rejecting the plaintiff's argument that in certain circumstances international law will impose corporate liability, the *Jesner* Court held that "the sources petitioners rely on to support their contention that liability for corporations is well established as a matter of international law lend weak support to their position." *Id.* As such, in *Jesner*, the Supreme Court held that a plaintiff could not bring suit against a foreign corporation for an alleged violation of the ATS and that the determination of whether, and in what instances, to impose liability on a foreign corporation should be determined, if at all, by the political branches of government. *Id.* at 1408.

Although *Jesner* concerned the issue of liability of a foreign corporate entity under the ATS, the decision is equally applicable to a domestic corporate entity such as KFF. As noted above, under *Sosa*, ATS liability "is limited to those cases alleging a violation of an international norm that is 'specific, universal, and obligatory." *Kiobel*, 621 F.3d at 148, quoting *Sosa*, 542 U.S. at 732. And, as *Jesner* demonstrates, there is no "specific, universal and obligatory" norm under international law that imposes liability upon a corporate actor for violations of international law. *Jesner*, 138 S.Ct. at 1400. Indeed, in *Jesner*, the Supreme Court made clear

32

that, notwithstanding that the international community has come to recognize the danger of human rights violations, "[i]t does not follow…that current principles of international law extend liability—civil or criminal—for human-rights violations to corporations or other artificial entities." *Id.* Indeed, the Supreme Court found that the lack of an international norm imposing liability upon artificial entities such as KFF "is confirmed by the fact that the charters of respective international criminal tribunals often exclude corporations from their jurisdictional reach." *Id.* Given that ATS liability can only be imposed where a complaint alleges the violation of a specific, universal and obligatory international norm, and given that, as confirmed by both *Kiobel* and *Jesner*, there is no specific, universal or obligatory international norm imposing liability for alleged human rights abuses on corporate entities such as KFF, Plaintiffs cannot maintain a cause of action against KFF under the ATS.

## VI.  ALL CLAIMS AGAINST KFF MUST BE DISMISSED BECAUSE THE AMENDED COMPLAINT FAILS TO PROVIDE PLAUSIBLE ALLEGATIONS TO SUPPORT THEIR CLAIMS

As discussed above, "[t]o survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). This requires a plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[L]abels and conclusions," and "naked assertion[s] devoid of further factual enhancement," do not satisfy the pleading standard. *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted). The Court need not accept legal conclusions or inferences drawn by the plaintiff where those inferences are unsupported by facts alleged in the Amended Complaint. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). *Iqbal*'s plausibility standard requires more than a "sheer possibility" that a defendant is liable. *Iqbal*, 556 U.S. at 678.

A.    **ATA Claim**

Plaintiffs' first cause of action alleges that KFF is liable under the ATA for Civil Conspiracy to Arm and Train Foreign Militia Units.  As described above, the ATA – primarily a criminal statute – contains a civil remedies provision that provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States."  18 U.S.C. § 2333(a).  Plaintiffs unsuccessfully seek to link KFF to the actions of the Israeli defendants by claiming "conspiracy," but their allegations of conspiracy fall far short of plausible.  The elements of conspiracy are: an 1) agreement; 2) to participate in an unlawful act (or lawful act by unlawful means); 3) resulting in an injury; 4) caused by an overt unlawful act performed by one of the parties to the agreement; 5) which act was done in furtherance of the common scheme of the conspiracy.  *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983).

1.    **Plaintiffs Fail to Adequately Plead the Existence of an Agreement**

To begin with, Plaintiffs fail to allege any nexus between KFF's collection and donation activities on the one hand, and the allegedly wrongful activities of the Israeli defendants, on the other.  Specifically, with respect to the required element that there be an "agreement" for civil conspiracy, the Amended Complaint fails to allege the actual existence of a specific agreement of any kind, much less an agreement to perform any illegal act.  The Amended Complaint states, vaguely, as part of its recitation of the elements of the claim, that there was an "agreement" between "U.S. and Israeli Defendants/Netanyahu and IMD officials/Kushner family and Friedman."  Am. Compl., ¶ 87.  However, Plaintiffs offer no facts in support of this legal conclusion: they identify no actual written or oral agreement, and they offer no facts regarding "specific time[s], place[s], or persons[s]" involved in any act in furtherance of the conspiracy.

