UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIKO PELED, *et al.*,                          )
                                               )
            Plaintiffs,                        )
                                               )
      v.                                       )      Docket No: 1:17-cv-00260
                                               )      Hon. Reggie B. Walton
BENJAMIN NETANYAHU, *et al.*,                  )
                                               )
            Defendants.                        )
_____)

## <u>PLAINTIFFS' AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANT BILLET FEIT & PREIS, P.C.'S MOTION TO DISMISS THE AMENDED COMPLAINT</u>

COMES NOW Plaintiffs herein and hereby oppose the Motion to Dismiss filed by

Defendant Billet, Feit, & Preis, (hereinafter "BFP"). The Motion should be denied for a number

of reasons, including the fact that its main argument centers on the application of the political

question doctrine. As numerous authorities have held, including Judge Collyer in this judicial

district, (*see Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172

(D.D.C. 2004) ("*Biton I*"); *Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp.

2d 1, 5-6 (D.D.C. 2005) ("*Biton II*")), the political question doctrine has no application on our

facts. Additionally, the D.C. Circuit's decision in *Al-Tamimi v. Adelson* discussed *infra*, where

that Court held that the political doctrine did not bar Plaintiffs from pursuing claims in an almost

identical case, should convince this Court that the doctrine has no application to the instant case.

Besides relying on the political question doctrine, Defendant's other erroneous assertion

is that the Act of State Doctrine similarly bars this lawsuit from going forward. As explained

herein, the Act of State Doctrine is based on the fact that no Court can ignore the public policy of

a foreign country or its statutes. As detailed in this Amended Memorandum in Opposition and in

the Amended Complaint, however, the Israeli government has condemned the settlement

enterprise for at least 30 years, and even *banned charitable deductions made to settlements* since 1992. In addition, Defendant BFP provides its clients like Co-Defendant Kushner Family Foundation ("KFF") with illegal tax advice that it can use charitable donations to provide funding for violence in the Middle East.

That is the primary function of a 501(c)(3) entity like KFF, which utilizes the advice and aide of BFP to operate as a funnel for funds. The reason why it operates as a "funnel," is that it only holds donor funds for 24 hours so that they can secure a tax deduction. The KFF's donors have been taking illegal tax deductions as a result of BFP's accounting advice for years. The funds are then sent by the funnel to the Israeli army and numerous settlements in order to finance the maiming and murdering of Palestinian civilians—a war crime as defined under both the U.S. and the Israeli war crimes statute. Thus, the Act of State Doctrine cannot serve as a basis to dismiss this suit, because *inter alia*, the Israeli government has condemned settlement expansion.

Besides ignoring the relevant case law in this judicial district, the Defendant has also failed to address a number of serious issues. First, as explained herein, an entity that collects funds with the purpose of sending them overseas to intimidate a civilian population is guilty of violating 18 U.S.C. § 2339(C), which BFP's clients have done just by collecting funds for the settlements and for rogue soldiers in the Israeli army through their advice (why Defendants like the KFF seek out and hire BFP to provide them with the knowledge and means to provide funding for settlement expansion and violence in the Middle East). The second important fact Defendant BFP ignores, is that no charity in America can send money overseas to fund a foreign army without violating the law. *See* 18 U.S.C. § 960. Defendant KFF has been doing that for years by sending millions of dollars to the 501(c)(3) known as the Friends of the Israeli Army as a direct result of BFP's advice. Unfortunately for KFF, that's not the only criminal statute it has

violated with the help and advice of Defendant BFP.

Both U.S. and Israeli money laundering statutes, as explained herein, criminalize the operations of a U.S. charity that decides to send money abroad to promote and finance criminal activities like arms trafficking and ethnic cleansing. *See* 18 U.S.C. § 1956 (U.S. money laundering statute). Based on BFP's advice, Defendants like the Kushner Family Foundation have made contributions to Israeli settlements like Bet El. Through funding received as a result of BFP's advice, settlements like Bet El have been able to greatly expand on stolen land, with the funds providing for the building of firing ranges, setting up sniper schools, and funding a "Jewish only" military academy whose graduates learn how to maim and murder innocent Palestinian civilians.

The third issue BFP fails to address is a 1992 Israeli government report that involved the investigation of settlement activity for over a decade, and specifically details and confirms the criminal activity described herein. *See* Am. Compl. ¶ 127. Bet El and other settlements that receive their funding as a result of illegal advice BFP provides its clients all have local militia units who are armed with Kalashnikovs, M16s, stun grenades, body armor, and sniper scopes. Every year, based on the advice of Defendant BFP principals, the Kushner family takes charitable deductions based on expenditures for the purchase of this military hardware, (arms trafficking), which obviously cannot be deemed to be a charitable activity. Thus, BFP principals have been encouraging and advising tax fraud every April 18 when they tell their clients to write off contributions to the Bet El settlement and the Israeli army as charitable deductions.

Besides providing clients like Defendant KFF a basis for violating 18 U.S.C. § 960 (funding a foreign army) and 18 U.S.C. § 1956 (money laundering statute), the BFP has also ignored numerous Treasury Department regulations governing the advice they give for their

3

clients' alleged charitable activities. For example, one cannot use charitable donations to promote discriminatory housing or educational facilities, yet that is exactly what the Kushner family has done by making contributions to Bet El, i.e. erecting "Jewish only" housing projects, "Jewish only" highways, and "Jewish only" schools—that is impermissible conduct that a valid 501(c)(3) can engage in. *See Bob Jones University v. United States*, 461 U.S. 574 (1983).

The advice BFP principals give to their clients like the KFF also violates 18 U.S.C. § 2339C, President Clinton's 1995 Executive Order 12947, and numerous other statutes. (Violation of these criminal statutes is all detailed in this lawsuit, *see*, *e.g.*, Am. Compl. at ¶¶ 112, 116, 126, 128.) 18 U.S.C. § 2339C and Executive Order 12947 both provide that monies cannot be sent overseas to promote or finance terrorist activity, including the intimidation of a local civilian population. Both the Israeli army and the irate settlers coming from Bet El and other settlements seeking revenge for the killing of IDF soldieries in what is known as "price tag"[1] killings in an effort to convince them to leave the Occupied Palestinian Territories ("OPT"). In fact, irate settlers coming from the Bet El settlement and other nearby settlements have been accused of engaging in these price tag attacks. These are the same settlements which the Kushner family through KFF have supported with its funding based on the advice given to them by BFP principals.

The issue of proximate cause in the context of similar facts has been litigated in this judicial district, and it appears that the Plaintiffs have satisfied their burden of proof. Their obligation of course is to link up contributions made to pro settlement U.S.-based 501(c)(3) entities like the Kushner Family Foundation and American Friends of Bet El Institutions because

---

[1] Jon Schuppe, "What is 'Price Tag'? Behind the Israeli Extremist Movement", NBC News, available at http://www.nbcnews.com/news/world/what-price-tag-behind-israeli-extremist-movement-n401896.

of advice given to them by BFP principals, which funds are then transferred through the funnel entity to the Israeli army and to settlements like Bet El to fund the criminal conduct described in the Amended Complaint.

The Amended Complaint, despite Defendant BFP's assertions, clearly outlines that the funding provided by the Kushner Family Foundation and American Friends of Bet El Yeshiva would not have occurred without the advice and aide of BFP principals in making the funds and donations providing them tax deductible. *See*, *e.g.*, Am. Compl. ¶¶ 86-110, 135, 138, 175. As explained in the Amended Complaint, Bet El and other settlements in the West Bank could not have survived without these funds, especially after the Israeli government in 1992 banned all charitable donations to settlements. *Id*. Furthermore, Treasury regulations provide that no transfers can occur overseas if they violate a country's public policy or legislation like Israel's money laundering statute.

