UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIKO PELED, *et al.*,                )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )        Docket No: 1:17-cv-00260
                                     )        Hon. Reggie B. Walton
BENJAMIN NETANYAHU, *et al.*,        )
                                     )
        Defendants.                  )
_____)

**PLAINTIFFS' AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANT
KUSHNER FAMILY FOUNDATION'S MOTION TO DISMISS**

COMES NOW Plaintiffs herein and hereby oppose the amended motion to dismiss filed

by the Kushner Family Foundation (hereinafter "KFF"). The motion should be denied for a

number of reasons, including the fact that its main argument centers on the application of the

political question doctrine. As numerous authorities have held, including Judge Rosemary

Collyer in this judicial district (*see Biton v. Palestinian Interim Self-Government Authority*, 310

F. Supp. 2d 172 (D.D.C. 2004) ("*Biton I*")*; Biton v. Palestinian Interim Self-Government

Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005) ("*Biton II*")), the political question doctrine has

no application on our facts. Additionally, the D.C. Circuit's decision in *Al-Tamimi v. Adelson*

discussed *infra*, where that Court held that the political doctrine did not bar Plaintiffs from

pursuing claims in an almost identical case, should convince this Court that the doctrine has no

application to the instant case.

Besides relying on the political question doctrine, Defendant's other erroneous assertion

is that the Act of State Doctrine similarly bars this lawsuit from going forward. As explained

herein, that Doctrine is based on the fact that no Court can ignore the public policy of a foreign

country or its statutes. As detailed in this Amended Memorandum in Opposition and the

Plaintiffs' Amended Complaint, however, the Israeli government has condemned the settlement

enterprise for at least 30 years, and even *banned charitable deductions made to settlements* since

1992. That is the primary function of a 501(c)(3) entity like KFF which operates like a funnel.

The reason why it operates as a "funnel," is that it only holds donor funds for 24 hours so

that donors can secure a tax deduction. The Kushner Family has been taking illegal tax

deductions through the KFF for at least 20 years. The funds are then sent through the funnel to

the Israeli army and numerous settlements in order to finance the maiming and murdering of

Palestinian civilians—a war crime as defined under both the U.S. and the Israeli war crimes

statutes. Thus, the Act of State Doctrine cannot serve as a basis to dismiss this suit, because the

Israeli government itself has condemned settlement expansion, *inter alia*.

Besides ignoring the relevant case law in this judicial district, the Defendant has also

failed to address a number of serious issues. First, as explained herein, an entity that collects

funds with the purpose of sending them overseas to intimidate a civilian population is guilty of

an 18 U.S.C. § 2339(C) violation just by collecting funds for the settlements and for rogue

soldiers in the Israeli army.

Second, no charity in America can send money overseas to fund a foreign army without

violating the law. *See* 18 U.S.C. § 960. And yet, KFF has been doing that for approximately 20

years by sending millions of dollars to the 501(c)(3) known as the Friends of the Israeli Army.

Unfortunately for KFF, 18 U.S.C. § 960 is not the only criminal statute it has violated.

Both U.S. and Israeli money laundering statutes, as explained herein, criminalize the

operations of a U.S. charity that sends money abroad to promote and finance criminal activities

like arms trafficking and ethnic cleansing. *See* 18 U.S.C. § 1956 (the U.S. money laundering

statute). For at least 20 years, KFF has been making contributions to Israeli settlements like Bet El, the one owned by Defendant Friedman Bet El has been financed by the Kushner Family, and the activities it has financed include building firing ranges, setting up sniper schools, and funding a "Jewish only" military academy whose graduates learn how to maim and murder innocent Palestinian civilians.

Third, a 1992 Israeli government study report details settlement activity for over a decade, and specifically details and confirms that criminal activity, described herein. *See* Am. Compl. ¶ 127. Bet El and other settlements that the family supports all have local militia units which are armed with Kalashnikovs, M-16s, stun grenades, body armor, and sniper scopes. Every year, the Kushner family takes charitable deductions based on expenditures for the purchase of military hardware, (arms trafficking), which obviously cannot be deemed to be a charitable activity. Thus, the Kushner family members have been committing tax fraud every April 15 when they write off contributions to the Bet El settlement and the Israeli army as charitable deductions.

Besides violating 18 U.S.C. § 960--funding a foreign army--and 18 U.S.C. § 1956. –the money laundering prohibition statute--the Kushner Family has also ignored numerous Treasury Department regulations governing their alleged charitable activities. For example, one cannot use charitable donations to promote discriminatory housing or educational facilities, yet that is exactly what the Kushner family has done by making contributions to Bet El, i.e. erecting "Jewish only" housing projects, "Jewish only" highways, and "Jewish only" schools. Such conduct is impermissible for a valid 501(c)(3) can engage in. *See Bob Jones University v. United States*, 461 U.S. 574 (1983).

As pointed out in Section I below, KFF officials have also violated 18 U.S.C. 2339C, and President Clinton's 1995 Executive Order 12947. That statute and executive order both provide that monies cannot be sent overseas to promote or finance terrorist activity, including the intimidation of a local civilian population. Both the Israeli army and the irate settlers coming from Bet El and other settlements seek revenge for the killing of IDF soldiers in what is known as "price tag" killings,[1] in an effort to convince Palestinians to leave the Occupied Palestinian Territories ("OPT"). In fact, irate settlers coming from the Bet El settlement, and other nearby settlements, have been accused of engaging in these "price tag" attacks. These are the same settlements which the Kushner family, through the KFF, have supported with funding for at least 20-30 years.

The KFF's funding sent to these irate settlers has enabled them to intimidate Palestinian farmers and enabled settlers maiming and murdered them in an effort to convince those who remain to leave the occupied territories. The Kushner family, through the KFF entity, has been very successful, because 400,000 Palestinians no longer live in the OPT, and they no longer own the 49,000 homes that they occupied before settlements sprung up about 40 years ago—when the Bet El settlement was founded. Violation of these criminal statutes is all detailed in this lawsuit. *See*, *e.g.*, Am. Compl. ¶¶ 112, 116, 126, 128.

The issue of proximate cause in the context of similar facts has been litigated in this judicial district, and it appears that the Plaintiffs have satisfied their burden of proof. Their obligation, of course, is to link up contributions made to pro settlement U.S. based 501(c)(3) entities like the KFF, which funds are then transferred through the funnel entity to the Israeli

---

[1] Jon Schuppe, "What is 'Price Tag'? Behind the Israeli Extremist Movement", NBC News, available at http://www.nbcnews.com/news/world/what-price-tag-behind-israeli-extremist-movement-n401896.

army and to settlements like Bet El to fund the criminal conduct described herein. As explained

herein, Bet El and the other hundred settlements in the West Bank couldn't have survived

without these funds, especially after the government in 1992 banned all charitable donations to

settlements. Treasury regulations provide that no transfers can occur overseas if they violate a

country's public policy or legislation like Israel's money laundering statute.

The flow of funds starts with contributions to the 501(c)(3)'s based in the U.S., which

proceeds are then sent to the Israeli army, and to settlements. Jewish only citizens in the

settlements are then armed with sophisticated military hardware, and after stealing Palestinian

property, Israeli army members hired by the settlements surround and protect the new

settlements, thus condoning the theft of Palestinian private property.

Based on Treasury regulations, it is obvious that charitable donations cannot be sent

abroad to steal or confiscate private property, or to finance arms trafficking, ethnic cleansing,

and genocide. In stark contrast, the Justice Department has repeatedly indicted local armed

militia groups located in Western United States intent on occupying private U.S. private

property.

The records relied upon by the Plaintiffs are the annual income tax forms filed by

501(c)(3) entities like the Friends of the Israeli army or the Friends of Bet El and KFF. In sum,

there is no basis to grant this motion to dismiss, and in the words of Judge Collyer in *Biton II*

"Defendants argue that the Court would be required to assess the Israeli Palestinian conflict and

the illegality of Israeli's oppressive actions in its occupation of the West Bank and Gaza." 412 F.

Supp. 2d 1, 5-6 (D.D.C. 2005) She thoroughly rejected that argument on the basis that "*the basic*

*elements of the claim lie in tort, not in the relations between Palestine and Israel*". *Id*. KFF's

Motion to Dismiss can be denied based solely on Judge Collyer's opinions in *Biton I* and *Biton*

*II*, and that of course is what the Plaintiffs are requesting that this Court do at this juncture. *See "Biton I" (Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004)) *and "Biton II" (Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005))*.*

 Lastly, it appears that this Defendant, along with the other two Defendants who have filed Amended Motions to Dismiss, want this Court to overturn the holding in *Al-Tamimi v. Adelson*. *See* 916 F.3d 1 (D.C. Cir. 2019). For the reasons explained at the end of Section II *infra*, this Court is bound by the decision by the D.C. Circuit in that case.

