UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MIKO PELED, et. al.,

    *Plaintiffs*

v.                                            CIVIL ACTION
                                               NO. 1:17-cv-00260-RBW

BENJAMIN NETANYAHU, et. al.,

    *Defendants*

## SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSES TO DEFENDANTS' MOTIONS TO DISMISS

COME NOW Plaintiffs who hereby file the following supplemental brief in support of Plaintiffs' prior responses (ECF Dkts. 62-64) to Defendants' amended motions to dismiss (ECF Dkts. 58-60), including Defendants' subsequent replies (ECF Dkts. 67, 70, and 71) and Defendants' subsequent notices of supplemental authority (ECF Dkts. 77-79).

## INTRODUCTION

Pursuant to this Court's Order (ECF Dkt. 109), Plaintiffs put forward the following memorandum of law arguing that Nestle USA, Inc. v. Doe, 141 S. Ct. 1931 (2021) in conjunction with Jesner v. Arab Bank, PLC, 138 S. Ct. 1386 (2017) concretely establish viability of Plaintiffs' claims against U.S.-based defendant corporations. Contrary to Defendants' conclusory two-page filing claiming that Nestle favors dismissal, Nestle establishes unambiguously that U.S.-based corporations who engage in more than "generic corporate activity" – like remaining Defendants in this case – can be held liable for torts under the ATS for violations of international law that take place outside the United States.

1

## BACKGROUND

Plaintiffs are Palestinians and Palestinian-Americans who have suffered serious abuses at the hands of Israeli soldiers and settlers, in conspiracy with U.S.-based remaining Defendants, Kushner Family Foundation (KFF), American Friends of Bet El Institutions (AFBI) and Billet, Feit & Preis, P.C. (BFP). Plaintiffs filed this tort action against Defendants for their complicity in various violations of international human rights law and international humanitarian law pursuant to the Alien Tort Statute (ATS), civil violations of the Anti-Terrorism Act (ATA), and other civil tort theories on February 9, 2017. The violations of law are based around the role Defendants played in a colonial enterprise of displacement, land confiscation, and associated uses of military and paramilitary force to dispossess Palestinian residents of the West Bank, including Plaintiffs, and replace them with Jewish settlers as part of an ideological agenda to colonize the West Bank.

On June 17, 2021, Plaintiffs' then-primary counsel, Martin McMahon, died. Nearly two weeks after Mr. McMahon died, the Supreme Court issued its ruling in <u>Nestle</u>. This landmark ruling reshaped the landscape of ATS litigation, establishing unambiguously that U.S.-based corporations are liable for claims under the ATS, that the presumption against extraterritoriality can be overcome for claims against U.S. corporations pursuant to rule identified in <u>RJR Nabisco, Inc. v. European Cmty</u>, 136 S. Ct. 2090 (2016), and that U.S.-based defendants sued for international torts that took place overseas need only be alleged to have engaged in more than "general corporate activity."

Following the ruling and while Plaintiffs were effectively unrepresented, Defendants filed notices of supplemental authority arguing that <u>Nestle</u> favored dismissal. Defendants' filings were

conclusory and simply indicated that "general corporate activity" is insufficient without any explanation for how such a ruling would benefit Defendants.

## ARGUMENT

### Nestle USA v. Doe I establishes that Plaintiffs' ATS claims are viable, that dismissal at this stage is unwarranted.

Defendants' supplemental filing is as short as it is wrong. According to a two-page notice of supplemental authority filed by AFBE (see ECF Dkt 77) and joined by KFF (see ECF Dkt. 79), Defendants cite the Supreme Court's conclusion that, even accepting that corporate decisions made in the U.S. are the proper focus of ATS-related extraterritoriality analysis, "allegations of general corporate activity – like decisionmaking – cannot alone establish domestic application of the ATS." Nestle, 141 S. Ct. at 1937 (emphasis added). Indeed, decision-making and other general corporate practices alone may be insufficient. But Plaintiffs have alleged far more than that.

**A) Corporate Liability and the ATS**. In Nestle, a majority of the Supreme Court signaled that they do not draw a distinction between corporate and individual liability for tort claims, thereby establishing unambiguously that U.S. corporations – like Defendants -- can be held liable under the ATS, contrary to Defendants' prior filings.[1] Nonetheless, the Supreme Court dismissed Nestle plaintiffs' claims – but for reasons plainly distinguishable from the present case.