*See Twombly,* 550 U.S. at 565 ("the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place").

Plaintiffs cannot plead an agreement because there was no such agreement.  That a pro-Jewish organization in the United States donated money to a pro-Jewish organization in Israel is hardly surprising.  *See Twombly,* 550 U.S. at 566 ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway").  That such donations were typical of those between groups that share a common background and heritage is a plausible inference.  That such donations were part of an agreed-upon conspiracy between corporate entities and governmental entities and officials in both countries to fund specific settlements in the West Bank and terrorize the Palestinian population is not.

Without an agreement, the *sine qua non* of a conspiracy claim, the entire civil conspiracy cause of action fails as a matter of law.

## 2.     Plaintiffs Fail to Adequately Plead Knowledge or Intent

It is telling how many times Plaintiffs allege that KFF "had to know" that their charitable collections and donations were being used for purposes that were criminal or terroristic in nature. These "had to know" allegations are the classic "legal conclusions" that should be excluded in the Court's 12(b)(6) analysis.  Like the intent allegations rejected as insufficient in *Iqbal*, they are nothing more than "a formulaic recitation of the elements of a cause of action[.]."  *Id*. at 555. Stating that KFF "had to know" is asking the Court to make an unwarranted inference and does not meet the requirement that a plaintiff allege "knowledge about the organization's connection to terrorism . . . ."  *Holder v. Humanitarian Law Project,* 561 U.S. 1, 2 (2010); *see also Stutts v. De Dietrich Group*, 2006 WL 1867060, at * 1 (E.D.N.Y. June 30, 2006) (rejecting as speculative the argument that banks should have known they were enabling a chemical weapons program

where there no factual allegations supporting the banks' alleged knowledge); *In re Terrorist Attacks*, 349 F.Supp.2d at 831-34 (same).

There is no non-conclusory allegation that KFF knew what uses its specific donations were put to. The State of Israel is not, nor has it ever been, designated by the United States as a state-sponsored terrorist organization, so the requisite knowledge or intent cannot be inferred simply by virtue of the transfer of charitable funds to Israel or to Israeli NGOs. *Cf. Owens v. BNP Paribas S.A.,* No. CV 15-1945 (JDB), 2017 WL 394483, at *10 (D.D.C. Jan. 27, 2017).

The deficiencies in the allegations here become clear in comparison to those in *Wultz v. Islamic Republic of Iran*. 755 F. Supp. 2d 1 (D.D.C. 2010). There the Court found that "Israeli officials allegedly informed China, which informed [Bank of China ("BOC")], that the transfers were enabling the terrorist activities of the [Palestinian Islamic Jihad ("PIJ")]." *Id*. at 46. Thus, in *Wultz* the defendant BOC was specifically notified by Chinese officials that its provision of financial services was enabling the terrorist activities of the PIJ (which notice was ignored by the bank, which continued to provide those services). *Id*. at 50-51. ("In this case, plaintiffs have pled facts alleging that BOC *actually knew* it was providing financial services to an agent of the PIJ, thus risking the use of those funds in furtherance of the PIJ's terrorist attacks.") (emphasis added).

Here, there is no allegation that anyone notified KFF that its donations were being used to bring about any of the alleged injuries in the Amended Complaint. There is no explanation in the Amended Complaint regarding how KFF could have divined that its money was (allegedly) being routed through Israeli NGOs, to government slush funds and then to the IDF, who then used that money to engage in various activities that promoted settlement expansion, which expansion then was, one presumes, the cause of Plaintiffs' alleged injuries in the Amended

36

Complaint. Instead, Plaintiffs offer their bare say-so as to KFF's knowledge. But Plaintiffs must furnish "more than labels and conclusions" in order to provide the "grounds" of "entitle[ment] to relief." *Twombly,* 550 U.S. at 555–56. These legal conclusions regarding KFF's knowledge and intent are not entitled to a presumption of truth and when removed from the stated claim of civil conspiracy under the ATA, the claim necessarily fails as a matter of law.