All of the elements needed for the Plaintiffs' claims against BFP are fully alleged and outlined in the Amended Complaint. As explained therein, the flow of funds starts with advice given by accounting firms such as Defendant BFP, who tell their 501(c)(3) clients (such as the Kushner Family Foundation in this instance), that they can take charitable contributions for money raised in the U.S. and sent to the Israeli army and settlements. Jewish only citizens in the settlements are then armed with sophisticated military hardware, and after stealing Palestinian property, Israeli army members hired by the settlements surround and protect the new settlements, thus condoning the theft of Palestinian private property. Based on Treasury regulations, it is obvious that charitable donations cannot be sent abroad to steal or confiscate private property, or to finance arms trafficking, ethnic cleansing, and genocide. In stark contrast, the Justice Department has repeatedly indicted local armed militia groups located in Western

United States intent on occupying private U.S. private property.

The records relied upon by the Plaintiffs are the annual income tax forms filed by 501(c)(3) entities like the Kushner Family Foundation on advice given to them by BFP principals as detailed in the Amended Complaint. In sum, there is no basis to grant this motion to dismiss, and in the words of Judge Collyer in *Biton II* after rejecting the defendants' argument that the Court would be required to essentially "assess the Israeli Palestinian conflict", that "*the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*" 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005) (emphasis added).

Lastly, it appears that this Defendant, along with the other two Defendants who have filed Amended Motions to Dismiss, believe that this Court has the inherent ability to overturn the holding in *Al-Tamimi v. Adelson*. *See* 916 F.3d 1 (D.C. Cir. 2019). For the reasons explained at the end of Section I *infra*, this Court is bound by the decision by the D.C. Circuit in that case.

## **TABLE OF CONTENTS**

Introduction  ...................................................................................................................1

Table of Contents.............................................................................................................7

Index of Authorities .........................................................................................................8

Legal Standards................................................................................................................11

Argument  ........................................................................................................................12
    I.    The Political Question Doctrine Does Not Bar Plaintiffs' Claims
        .....................................................................................................................12
        a.   Applying the *Baker* Test Does Not Bar This Lawsuit
           .................................................................................................15
    II.   The Act of State Doctrine Does Not Bar Plaintiffs' Claims
        .....................................................................................................................18
    III.  Other Federal Courts Have Held that Claims Based on the ATA or the ATS Do Not
        Bar a Federal Judge From Hearing Claims Involving Violation of International Norms
        ...............................................................................................................20
    IV.  Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over 40 Years
        .....................................................................................................................22
        a.   The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S. Soil, and
           Thus There is Sufficient Contact with the United States to Provide Jurisdiction
           in This Court.
           .................................................................................................24

    V.   The Complaint Lays Out a Clear Basis for BFP's Liability to the Plaintiffs and its
        Proximate Cause of Their Injuries
        .....................................................................................................................28
        a.   The Plaintiffs' Negligence Claims Against Defendant BFP are Well Pled
           .................................................................................................33
    VI.  This Court Has Personal Jurisdiction Over Defendant BFP
        .....................................................................................................................34


Conclusion  .....................................................................................................................35

## **INDEX OF AUTHORITIES**[2]

**CASES:**

Abbas v. Foreign Policy Group, LLC.,
    783 F.3d 1328 (D.C. Cir. 2015)................................................................12

Abdullahi v. Pfizer, Inc.,
    562 F.3d 163 (2d Cir. 2009) ...................................................................24

Al-Tamimi v. Adelson,
    916 F.3d 1 (D.C. Cir. 2019)……………………………………………………1, 6, 17, 18

Almog v. Arab Bank, PLC,
    471 F.Supp.2d 257 (E.D.N.Y. 2007) .......................................................20

Alperin v. Vatican Bank,
    410 F.3d 532 (9th Cir. 2005) .................................................................15

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ............................................................................11

*Baker v. Carr,
    369 U.S. 186 (1962) ................................................................ 13-15, 17, 21

Balintulo v. Daimler AG,
    727 F.3d 174 (2d Cir. 2013) .................................................................26

*Biton v. Palestinian Interim Self-Government Authority,
    310 F. Supp. 2d 172 (D.D.C. 2004) ("Biton I") ......................1, 6, 12, 14, 36

*Biton v. Palestinian Interim Self-Government Authority,
    412 F. Supp. 2d 1 (D.D.C. 2005) ("Biton II")........................ 1, 6, 12-14, 36

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) .........................................................................11, 12

Beneficial Nat'l Bank v. Anderson,
    539 U.S. 1 (2003) ...............................................................................11

Hinder v. Portocarrero,
    963 F.2d 332, 332 (11th Cir. 1992) .........................................................22

Doe I v. State of Israel,
    400 F. Supp. 2d 86 (D.D.C. 2005).........................................................14

---

[2] *Asterisks identify those authorities on which Plaintiffs chiefly rely.

*Doe v. Exxon Mobil Corporation,
    69 F. Supp. 3d 75 (D.D.C. 2014)............................................................. 16-19, 27, 29

Estate of Klieman v. Palestinian Auth.,
    424 F. Supp. 2d 153, 162 (D.D.C. 2006)....................................................13

Filartiga v. Pena-Irala,
    630 F. 2d 876 (2d Cir. 1980) ................................................................20, 25

Halberstam v. Welch,
    705 F.2d 472 (D.C.Cir. 1983)..................................................................36

*In re: South African Apartheid Litigation,
    617 F. Supp.2d 228 (S.D.N.Y. 2009) .....................................................20, 25

Japan Whaling Ass'n v. American Cetacean Society,
    478 U.S. 221 (1986) ............................................................................16

Kadic v. Karadzic,
    70 F.3d 232 (2d Cir. 1995) ................................................................15, 20

*Kiobel v. Royal Dutch Petroleum Co.,
    133 S.Ct. 1659 (2013) ...................................................................... 25-28

Klinghoffer v. S.N.C. Achille Lauro,
    937 F.2d 44 (2d Cir. 1991) ...................................................................23

Louisville & Nashville R. Co. v. Motely
    211 U.S. 149 (1908) ...........................................................................11

Mamani v. Berzain,
    654 F. 2d 1148, (11th Cir. 2011) ..........................................................22

Oneida Indian Nation of N.Y. v. County of Oneida,
    414 U.S. 661 (1974) ...........................................................................12

Owens v. BNP Paribas S.A.,
    235 F. Supp. 3d 85 (D.D.C. 2017)......................................................... 32-33

*Sokolow v. Palestine Liberation Organization,
    583 F.Supp.2d 451 (S.D.N.Y. 2008) ........................................................23

Sosa v. Alvarez-Machain,
    542 U.S. 692 (2004) ...............................................................23, 25, 26, 28

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ...............................................................................................11

Whiteman v. Dorotheum GmbH & Co. KG,
    369 U.S. 186 (1962) ............................................................................................15

Wultz v. Islamic Republic of Iran,
    755 F. Supp. 2d 1, 22 (D.D.C. 2010)..................................................................29

**STATUTES AND RULES:**

18 U.S.C. § 960...........................................................................................2, 3, 14
18 U.S.C. § 1952.................................................................................................14
18 U.S.C. § 1956......................................................................................2, 3, 30
*18 U.S.C. § 2331.............................................................14, 35, 36, 37, 38
18 U.S.C. § 2336.................................................................................................38
18 U.S.C. § 2339A.............................................................................................34
18 U.S.C. § 2339B.............................................................................................34
*18 U.S.C. § 2339C.........................................................2, 3, 12, 13, 14, 15, 32

**LEGAL STANDARDS**

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual

matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570). A

claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

Plausibility requires pleading facts, as opposed to conclusory allegations, and must rise above the

mere conceivability or possibility of unlawful conduct that entitles to pleader to relief. *Id*. at 678-

79. A complaint must be "factually suggestive." *Twombly*, 550 U.S. at 557 n.5. A claimant must

provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in

order to give the defendant fair notice of what the claim is and the grounds upon which it rests."