## **TABLE OF CONTENTS**

Introduction .............................................................................................................1

Table of Contents ....................................................................................................7

Index of Authorities ...............................................................................................8

Legal Standards.....................................................................................................11

Argument .............................................................................................................12

I.  Defendant Kushner Family Foundation Apparently Does Not Understand the Legislative Initiatives Passed by Congress to Deal with the Concept of "Financing Terrorism"
.............................................................................................................12

II.  This District Has Rejected Application of the Political Question Doctrine as a Bar to Hearing Similar Claims
.............................................................................................................15

III.  Other Federal Courts Have Also Held that Claims Based on the ATA or the ATS Do Not Bar a Federal Judge From Hearing Claims Involving Violation of International Norms
.............................................................................................................21

IV.  Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over 40 Years
.............................................................................................................24

V.  The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S. Soil, and Thus There is Sufficient Contact with the United States to Provide Jurisdiction in This Court.
.............................................................................................................25

VI.  The Complaint Lays Out a Clear Basis for KFF's Liability to the Plaintiffs and its Proximate Cause of Their Injuries
.............................................................................................................29

VII.  The Complaint is Not Predicated Upon Traditional "Acts of War" as Defendants Assert. The Underlying Claim is Based on Fundamental Principals of Tort Law
.............................................................................................................37

VIII.  The Act of State Doctrine is Not Applicable to the Case at Bar
.............................................................................................................38

IX.  This Court Has Personal Jurisdiction Over Defendant KFF
.............................................................................................................40

X.  Plaintiffs Have Standing to Bring This Complaint Against the Defendants, Including KFF
.............................................................................................................41

Conclusion .............................................................................................................43

# INDEX OF AUTHORITIES[2]

**CASES:**

Abbas v. Foreign Policy Group, LLC.,
   783 F.3d 1328 (D.C. Cir. 2015)..................................................................................12

Abdullahi v. Pfizer, Inc.,
   562 F.3d 163 (2d Cir. 2009) ......................................................................................25

Abecassis v. Wyatt.,
   704 F. Supp. 2d 623 (S.D. Tex. 2010).......................................................................34

Almog v. Arab Bank, PLC,
   471 F. Supp.2d 257 (E.D.N.Y. 2007) ..................................................................21, 22

Alperin v. Vatican Bank,
   410 F.3d 532 (9th Cir. 2005) .....................................................................................19

Al-Tamimi v. Adelson,
   264 F. Supp. 3d 69 (D.D.C. 2017)……………………………………………………40

Al-Tamimi v. Adelson,
   916 F.3d 1 (D.C. Cir. 2009).......................................................................1, 6, 20, 21

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) ...................................................................................................11

Atkins v. Fed. Election Comm'n,
   101 F.3d 731 (D.C. Cir. 1996)....................................................................................43

*Baker v. Carr,
   369 U.S. 186 (1962) ...................................................................................16, 18, 19

Balintulo v. Daimler AG,
   727 F.3d 174 (2d Cir. 2013) ......................................................................................27

*Biton v. Palestinian Interim Self-Government Authority,
   310 F. Supp. 2d 172 (D.D.C. 2004) ("Biton I") ..................................1, 5, 6, 15, 17, 44

*Biton v. Palestinian Interim Self-Government Authority,
   412 F. Supp. 2d 1 (D.D.C. 2005) ("Biton II").........................1, 5, 6, 15, 16, 17, 24, 44

Bell Atlantic Corp. v. Twombly,
   550 U.S. 544 (2007) ..............................................................................................11, 12

---

[2]        *Asterisks identify those authorities on which Plaintiffs chiefly rely.

Beneficial Nat'l Bank v. Anderson,
    539 U.S. 1 (2003) ...................................................................................11

Hinder v. Portocarrero,
    963 F.2d 332 (11th Cir. 1992) ...............................................................23

Doe I v. State of Israel,
    400 F. Supp. 2d 86 (D.D.C. 2005) .........................................................17

*Doe v. Exxon Mobil Corporation,
    69 F. Supp. 3d 75 (D.D.C. 2014) ...................................................20, 28, 29, 40

Estate of Klieman v. Palestinian Auth.,
    424 F. Supp. 2d 153, 162 (D.D.C. 2006) ...............................................16

Filartiga v. Pena-Irala,
    630 F.2d 876 (2d Cir. 1980) .............................................................21, 26

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................42

*In re: South African Apartheid Litigation,
    617 F. Supp.2d 228 (S.D.N.Y. 2009) ..........................................21, 24, 25, 26

Japan Whaling Ass'n v. American Cetacean Society,
    478 U.S. 221 (1986) ...............................................................................19

Kadic v. Karadzic,
    70 F.3d 232 (2d Cir. 1995) ..............................................................19, 21

*Kiobel v. Royal Dutch Petroleum Co.,
    133 S. Ct. 1659 (2013) .............................................................26, 27, 28, 29

Klinghoffer v. S.N.C. Achille Lauro,
    937 F.2d 44 (2d Cir. 1991) .....................................................................24

Linde v. Arab Bank,
    97 F. Supp. 3d 287 (E.D.N.Y. 2015) ................................................12, 13

Louisville & Nashville R. Co. v. Motely
    211 U.S. 149 (1908) ...............................................................................12

Mamani v. Berzain,
    654 F.2d 1148, (11th Cir. 2011) .............................................................23

Morris v. Khadr,

    415 F. Supp. 2d 1323 (D.U. 2006) ...............................................................39

Oneida Indian Nation of N.Y. v. County of Oneida,
    414 U.S. 661 (1974) ...................................................................................12

Owens v. BNP Paribas S.A.,
    2017 WL 394483 (D.D.C. Jan. 27, 2017).......................................13, 33, 34, 35, 36, 37

Public Citizen v. National Highway Traffic Safety Society,
    489 F. 3d 1279 (D.C. Cir. 2007)...................................................................43

*Sokolow v. Palestine Liberation Organization,
    583 F. Supp. 2d 451 (S.D.N.Y. 2008) .................................................24, 38

Sosa v. Alvarez-Machain,
    542 U.S. 692 (2004) ......................................................................25, 26, 27

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ....................................................................................12

Strauss v. Credit Lyonaise S.A.
    925, F. Supp. 2d 414, 433-34, (EDNY 2013).......................................31, 32

Whiteman v. Dorotheum GmbH & Co. KG,
    369 U.S. 186 (1962)  .............................................................................18, 19

Wultz v. Islamic Republic of Iran,
    755 F. Supp. 2d 1, 22 (D.D.C. 2010)....................................................30, 31

**STATUTES AND RULES:**

18 U.S.C. § 960....................................................................................2, 3, 14
18 U.S.C. § 1952..........................................................................................14
18 U.S.C. § 1956....................................................................................2, 3, 30
*18 U.S.C. § 2331.............................................................14, 35, 36, 37, 38
18 U.S.C. § 2336..........................................................................................38
18 U.S.C. § 2339A........................................................................................34
18 U.S.C. § 2339B........................................................................................34
*18 U.S.C. § 2339C ....................................................2, 3, 12, 13, 14, 15, 32

## LEGAL STANDARDS

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Plausibility requires pleading facts, as opposed to conclusory allegations, and must rise above the mere conceivability or possibility of unlawful conduct that entitles to pleader to relief. *Id*. at 678-79. A complaint must be "factually suggestive." *Twombly*, 550 U.S. at 557 n.5. A claimant must provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007) (citations and ellipsis omitted). The Court emphasized that a complaint must contain a "statement of circumstances, occurrences, and events in support of the claim presented" and not mere conclusory statements. *Id*. at 556 (citing 5 Wright & Miller, Federal Practice and Procedure § 1202, at 94-95 (2004)). Although a claimant need not set out in detail the facts underlying his claim, Fed. R. Civ. P. 8(a)(2) "still requires a 'showing' . . . of entitlement to relief." *Id*.

When determining whether a claim arises under federal law, a court will "examine the 'well pleaded' allegations of the complaint and ignore potential defenses: '[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution.'" *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) (quoting *Louisville & Nashville R. Co. v. Motely*, 211 U.S. 149, 152 (1908). A federal court lacks jurisdiction over a claim involving federal law "only

when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citing *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)). "The test for dismissal is a rigorous one and if there is any foundation or plausibility to the claim, federal jurisdiction exists." 13D Wright & Miller § 3654, pp. 244-45.

The D.C. Circuit has recognized that "[a] well-pleaded complaint 'may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" *Abbas v. Foreign Policy Group, LLC*, 783 F. 3d 1328 (D.C. Cir. 2015) (quoting *Twombly* at 556). One of the reasons why, is that the Defendant always has an additional remedy to pursue before trial, i.e. if the complaint survives a motion to dismiss, a defendant may still move before trial for summary judgment under Rule 56. *Id*. Thus, it is difficult for the Defendant to assert prejudice at this early stage in the litigation.

## ARGUMENT

### I. Defendant Kushner Family Foundation Apparently Does Not Understand the Legislative Initiatives Passed by Congress to Deal with the Concept of "Financing Terrorism"

As detailed in *Linde v. Arab Bank PLC*, 18 U.S.C. § 2339(a) provides that "whoever provides material support or resources knowing or intending that they are to be used in preparation or in carrying out various federal crimes, or attempts or conspires to do such an act shall be guilty of a crime." 384 F. Supp 2d 571, 582 (E.D.N.Y. 2005). What KFF fails to appreciate is that section 18 U.S.C. § 2339(c) specifically addressed the concept of "financing of terrorism" and what that actually can entail. It appears that KFF officials are oblivious to the

means and methods of financing terrorism. The *Linde* Court noted that a financier of terrorism is

an individual or organization who

> by any means, directly or indirectly, unlawfully and willfully provides or *collects funds*
> *with the intention that such funds be used*, or with the knowledge that such funds are to
> be used in full or part in order to carry out . . . (B) any other act intended to cause death
> or serious bodily injury to a civilian, or to . . . intimidate a population . . . shall be [guilty
> of a crime].