---

1  Specifically: Nestle, 141 S. Ct. at 1941 (J. Gorsuch, concurring) ("Nothing in the ATS supplies corporations with special protections against suit...nowhere does it suggest that anything depends on whether the defendant happens to be a person or a corporation") and at 1951 n. 4 (J. Sotomayor, joined by J. Breyer and J. Kagan, concurring) (regarding "whether domestic corporations are immune from suit under the ATS (regardless of the kind of torts for which they are sued)...I would answer this question in the negative. (So would four other Justices.)") and 1950 (J. Alito, dissenting) ("...for the reasons explained in Part I of Justice Gorsuch's opinion...I would hold that if a particular claim may be brought under the ATS against a natural person who is a United States citizen, a similar claim may be brought against a domestic corporation.").

**B) Extraterritoriality and the ATS**. The Nestle ruling was the culmination of sixteen years of litigation between individuals alleging that they were subject to slavery and other horrors in the Ivory Coast at the hand of subcontractors working primarily for U.S. and international cocoa companies, which had effective monopolies in the cocoa industry and were alleged to know and disregard the widespread practice by subcontractors of enslaving Plaintiffs and others, and to continue supplying those subcontractors with funding and technical assistance. The Nestle defendants were alleged to be acting purely in their economic interests, knowing that slavery-based cocoa production was cheaper than fair trade cocoa. In Nestle, the Supreme Court adopted the framework of RJR Nabisco for evaluating the application of extraterritorial ATS claims, officially subordinating the "touch and concern" test of Kiobel to the framework in RJR Nabisco and Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010).

Accordingly, when a statute has no explicit text regarding its extraterritoriality, courts should look to whether the object of a statute's regulation – its "focus" – took place intraterritorially. The Nestle Court explicitly refused to rule on whether the focus of ATS corporate liability claims is on the underlying torts, which took place in the Ivory Coast, or the corporate actions that aided and abetted the underlying torts, which took place in the United States. Instead, the Court ruled that even accepting Plaintiff's viewpoint "that the 'focus' of the ATS is conduct that violates international law, that aiding and abetting forced labor is a violation of international law, and that domestic conduct can aid and abet an injury that occurs overseas," the allegations against the Nestle defendants was an impermissible extraterritorial application of the ATS because those defendants' conduct was "general corporate activity," which the Court likened to "mere corporate presence" in Kiobel. Nestle, 147 St. Ct. at 1936-1937. Rather,

4

"[n]early all the conduct that [Nestle Plaintiffs] say aided and abetted forced labor – providing training, fertilizer, tools, and cash to overseas farms – occurred in Ivory Coast." Id.

The "generic" nature of Plaintiff's allegations of corporate misconduct, which triggered the Supreme Court's ruling, warrants review. Nestle plaintiffs' second amended complaint was originally dismissed by the District Court for Central District of California based on the "focus" test after concluding based on circuit precedent that RJR Nabisco applied to ATS claims. Doe v. Nestle, S.A., Case No. 2:05-cv-05133-SVW-MRW (C.D. Cal. 2017). According to the district court, Nestle defendants' "U.S. based decision-making, provision of funds originating in the U.S., and furnishing additional supplies and training from the U.S." were insufficient to displace the presumption against extraterritoriality where "[t]hese are all activities that ordinary international businesses engage in". Id. at 6. Where these generic actions were the only actions taken by U.S. Nestle defendants within the United States, the district court dismissed for failure to overcome the presumption against extraterritoriality.

The Ninth Circuit reversed, noting that Nestle plaintiffs' alleged that Nestle defendants contributed "personal spending money" to cocoa farms that was "akin to 'kickbacks'" designed to ensure loyalty from farms that were selling cheap cocoa due to the use of slave labor, that these payments were distinct from "ordinary business conduct," and were provided in conjunction with monitoring and inspection by employees from the United States. Doe v. Nestle, S.A., 906 F.3d 1120, 1127 (9th Cir. 2018). Plaintiffs were directed to re-plead their complaint to distinguish both foreign and U.S. defendants pursuant to Jesner and to specify what conduct was specific to which U.S. defendant. Id. at 1128.

5

But before Plaintiffs were able to do this, the Supreme Court granted certiorari.[2] In other words, Plaintiffs were never provided the opportunity to remove non-U.S. defendants and expand their claims against U.S.-based defendants to specify what corporate conduct was linked to what culpable conduct. As such, the Supreme Court's intervening ruling referred only to very generic activities taken from the operative complaint that apply to any corporate defendant, mimicking the Nestle district court's ruling and rejecting the exception created by "kickbacks" in the Nestle circuit court ruling. The Nestle ruling should therefore be interpreted only as a narrow ruling that more than kickbacks are necessary to overcome the "generic corporate activity" bar required to plead an ATS claim.