Moreover, unlike banks, such as the BOC at issue in *Wultz,* which are charged by law with keeping accurate and routine records of all transfers, KFF has no such duty. Thus, the *Wultz* court held that, even before the BOC was notified by Chinese officials, the heavily regulated bank knew or should have known that the transfers were made for illegal purposes "based on several attributes of the transfers that are universally recognized by all professional bankers, including BOC and its employees, as typical indicia of transactions made for illegal purposes." *See Wultz,* 755 F. Supp2d at 52. This reasoning does not apply at all to a non-banking institution like KFF.

In sum, because the Amended Complaint, in its hundred-plus pages, does not muster any facts in support of its broad claims of conspiracy, the ATA claim must be dismissed.

### B. ATS Claim

For a second cause of action, Plaintiffs allege that KFF is secondarily liable under the ATS for aiding and abetting terrorist acts. "[A]iding and abetting liability [ ] under the ATS [ ] involves a "knowledge" *mens rea* and a showing for *actus reus* of acts that have a substantial effect in bringing about the violation." *Doe v. Exxon Mobil Corp.,* 654 F.3d 11, 39 (D.C. Cir. 2011), *vacated on other grounds,* 527 F. App'x 7 (D.C. Cir. 2013). The claim that KFF is secondarily liable under the ATS requires: (1) a well-pled allegation of a *primary* violation of the law of nations and (2) that the Amended Complaint plead a *secondary* violation of the law of nations, by pleading the requirements for aiding and abetting liability as a matter of customary

37

international law.  *See id.*, 654 F.3d. at 20.  In this case, then, Plaintiffs must plausibly allege that KFF was aware of the wrongful acts at the time the donations were collected and/or made, and that KFF had knowledge not merely of the existence of the allegedly illegal activities in the occupied territories, but, specifically, knowledge that the charitable funds it donated to Israel would be used to carry out the specific acts that led to the specific injuries alleged in the Amended Complaint.  Additionally, Plaintiffs must then plausibly allege that KFF's donations had a substantial effect in bringing about their injuries.  Plaintiffs fail on both fronts.

### 1.     <u>Plaintiffs Fail to Adequately Plead The Requisite Knowledge</u>

For the same reasons that Plaintiffs fail adequately to plead scienter with respect to the ATA conspiracy claim, they also fail in this regard with respect to the ATS claim, using the same conclusory "had to know" language.  *See, e.g.,* Am. Compl., ¶ 77.  The Amended Complaint does not plead any direct link between the aid allegedly rendered by KFF to Israeli-based NGOs and the injuries alleged, as is required to establish aiding and abetting liability under international law.  *See, e.g.*, *Islamic Salvation Front*, 257 F. Supp.2d 115, 121 (D.D.C. 2003) (alleged links between defendant's conduct and acts committed by armed Islamic groups purportedly in violation of law of nations were "much too tenuous to support finding of [aiding and abetting] liability" under ATS); *Carmichael v. United Techs. Corp.*, 835 F.2d 109, 115 (5th Cir. 1988) (ATS aiding-and-abetting claim failed absent evidence demonstrating a "causal connection" between defendant's conduct and putative law of nations violation).  Thus, the ATS claim must be dismissed for the same reasons the ATA claim must be dismissed – Plaintiffs have not plead any facts that would support the plausible inference that KFF has aided and abetted violations of international law.

### 2.    Plaintiffs Fail to Adequately Plead Actus Reus

In the respects pertinent here, the *actus reus* must "consist [] of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." *Doe v. Exxon,* 654 F.3d at 34 (D.C. Cir. 2011). "[A]iding and abetting may only be found where assistance is provided to a criminal's human rights abuses, not simply to the criminal him or herself." *Doe v. Exxon Mobil Corp.,* No. CV 01-1357(RCL), 2015 WL 5042118, at *9 (D.D.C. 2015) (citing *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 257 (S.D.N.Y. 2009).