*Twombly*, 550 U.S. at 555 (2007) (citations and ellipsis omitted). The Court emphasized that a

complaint must contain a "statement of circumstances, occurrences, and events in support of the

claim presented" and not mere conclusory statements. *Id*. at 556 (citing 5 Wright & Miller,

Federal Practice and Procedure § 1202, at 94-95 (2004)). Although a claimant need not set out in

detail the facts underlying his claim, Fed. R. Civ. P. 8(a)(2) "still requires a 'showing' . . . of

entitlement to relief." *Id*.

When determining whether a claim arises under federal law, a court will "examine the

'well pleaded' allegations of the complaint and ignore potential defenses: '[A] suit arises under

the Constitution and laws of the United States only when the plaintiff's statement of his own

cause of action shows that it is based upon those laws or that Constitution.'" *Beneficial Nat'l*

*Bank v. Anderson*, 539 U.S. 1, 6 (2003) (quoting *Louisville & Nashville R. Co. v. Motely*, 211

U.S. 149, 152 (1908). A federal court lacks jurisdiction over a claim involving federal law "only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citing *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)). "The test for dismissal is a rigorous one and if there is any foundation or plausibility to the claim, federal jurisdiction exists." 13D Wright & Miller § 3654, at 244-45.

The D.C. Circuit has recognized that "[a] well-pleaded complaint 'may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" *Abbas v. Foreign Policy Group, LLC*, 783 F. 3d 1328 (D.C. Cir. 2015) (quoting *Twombly* at 556). One of the reasons why, is that the Defendant always has an additional remedy to pursue before trial, i.e. if the complaint survives a motion to dismiss, a defendant may still move before trial for summary judgment under Rule 56. *Id*. Thus, it is difficult for the Defendant to assert prejudice at this early stage in the litigation.

## ARGUMENT

### I.    The Political Question Doctrine Does Not Bar Plaintiffs' Claims

Numerous Courts have held, contrary to the Defendant's memorandum, that the political question doctrine has no application in similar circumstances. That is why Defendant American Friends has ignored a number of relevant opinions issued in this District that can be used as a basis for denying their motion to dismiss. In *Biton I* and *Biton II*, Judge Collyer opined that the Court was competent to rule on similar claims made herein. 412 F.Supp.2d 1 (D.D.C. 2005). Judge Collyer analyzed both the political question doctrine and Act of State Doctrine at length and rejected the Defendant's argument that having the case go forward would violate those

doctrines.

Citations from her opinions significantly bear on the issue before the Court, i.e.,

disposition of the Defendants' motion to dismiss for lack of subject matter jurisdiction. As Judge

Collyer pointed out in *Biton II*: "Defendants argue that the Court would be required 'to assess the

Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the

West Bank and Gaza.'" *Id*. She rejected that argument because, "Defendants misperceive the

status of the case. Plaintiffs complain that Defendants' actions caused them injury; while the

ATA provides jurisdiction for the suit in federal court, *the basic elements of the claim lie in tort,*

*not in the relations between Palestine and Israel*". *Id*. at 5-6. (emphasis added). In rejecting the

identical argument advanced in the Defendants' memorandum, Judge Collyer also explained in

*Biton II*:

> This is a tort suit brought under a legislative scheme that Congress enacted for the
> express purpose of providing a legal remedy for injuries or death occasioned by acts of
> international terrorism.' There is no flaw in this Court's ability to address Plaintiff's
> claims: Congress explicitly committed these issues to the federal courts under the ATA.
> Similarly, the Court has access to 'judicially manageable standards for resolving the
> issues before it,' id., from both existing ATA caselaw and traditional tort caselaw.
>
> The 'initial policy determination' involved here has already been made by the U.S.
> Congress: Americans injured by terrorist acts can sue their attackers in U.S. courts and
> the Court can manage this case to resolution of Defendants' alleged liability without
> 'expressing lack of the respect due coordinate branches of government.' Baker, 369 U.S.
> at 217. The Fifth and Sixth factors from Baker v. Carr do not apply because a decision in
> this individual case will have no consequences concerning 'political decisions already
> made' and will raise only the question of Defendants' alleged liability regarding this
> single bombing of a bus. Thus, nothing in Baker v. Carr counsels against having this case
> proceed.

412 F. Supp. 2d at 6 (internal quotation marks omitted). Similar to the holding in *Estate*

*of Klieman v. Palestinian Auth*, the tortfeasors named herein "have made no attempt to

distinguish any of these prior decisions in their moving papers." 424 F. Supp. 2d 153, 162

(D.D.C. 2006). And, just as in *Biton II*, a decision on Plaintiffs' claims alleged herein can be

resolved by this Court by deciding the liability of the Defendant tortfeasors. Thus, it would have

no consequences concerning "political decisions already made." *Biton II*, 412 F. Supp. 2d at 6.

As this Court can take judicial notice of, the State Department reiterated the political decisions

that have been made by at least 12 Presidents, i.e. settlement activity is illegal, and has been

condemned by the U.S. State Department for decades. Thus, there should be no fear that any

political decisions already made would be contradicted by allowing this lawsuit to go forward.

The Plaintiffs respectfully submit that BFP's Motion to Dismiss can be denied based

solely on the holdings in *Biton I* and *Biton II. See Biton v. Palestinian Interim Self-Government

Authority,* 310 F. Supp. 2d 172 (D.D.C. 2004) ("*Biton I*"); *Biton v. Palestinian Interim Self-

Government Authority*, 412 F. Supp. 2d 1 (D.D.C. 2005) ("*Biton II*"). A ruling on this case

would not require the Court to decide foreign policy, but rather—as repeatedly explained in the

Amended Complaint and herein—Plaintiffs simply seek a remedy for the damages they have

suffered as a result of specific, universally recognized war crimes that were committed as a result

of the advice BFP gave its clients in how to finance them.

The bottom line is that it would be judicial error for this Court to grant the motion to

dismiss based on Judge Bates' holding in *Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C.

2005). They are two entirely different cases—first, the *Doe* Plaintiffs actually sued the state of

Israel itself, and they never alleged that Defendant tortfeasors like BFP were aiding and abetting

a money laundering scheme on U.S. soil designed to rid the West Bank of all non-Jews by

financing violence against Palestinian civilians. *Id*. That is clear evidence of financing war

crimes, for example, ethnic cleansing. Thus, BFP and its principals can properly be referred to as

collaborators under both the U.S. and Israeli war crimes statute.

### a.   Applying the *Baker* Test Does Not Bar This Lawsuit

Defendant BFP argues that having the Court decide the issues raised in the Complaint

would violate the standards set forth in *Baker v. Carr* as to issues best left to the political

branches of government. Mem. of Law of Def. BFP in Supp't of Mot. Dismiss the Am. Compl.

at 14-17 (citing 369 U.S. 86 (1962)) [hereinafter BFP Mot. Dismiss] (ECF No. 59). The Court

pointed out in *Baker*, however, that "[a]n action does not lie beyond judicial cognizance solely

because it raises questions touching upon foreign relations." 369 U.S. at 211. The Second Circuit

noted that "[w]ith respect to the first *Baker* test, while foreign policy is committed in the first

instance to the Executive, tort claims against foreign countries and individuals under the law of

nations, as well as issues of sovereign immunity, *are constitutionally committed to 'none other*

*than our own Judiciary*.'" *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d. Cir.