*Id.* (quoting 18 U.S.C. 2339C(a)(1) (emphasis added). So as is obvious, section 2339(c)

specifically focuses on activity like "collecting funds" with the intention to use that financing to

intimidate a civilian population. What the KFF similarly does not understand is that based upon

18 U.S.C. 2339C(a)(1), a terrorist act may "constitute an offense under the statute *without a*

*showing that the funds were actually used to carry out the predicate act of terrorism*." *Id.*

(emphasis added); *see also* 18 U.S.C. 2339(C)(a)(3). What this means in the context of the

claims asserted herein, is that since the Plaintiffs allege the Kushner Family Foundation collected

funds with the intention that the funds would be used by irate settlers or the Israeli army to

intimidate the Palestinian civilian population through illegal means, they can be found liable

based on a violation of 18 U.S.C. § 2339C, which is a predicate act in terms of financing

terrorism. Indeed, the Court in *Owens v. BNP Paribas S.A.*, a case which Defendant KFF heavily

relies upon in support of its motion, never analyzed 18 U.S.C. § 2339C in its decision—making

Defendant's reliance on this case misplaced. *See* 235 F. Supp. 3d 85 (D.D.C. 2017).

The statute further specifically condemns "any other act intended to cause death or

serious bodily injury to a civilian." Sending funds overseas to fund violence in the middle east,

as should be obvious to the Kushner family, violates 18 U.S.C. § 960, specifically you cannot

fund a foreign army. Moreover, KFF apparently doesn't understand that 18 U.S.C. § 1952 bars

individuals from traveling throughout America to raise funds to promote violence overseas. As

pled herein, KFF officials solicited funds all over America, including in this District, with the intention that such funds would be used overseas by irate settlers and out of control army soldiers to maim and murder Palestinians. It can be assumed that engaging in arms trafficking and purchasing body armor, sniper scopes, M16's, would be used by the irate settlers to maim and murder their Palestinian neighbors. And again to repeat the obvious, even if the funds were not actually used to carry out the predicate acts of terrorism alleged (arms trafficking, money laundering, maiming and murdering civilians), the very act of providing the funding itself on the part of the KFF may constitute an offense under the statute.

So, the Defendant's argument that the funds that were sent by the KFF were not actually used to carry out maiming and murdering Palestinians is irrelevant based un section 18 U.S.C. 2339(C)(a)(1). It also makes moot any issue about whether some of the funding that went to the Bet El settlement or the Israeli army were for charitable purposes. Of course, it is difficult to conceive how building firing ranges in the Bet El settlement, financing a "Jewish-only" military academy there, and the setting up of sniper schools can qualify under Treasury regulations as a "charitable activity."

To reiterate, international terrorism, as contemplated in 18 U.S.C. § 2331 encompasses activity such as "providing material support to an organization" or individual that is hell bent on maiming innocent civilians, stealing their property, murdering them, and engaging in genocide and extra judicial killings. So, this Court, in order to grant KFF's motion to dismiss, has to conclude that the financing provided by the Kushner family did not satisfy the requirements of section 2339(C). Moreover, the Plaintiffs in the lawsuit have repeatedly identified why KFF officials had to know (*scienter*) that the funds they were transferring overseas would be used to maim and murder Palestinian civilians. *See* Am. Compl. ¶¶ 22(ii), 46, 50, 68, 96, 100, 109, 112,

114, 116, 117, 128, 138. There have been numerous articles written in the New York Times and Haaretz explaining how U.S. based tax-exempt entities abuse the tax code.

## II.   This District Has Rejected Application of the Political Question Doctrine as a Bar to Hearing Similar Claims

Numerous Courts have held, contrary to the Defendant's memorandum, that the political question doctrine has no application in similar circumstances. That is why Defendant KFF has ignored a number of relevant opinions issued in this District that can be used as a basis for denying their motion to dismiss. In *Biton I* and *Biton II*, Judge Collyer opined that the Court was competent to rule on similar claims made herein. 412 F.Supp.2d 1 (D.D.C. 2005). Judge Collyer analyzed both the political question doctrine and act of state doctrine at length and rejected the Defendant's argument that having the case go forward would violate those doctrines.

Citations from her opinions significantly bear on the issue before the Court, i.e. disposition of the Defendants' motion to dismiss for lack of subject matter jurisdiction. As Judge Collyer pointed out in *Biton II*: "Defendants argue that the Court would be required 'to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza.'" *Id.* She rejected that argument because, "Defendants misperceive the status of the case. Plaintiffs complain that Defendants' actions caused them injury; while the ATA provides jurisdiction for the suit in federal court, *the basic elements of the claim lie in tort, not in the relations between Palestine and Israel*". *Id.* at 5-6. (emphasis added). In rejecting the identical argument advanced in the Defendants' memorandum, Judge Collyer also explained in *Biton II*:

> "'This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism.' There is no flaw in this Court's ability to address Plaintiff's claims: Congress explicitly committed these issues to the federal courts under the ATA. Similarly, the Court has access to 'judicially manageable standards for resolving the

issues before it,' id., from both existing ATA caselaw and traditional tort caselaw.

> The 'initial policy determination' involved here has already been made by the U.S. Congress: Americans injured by terrorist acts can sue their attackers in U.S. courts and the Court can manage this case to resolution of Defendants' alleged liability without 'expressing lack of the respect due coordinate branches of government.' Baker, 369 U.S. at 217. The Fifth and Sixth factors from Baker v. Carr do not apply because a decision in this individual case will have no consequences concerning 'political decisions already made' and will raise only the question of Defendants' alleged liability regarding this single bombing of a bus. Thus, nothing in Baker v. Carr counsels against having this case proceed."

*Biton II*, 412 F. Supp. 2d at 6.

Similar to the holding in *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006), the tortfeasors named herein "have made no attempt to distinguish any of these prior decisions in their moving papers." Just as in *Biton II*, a decision on Plaintiffs' claims alleged herein can be resolved by this Court by deciding the liability of the Defendant tortfeasors, thus it would have no consequences concerning "political decisions already made." *Biton II* at 6. As this Court can take judicial notice of, the State Department reiterated the political decisions that have been made by at least 12 Presidents, i.e. settlement activity is illegal, and has been condemned by the U.S. State Department for decades. Thus, there should be no fear that any political decisions already made would be contradicted by allowing this lawsuit to go forward.

The Plaintiffs respectfully submit that the Motion to Dismiss can be denied based solely on the holdings in *Biton I* and *Biton II*. *See Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005)*. The bottom line is that it would be judicial error for this Court to grant the motion to dismiss based on Judge Bates' holding in *Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005). They are two entirely different cases—first, the *Doe* Plaintiffs actually sued the state of Israel itself, and they never alleged that Defendant tortfeasors

like KFF were engaging in a money laundering scheme on U.S. soil designed to rid the West

Bank of all non-Jews. *Id*. That is clear evidence of financing war crimes, for example, ethnic

cleansing. Thus, Kushner family members can properly be referred to as collaborators under both

the U.S. and Israeli war crimes statute.

All Defendants, including Defendant KFF, know that the fulfillment of that goal—

ridding the West Bank of all non-Jews—necessarily entailed massive ethnic cleansing and

genocide. Without the funding provided by KFF (for example, $315,000 from 2011 to 2013 to

FIDF alone), U.S. based tax-exempt entities, and donors such as the Kushner family members,

belligerent settlers would never have had the financial resources to accomplish that goal. *See*

Am. Compl. at ¶ 100. Evidence thereof is the fact that equipping a fifty-member militia unit with

body armor or Kalashnikovs or M-16s is an expensive endeavor. None of the settlements have

that amount of money lying around to purchase military hardware and fund a militia unit. Sniper

scopes cost a fortune, as does body armor, which the settlements couldn't afford. The solution—

secure the necessary funding for a local militia unit from pro occupation tax-exempt entities like

KFF's financial backing.

Defendant urges this Court to accept the argument that suing organizations like

Defendant KFF that are financing war crimes abroad, including arms trafficking, in this manner

will somehow impact the ability of the political branches to function. Besides being an absurd

argument to embrace based on relevant case law in this District, such a decision would likely

violate provisions contained in the *International Covenant on Civil and Political Rights*. As this

Court surely realizes, foreign plaintiffs should be able to access U.S. court to have legitimate

property and war crimes claims adjudicated, especially where they complain about ethnic

cleansing and genocide. These are classic war crimes, which violate international norms

recognized by the world at large. Thus, if foreign plaintiffs are denied that right, this Court could possibly be violating relevant provisions contained in the International Covenant on Civil and Political Rights, a treaty that both Israel and the U.S. are parties to. The irony is that by doing so, they would be protecting U.S. citizens who every April 15th defraud the IRS of significant revenues.