The Supreme Court's ruling triggered pessimism among some human rights advocates, including one who concluded that the ruling "appears to limit the ATS cause of action to claims against U.S. corporations based on conduct in the United States that goes beyond making decisions about how to conduct operations abroad. There may be cases that fit that description, but they are likely to be few and far between."[3] **This is one of those cases.**

**C) Plaintiffs Allege More than Generic Corporate Activity**. Defendants in this case are not corporations looking solely at their 'bottom line'. They are not corporations who have publicly condemned the underlying war crimes of foreign co-conspirators, even dishonestly. They are not corporations engaging in generic provisions of money or technical assistance that could be misused by other people. Defendants in this case are part of an ideologically-driven conspiracy

---

2   Nestle Plaintiffs argued, unsuccessfully, that the case was not ripe for Supreme Court review because they had not yet re-pled. See Brief for Respondents at 18, Nestle v. Doe, 141 S. Ct. 1931 (2021) (ECF Dkt. 14).
3   William S. Dodge, The Surprisingly Broad Implications of Nestle USA, Inc. v. Doe for Human Rights Litigation and Extraterritoriality, Just Security (Jun. 18, 2021), available at https://www.justsecurity.org/77012/the-surprisingly-broad-implications-of-nestle-usa-inc-v-doe-for-human-rights-litigation-and-extraterritoriality/.

to engage in genocide, war crimes, terrorist activity, and other crimes that render them liable, and fraudulently. There is plainly no interpretation of Plaintiffs' allegations in which Defendants' complicity in the underlying war crimes is at all "generic".

**C.1) Alleged Settlement-Related Activity is Necessarily Criminal**. Nestle defendants were accused of conspiring in crimes that were committed by their subcontractors; the crime of slavery was functionally distinct from the subcontracting parties' cocoa-growing business itself, wherein some cocoa farms did not use slavery and were therefore not complicit in any international crimes.

This is completely untrue of Israeli settlement activity. As alleged in the complaint, the very construction and expansion of settlements themselves, irrespective of the additional criminal actions taken by co-conspirators in furtherance of the settlement enterprise against Palestinian plaintiffs, are unlawful under the laws of nations and U.S., international, and Israeli authorities have long acknowledged this. See, e.g., Compl. at:

- ¶36 (discussing Israeli bans on settlement activities themselves pursuant to Israeli accommodations of international law);

- ¶¶s 71, 75-77, 82 (Israeli prosecutor's report detailing extensive – and illegal – construction of settlement outposts, suggesting criminal prosecution);

- ¶78 (the Israeli government's 1993 ban on settlements pursuant to Israeli court recognition of international law restrictions on settlement activity);

- ¶79 (affirmative steps that the Israeli government took to restrict the activity – and that Israeli settlers, politicians, and U.S.-based conspirators, including Defendants, violated);

- ¶¶s 18, 80 (recognition by then Israeli Foreign Minister that settlements generally are illegal in 1967, from the beginning of Israeli occupation/administration of the West Bank);
- and Compl. at 7 (discussing general legal authorities that ban confiscation of property to build Jewish-only settlements, including U.S. and Israeli war crimes statutes, multiple human rights conventions, the Geneva, Hague, and genocide conventions).

Furthermore, where the Israeli settlement construction activities were inextricably linked with other crimes alleged, Defendants cannot expect the court to arbitrarily distinguish between the settlement construction and expansion activity and the underlying international torts. For example, where the allegations of conspiracy to commit genocide are premised on the simultaneous confiscation of Palestinian land and the replacement of Palestinians with Jewish Israeli settlers, the settlement construction activity is a part of the criminal conduct underpinning the conspiracy. See, e.g. Compl. at 125(c) (discussing the role of settlement activity and land consfication in the deliberate infliction of conditions of life designed calculated to bring about its destruction in whole or in part). The same is true for Plaintiffs' allegations of denationalization and/or apartheid. See, e.g. Compl. at 7, 15 (discussing the role of land confiscation in dividing the territory and walling off and containing Palestinian residents, constituting the offense of apartheid); and ¶ 19, 29, 148 (discussing denationalization and apartheid, in reference to settlement and colonization activity).

Defendants are accused of contributing funds to Israeli settlement-related activity broadly: from providing under-the-table financing for settlement activity to get around the aforementioned Israeli legal restrictions and well as U.S. laws (discussed infra) to paying for "security" or paramilitary services and weaponry involving settlers for the purpose of

accomplishing unlawful ends. See e.g. Compl. at 9-15, ¶44-52, (discussing the various forms of assistance to the settlement enterprise, including encroachment on Palestinian property, paramilitary services, weaponry and military hardware, funding of Israeli entities that engage in the theft of property); ¶95-103, 112, 114 (discussing how laundered funds and accounting advice would assist in the confiscation of land and the use of paramilitary violence for the unlawful purposes of genocide, ethnic cleansing, and other crimes).