For all of the same reasons discussed with respect to the ATA claim, the Amended Complaint does not plausibly plead the actus reus that connects KFF's conduct and the allegedly illegal settlement activities. KFF's collection and donation of funds to Israeli NGOs – which is the only conduct pled in non-conclusory terms – is too indirect to satisfy the proximate cause standard. *See Rothstein*, 708 F.3d at 96; *In re Terrorist Attacks,* 714 F.3d at 124. The Amended Complaint also fails to plausibly allege specific funds sent by KFF to Israeli groups was transferred to those that caused the alleged injures. *See id.* The inference it makes to the contrary is no more than a "naked assertio[n] devoid of further factual enhancement," *Sievarding*, 693 F. Supp. at 99, 100, and does not satisfy the *Iqbal* pleading standard.

## VII.    ALL CLAIMS MUST BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER KFF

This Court must also dismiss Plaintiffs' claims against KFF for lack of personal jurisdiction. See Fed. R. Civ. P. 12(b)(2) (2007). For this Court to maintain personal jurisdiction over KFF, jurisdiction must be proper under the District of Columbia's long-arm statute and the Due Process Clause. *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation. For a State to exercise

jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014) (internal quotation marks and citations omitted).  The relationship between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Id.* at 1122 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in original).  The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.*  And the "same principles apply when intentional torts are involved." *Id.* at 1123.

Plaintiffs must allege "specific facts" on which personal jurisdiction can be based; they cannot rely on conclusory allegations. *Atlantigas Corp. v. Nisource*, Inc., 290 F. Supp. 2d 34, 42 (D.D.C. 2003).  In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat Plaintiffs' allegations as true. *Id.*  Instead, the Court may consider and weigh affidavits and other relevant matter. *Id.*

KFF is not a resident of the District of Columbia, nor is it registered to do business here. *See* Declaration of David Donald, ¶ 3, Ex. 1.  Here, in support of jurisdiction in D.C., Plaintiffs allege that KFF "solicit[s] funds in this metropolitan area and all over America to support the Israeli army and belligerent settlers engaging in theft of private property to ensure settlement expansion." Am. Compl., ¶ 22(ii).  That conclusory statement is the only basis offered for this Court's jurisdiction over KFF.[12]  It does not suffice.

---

[12] Plaintiffs also assert that this Court may exercise jurisdiction on a "conspiracy theory" of personal jurisdiction. See Am. Compl., ¶ 21 (*citing Second Amendment Found. v. United States Conf. of Mayors*, 274 F.3d 521 (D.C. 2001)).  But Plaintiffs' argument is circular – jurisdiction cannot be established over conspiracy and other claims based merely on their allegation.  Rather, the "general rule ... that a plaintiff must make a *prima facie* showing of the pertinent jurisdictional facts" applies to conspiracy-based jurisdiction. *Second Amendment Found.,* 274 F.3d at 524 (D.C. Cir. 2001).  In other words, "[s]ince the bare allegation of conspiracy or agency is insufficient to establish personal jurisdiction, a plaintiff must allege specific acts connecting the defendant with the forum." *Id.* (internal citations and quotations omitted).  As demonstrated above, Plaintiffs have utterly failed to plausibly allege facts

## VIII.   THE ATS AND ATA CLAIMS MUST BOTH BE DISMISSED AS TO CERTAIN PLAINTIFFS DEPENDING ON NATIONAL ORIGIN

Finally, the ATA claims must be dismissed to the extent brought by the foreign Palestinian plaintiffs.  *See* 18 U.S.C. § 2333(a) (to be eligible for civil relief under the ATA, a plaintiff must either be a U.S. national or an estate, a survivor, or an heir of a United States national).  Similarly, the ATS claims must be dismissed to the extent brought by the United States citizen Plaintiffs.  *See Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1026 (W.D. Wash. 2005), *aff'd,* 503 F.3d 974 (9th Cir. 2007).