2005) (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995)*; see also Alperin v. Vatican*

*Bank*, 410 F.3d 532, 551 (9th Cir. 2005). Again, this application to the facts herein only require

an adjudication of tort, and do not require the judiciary to infringe on the coordinate branches of

government.

As for the second and third *Baker* tests, just like in *Whiteman*, they are met by applying

not only the traditional adjudication process, but also through "the universally recognized norms

of international law [invoked by the Plaintiff]." *Whiteman*, 431 F.3d at 77. The Second Circuit

noted, for example, that the "FSIA "'provide[s] judicially … manageable standards for

adjudicating suits' and 'obviate[s] any need to make policy decisions of the kind normally

reserved for non-judicial discretion.'" *Id*. (citing *Kadic*, 70 F.3d at 249). As further outlined in

*Whiteman*, "[t]he fourth and sixth tests are basically coterminous with the fifth, that they involve

cases where an exercise of jurisdiction, although not *per se* outside the judiciary's authority,

would somehow contradict actions taken by the political branches; [the Court] will therefore discuss them together." *Id*.

It is important to reiterate that a ruling in this case would in no way contradict prior decisions taken by the other political branches—executive or legislative. *Id*.; *see also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221 (1986) (the Supreme Court for example unanimously declined to dismiss as non-justiciable a claim that the Secretary of Commerce had violated federal statutory law by refusing to certify that Japan's whaling practices were undermining the effectiveness of an international fishing conservation program). If anything, this case serves to reinforce fundamental principles of international law approved by 12 American Presidents and at least 10 Secretaries of State and the United Nations— fundamental principles of international law have criminalized ethnic cleansing, genocide, and the denationalization of a civilian population as horrific war crimes. Both the Justice and State Departments have made it abundantly clear that U.S. individuals who finance war crimes and/or arms trafficking abroad should be criminally prosecuted to the full extent of the law. That should include BFP and its principals, who have enabled the financing of the Israeli army and belligerent settlers intent on ethnically cleansing the OPT of all Palestinians through its accounting and tax advice to 501(c)(3)'s like Defendant Kushner Family Foundation.

As noted by this Court in *Doe v. Exxon Mobil Corp*., when determining if the political question doctrine bars a suit from moving forward, "[e]vidence of the State Department's views as to this issue are accorded 'substantial weight' because the effect of litigation on the foreign policy interests of the nation is 'at the heart of the Department's expertise.'" 69 F. Supp. 3d 75, 92 (D.D.C., 2014). Exxon did not succeed on its motion to dismiss on political question doctrine grounds for the same reason BFP's motion should fail here—"[i]n short, there is an insufficiently

recent and definite statement from the Executive that this case interferes with the foreign policy

of the United States." *Id*. If anything, the case for denying BFP's motion to dismiss is stronger

here than it was in *Doe v. Exxon*, as the Executive branch, including the State Department, and

even Israeli official government policy have all condemned the settlement enterprise described in

the complaint.[3] Moreover, the State Department has not filed a declaration of interest to register

its opposition to this lawsuit with this Court.[4] If any of the *Baker* factors were invoked, as

Defendant BFP alleges, as to this lawsuit's affect or interference on the political branches, the

State Department would have filed a declaration or statement of interest against the suit,

something it has not done here:

> The Executive Branch ... has given no indication that adjudication of the plaintiffs'
> lawsuit would encroach on those agreements or raise any broader foreign relations
> concerns. The Executive often files a statement in Court if it believes that judicial
> consideration of a case would interfere with the operation of the United States' treaties
> and agreements or would otherwise impinge on the conduct of foreign relations.

*Alperin v. Vatican Bank*, 410 F.3d 532, 556-57 (9th Cir. 2005); *see also Doe v. Exxon*

*Mobil Corp.*, 69 F.Supp.3d at 92 (D.D.C. 2014) (concluding that the political question doctrine

did not bar the plaintiffs' claims because the Executive had not filed such a statement). Here,

however, the United States has filed such a statement in its motion to dismiss. This is clear

evidence that the *Baker* factors are not applicable to this case, as the coordinate branches of

government would be unaffected by a decision herein. Defendant BFP's Motion to Dismiss

should therefore be denied on that alone.

Notwithstanding the above, BFP addresses the D.C. Circuit's opinion in *Al-Tamimi v.*

*Adelson* as they must. *See* 916 F.3d 1 (D.C. Cir. 2019). BFP focused on the idea that the Israeli

---

[3] *See* Am. Compl. ¶¶ 52, 67, 68, 75.
[4] (Through Plaintiffs' attempts to serve Ambassador Friedman, the State Department's legal
department has been put on notice of this lawsuit).

military is integral to the Plaintiffs claims herein, whereas that was not the case in *Al-Tamimi*. As a result, BFP argues that this case can be distinguished from that case.

However, just like the Plaintiffs' claims in *Al-Tamimi*, the Plaintiffs claims herein can also be extricated from the inquiry of whether the Israeli military is involved in the murdering and maiming of Palestinians. While Plaintiffs here do allege that some of the money BFP helped funnel for Defendants like American Friends and KFF did go to the Israeli military to commit unsanctioned killings of Palestinians, they also allege that money was being sent to settlers to buy military hardware and commit violence on Palestinians. As the tax records produced in discovery will likely show where the money sent by U.S. 501(c)(3)s was sent, specifically, the idea that money was also sent to the military as a basis for raising the political question doctrine is unconvincing. Moreover, as it relates to BFP, Plaintiffs allege that it is responsible for essentially rendering tax advice to help the other Defendants avoid tax regulations and use loopholes to receive charitable deductions for funding violence in the OPT. *See*, *e.g.*, Am. Compl. ¶ 110. This type of tortious conduct can be adjudicated by this Court and is not barred by the political question doctrine.

Furthermore, this record is devoid of an affidavit from the managing partner of BFP that essentially says that his firm never advised and has no knowledge of pro-occupation 501(c)(3)s that have supported the permanent occupation of Palestine and have sent money both to the Israeli army and the settlements.

## II.   The Act of State Doctrine Does Not Bar Plaintiffs' Claims

In *Doe v. Exxon Mobil Corp.*, this Court provided a detailed analysis of the inapplicability of the Act of State Doctrine to facts quite similar to the case at bar. 69 F. Supp. 3d 75 (D.D.C. 2014). As noted by Judge Lamberth, "The type of official act that implicates the act

of state doctrine is that which is 'by nature distinctly sovereign, i.e., conduct that cannot be

undertaken by a private individual or entity . . .An illustrative list of such public acts includes

'pass[ing] a law, issu[ing] an edict or decree, or engag[ing] in formal governmental action taking

[plaintiff's] property.'" *Doe* v. *Exxon*, 69 F. Supp. 3d at 88 (internal citations omitted). The

Court's analysis in *Doe* v. *Exxon* can be applied directly to the Complaint herein. Specifically,

the Court found that:

> No such sovereign public act is at issue in this suit. Plaintiffs do not allege that Exxon's security forces [the belligerent settlers and rogue Israeli Army personnel funded by KFF], while admittedly soldiers in the Indonesian military, injured them pursuant to official policies of the GOI [Israeli government] or orders from military commanders. Indeed, this fact about plaintiffs' allegations is the key point distinguishing these cases from those upon which Exxon [KFF] bases its argument . . . Exxon [KFF] has made no showing that plaintiffs were injured pursuant to official military orders as required by the act of state doctrine. Because Exxon [KFF] possesses the burden of proof as the party invoking the defense, this failure to so demonstrate is fatal to their invocation of the doctrine.