Defendant KFF further argues that having the Court decide the issues raised in the Complaint would violate the standards set forth in *Baker v. Carr* as to issues best left to the political branches of government. *See* Am. Mem. of Law of Def. Kushner Family Foundation in Supp't of Mot. Dismiss Am. Compl. at 11-14 (citing 369 U.S. 186 (1962)) (ECF No. 58-4) [hereinafter KFF Mot. Dismiss]. The Court pointed out in *Baker*, however, that "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211. The Second Circuit noted that "[w]ith respect to the first *Baker* test, while foreign policy is committed in the first instance to the Executive, tort claims against foreign countries and individuals under the law of nations, as well as issues of sovereign immunity, *are constitutionally committed to 'none other than our own Judiciary*.'" *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d. Cir. 2005) (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). *See also Alperin v. Vatican Bank*, 410 F.3d 532, 551 (9th Cir. 2005).

As for the second and third *Baker* tests, just like in *Whiteman*, they are met by applying not only the traditional adjudication process, but also through "the universally recognized norms of international law [invoked by the Plaintiff]." *Whiteman,* 431 F.3d at 77. The Second Circuit noted, for example, that the "FSIA "'provide[s] judicially … manageable standards for adjudicating suits' and 'obviate[s] any need to make policy decisions of the kind normally reserved for non-judicial discretion.'" *Id*. (citing *Kadic*, 70 F.3d at 249). As further outlined in

*Whiteman*, "[t]he fourth and sixth tests are basically coterminous with the fifth, that they involve cases where an exercise of jurisdiction, although not *per se* outside the judiciary's authority, would somehow contradict actions taken by the political branches; [the Court] will therefore discuss them together." *Id*.

It is important to reiterate that a ruling in this case would in no way contradict prior decisions taken by the other political branches—executive or legislative. *Id*.; *see also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221 (1986) (the Supreme Court for example unanimously declined to dismiss as non-justiciable a claim that the Secretary of Commerce had violated federal statutory law by refusing to certify that Japan's whaling practices were undermining the effectiveness of an international fishing conservation program). If anything, this case serves to reinforce fundamental principles of international law approved by 12 American Presidents and at least 10 Secretaries of State and the United Nations— fundamental principles of international law have criminalized ethnic cleansing, genocide, and the denationalization of a civilian population as horrific war crimes. Both the Justice and State Departments have made it abundantly clear that U.S. individuals who finance war crimes and/or arms trafficking abroad should be criminally prosecuted to the full extent of the law. That should include members of the Kushner family who, through the KFF, have financed the Israeli army and belligerent settlers intent on ethnically cleansing the OPT of all Palestinians.

As noted by this Court in *Doe v. Exxon Mobil Corp*., when determining if the political question doctrine bars a suit from moving forward, "[e]vidence of the State Department's views as to this issue are accorded 'substantial weight' because the effect of litigation on the foreign policy interests of the nation is 'at the heart of the Department's expertise.'" 69 F. Supp. 35 at 92 (D.D.C. 2014). Exxon did not succeed on its motion to dismiss on political question doctrine

grounds for the same reason KFF's motion should fail here—"[i]n short, there is an insufficiently recent and definite statement from the Executive that this case interferes with the foreign policy of the United States." *Id*. If anything, the case for denying KFF's motion to dismiss is stronger here than it was in *Doe v. Exxon*, as the Executive branch, including the State Department, and even Israeli official government policy have all condemned the settlement enterprise described in the complaint.[3] Moreover, the State Department has not filed a declaration of interest to register its opposition to this lawsuit with this Court.[4] This is important because there are at least 20 cases in this judicial district where it was found that a State Department filing is accorded great weight in terms of deciding whether the political question doctrine has application. Because it has not done so here, it can be presumed that that Department does not feel this case raises a political question.

Notwithstanding the above, in their Amended Motion, the Defendants address the D.C. Circuit's opinion in *Al-Tamimi v. Adelson*, and essentially argue that the Plaintiffs claims are different from the claims in that case because their claims in the instant case are "inextricably intertwined with all of the theories of liability in this case", and that the existence of Israeli government officials is indicative of that. KFF Mot. Dismiss at 14-15 (citing 916 F.3d 1 (D.C. Cir. 2019)). Therefore, they assert that even though that Court found the political question doctrine did not bar the plaintiffs' claims in that case, that doctrine should bar Plaintiffs' claims herein. *Id.* at 15.

As a preliminary matter and for the Court's edification, the Plaintiffs imminently intend to dismiss all of the Israeli officials and Ambassador Friedman from this case for two reasons.

---

[3] *See* Am. Compl. ¶¶ 52, 67, 68, 75.
[4] (Through Plaintiffs' attempts to serve Ambassador Friedman, the State Department's legal department has been put on notice of this lawsuit).

First, recent decisions have reaffirmed the principle that foreign sovereigns, such as Defendant Netanyahu, cannot be sued individually. And second, Plaintiffs encountered substantial issues with service of the Summons and Complaint on the foreign officials, whose representatives, in some cases, refused to accept service. Hence, Defendant KFF's arguments which primarily involve the other Defendants will shortly be moot.

Moreover, the fact that KFF funneled money to the Israeli army and settlements on behalf of the Kushner family in order to harm Palestinians is not the same as the U.S. government sending funds to the Israeli army for its defense. KFF is a private corporate entity. Consequently, the real issue with respect to KFF and the other U.S. Defendants is not the sovereignty of the OPT, as the Defendants try to suggest in an effort to obfuscate the matter. The real issue is whether these Defendants illegally funneled money to the Israeli army and Israeli settlers to commit violence against Palestinians, as Plaintiffs claim herein. *See* 9 F.3d at 21 ("We believe this political question [of who claims the sovereignty over the OPT] is extricable. From what we can tell, the court should rule in the plaintiffs' favor **on all counts without addressing who has sovereignty over the disputed territory**.") (emphasis added). As such, the political question doctrine does not bar the Plaintiffs' claims herein in the same way it did not for the Plaintiffs in *Al-Tamimi*.

### III. Other Federal Courts Have Also Held That Claims Based on the ATA or the ATS Do Not Bar a Federal Judge From Hearing Claims Involving Violation of International Norms

It is not just Judge Collyer and the D.C. Circuit that have decided to reject the argument that Courts lack subject matter jurisdiction to entertain claims based on violation of international norms. Other Courts have decided to reject the application of the Political Question Doctrine based on similar allegations made herein. For example, in *Almog v. Arab Bank, PLC*, Judge

Gershon of the Eastern District of New York rejected the invocation of the political question doctrine to bar similar claims made herein. 471 F. Supp. 2d 257, n. 45 (E.D.N.Y. 2007). She found that this argument was unavailing because foreign plaintiffs were allowed to sue foreign defendants for extra territorial conduct in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995). *Id*.; *see also Filartiga v. Pena-Irala*, 630 F. 2d 876 (2d Cir. 1980).

In *Almog*, just like the Plaintiffs herein, the Defendant Bank had, through the provision of financial services to groups that engaged in terrorist activity, knowingly and intentionally aided and abetted violent criminal attacks on civilians in Israel in violation of international law. The only difference between those allegations and the allegations pled herein is that instead of a bank providing financial support for terrorist activity (intimidating a civilian population), it is Defendant KFF's donations and provision of funds that enable violent settlers and militia groups to engage in attacks on civilians and steal private property, among other crimes. In fact, a horrific arson incident which killed an entire Palestinian family occurred in in the OPT, and violent settlers have been criminally prosecuted for that terrorist act. *See* Am. Compl. ¶ 5(a). The Plaintiffs herein, just like the Plaintiffs in *Almog*, have alleged that they've been injured by the Defendant KFF providing substantial financial assistance to various settlements and to the Israeli Army to promote that criminal activity.

Judge Gershon went on to point out in *Almog* that the three theories of international law violations asserted in the case were all based upon principles to which the United States has expressed strong adherence. *Id*. at 271-72. Just as the plaintiffs alleged in *Almog*, U.S. senior officials like Senator Leahy have expressed strong adherence to international law conventions, like the Geneva Convention. Senator Leahy has, among others, specifically condemned the extra judicial killings (the Dawabshe family was literally burned to death by irate settlers like those

described in this complaint). *See* Am. Compl. ¶ 5(a). And senior State Department officials have repeatedly condemned not only extra judicial killings, but settlement expansion and the violence it promotes. A recent State Department report reveals that entities like the Kushner Family Foundation are still financing wholesale violence in the Occupied Territories. The Court should take judicial notice of the fact that President Clinton criminalized this activity 22 years ago. *See* President Clinton's 1995 Executive Order 12947.

Moreover, successful prosecution of this lawsuit will, if anything, reinforce U.S. public policy concerns about settlement expansion, the frustration of U.S. foreign policy objectives, (see JASTA legislation), and encouraging criminal activity like money laundering, arson and arms trafficking. As this Court knows, money-laundering and arms trafficking are prosecuted on a daily basis by the Justice Department. As recited in *Mamani v. Berzain*, the claims alleged therein simply required the court to evaluate the lawfulness of the conduct of the Defendants/tortfeasors named therein. 654 F. 2d 1148 (11th Cir. 2011). For example, the claims in *Mamani*, such as extra judicial killings occurring in Bolivia by government officials, did not require the Court to decide the legitimacy of U.S. executive branch foreign policy decisions. *Mamani* at 1151 (quoting *Hinder v. Portocarrero*, 963 F.2d 332, 332 (11th Cir. 1992)).