Based on these allegations, an illegal Israeli settlement cannot be understood as simply a place or an organization in which the other crimes took place. Rather, the settlement construction/expansion *itself* is an international law violation. That should be contrasted with, say, a factory or farm in the Ivory Coast in which someone may be committing a crime (slavery) but which is not itself part of the criminal enterprise. Hence, the case is distinguishable from other forms corporate liability in which the actions, rather than the enterprise itself, are the limits of the underlying legal violations.

**C.2) Ideological Conspiracy**. Nor are Defendants' actions akin to general business assistance. Where the assistance provided was charitable, Defendants KFF and AFBI had at best only an indirect profit motive. Their motivation was ideological: their underlying support for Israeli settlement expansion. See, e.g., Compl. at ¶49 (discussing AFBI's ideologically-motivated co-conspirators and collaborators who seek to rid the West Bank of Palestinians);¶¶22-23 (Defendants fundraise among people who share their agenda to dispossess Palestinians); ¶50-51, 65 (all Defendants' close collaboration with violent agenda-driven extremists who seek the mass expulsion of Palestinians in their fundraising work); ¶¶109-110 (Defendant BFP specifically serves clientele that share these unlawful motives); ¶ 137 (Israeli prosecutor discusses the

ideological agenda of unlawful Israeli settlement activity and the desire to circumvent existing statutes to accomplish these ends); and at 9 (Israeli prosecutor's report that terrorism financing was not a policy matter but an ideological agenda).

Defendants' political views are, of course, protected speech, irrespective of how violent or discriminatory they may be. However, they are relevant to the inquiry where these views underpinned the nature of the civil conspiracy, in that a conspiracy to commit war crimes, particularly genocide or apartheid, are necessarily ideological ones. The Defendants cannot even put forward half-hearted advocacy materials suggesting they are against the underlying criminal behavior, as Nestle defendants did to imply that they were cracking down on slave labor practices.[4] That is because the unlawful criminal acts are fundamentally part of the ideologically-motivated conspiracy and aiding and abetting activity itself.

**C.3) The alleged funding activities are independently unlawful**. Finally, the activities alleged not only involved the unlawful end of facilitating the listed international crimes, but, as Plaintiffs have alleged, involved the violation of numerous criminal statutes in the United States and Israel independently of the international law violations and/or terrorism financing violations themselves. See Compl. at ¶13 (Defendants' funding activity violated U.S. money laundering statute, bans on financing foreign militia units that carry out war crimes, and ban on conspiracy to injure foreign civilians and their property, 18 U.S.C. §§ 1956, 960, & 371); ¶26 (Defendants' fundraising activities violate the Interstate Travel Act, 18 U.S.C. § 1952); at ¶28 (Defendants defrauded the U.S. government, 18 U.S.C. § 371); ¶¶30, 32 (Defendants were circumventing Israeli restrictions on funding criminal conduct and money laundering); ¶46 (Defendants

---

4   See Brief for Respondents at 6, Nestle v. Doe, 141 S. Ct. 1931 (2021) (ECF Dkt. 14) (discussing Nestle defendant's PR materials implying that the company was cracking down on unlawful labor practices.)

unlawfully gave funds to foreign militias to commit war crimes, 18 U.S.C. § 960); ¶112 (Defendants engaged in money laundering and perjury), ¶162 (tax fraud).

In particular, the complaint alleges that Defendants' funding activities, in conjunction with the legal landscape and context and Defendants' personal knowledge, lend not only to their civil liability but potential criminal prosecution. The violations of money laundering statutes were particularly important: the aim of the conspiracy, as Plaintiffs have alleged, is to provide financing for unlawful activities by Israeli co-conspirators that have been banned by Israeli statutes and government decrees, such as the 1993 freeze on settlement construction and expansion. As such, not only were Defendants' actions illegal, their illegality was a key part of the scheme to get around legal restrictions on Israeli settlement activity and the serious international law violations such activity entails. See, e.g. Compl. at 15, 44. As such, none of the activities alleged can be viewed as "general" corporate activity.

## CONCLUSION

Defendants' motions to dismiss should be denied.

Respectfully submitted this 18th Day of July,

/s/ Amith Gupta
Amith Gupta, Counsel for Plaintiffs
American Trial Law Litigators, LLC
925B Peachtree St. NE, Unit 2151
Atlanta, GA 30309
Tel: (408) 355-5782
amithrgupta+law@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have submitted the foregoing SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSES TO DEFENDANTS' MOTIONS TO DISMISS to the Clerk of Court and all parties via the ECF system.

/s/ Amith Gupta
Amith Gupta, Counsel for Plaintiffs
American Trial Law Litigators, LLC
925B Peachtree St. NE, Unit 2151
Atlanta, GA 30309
Tel: (408) 355-5782
amithrgupta+law@gmail.com