## IX.   MULTIPLE DEFENDANTS MUST BE DISMISSED FROM THE CASE BE-CAUSE THEY LACK ARTICLE III STANDING

Article III requires, as an "irreducible minimum," that a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical'[.]" *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992) (internal citations omitted).  Regardless of whether this Court dismisses all claims against all Defendants – which it should, as explained above – twenty-three plaintiffs[13] (the "Art. III Plaintiffs") must be dismissed from this case because they do not allege any "concrete and particularized" injuries in the Amended Complaint.

Indeed, the Art. III Plaintiffs do not allege any particular injuries at all.   Instead, the Amended Complaint alleges summarily that "[a]ll of the Plaintiff's [sic] named herein have been injured by the aforementioned $2 billion money laundering scheme and the illegal criminal

---

supporting their conspiracy claim.  See *supra,* § 6.A.  As such, neither KFF-specific allegations nor the conspiracy allegations in the Amended Complaint suffice as a basis for personal jurisdiction over KFF.

[13] Susan Abulhawa, Abdur-Rahim Dudar, Linda Mansour, Muhammad Jihad Muhammad Al-Qara, Muhammad Suleiman Mahmoud Baraka, Saad Malley, Sami Shawqi Ahmed Madi, Tagrid Eleyan Mahmoud Abu-Teer, Waddah Khalid Sofan, Wala'a Jihad Muhammad Al-Qara, Zeinab Safwat Abd Abu-Teer, A'id Mahnmoud Ahmed Al-Bur'I, Ahmad Kamal Ibrahim Suleiman Abu-Teer, Ahmad Suleiman Mahmoud Sahmour, Ahmed Abdullah Muhammad Abu-Salah, Ali Abd Suleiman Abu-Teer, Ashraf Abu-Rahma, Basem Ibrahim Ahmed Abu-Rahmeh, Hanafi Mahmoud Kamel Abu-Yousef, Ibrahim Khalil Suleiman Qablan, Ibrahim Suleiman Qablan Abu-Qablan, Ismail Mahmoud Muhhamad Abu-Dharifa, Jawad Issa Ibrahim Salamah Al Horoob, Jawaher Ibrahim Abu-Rahmeh

41

activity which has been committed in the OPT on a daily basis."  Am. Compl., ¶ 37; *see also* Am. Compl., ¶ 106 ("As a result of these Defendants participating in this civil conspiracy, the Plaintiffs and their relatives have been injured . . . ").  But collective allegations of this nature do not suffice for Art. III standing; rather, "each [Plaintiff must] assert a distinct, individual injury." *Akins v. Fed. Election Comm'n,* 101 F.3d 731, 737 (D.C. Cir. 1996), *vacated on other grounds*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998); s*ee also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, (1982) ("Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant[.]"); *Lujan,* 504 U.S. at 581 ("While it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way."); *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,* 489 F.3d 1279, 1292 (D.C. Cir. 2007) ("[T]he asserted injury must be particularized—which the [Supreme] Court has also described as personal, individual, distinct, and differentiated—not generalized or undifferentiated.").

In sum, 'injury-in-fact' requires that each individual Plaintiff plead specific facts that make up their particular injury.  The Art. III Plaintiffs have failed to do so, and as such they must be dismissed from this case.

## **CONCLUSION**

For all of the foregoing reasons, defendant Kushner Family Foundation respectfully requests that this Court dismiss the Amended Complaint as against KFF in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), and grant KFF such other and further relief as this Court deems just and proper.

New York, New York
Dated: April 18, 2019

                                            Respectfully submitted,

                                            */s/ Donald N. David*
                                            Donald N. David
                                            Joshua D. Bernstein (*pro hac vice*)
                                            AKERMAN LLP
                                            666 Fifth Avenue, 20th Floor
                                            New York, NY, 10103
                                            Tel.: (212) 880-3856
                                            Fax: (212) 905-6410
                                            Email: donald.david@akerman.com
                                            D.C. Bar Number 514870

                                            *Counsel for Defendant Kushner Family Foundation*

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

*/s/ Donald N. David*
Donald N. David

48631189