*Id.* (internal citations omitted). Like in that case, the Complaint herein implicates no

Israeli government act that is "by nature distinctly sovereign." Furthermore, as the Court stated

in Doe: "[i]t is not sufficient under the act of state doctrine that a court's factual findings would

'impugn' the foreign state's actions; the claims must call for the invalidation of those actions."

*Id*. Here, BFP has not shown that the claims made herein would call for invalidation of a foreign

state's action, as the Amended Complaint is not implicating any specific state actions. As is

obvious to this Court, the Israeli government has not yet issued an executive order that condones

and promotes ethnic cleansing, genocide, arms trafficking, and the theft of private property. As

BFP "has made no showing that Plaintiffs were injured pursuant to official military orders," the

Act of State doctrine is not applicable here to bar the Plaintiffs' claims.

### III. Other Federal Courts Have Held That Claims Based on the ATA or the ATS Do Not Bar a Federal Judge From Hearing Claims Involving Violation of International Norms

It is not just Judge Collyer and the D.C. Circuit that have decided to reject the argument that Courts lack subject matter jurisdiction to entertain claims based on violation of international norms. Other Courts have decided to reject the application of the Political Question Doctrine based on similar allegations made herein. For example, in *Almog v. Arab Bank, PLC*, Judge Gershon of the Eastern District of New York rejected the invocation of the political question doctrine to bar similar claims made herein. 471 F. Supp. 2d 257, n. 45 (E.D.N.Y. 2007). She found that this argument was unavailing because foreign plaintiffs were allowed to sue foreign defendants for extra territorial conduct in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995). *Id.*; *see also Filartiga v. Pena-Irala*, 630 F. 2d 876 (2d Cir. 1980).

In *Almog*, just like the Plaintiffs pled herein, the Defendant Bank had, through the provision of financial services to groups that engaged in terrorist activity, knowingly and intentionally aided and abetted violent criminal attacks on civilians in Israel in violation of international law. The only difference between those allegations and the allegations pled herein is that instead of a bank providing financial support for terrorist activity (intimidating a civilian population), it is Defendant KFF's donations and provision of funds that enable violent settlers and militia groups to engage in attacks on civilians and steal private property, among other crimes. In fact, a horrific arson incident which killed an entire Palestinian family occurred in in the OPT, and violent settlers have been criminally prosecuted for that terrorist act. *See* Am. Compl. ¶ 5(a). The Plaintiffs herein, just like the Plaintiffs in *Almog*, have alleged that they've been injured by the Defendant KFF providing substantial financial assistance to various settlements and to the Israeli Army to promote that criminal activity.

Judge Gershon went on to point out in *Almog* that the three theories of international law violations asserted in the case were all based upon principles to which the United States has expressed strong adherence. *Id*. at 271-72. Just as the plaintiffs alleged in *Almog*, U.S. senior officials like Senator Leahy have expressed strong adherence to international law conventions, like the Geneva Convention. Senator Leahy has, among others, specifically condemned the extra judicial killings. *See* Am. Compl. ¶ 5(a). And senior State Department officials have repeatedly condemned not only extra judicial killings, but settlement expansion and the violence it promotes. A recent State Department report reveals that entities like the Kushner Family Foundation are still financing wholesale violence in the Occupied Territories. The Court should take judicial notice of the fact that President Clinton criminalized this activity 22 years ago. *See* President Clinton's 1995 Executive Order 12947.

Moreover, successful prosecution of this lawsuit will, if anything, reinforce U.S. public policy concerns about settlement expansion, the frustration of U.S. foreign policy objectives, (see JASTA legislation), and encouraging criminal activity like money laundering, arson and arms trafficking. As this Court knows, money-laundering and arms trafficking are prosecuted on a daily basis by the Justice Department. As recited in *Mamani v. Berzain*, the claims alleged therein simply required the court to evaluate the lawfulness of the conduct of the Defendants/tortfeasors named therein. *See* 654 F. 2d 1148 (11th Cir. 2011). For example, the claims in *Mamani*, such as extra judicial killings occurring in Bolivia by government officials, did not require the Court to decide the legitimacy of U.S. executive branch foreign policy decisions. *Id.* at 1151 (quoting *Hinder v. Portocarrero*, 963 F.2d 332, 332 (11th Cir. 1992)).

Just like here, the claims asserted by the Plaintiffs (genocide, denationalization of a civilian population and ethnic cleansing) do not require this court to decide the propriety of the

U.S. executive branch's foreign policy decisions as they pertain to the Middle East. Moreover, Congressional concern, as is evident by the passage of the JASTA legislation, focused on international terrorist activity and the funding thereof, which frustrates U.S. foreign policy objectives. Every time the Kushner family, after receiving BFP's accounting advice, sends millions of dollars overseas to fund settlement expansion and arms trafficking, they are specifically frustrating U.S. foreign policy objectives and promoting violence in the Middle East.

## IV. Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over 40 Years

A case remarkable on its facts to the case *sub judici*, is *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008). The *Sokolow* plaintiffs alleged that the defendants therein have carried out and inflicted violent physical attacks on an innocent civilian population in order to terrorize and intimidate them. That is the identical claim which has been alleged herein. The court in *Sokolow* noted that "[t]he [Defendants] PA and PLO repeatedly fail to realize that the nonjusticiability doctrine is one of political questions and not political cases." *Id*. at 456 (quoting *Estates of Ungar v. Palestinian Authority*, 315 F. Supp. 2d 15 (D.R.I. 2004)),

The Defendants raise many of the same foreign policy concerns as the PLO did in *Sokolow* and *Klinghoffer,* with the Second Circuit observing that "[*t*]*he fact that the issues before [the court] arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question.*" Id.* (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)) (emphasis added); *see also Biton II*, 412 F. Supp. 2d 1, 6 (noting that "the ATA provides jurisdiction for suits in federal courts, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*."

In addition, federal courts, such as the Second and Ninth Circuits have recognized tort liability for torture, genocide, and war crimes committed by both state and non-state actors. *See*,

*e.g.*, *In re S. African Apartheid Litig*, 617 F. Supp, 2d 228, 248-49 (S.D.N.Y. 2009). In one of the decisions in South African Apartheid litigation, the Court held "that a court's jurisdiction to hear claims under the ATCA is not limited by 'the focus of the injury.'" *Id*. at 247 (quoting *Trajano v. Marcos*, 978 F. 2d 493, 500 (9th Cir. 1992). A tort that violates customary international law will be recognized under the ATS if "the norm alleged (1) is defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*. (2) is based upon a norm of international character accepted by the civilized world, and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Id.* at 248 (quoting *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009)). As this Court knows, genocide and ethnic cleansing are classic war crimes, and violate norms of international character accepted by the civilized world, specifically including Israel.