Just like here, the claims asserted by the Plaintiffs (genocide, denationalization of a civilian population and ethnic cleansing) do not require this court to decide the propriety of the U.S. executive branch's foreign policy decisions as they pertain to the Middle East. Moreover, Congressional concern, as is evident by the passage of the JASTA legislation, focused on international terrorist activity and the funding thereof, which frustrates U.S. foreign policy objectives. Every time the Kushner Family, through the KFF, sends millions of dollars overseas

to fund settlement expansion and arms trafficking, they are specifically frustrating U.S. foreign

policy objectives and promoting violence in the Middle East.

## IV.    Alien Torts Statute Claims Have Been Entertained by Federal Courts for Over 40 Years

A case remarkable on its facts to the instant case is *Sokolow v. Palestine Liberation*

*Organization. See* 583 F. Supp. 2d 451 (S.D.N.Y. 2008). The *Sokolow* plaintiffs alleged that the

defendants therein had carried out and inflicted violent physical attacks on an innocent civilian

population in order to terrorize and intimidate them. That is the identical claim which has been

alleged herein. The court in *Sokolow* noted that "[t]he [Defendants] PA and PLO repeatedly fail

to realize that the nonjusticiability doctrine is one of political questions and not political cases."

*Id*. at 456 (quoting *Estates of Ungar v. Palestinian Authority*, 315 F. Supp. 2d 15 (D.R.I. 2004).

The Defendants raise many of the same foreign policy concerns as the PLO did in

*Sokolow* and *Klinghoffer,* with the Second Circuit observing that "[*t*]*he fact that the issues before*

*[the court] arise in a politically charged context does not convert what is essentially an ordinary*

*tort suit into a non-justiciable political question.*" *Id.* (quoting *Klinghoffer v. S.N.C. Achille*

*Lauro*, 937 F.2d 44 (2d Cir. 1991)); *see also Biton II*, 412 F. Supp. 2d 1, 6 (noting that "while the

ATA provides jurisdiction for suits in federal courts, *the basic elements of the claim lie in tort,*

*not in the relations between Palestine and Israel*") (emphasis added).

In addition, federal courts, such as the Second and Ninth Circuits have recognized tort

liability for torture, genocide, and war crimes committed by both state and non-state actors, such

as in the case *In re South African Apartheid Litigation. See* 617 F. Supp. 2d 228, 248-49

(S.D.N.Y. 2009). The Court in that case, citing to other cases, acknowledged "that a court's

jurisdiction to hear claims under the ATCA is not limited by 'the locus of the injury.'" *Id*. at 247

(quoting *Trajano v. Marcos*, 978 F. 2d 493, 500 (9th Cir. 1992). A tort that violates customary

international law will be recognized under the ATS if "the norm alleged (1) is defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*. (2) is based upon a norm of international character accepted by the civilized world, and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Apartheid Litig.,* 617 F. Supp. 2d at 248 (quoting *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009). As this Court knows, genocide and ethnic cleansing are classic war crimes, and violate norms of international character accepted by the civilized world, specifically including Israel.

Plaintiffs also allege the international crime of denationalization, which has been recognized as an actionable tort basis for jurisdiction under the ATCA. *See Apartheid Litig.,* 617 F. Supp. 2d at 252 ("A state actor commits arbitrary denationalization if it terminates the nationality of a citizen either arbitrarily or on the basis of race, religion, ethnicity, gender, or political beliefs"); *see also* 1907 Hague Convention Respecting the Laws and Customs of War on Land (reciting that individuals have a right to retain their citizenship, even in during a hostile invasion). The Plaintiffs have alleged herein that state actors like out of control Israeli soldiers and belligerent settlers have committed arbitrary denationalization based on race, religion, ethnicity, and political beliefs; all made possible by Defendant KFF's donations and funding. *See*, *e.g.*, Am. Compl. ¶¶ 116, 117, 126, 128.

## V.    The Plaintiffs' ATS Claims Arise Out of Conduct Engaged in on U.S. Soil, and Thus There is Sufficient Contact with the United States to Provide Jurisdiction in This Court

Defendant KFF argues the Plaintiffs' ATS claim lacks sufficient contact with the United States citing *Kiobel*, making essentially the same arguments as the Defendants did in *Apartheid Litigation*, i.e., that the Court does not have jurisdiction to address tort claims based on extraterritorial events. Although the physical injuries complained of herein, i.e. maiming and

murdering Palestinian civilians, occurred outside the U.S., this is no bar to jurisdiction. *See Apartheid Litig.,* 617 F. Supp. 2d at 246. As detailed in the Complaint, pro-occupation U.S. donors and 501(c)(3) officials such as Defendants KFF have conspired on U.S. soil for approximately 30 years to finance horrific criminal activity—maim and murder Palestinians, steal their property, engage in ethnic cleansing and genocide. "It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." *Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980). And the reality is that even today the Kushner Family is financing acts of international terrorism. *See State Department's Country Report on Terrorism for 2016.*

As referenced by Defendant KFF, the ATS "permits federal courts to 'recognize private claims [for a modest number of international law violations] under federal common law.'" KFF's Motion to Dismiss at 28 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004)). The Supreme Court in *Sosa* noted "that no development of law in the last two centuries has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law," but that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering such a new cause of action." *Sosa* at 692. In explaining what it meant, the Court further elaborated that "[w]e think it is correct, then, to assume that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Sosa* at 725. In its ruling the Court added that "we think courts should require any claim based on present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a

specificity comparable to the features of the 18th century paradigms we have recognized[5]" as
what constitutes the law of nations. *Id.*

Indeed, Plaintiffs meet this burden laid out by the Court in *Sosa*, as they have clearly
alleged with great specificity the present-day law of nations violations in the Complaint that rest
on a norm of international character accepted by the civilized world, such as genocide, ethnic
cleansing, arms trafficking, and murder. *See, e.g.*, Am. Compl. ¶¶ 46, 50. Plaintiffs thus clearly
meet the jurisdictional test of *Sosa* for claims brought under the ATS. In addition, defendant KFF
wrongly asserts that Plaintiffs' ATS claims are barred by application of *Kiobel v. Royal Dutch
Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) and *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir.
2013). As Defendant KFF points out, there is generally a "presumption against extraterritorial
application of federal statutes". KFF Mot. Dismiss at 27-28. But Defendant KFF also acquiesces
in the conclusion that "[t]he Supreme Court allowed that certain 'claims [may] touch and
concern the territory of the United States . . . with sufficient force to displace the presumption
against extraterritorial application." KFF Mot. Dismiss at 28 (quoting *Kiobel*, 139 S. Ct. at
1669).

Additionally, Judge Lamberth noted in *Doe v. Exxon Mobil Corp.* that under *Kiobel*, "If
plaintiffs have sufficiently alleged conduct within the United States that is actionable under the
ATS, *their ATS claims are not defeated on the basis of the presumption against
extraterritoriality.*" 69 F. Supp. 3d 75, 96 (D.D.C. 2014) (citation omitted) (emphasis added). As

---

[5] The "18th century paradigms" referenced by the Court are that "the reasonable inference from
history and practice is that the ATS was intended to have practical effect the moment it became
law, on the understanding that the common law would provide a cause of action for the modest
number of international law violations thought to carry personal liability at the time: offenses
against ambassadors, violation of safe conducts, and piracy"—international norms that were
specifically accepted throughout the civilized word at the end of the 18th century. *Sosa*, 540 U.S.
at 692.

the Court noted in denying Defendant Exxon Mobil Corp.'s motion to dismiss, the plaintiffs

therein "allege[d] that EMC officials based in the United States made and implemented the

decision to hire or otherwise retain additional security personnel for [Exxon's] Aceh facilities",

and made "a number of other allegations regarding the support provided by Exxon to their

security personnel." *Id.* (internal quotation marks omitted). These allegations included: "Exxon

provided material support to its security personnel by, for example, constructing facilities,

*providing funding for weapons, providing supplies and equipment, and paying for the services of*

*consultants in training and equipping the personnel...*". *Id.* (emphasis added). These allegations

allege almost identical conduct which the Plaintiffs here allege against American Friends and the

other U.S. Defendants—*i.e.*, they provided the funding for settlers' weapons, sniper scopes,

supplies, training, equipment, and even establishing sniper schools and firing ranges to use on

Palestinians. *See*, *e.g.*, Am. Compl. ¶¶ 44, 64, 66, 68, 95, 116, 135.

But the Complaint herein goes a step further than that of *Doe* v. *Exxon* in complying with

the requirements of *Kiobel*. *See Doe,* 69 F. Supp. 35 at 96. The Plaintiffs have alleged herein

that: a) KFF's monetary support comes from the United States; b) that the donors involved are

U.S. citizens; and c) there is an ongoing nationwide solicitation effort which aggregates to a $2

billion monetary transfer to illegal settlements every year. Finally, all 501(c)(3)'s like the KFF

have to file annual reports with the IRS—they are called 990s. By failing to detail the criminal

activities that they finance abroad, specifically arms trafficking and money laundering, they have

repeatedly committed income tax fraud. The Treasury Department has repeatedly condemned

any and all charities that commit income tax fraud.

What Defendant further ignores in its brief, is that KFF's conduct directly provided the

funding and support required for the violation of numerous present-day laws of nations, and thus

satisfy the requirements of international acceptance outlined in *Sosa* right here on U.S. soil.