Plaintiffs also allege the international crime of denationalization, which has been recognized as an actionable tort basis for jurisdiction under the ATCA. *See Apartheid Litig.*, 617 F. Supp. 2d at 252 ("A state actor commits arbitrary denationalization if it terminates the nationality of a citizen either arbitrarily or on the basis of race, religion, ethnicity, gender, or political beliefs"); *see also* the 1907 Hague Convention Respecting the Laws and Customs of War on Land (individuals have a right to retain their citizenship, even in the fact of a hostile invasion). The Plaintiffs have alleged herein that state actors like out of control Israeli soldiers and belligerent settlers have committed arbitrary denationalization based on race, religion, ethnicity, and political beliefs; all made possible by Defendant Kushner Family Foundation's donations and funding as a result of BFP's advice on how to take tax deductions for these funds. *See*, *e.g.*, Am. Compl. ¶¶ 116, 117, 126, 128 135, 138, 173 – 175.

Lastly, Plaintiffs wish to address BFP's claims regarding the Supreme Court's recent

decision in Jesner v. Arab Bank. *See* BFP Mot. Dismiss at 24 (citing 138 S. Ct. 1386 (2018)).

BFP claims that that case stands for the proposition that Plaintiffs cannot assert claims against

*any* corporations under the ATS, not just foreign corporations. Plaintiffs do not read that case as

extensively and judging by BFP's renewed Motion to Dismiss' arguments on this point, they

have found no case that has extended *Jesner* to domestic corporations. The fact that neither KFF

nor American Friends cited *Jesner* for that proposition is also telling and further suggests *Jesner*

does not apply to domestic corporations.

> **a. The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S. Soil, and Thus There is Sufficient Contact with the United States to Provide Jurisdiction in This Court**

Defendant BFP argues the Plaintiffs' ATS claim lacks sufficient contact with the United

States Under *Kiobel*, making essentially the same arguments as the Defendants did in *Apartheid*

*Litigation*, re: that the Court does not have jurisdiction to address tort claims based on

extraterritorial events. Although the physical injuries complained of herein, i.e. maiming and

murdering Palestinian civilians, occurred outside the U.S., this is no bar to jurisdiction. *See In re*

*South African Apartheid Litig.*, 617 F. Supp. 2d 228, 246 (S.D.N.Y. 2009). As detailed in the

Complaint, pro-occupation U.S. donors and 501(c)(3) officials such as Defendant Kushner

Family Foundation, with the help of BFP principals, have conspired on U.S. soil for years to

finance horrific criminal activity—maim and murder Palestinians, steal their property, engage in

ethnic cleansing and genocide—with resulting U.S. tax deductions to boot. "It is not

extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction."

*Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980). And the reality is that even today the

Kushner Family is financing acts of international terrorism. *See State Department's Country*

*Report on Terrorism for 2016*.

The ATS permits federal courts to "recognize private claims . . . under federal common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). The Supreme Court in *Sosa* noted "that no development of law in the last two centuries has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law," but that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering such a new cause of action." *Sosa* at 692. In explaining what it meant, the Court further elaborated that "[w]e think it is correct, then, to assume that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Sosa* at 725. In its ruling the Court added that "we think courts should require any claim based on present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized[5]" as what constitutes the law of nations. *Id.*

Indeed, Plaintiffs meet this burden laid out by the Court in *Sosa*, as they have clearly alleged with great specificity the present-day law of nations violations in the Complaint that rest on a norm of international character accepted by the civilized world, such as genocide, ethnic cleansing, arms trafficking, and murder. *See*, *e.g.*, Am. Compl. ¶¶ 46, 50. Plaintiffs thus clearly meet the jurisdictional test of *Sosa* for claims brought under the ATS. In addition, defendant BFP wrongly asserts that Plaintiffs' ATS claims are barred by application of *Kiobel v. Royal Dutch*

---

[5] The "18th century paradigms" referenced by the Court is that "the reasonable inference from history and practice is that the ATS was intended to have practical effect the moment it became law, on the understanding that the common law would provide a cause of action for the modest number of international law violations thought to carry personal liability at the time: offenses against ambassadors, violation of safe conducts, and piracy"—international norms that were specifically accepted throughout the civilized word at the end of the 18th century. *Sosa* at 692.

*Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) and *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir.

2013). While there is generally a presumption against extraterritorial application of federal

statutes, the Supreme Court has allowed that certain "claims [may] touch and concern the

territory of the United States . . . with sufficient force to displace the presumption against

extraterritorial application." *Kiobel* at 1669.

Additionally, Judge Lamberth noted in *Doe v. Exxon Mobil Corp.* that under *Kiobel*, "If

plaintiffs have sufficiently alleged conduct within the United States that is actionable under the

ATS, *their ATS claims are not defeated on the basis of the presumption against*

*extraterritoriality.*" 69 F. Supp. 3d 75, 96 (emphasis added). As the Court noted in denying

Defendant Exxon Mobil Corp.'s motion to dismiss, the plaintiffs therein "allege[d] that EMC

officials based in the United States 'made and implemented the decision to hire or otherwise

retain additional security personnel for [Exxon's] Aceh facilities", and made "a number of other

allegations regarding the support provided by Exxon to their security personnel." *Id.* (internal

quotation marks omitted). These allegations included: "Exxon provided material support to its

security personnel by, for example, constructing facilities, *providing funding for weapons,*

*providing supplies and equipment, and paying for the services of consultants in training and*

*equipping the personnel...*". *Id*. (emphasis added). These allegations allege almost identical

conduct which the Plaintiffs here allege the advice of BFP Principals enabled Defendant Kushner

Family Foundation to engage in—i.e., providing the funding for weapons, sniper scopes,

supplies, training, equipment, and even establishing sniper schools and firing ranges. *See*, *e.g.*,

Am. Compl. ¶¶ 68, 69, 96, 100, 135.

But the Complaint herein goes a step further than that of *Doe* v. *Exxon* in complying with

the requirements of *Kiobel*. *See Doe,* 69 F. Supp. 35 at 96. The Plaintiffs have alleged herein

that: a) Defendant Kushner Family Foundation's monetary support comes from the United States; b) that the donors involved are U.S. citizens; c) there is an ongoing nationwide solicitation effort which aggregates to a \$2 billion monetary transfer to illegal settlements every year; and d) that Defendant Kushner Family Foundation's support is a result of the advice given to it by Defendant BFP principals. Finally, all 501(c)(3)'s like the Kushner Family Foundation have to file annual reports with the IRS—they are called 990s. These 990 forms are prepared and filed by BFP principals. By failing to detail the criminal activities that they finance abroad, specifically arms trafficking and money laundering, BFP has repeatedly advised for and aided committed income tax fraud. The Treasury Department has repeatedly condemned any and all charities that commit income tax fraud.

What Defendant further ignores in its brief, is that BFP's conduct and advice to their clients like Defendant Kushner Family Foundation enabled those clients to directly provide the funding and support required for the violation of numerous present-day laws of nations, and thus satisfy the requirements of international acceptance outlined in *Sosa* right here on U.S. soil. These include: Money laundering, providing financing for the commission of internationally accepted crimes like genocide, ethnic cleansing, denationalization, murdering and maiming, theft of private property, and arms trafficking. *See* Compl. ¶¶ 22, 34, 46, 50, 96, 100, 112, 116, 117, 135, 138, 169, 171, 173 – 175. All of these actions were financed based on the advice and tax deductions calculated by BFP principals, as alleged in the Complaint, and constitute violations of international law that occurred on U.S. soil—sufficiently meeting the "touch and concern" requirements of *Kiobel*, as explained in great detail by the Court in *Doe* v. *Exxon Mobil Corp.* *See* 69 F. Supp. 3d at 96. Defendant's arguments to the contrary are thus unavailing to warrant dismissal of the claims brought under the ATS.