These include: Money laundering, providing financing for the commission of internationally

accepted crimes like genocide, ethnic cleansing, denationalization, murdering and maiming, theft

of private property, and arms trafficking. *See* Am. Compl. ¶¶ 22, 34, 46, 50, 96, 100, 112, 116,

117, 169, 171. All of these actions financed by the KFF, as alleged in the Complaint, constitute

violations of international law that occurred on U.S. soil—sufficiently meeting the "touch and

concern" requirements of *Kiobel*, as explained in great detail by the Court in *Doe* v. *Exxon Mobil*

*Corp.*, 69 F. Supp. 3d at 96. Defendant's arguments to the contrary are thus unavailing to warrant

dismissal of the claims brought under the ATS.

Regarding the "touch and concern test," Defendant KFF began engaging in conduct on

U.S. soil approximately 30 years ago, when it initially filed for 501(c)(3) status. Securing that

tax-exempt status made it possible for KFF to solicit funds on U.S. soil destined to be sent

overseas to promote criminal activity since that original filing. Pro-Occupation donors not only

made settlement expansion and the theft of private Palestinian property possible, they actually

got a bonus—tax deductions.

## VI.   The Complaint Lays out a Clear Basis for KFF's Liability to the Plaintiffs and its Proximate Cause of Their Injuries

Defendant KFF argues that the complaint should be dismissed because "there is no

allegation that KFF itself participated in or made *direct* transfers to enable any terrorist activity,"

and that there is thus no proximate cause for Plaintiffs' injuries. Defendant's Motion to Dismiss

at 23. This, however, is a misreading of the complaint. *See* Am. Compl. ¶50: "Between 2011 and

2013, KFF provided $315,000 to Friends of the Israeli Army [FIDF], on whose board Jared

Kushner serves."; ¶46: FIDF uses its funds "to support extensive criminal activity, i.e. arson,

arms trafficking, murdering and maiming Palestinians, theft of private property, ethnic cleansing,

and genocide."; ¶100: "All Defendants knew what their funding would achieve..."; ¶128: "KFF officials similarly collaborated in financing war crimes by continuing to raise and transfer massive amounts of funds to the Israeli army and to belligerent settlers"; ¶171: without KFF's funding "the criminal activities described herein [money laundering, arms trafficking, genocide, theft of private property] would never have taken place."

As recited in the Complaint, the U.S. based 501(c)(3)'s, that receive these donations, including KFF, hold the funds for 24 hours before sending them off in order for their donors to receive favorable tax write-offs. As explained earlier, 501(c)(3)'s who engage in such activity act as temporary custodians of these funds, which entities have been deemed by the Treasury Department to be "funnels," i.e. they're not engaged in charitable conduct—they simply collect funds and send them overseas to promote criminal conduct. That is classic money laundering activity, see 18 U.S.C.§ 1956.

Although Defendants cite *Wultz v. Islamic Republic of Iran* in support of their motion, its application in fact has the opposite effect than KFF intends. In *Wultz*, proximate causation was found because the complaint "alleged a flow of money *directly* into the coffers of PIJ." 755 F. Supp. 2d 1, 22 (D.D.C. 2010). The Complaint herein shows the same actions as the Complaint in *Wultz*, noting that KFF directly provided funding to the Friends of the Bet El Settlement and the FIDF. KFF officials knew that those recipients would be "unlikely to use wired moneys for any other purpose" besides financing the war crimes alleged in the Complaint, such as maiming and murdering Palestinians. *See Wultz* at 22; Am. Compl. ¶¶ 34, 46, 50.

An application of *Wultz* to the Complaint herein therefore warrants denial of Defendant's Motion. These sections of the Complaint also clearly allege that KFF had the requisite knowledge and actus reus required for both the ATS and ATA claims, despite KFF's attempted

arguments to the contrary. *See* Am. Compl. ¶¶ 34, 46, 50, 96, 100, 117, 138, 171; ("This activity [violations of international law] could not have occurred without . . . the financial assistance provided by" KFF; "All Defendants knew that, without those funds [provided by Defendants], the settlements would have been abandoned thirty years ago."). KFF's arguments that these facts are not adequately pled in the complaint are thus unavailing. Plaintiffs however have demonstrated that these tax-exempt entities finance criminal activities abroad, consistent with the report that the State Department issued in January 2016. *See State Department's Country Report on Terrorism for 2016.*[6]

KFF's repeated arguments against a finding of proximate cause for Plaintiffs' injuries are akin to saying there should be a requirement imposed on the Plaintiffs to trace specific wire dollar transfers to specific physical attacks on innocent Palestinian civilians. That requirement has been repeatedly rejected by our federal courts. *See Strauss v. Credit Lyonnais S.A*, 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013). ("Plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter.") Similarly, it would be impossible to trace specific dollars to specific attacks on our facts. For example, Defendant KFF has been executing wire transfers for at least several decades—that probably means they have sent at least 10,000 wire transfers. But also, while KFF appears to claim it has no control over how their funds are used, failing to control funds sent overseas violates a number of Treasury Department regulations, and IRS regulations, i.e., funds transferred overseas should not fall into the hands of individuals who plan to harm the U.S.

Based on the allegations made herein, a reasonable juror could conclude that the

---

[6] https://www.state.gov/j/ct/rls/crt/2016/index.htm

significant amount of money sent by KFF overseas was a substantial reason belligerent settlers and rogue Israeli army soldiers were able to finance the horrific terrorist attacks described herein in order to rid the West Bank of all non-Jews. In fact, the KFF gave the FIDF $315,000 between 2011 and 2013, and over multiple decades such continued donations would amount to $3,150,000 to the FIDF. *See* Compl ¶ 22. It also would be obvious to any juror hearing this case that an annual subsidy provided by the KFF of $100,000+ to the Bet El settlement quite a staggering sum. *See*, *e.g.*, Am. Compl. ¶ 107.

Besides the amount of the subsidy, another reason why those funds were so crucial is that the Israeli government as of 1992 had prohibited charitable donations to settlements, which cut off a significant source of income. Likewise, Secretary of State Baker was assured by Prime Minister Shamir in 1992 [the Baker/Shamir Accord], that no part of American financial aid would be used to set up new settlements or finance expansion of existing settlements. As is obvious, the Kushner Family has been violating that accord every time they wire money overseas to the Bet El settlements to promote criminal violence. Thus, without the funding from Defendant KFF, the belligerent settlers and rogue Israeli army personnel described in the Complaint would not have a source of funding to: a) properly arm and equip local Israeli militia units; b) afford or conduct training such as that done at sniper schools used to commit the war crimes alleged in the complaint; and c) build vital infrastructure improvements like electric power grids and sewage hookups needed for settlement expansion necessitating the theft of private Palestinian property.

Defendant KFF also relies heavily on the recent case of *Owens v. Paribas S.A.* in its motion to dismiss. *See*, *e.g.*, KFF Mot. Dismiss at 20-21, 24 (citing 235 F. Supp. 3d 85 (D.D.C. 2017)). *Owens*, however, has several very key distinctions *vis-à-vis* the present case, which KFF

fails to point out. The *Owens* Plaintiffs were all U.S. nationals injured in 1998 embassy

bombings who sued defendant banks that allegedly processed financial transactions for terrorist

entities. In *Owens*, the defendant bank BNPP was engaging in bank-to-bank financial

transactions. In the present case, we do not have bank to bank transactions or banks processing

transactions, but rather American 501(c)(3)'s like Defendant KFF who have been directly

funding war crimes. The Court dismissed the *Owens* case because it found that:

> Even assuming that these facts alone establish that BNPP was illegally processing dollar-
> denominated transactions for Sudan between 1997 and 1998, this only establishes
> BNPP's connection to Sudan, not a connection to any terrorist group or terrorist activity
> prior to August 1998—the latter being necessary to show a predicate violation of §
> 2339A or § 2339B.
> …
> Unlike the fronts . . . [Sudan] [is] not merely a funnel of funds to terrorists. [Sudan] [is] a
> recognized sovereign nation with a variety of responsibilities and pursuing a variety of
> interests.

*Owens*, 235 F. Supp. 3d at 92-93 (internal quotation marks and citations omitted). Judge Bates

found that the *Owens* plaintiffs did not allege "that defendants knew the ultimate beneficiaries of

the financial services would be a terrorist organization or terrorist," *Id*. at 22 (internal citation

omitted). Unlike the *Owens* plaintiffs, the Plaintiffs named herein have specifically allege that

Defendant KFF is a "funnel" 501(c)(3) which finances settlements and organizations like the

Israeli Army. They further allege that they use those funds to commit war crimes such as ethnic

cleansing, genocide, and the maiming and murdering of innocent civilians. *See* Am. Compl. ¶¶

96, 100, 112, 114, 117.

Ultimately, Judge Bates dismissed the *Owens* plaintiffs' claims because they did not

allege "enough to sustain a sufficiently direct causal connection between defendants' conduct

and the embassy bombings that injured plaintiffs," holding that the complaint "failed to plausibly

allege that the defendant banks had the necessary *scienter* to support plaintiffs' ATA claims, and

because plaintiffs have failed to allege a sufficient causal connection between the banks' conduct

and plaintiffs' injuries, plaintiffs' complaint must be dismissed." *Owens*, 235 F. Supp. 3d at 23-

24. The Court noted that the "Plaintiffs have alleged very few facts with respect to the time

period between the imposition of sanctions against Sudan in November 1997 and the 1998

embassy bombings." *Id.* at 20.