Regarding the "touch and concern test," Defendant BFP engaged in conduct on U.S. soil years ago, when it initially filed for its clients' 501(c)(3) status's right here in Washington, D.C. This conduct continues each year when BFP principals file their clients' annual tax returns and updated 990s. Securing this tax-exempt status with the aid of BFP principals made it possible for Defendants like the Kushner Family Foundation to solicit funds on U.S. soil destined to be sent overseas to promote criminal activity. Defendant BFP not only made settlement expansion and the theft of private Palestinian property possible, they actually got their clients an incredible bonus for doing so, which is why they continue to hire BFP—tax deductions.

## V.   The Complaint Lays out a Clear Basis for BFP's Liability to the Plaintiffs and its Proximate Cause of Their Injuries

As recited in the Complaint, the U.S. based 501(c)(3)'s like the Kushner Family Foundation who receive donations destined to finance war crimes and settlement expansion, use BFP principals' advice to hold the funds for 24 hours before sending them off in order for their donors to receive favorable tax write-offs. As explained earlier, 501(c)(3)'s who engage in such activity act as temporary custodians of these funds, which entities have been deemed by the Treasury Department to be "funnels," i.e. they're not engaged in charitable conduct—they simply collect funds and send them overseas to promote criminal conduct. That is classic money laundering activity, and as alleged in the Amended Complaint, BFP principals have been encouraging and enabling this activity for years. *See* 18 U.S.C.§ 1956. *See i.e.* Compl. ¶¶ 135, 138, 173 – 175.

In *Wultz v. Islamic Republic of Iran*, proximate causation was found because the complaint "alleged a flow of money *directly* into the coffers of PIJ." 755 F. Supp. 2d 1, 22 (D.D.C. 2010). The Complaint herein meets this same requirement as the Complaint in *Wultz*, noting that Defendant Kushner Family Foundation directly provided funding to the Friends of

the Bet El Settlement and the FIDF due to the advice of BFP Principals. Those officials knew

that those recipients would be "unlikely to use wired moneys for any other purpose" besides

financing the war crimes alleged in the Complaint, such as maiming and murdering Palestinians.

*See Wultz* at 22; Compl. at ¶¶ 34, 46, 50, 135, 138, 175. An application of *Wultz* to the

Complaint herein therefore warrants denial of Defendant's Motion. *See* Compl. at ¶¶ 34, 46, 50,

96, 100, 117, 138, 171; ("This activity [violations of international law] could not have occurred

without . . . the financial assistance provided by" the Kushner Family Foundation and American

Friends of Bet El Institutions as a result of BFP's advice and accounting work; "All Defendants

knew that, without those funds [provided by Defendants], the settlements would have been

abandoned thirty years ago.").

The Complaint clearly states that if it were not for BFP's advice to its clients, the funding

would never have occurred, and as a direct result the Plaintiffs' injuries caused by the war crimes

enabled by this funding would not have occurred. *See* Compl. at ¶ 138. In addition:

> As a result of the advice that members of the accounting firm BFP have given to their
> pro-occupation clients, Defendants Friedman and Kushner family members have taken
> illegal tax write offs every April 15th, saving them huge sums in tax obligations. More
> importantly, as it concerns this case, had Defendants Friedman and KFF officials been
> informed that donations to the Israeli army and the Bet El settlement constituted income
> tax fraud, they never would have considered financing the Israeli army or the Bet El
> settlement for two reasons. First, they could go to jail because they were participating in a
> $2 billion money laundering scheme and financing genocide, arms trafficking, and ethnic
> cleansing. Second, there are at least 1,000 legitimate tax-exempt entities located in New
> York City, including Friends of Lincoln Center. All Defendants knew that, without those
> funds, the settlements would have been abandoned thirty years ago.

*See also* Compl. ¶ 175. Defendant's arguments that these allegations are not adequately pled in

the Amended Complaint are thus unavailing. (*See i.e.* Defendant's Motion to Dismiss at 23,

which ignores this allegation of the Amended Complaint). Plaintiffs, however, have

demonstrated that these tax-exempt entities finance criminal activities abroad, consistent with the

report that the State Department issued in January 2016. *See State Department's Country Report*

*on Terrorism for 2016.*[6]

Based on the allegations made herein, a reasonable juror could conclude that the significant amount of money was sent by Defendant Kushner Family Foundation overseas as a direct result of the advice and aide given by Defendant BFP in preparing its annual 501(c)(3) tax forms. This was a substantial reason why those intent on ridding the West Bank of all non-Jews-- belligerent settlers, and rogue Israeli army soldiers--were able to finance the horrific terrorist attacks described herein.

Another reason BFP principal's advice and aide with the provision of those funds were so crucial is that the Israeli government as of 1992 had prohibited charitable donations to settlements, which cut off a significant source of income. Likewise, Secretary of State Baker was assured by Prime Minister Shamir in 1992 [the Baker/Shamir Accord], that no part of American financial aid would be used to set up new settlements or finance expansion of existing settlements. As is obvious, the Kushner Family has been violating that accord every time they wire money overseas to the Bet El settlements to promote criminal violence utilizing the advice of BFP. Without BFP's advice on filing the annual tax forms and using these donations for tax write offs, the Kushner Family Foundation would not have provided these funds. As outlined in the Amended Complaint, without the funding from Defendant Kushner Family Foundation, the belligerent settlers and rogue Israeli army personnel described in the Complaint would not have a source of funding to: a) sufficiently arm and equip local Israeli militia units; b) afford or conduct training such as that done at sniper schools used to commit the war crimes alleged in the complaint; and c) build vital infrastructure improvements like electric power grids and sewage hookups needed for settlement expansion necessitating the theft of private Palestinian property.

---

[6] https://www.state.gov/j/ct/rls/crt/2016/index.htm

In the present case, the Plaintiffs have specifically alleged numerous facts to support their claims, noting the alleged war crimes have not only been occurring for at least the last several decades, but that they are still ongoing to this day. *See*, *e.g.*, Compl. ¶¶ 125, 131, 145; *see also* the earlier referenced *State Department's Country Report on Terrorism for 2016*. Plaintiffs herein specifically allege that BFP's advice to the Kushner Family Foundation by enabling the Foundation to act as a "funnel" who raises funds in American and then passes those funds on necessary to commit the alleged war crimes, with BFP specifically having necessary *scienter* to know how its advice was being used (re: to finance war crimes and subjugate the civilian Palestinian population through violence and intimidation), in order to retain and profit from its clients. *See* Compl. ¶ 135 (noting that BFP knew where and how their clients' funds were being used due to their access to extensive accounting records):

> Members of the accounting firm BFP knew that FOBI, KFF, and other tax-exempt entities were engaging in money laundering by sending approximately $2 billion in laundered funds every year to their sister educational facilities which adhere to discriminatory policies violate numerous Treasury Department regulations. (*See U.S. v. Jones University*, 615 F.3d 544 (2012)). Also, members of the firm, being well acquainted with their clients' financial operations knew that FOBI, KFF, and other tax-exempt entities like FIDF were engaging in money-laundering by sending approximately $2 billion every year to their sister Israeli-based NGOs and to the Israeli army.

> Furthermore, 18 U.S.C. § 2331 defines international terrorism to mean activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State; (B) *appear to be intended—(i) to intimidate or coerce a civilian population . . . and (C) occur primarily outside the territorial jurisdiction of the United States...*

(emphasis added). The violations of the laws of nations alleged in the Amended Complaint (ethnic cleansing, genocide, theft of private property, murdering and maiming Palestinian civilians, etc.,) certainly fall within the definition of international terrorism as defined in 18 U.S.C. § 2331 above, as Plaintiffs have alleged these war crimes are being used to intimidate and

subjugate the civilian population of Palestine in order to steal their private property, expand the

settlement enterprise, and ultimately rid the OPT of all Palestinians. *See* Compl. ¶¶ 87, 117.