In the present case, the Plaintiffs have specifically alleged numerous facts to support their

claims, noting the alleged war crimes have not only been occurring for at least the last several

decades, but that they are still ongoing to this day. *See*, *e.g.*, Am. Compl. ¶¶ 125, 131, 145; *see

also* the earlier referenced *State Department's Country Report on Terrorism for 2016*. Indeed,

unlike the *Owens* plaintiffs, Plaintiffs herein specifically allege that KFF is not only a "funnel"

which raises funds in American and then passes the necessary funds on to commit the alleged

war crimes, but that KFF officials specifically knew and had the necessary *scienter* that its funds

were being used to commit the war crimes in order to and subjugate the Palestinian civilian

population by intimidating them through the use of violence. *See* Am. Compl. ¶¶ 50, 68, 96, 100

129, 135. Furthermore, 18 U.S.C. § 2331 defines international terrorism to mean activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the
> criminal laws of the United States or of any State, or that would be a criminal violation if
> committed within the jurisdiction of the United States or any State; (B) *appear to be
> intended—(i) to intimidate or coerce a civilian population . . . and (C) occur primarily
> outside the territorial jurisdiction of the United States...*

(emphasis added). The violations of the laws of nations alleged in the Amended Complaint

(ethnic cleansing, genocide, theft of private property, murdering and maiming Palestinian

civilians, etc.,) certainly fall within the definition of international terrorism as defined in 18

U.S.C. § 2331 above, as Plaintiffs have alleged these war crimes are being committed to

intimidate and subjugate the civilian population of Palestine in order to steal their private

property, expand the settlement enterprise, and ultimately rid the Occupied Territories of all

Palestinians. *See* Am. Compl. ¶¶ 87, 117. Accordingly, these Plaintiffs allege facts that are

wholly different than the facts relied upon by Judge Bates to reject an aiding and abetting theory

in *Owens* (that Defendant bank processed funds in Sudan, and Sudan provided material support

to Al Qaeda), but instead assert that KFF knowingly and directly provided the funds used in the

commission of terrorist activity. *See* 235 F. Supp. 3d at 9-10.

Defendant KFF's use of *Rothstein v. UBS AG* (708 F.3d 82 (2d Cir. 2013)), a case similar

to *Owens*, is also not applicable to the facts alleged in the Amended Complaint. In *Rothstein*, the

defendant bank was dealing with a "truly independent intermediary" to fully process the funds,

the nation of Iran. *Id.* at 19. As noted by Judge Bates in his analysis of *Rothstein* in his *Owens*

opinion, the Plaintiffs failed to allege "a more concrete connection to indicate that Iran did or

was likely to use the money defendants processed to fund terrorist acts, [thus] plaintiffs' injuries

were not necessarily a 'natural' consequence of defendant's conduct." *Owens*, 235 F. Supp. 3d at

19. Again, here we are not dealing with banks processing financial transactions allegedly used to

fund terrorist activities. Here, U.S. based 501(c)(3)'s like Defendant KFF, as clearly alleged in

the Amended Complaint, directly provide funding to belligerent settlers and the Israeli Army,

who are unlikely to use the funds for any other purpose but the commission of war crimes and

terrorist acts as defined under 18 U.S.C. § 2331.

Unlike the ATA claims made against defendant banks in *Owens* and *Rothstein*, Plaintiffs

herein allege that KFF has provided funds to FIDF—a charitable front, AKA "funnel" as alleged

in Amended Complaint—making it foreseeable that the funds KFF sends them would likely be

used in financing of terrorist activity. *See*, *e.g.*, Am. Compl. ¶¶ 95, 96, 100, 107, 112. Thus, there

is a concrete connection between KFF and the Plaintiffs' injuries, which were a direct result of

KFF financing arms trafficking, without which the war crimes complained of herein could not have occurred. Thus, neither *Rothstein* nor *Owens* provide a basis to grant Defendant's motion when compared to the facts alleged herein.

Furthermore, as defined by Judge Bates in *Owens*, a finding of proximate cause under § 2333 "is defined as a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to have been foreseen in light of the circumstances . . . '[a]ny terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda.'" *Owens* at 20 (internal citations omitted). Because of the massive funds sent by KFF to groups like FIDF and settlements like Bet El that build sniper schools to train settlers and purchase sophisticated military equipment like M16s, stun grenades, and sniper scopes used for committing war crimes and subjugating the local civilian populations, the Plaintiffs have clearly alleged in the Complaint both that KFF had the necessary *scienter* to know its funds were being used to finance war crimes and terrorist activities as defined in 18 U.S.C. § 2331, and the funding provided by KFF was the proximate cause of Plaintiffs' injuries.

It is difficult to conceive how any settlement could afford spending $50,000 to $100,000 on a local militia unit. Concrete evidence thereof is provided by the One Israeli Fund. That Fund explicitly stated on its website: "in light of the recent budget cuts that have been made to the IDF and the cut back of checkpoints allocated to protect these communities, the security resources and training that we provide is paramount to the future of these areas." KFF officials have been funding security resources and training, which made it possible for these settlements to be maintained and expand in the last 30 years.

**VII.    The Complaint is Not Predicated Upon Traditional "Acts of War" as Defendants Assert. The Underlying Claim is Based on Fundamental Principals of Tort Law**

Defendant KFF asserts that the ATA claims should be dismissed under 18 U.S.C. § 2336(a), which notes that "[a]n ATA action may not be brought 'for injury or loss by reason of an act of war.'" *Sokolow v. PLO*, 583 F. Supp. 2d 451, 458 (S.D.N.Y. 2008) (*quoting* 18 U.S.C. §2336(a)). As noted by the Court in *Sokolow*, "[i]n pertinent part, 'the term 'act of war' means any act occurring in the course of . . . armed conflict between military forces of any origin." *Sokolow* at 458-59, (*quoting* 18 U.S.C. § 2331(4)(C)). The Defendants in *Sokolow*, as highlighted by the Southern District of New York, made very similar arguments as Defendant KFF at present—primarily asserting "that the persistence of violence, between Israelis and Palestinians in the West bank and Gaza Strip, constitute 'armed conflict,' under the ATA." *Sokolow* at 459.

The Court, however, rejected this argument in *Sokolow*, finding it had subject matter jurisdiction over the case when accepting the allegations in the amended complaint as true. The *Sokolow* Court noted in support of its decision that the "plaintiffs allege that the attacks were intentionally targeted at the civilian population," outlining within the amended complaint the "killing and maiming untold numbers in heavily populated civilian areas. Such claimed violent attacks upon non-combatant civilians, who were allegedly simply going about their everyday lives, do not constitute acts of war for purposes of the ATA." *Sokolow* at 459. Palestinian farmers are clearly non-combatant civilians who are intentionally targeted by irate settlers armed with M16's and sniper scopes.

Moreover, Plaintiffs herein allege the same violent attacks upon non-combatant civilians stemming from arms trafficking, which results in ethnic cleansing, genocide, and other violations of international law—funded by the "charitable" donations of Defendant KFF. *See*, *e.g.*, Am.

Compl. ¶¶ 34, 46, 50, 112, 117, 126, and 128 ("all Defendants have engaged in or financed

'murder, ill treatment of the civilian population in the occupied territory, extermination (Ethnic

cleansing), persecutions based on political, racial, or religious grounds, and wanton destruction

of villages.'") The defense of Acts of War asserted by the Defendant therefore has no application

in terms of barring the Amended Complaint from moving forward, as Plaintiffs do not allege

claims "occurring out of the armed conflict between military forces," but rather a one-sided

attack on innocent civilians and farmers. *See*, *e.g.*, Am. Compl. ¶ 94. These farmers, for the

Court's edification, enter settlements in order to harvest their olive trees, which are now located

in the expanded settlement.

Other Courts have also further defined "[a]n 'act of war,'" as "'mean[ing] any act

occurring in the course of –(A) declared war; (B) armed conflict, *whether or not war has been*

*declared, between two or more nations*; or (C) armed conflict between military forces of any

origin." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1328 (D. Utah 2006) (emphasis added). If this

standard were applied to the Amended Complaint herein, Defendant KFF's arguments would

still fail, as there is no "declared war" against the civilians in the complaint or Palestine, with no

conflict between military forces, but rather attacks by armed belligerent settlers and rogue Israeli

army personnel against the innocent civilian population. *See*, *e.g.*, Am. Compl. ¶¶ 22(ii), 62. The

Motion to dismiss should therefore be denied, as the Plaintiffs' claims are not predicated upon

"Acts of War," as Defendant KFF asserts.

**VIII.    The Act of State Doctrine is Not Applicable to the Case at Bar**

In *Doe v. Exxon Mobil Corp.*, this Court provided a detailed analysis of the

inapplicability of the Act of State Doctrine to facts quite similar to the case at bar. 69 F. Supp. 3d

75 (D.D.C. 2014). As noted by Judge Lamberth, "The type of official act that implicates the act

of state doctrine is that which is 'by nature distinctly sovereign, i.e., conduct that cannot be

undertaken by a private individual or entity . . . An illustrative list of such public acts includes

'pass[ing] a law, issu[ing] an edict or decree, or engag[ing] in formal governmental action taking

[plaintiff's] property.'" *Id.* at 88 (internal citations omitted). The Court's analysis in *Doe* v.