Accordingly, these Plaintiffs allege facts that are wholly different than the facts relied upon by

Judge Bates to reject an aiding and abetting theory in *Owens v. BNP Paribas S.A.* (that

Defendant bank processed funds in Sudan, and Sudan provided material support to Al Qaeda),

but instead assert that BFP knowingly and directly provided the advice and aide necessary to

enable Defendant Kushner Family Foundation to provide the funds used in the commission of

terrorist activity. *See* 235 F. Supp. 3d 85 at 9-10.

Furthermore, as defined by Judge Bates in *Owens*, a finding of proximate cause under §

2333 "is defined as a test of whether the injury is the natural and probable consequence of the

negligent or wrongful act and ought to have been foreseen in light of the circumstances . . .

'[a]ny terrorist act, including the September 11 attacks, might have been the natural and probable

consequence of knowingly and intentionally providing financial support to al Qaeda.'" *Owens* at

20 (internal citations omitted). Because of the massive funds sent by the Kushner Family

Foundation based on advice from BFP principals to groups like FIDF and settlements like Bet El

that build sniper schools to train settlers and purchase sophisticated military equipment like

M16s, stun grenades, and sniper scopes used for committing war crimes and subjugating the

local civilian populations, the Plaintiffs have clearly alleged in the Complaint both that BFP

Principals had the necessary *scienter* to know its advice and accounting aide for its clients' funds

were being used to finance war crimes and terrorist activities as defined in 18 U.S.C. § 2331, and

that their advice and aide for the funding provided by the Kushner Family Foundation was thus

the proximate cause of Plaintiffs' injuries. *See*, *e.g.*, Compl. ¶¶ 86—110, 135, 138.

It is difficult to conceive how any settlement could afford spending $50,000 to $100,000

on a local militia unit. Concrete evidence thereof is provided by the One Israeli Fund. That Fund explicitly stated on its website: "in light of the recent budget cuts that have been made to the IDF and the cut back of checkpoints allocated to protect these communities, the security resources and training that we provide is paramount to the future of these areas." Kushner Family Foundation officials, due to the advice and accounting aid given them by BFP principals seeking to have and keep such long-term wealthy clients, have been funding security resources and training, which made it possible for these settlements to be maintained and expand in the last 30 years.

### a.   The Plaintiffs' Negligence Claims Against Defendant BFP Are Well Pled

Defendant BFP correctly notes that a claim for negligence under District of Columbia law requires a showing "'that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached its duty; and (3) the breach was the proximate cause of (4) damages sustained by plaintiff.' *Jalevare v. Alpha Kappa Alpha Sorority, Inc.* 521 F. Supp.2d 1, 14 (D.D.C. 2007)." Defendant's Motion to Dismiss at 33. Count V of the Amended Complaint clearly alleges each of these elements against Defendant BFP, noting that BFP had a duty of care "to render accurate professional advice . . . to any individuals who would be impacted by the nature of that advice, including the Plaintiffs herein." Compl. ¶ 175. That "Defendant BFP principals breached their duty of care owed" by providing incorrect and illegal advice based on current Treasury regulations, and that "For example, Plaintiffs Kateeb and Ali have lost $2-3 million worth of valuable real estate because [of] BFP's clients, utilizing their advice . . ." with the other Plaintiffs "injuries [] described in Counts I – IV.[7] Compl. ¶¶ 173 – 175. As all of the elements of a

---

[7] Am. Compl. ¶ 173 (the first allegation of Count V, specifically notes that "Plaintiffs hereby repeat and re-allege paragraphs 1 – 172 as if fully recited herein, especially those allegations made in Count IV").

negligence claim against BFP have been properly pled, BFP's motion to dismiss should be denied as to Count V.

## VI.   This Court Has Personal Jurisdiction Over Defendant BFP

While it is the Plaintiffs' burden to make a *prima facie* showing that this Court has personal jurisdiction over the Defendant Defendant's motion to dismiss based on a lack of personal jurisdiction is a classic red herring argument when one examines the allegations pled in the Amended Complaint. As earlier referenced, without the tax-exempt status provided by its advice and filings sent to the IRS, BFP's clients like the Kushner Family Foundation could not solicit funds in America and would thus not hire BFP for its services. As alleged in the Amended Complaint:

> The District of Columbia's long-arm statute is codified under D.C. Code § 13-423, and provides a basis for jurisdiction under the conspiracy theory of personal jurisdiction against members of a civil conspiracy when the elements of a civil conspiracy have been pled. *See Second Amendment Found. v. United States Conf. of Mayors*, 274 F.3d 521 (D.C. 2001); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997). In order for the Court to exercise personal jurisdiction under conspiracy theory, "the plaintiff must plead with particularity "the conspiracy as well as the overt acts within the conspiracy." *Jungquist* at 1031 (internal citations omitted). Conspiracy jurisdiction has been further defined to be where an individual is deemed to have transacted business in the forum state directly, and as a consequence other conspirators who have never entered the forum state are deemed to transact business there "by an agent." *Second Amendment Found.* at 523. Thus, if one member of a conspiracy engaged in activities in the forum, every member of the conspiracy is subject to the forum's jurisdiction. Defendants are therefore also subject to personal jurisdiction in the District of Columbia under the conspiracy jurisdiction theory. For example, Defendant Billet, Feit, and Price, P.C., as explained in more detail *supra*, is subject to conspiracy jurisdiction because of their role in the civil conspiracy complained of herein—i.e., routinely giving illegal advice to donors intent on settlement expansion through theft of private property and the commission of war crimes. *See* ¶¶ 86—110. If they had not rendered that advice to these donors, and therefore the donors could not secure tax write offs, settlement expansion would come to a screeching halt. They played therefore an important role in the civil conspiracy described herein.

Compl. ¶ 21. Defendant's Motion to Dismiss fails to adequately address this allegation of the

Amended Complaint, which clearly outlines BFP's role in the conspiracy, as well as its *scienter* and motivation. In addition, as already noted, all 501(c)(3)'s have to file annual 990 forms with the Treasury Department. That is classic business activity engaged in with a U.S. regulatory body, i.e. the Treasury Department, which BFP regularly engages in here in this District through its necessary work with the Treasury Department and IRS in preparing and filing its clients' tax forms. Thus, despite Defendant's arguments to the contrary, conspiracy jurisdiction over BFP is fully laid out and pled in the Amended Complaint. The elements of a civil conspiracy, as this court knows, have been laid out in the case *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983), which is cited as respected authority in the JASTA Act. Thus, Plaintiffs have in addition adequately pled conspiracy-based jurisdiction over Defendant BFP.

## **CONCLUSION**

Based on the authorities cited herein, especially those from this judicial district, *see Biton I and Biton* II, and the detailed allegations contained in the Complaint, this Court has ample precedent to rely on in denying the instant motion to dismiss.

Respectfully Submitted,

May 20, 2019
Date

/s/ *William R. Cowden*
William R. Cowden; Bar #426301
WILLIAM COWDEN LLC
1750 K Street, N.W., Suite 900
Washington, DC 20006
202-862-4360 / 888-899-6053 (fax)
wcowden@cowdenllc.com
*Counsel for Claimant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the below-listed date I filed this document with the Court by means of the Court's Electronic Case Filing System, causing it to be served electronically on all counsel of record.

<u>May 20, 2019</u>                             <u>*/s/ William R. Cowden*</u>
Date                                                William R. Cowden