*Exxon* can be applied directly to the Complaint herein:

> No such sovereign public act is at issue in this suit. Plaintiffs do not allege that Exxon's security forces [the belligerent settlers and rogue Israeli Army personnel funded by KFF], while admittedly soldiers in the Indonesian military, injured them pursuant to official policies of the GOI [Israeli government] or orders from military commanders. Indeed, this fact about plaintiffs' allegations is the key point distinguishing these cases from those upon which Exxon [KFF] bases its argument . . . Exxon [KFF] has made no showing that plaintiffs were injured pursuant to official military orders as required by the act of state doctrine. Because Exxon [KFF] possesses the burden of proof as the party invoking the defense, this failure to so demonstrate is fatal to their invocation of the doctrine.

*Id.* (internal citations omitted). The Complaint implicates no Israeli government act that is "by

nature distinctly sovereign." Furthermore, "[i]t is not sufficient under the act of state doctrine

that a court's factual findings would 'impugn' the foreign state's actions; the claims must call for

the invalidation of those actions." *Id*. KFF has not shown that the claims made herein would call

for invalidation of a foreign state's action, as the complaint is not implicating any specific state

actions. As is obvious to this Court, the Israeli government has not yet issued an executive order

that condones and promotes ethnic cleansing, genocide, arms trafficking, and the theft of private

property. As KFF "has made no showing that Plaintiffs were injured pursuant to official military

orders," the Act of State doctrine is not applicable here to bar the Plaintiffs' claims.

Plaintiffs also address the argument that KFF raises in its Amended Memorandum.

Specifically, it posits that the D.C. Circuit did not decide the issue of whether the Act of State

Doctrine applied to that case as another reason that the Doctrine bars Plaintiffs claims herein.

However, that Court did not decide that issue as it was not an issue on appeal in that case.

Furthermore, the lower Court in that case ruled that the Doctrine did not apply to the facts

therein. *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 87 (D.D.C. 2017). Specifically, the Court

found that the Plaintiffs did not sue Israel or Israeli government officials. While the Plaintiffs

have sued Israeli government officials in this case, they intend to dismiss those officials in short

form, and, moreover, KFF is not an Israeli government agency, for example. Again, then, this

Court should not find that the Act of State Doctrine applies as to it.

## IX.    This Court Has Personal Jurisdiction Over Defendant KFF

While it is of course true that for the "Court to maintain personal jurisdiction over KFF,

jurisdiction must be proper under the District of Columbia's long-arm statute and the Due

Process Clause," Defendant's motion to dismiss based on a lack of personal jurisdiction is a

classic red herring argument when one examines the allegations pled in the Amended Complaint.

Defendant's Motion to Dismiss at 38. Not only does KFF "solicit funds in this metropolitan

area," it "sent $315,000 to the Israeli army [via Friends of The Israeli Army] between 2011 and

2013" in order to take "illegal tax write-offs" on IRS income tax forms (the 1040 and the 990)

filed with the IRS based in the District of Columbia. Compl. ¶ 22(ii). As earlier referenced,

without the tax-exempt status provided by the IRS at least 20 years ago, the KFF entity could not

solicit funds in America.

Furthermore, the KFF "and their donors work with AIPAC officials who are located in

this jurisdiction, to *inter alia* preserve the practice of taking illegal tax deductions. They have

also worked with AIPAC officials *in this district* to revise Treasury Department regulations…"

Compl. ¶ 22(iii) (emphasis added). *See also* Am. Compl. ¶ 23 (noting KFF has "solicited funds

in this jurisdiction destined for illegal settlements . . . attended various AIPAC events here; and

d) have engaged in commercial activities with the Treasury Department" in this District, for

example filing for tax exempt status 20+ years ago. *See also* Am. Compl. ¶¶ 7, 9. In addition as already noted, all 501(c)(3)s have to file annual 990 forms with the Treasury Department. That is classic business activity engaged in with a U.S. regulatory body, i.e., the Treasury Department.

Despite Defendant's arguments to the contrary, conspiracy jurisdiction over KFF is fully laid out and pled in the Complaint as well. KFF attempts to argue in a footnote that conspiracy-based jurisdiction is not applicable simply because "Plaintiffs have utterly failed to plausibly allege facts supporting their conspiracy claim," but this is simply untrue. KFF Mot. Dismiss at 39, n. 13; *see*, *e.g.*, Am. Compl. ¶ 21 (describing in detail personal jurisdiction under conspiracy. The elements of a civil conspiracy, as this court knows, have been laid out in the case *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which is cited as respected authority in the JASTA Act); Am. Compl. ¶ 87 (laying out specifically each element of the conspiracy alleged against KFF); and Am. Compl. ¶ 128, "For at least 20 years, Defendant Friedman, FOBI and KFF officials similarly collaborated in financing war crimes by continuing to raise and transfer massive amounts of funds…" Thus, Plaintiffs have in addition adequately pled conspiracy-based jurisdiction over KFF.

## X.   Plaintiffs Have Standing to Bring This Complaint Against the Defendants, Including KFF

The Complaint outlines in great detail the injuries suffered by the Plaintiffs herein, including for example loss of private property and the death of family members. *See* Am. Compl. ¶¶ 13, 19 ("Defendants participated in the denationalization" of the civilian population, injuring every Palestinian Plaintiff); ¶¶ 20, 32 ("Defendants have conspired to forcible expel all non-Jews [the Palestinian Plaintiffs] from the OPT—a conspiracy to remove them from their homes and denationalize them); ¶ 35 (KFF's financing was "intended to cause the Plaintiffs serious physical and mental pain and suffering"); ¶ 37 ("All of the Plaintiffs named herein have been injured by the

aforementioned $2 billion money laundering scheme," with the injuries described above including mental and physical suffering, loss of their homes, and denationalization). As the Court would probably recognize, it is not a coincidence that 400,000 Palestinians no longer live in the Occupied Territories.

In its Motion, Defendant KFF insists that 23 plaintiffs should be dismissed because they "do not allege any particular injuries," arguing that "collective allegations of this nature do not suffice for Art. III standing; rather 'each [Plaintiff must] assert a distinct, individual injury,' *Atkins v. Fed. Election Comm'n*, 101 F. 3d 731, 737 (D.C. Cir. 1996), *vacated on other grounds*." Defendant's Motion to Dismiss at 40. This, however, is a misstatement of the citation, which actually reads: "The number of potential plaintiffs matters not *so long as each can* assert a distinct, individual injury," noting that a plaintiff can "suffer a particularized injury even if all other[s] [so similarly situated] also suffered an injury." *Atkins* at 737 (emphasis added). *See also Public Citizen v. National Highway Traffic Safety Society*, 489 F. 3d 1279, 1293 (D.C. Cir. 2007):

> ([S]tanding is not to be denied simply because many people suffer the same injury.") (internal quotation marks omitted).

> Even those Justices who have embraced a more robust view of constitutional standing requirements have not equated an injury suffered by a number of people to an impermissible generalized grievance. For example, a mass tort inflicts "widely shared" injury, and each victim "suffers a particularized and differentiated harm. One tort victim suffers a burnt leg, another a burnt arm—or even if both suffer burnt arms they are *different* arms. . . .

The injuries alleged by the Plaintiffs are both actual and imminent according to Senior Israeli Air Force Pilot Shapiro He alleges that he works for a terrorist entity, i.e. the Israeli air force, and has been instrumental in committing war crimes. *See* Am. Compl. ¶ 40. Unfortunately, this criminal activity has been ongoing thanks to the financing of the Defendants for 20-30+ years, and is still continuing to this day. *See State Department's Country Report on Terrorism*

*for 2016*; *see also* Am. Compl. ¶¶ 22, 35, 45, 103. As alleged in the Complaint, "As a direct result of the laundered funds" from KFF, they "have been able to commit war crimes with impunity [ethnic cleansing, torture, genocide] for at least 20 years." The Plaintiffs have all therefore properly pled injuries that are both caused by Defendant's actions and still in most cases ongoing as explained already referenced herein. KFF's Motion to Dismiss should therefore be denied, as all of the Plaintiffs have proper standing to sue the financiers of violent criminal activity abroad that has inflicted serious injury upon the Plaintiffs and their relatives.

### CONCLUSION

Based on the authorities cited herein, especially those from this judicial district, *see Biton I and Biton II*, and the detailed allegations contained in the Complaint, this Court has ample precedent to rely on in denying the instant motion to dismiss.

Respectfully Submitted,

May 20, 2019                          /s/ *William R. Cowden*
    Date                             William R. Cowden; Bar #426301
                                     WILLIAM COWDEN LLC
                                     1750 K Street, N.W., Suite 900
                                     Washington, DC 20006
                                     202-862-4360 / 888-899-6053 (fax)
                                     wcowden@cowdenllc.com
                                     *Counsel for Claimant*

### CERTIFICATE OF SERVICE

I hereby certify that on the below-listed date I filed this document with the Court by means of the Court's Electronic Case Filing System, causing it to be served electronically on all counsel of record.

May 20, 2019                          /s/ *William R. Cowden*
    Date                             William R. Cowden