**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

LINDA KATEEB,
MOHMOUD MOHAMMID ALI SHAALAN
MINA ISHAQ
AHMED AL-ZEER
ASHRAF ABU-RAHMA
BASEM IBRAHIM AHMED ABU-RAHMEH
BASSEM AL-TAMIMI
EMAD SHUJAIA,
HIBA BARGHOUTHI,
JAWAD ISSA IBRAHIM SALAMAH AL HOROOB,
JAWAHER IBRAHIM ABU-RAHMEH, and
ABDUR-RAHIM DUDAR

    *Plaintiffs*

    v.

AMERICAN FRIENDS OF BET EL INSTITUTIONS,
KUSHNER FAMILY FOUNDATION, and
BILLET, FEIT & PREIS, P.C.

    *Defendants*

**CIVIL ACTION**
**NO. 1:17-cv-00260 (RBW)**

---

## SECOND AMENDED COMPLAINT

## INTRODUCTION

COME NOW Plaintiffs herein, Palestinians and Palestinian-Americans, who have been directly injured as a result of crimes in violation of international law, acts of terrorism, and other violations of their rights detailed herein, for which Defendants are liable.

Specifically: Plaintiffs are current or former residents of the Palestinian West Bank, which fell under Israeli military rule during the 1967 War. Since at least that time, Israeli settlers, in violation of the laws of nations and/or Israeli law, have conspired to expel Palestinians,

1

including Plaintiffs, from these lands, by seizing or converting their property, constructing property on their lands, and carrying out direct acts of unlawful military and paramilitary violence against them. This violence is carried out directly and indirectly for both financial reward and ideological goals, including replacing Palestinian denizens of the West Bank with ethnic Jewish settlers. The construction of these Jewish settlements and the use of military measures, including movement restrictions, and paramilitary violence against the Palestinian population are unambiguously unlawful.

Defendants, U.S.-based non-profit corporations, joined this conspiracy along with other U.S.-based corporations by laundering and/or otherwise supplying money, estimated to amount in the billions, to Israeli entities to carry out these acts despite their violation of U.S. policy and international law and Israeli law. Defendants are liable for the resulting damages.

**PARTIES**

*Plaintiffs*

1.   Ms. Linda Kateeb was forcibly expelled from her property in the West Bank by armed Israeli settlers assisted by security guards and other gunmen driving heavy construction/destruction equipment. On information and belief, the military hardware and destruction equipment were supplied by Defendants and or their U.S.-based co-conspirators. Her home and other properties were violently confiscated to build a Jewish-only settlement outpost. Ms. Kateeb is Palestinian-American.

2.   Mr. Mohmoud Mohammad Ali Shaalan was sixteen-year-old child when Israeli gunmen, including both armed soldiers and private security guards, extrajudicially "riddled him with bullets" while he was walking near an expansion of the Bet El Jewish-only Israeli

settlement in the West Bank and prevented ambulances from reaching him.[1] On information and belief, the weaponry and security services, as well as the settlement expansion's construction itself, were supplied by Defendants and their co-conspirators. Mr. Shaalan was Palestinian-American. He is represented by his next of kin, his father Mr. Mohamed Ali Shaalan.

3.    Ms. Mina Ishaq is a resident of the West Bank who was forcibly expelled from her private property by armed Israeli settlers assisted by security guards and other gunmen driving heavy construction/destruction equipment. On information and belief, the military hardware and destruction equipment were supplied by Defendants and or their U.S.-based co-conspirators. Ms. Ishaq is Palestinian.

4.    Mr. Ahmed Al-Zeer is a farmer who was cultivating crops on his land near a Jewish-only settlement when Israeli settlers set upon him and violently and viciously beat him, causing a skull fracture, broken bones, bleeding on his brain and other internal bleeding, and resulting in his confinement to a wheelchair. The attack was part of a spate of attacks to drive villagers like Mr. Al-Zeer and other Plaintiffs out of their land. Mr. Al-Zeer is Palestinian.

5.    Ashraf Abu-Rahma is a Palestinian man who was shot at close distance by Israeli soldiers when he was standing near the construction of a barrier to confiscate land and facilitate the building of a Jewish-only settlement near his village in Bi'lin. Mr. Abu-Rahma survived but has permanent injuries. On information and belief, the settlement

---

[1]    See, American Friends Service Committee, "169 Palestinians have been killed by Israeli forces since October. The U.S. has a responsibility to find out why," Mar. 26, 2016, available at https://www.afsc.org/blogs/mahmoud-shaalan (quoting Palestinian Ministry of Health officials regarding the condition of Mr. Shaalan's body).

construction that triggered the military intervention has been financed by Defendants and/or their co-conspirators. Mr. Abu-Rahma is Palestinian.

6. Mr. Basem Ibrahim Abu Rahma was a Palestinian man from the village of Bil'in who was killed when an Israeli soldier fired a tear gas canister directly at his head. At the time, Mr. Abu Rahma was protesting the confiscation of his farmland to create a physical barrier to facilitate the creation of Jewish-only settlements. On information and belief, the settlement construction that triggered the military intervention has been financed by Defendants and/or their co-conspirators. Mr. Abu Rahma was Palestinian. He is represented by his next of kin, Mr. Ashraf Abu-Rahma.

7. Mr. Bassem Al-Tamimi is a villager in the West Bank town of Nabi Saleh. Mr. Al-Tamimi has repeatedly been taken prisoner by Israeli military and private security personnel for his protest activities against a barrier constructed through his village's farm land and the confiscation of farm land in the village to construct Jewish-only settlement homes. He has been tortured while incarcerated by Israeli military and private "security" personnel. Israeli settlers and paramilitary "security" personnel have separately inflicted physical attacks on him repeatedly. Mr. Al-Tamimi is Palestinian. On information and belief, the private security services were paid for by Defendants and/or their co-conspirators.

8. Mr. Emad Shujaia appears on behalf of his 16-year-old son, Qais Shujaia, both of whom are Palestinian. Young Qais was shot in the leg by a settler paramilitary from the Bet El settlement using a sniper rifle. Mr. Qais Shujaia can no longer walk properly and has a permanent disability. As a result of the shooting, Mr. Emad Shujaia suffered extreme emotional distress. Both continue to live in fear that Jewish settler paramilitaries from the

Bet El settlement will attempt to kill Qais or other Shujaia family members again. Mr. Shujaia is Palestinian. On information and belief, the weaponry used to shoot Mr. Shujaia's son was paid for by Defendants and/or their co-conspirators.

9.   Ms. Hiba Barghouthi is the sister of Mr. Abdelrahman Barghouthi. Mr. Barghouthi was walking on the road near the family's shared ancestral village when armed militants associated with a nearby settlement who may or may not have been soldiers shot him in the neck, killing him. Ms. Barghouthi suffered extreme emotional trauma and loss of consortium from the killing of her brother. Ms. Barghouthi is Palestinian. On information and belief, the settlement construction that underpinned this attack and the weaponry used to kill Mr. Barghouti was financed by Defendants and/or their co-conspirators.

10.   Mr. Jawad Issa Ibrahim Salamah Al Horoob is the son of a Palestinian man who was killed while passing a military checkpoint set up to restrict movement to facilitate the confiscation of land by nearby Israeli settlements. Mr. Al Horoob suffered severe emotional distress and loss of consortium as a result. On information and belief, the settlement construction that triggered the military intervention has been financed by Defendants and/or their co-conspirators.

11.   Ms. Jawaher Ibrahim Abu Rahmeh died after inhaling tear gas fired by soldiers near the construction of a barrier on Palestinian land in the village of Bi'in. The barrier confiscates land and facilitates the construction of a nearby Jewish-only settlement colony. On information and belief, the settlement construction that triggered the military intervention has been financed by Defendants and/or their co-conspirators. She is represented by her next of kin, Mr. Ashraf Abu-Rahma.

12.    Mr. Abdur-Rahim Dudar and his family have been expelled from multiple privately-
owned homes by Jewish settler militants associated with multiple Jewish-only
settlements. On information and belief, the weaponry and settlement construction were
financed by Defendants and/or their co-conspirators. Mr. Dudar is a Palestinian-
American.[2]

*Defendants*

13.    Defendants American Friends of Bet El (herein "AFBE") and Kushner Family
Foundation (herein "KFF") are U.S.-based 501(c)(3) non-profit corporations. AFBE and
KFF are two of several dozen U.S.-based non-profits that collect and contribute finances
to unlawful Israeli settlement enterprises for the shared ideological goal of driving
Palestinian residents, unlawfully and violently if necessary, from their lands while
illegally confiscating and converting their properties. AFBE and KFF, in their public
statements and advocacy, indicate their knowledge and shared goals and the intentions
behind their funding operations, operating as a "funnel" for money to enter into the hands
of violent Israeli settlement organizations to carry out crimes against Palestinians,
including but not limited to Plaintiffs.

14.    Defendant Billet, Feit & Preis, P.C. (herein "BFP") is an accounting firm. BFP provides
tax and accounting services to dozens of U.S.-based tax-exempt corporations that funnel
money to Israeli settlement enterprises, including Defendants AFBE and KFF. BFP
provides these services despite knowing they are unlawful, constituting tax fraud.

---

2   Mr. Dudar has indicated his interest in proceeding pro se. This complaint is being filed on
both Defendants and Mr. Dudar for his consent.

## JURISDICTION & VENUE

*Personal Jurisdiction*

15.     Defendants are subject to personal jurisdiction in this Court where they have regularly

visited or otherwise established minimum contacts with this district to raise funds, attend

annual lobbying conferences like the annual American Israel Public Affairs Committee

conference, engage in commercial and fundraising activities, and file for tax-exempt

status, and/or pursuant to 18 U.S.C. 1956(b)(2) (federal long-arm jurisdiction for

individuals engaged in money-laundering transactions across international borders),

and/or pursuant to D.C. Code 13-423 (conspiracy jurisdiction).

*Subject Matter Jurisdiction*

16.     This Court has subject matter jurisdiction over Defendants pursuant to 28 U.S.C. § 1331,

28 U.S.C. § 1350 (The Alien Tort Statute), 18 U.S.C. § 2333 (The Anti-Terrorism Act),

and 18 U.S.C. 1964(c) (Civil RICO Statute).

17.     Plaintiffs also invoke 28 U.S.C. 1367(a), establishing this Court's jurisdiction over all

other claims arising out of the same underlying nucleus of facts.

*Venue*

18.     Venue is proper in this court where Defendants are subject to personal jurisdiction in this

court and where a substantial portion of the events underlying the suit, namely

fundraising activity, lobbying, and attending various political galas and gatherings

pertaining to their activities, and submitting documents to federal agencies took place

within this district.

## BACKGROUND

A) The Settlement Enterprise

19.  In 1967, Israel conquered the West Bank.

20.  Soon after, Israeli Jews began colonizing the West Bank with the construction of civilian

     settlement outposts and the simultaneous military or paramilitary expulsion or restriction

     of Palestinian residents and denizens.

21.  Virtually all legal authorities concluded early on that this practice was unlawful and

     constituted a war crime.

22.  In a 1967 memo, Israeli Foreign Minister Theodor Meron advised that Israeli civilian

     settlement in the West Bank violated international law, and specifically the Geneva

     Convention.

23.  In 1978, the U.S. State Department Legal Advisor, citing the Geneva Conventions,

     concluded "the establishment of civilian settlements in those territories [conquered in

     1967] is inconsistent with international law."

24.  Multiple United Nations Security Council resolutions have explicitly reaffirmed that any

     construction of civilian settlements in territories conquered by Israel are unlawful,

     including:

a)   Resolution 446 (1979) (Security Council, referencing the Geneva Convention,

     "[D]etermines that the policy and practices of Israel in establishing settlments in the

     Palestinian and other Arab territories occupied since 1967 have no legal validity...Calls

     once more upon Israel...to desist from taking any action that would result in changing the

     legal status and geographical nature and materially affecting the demographic

8

composition of the Arab territories occupied since 1967...and, in particular, not to transfer parts of its own civilian population in to occupied Arab territories...");

b)     Resolution 452 (1979) ("The Security Council [referencing the Geneva Convention]...[is] [d]eeply concerned by the practices of the Israeli authorities in implementing [its] settlements policy in the occupied Arab territories, including Jersualem, and its consequences for the local...population");

c)     Resolution 465 (1980) ("The Security Council...[a]ffirming once more [the applicability of the Geneva Convention]...[d]etermines that all measures taken by Israel to change the physical character, demographic composition, institutional structure or status of the Palestinian and other Arab territories occupied since 1967...have no legal validity and that Israel's policy and practices of settling parts of its population and new immigrants in those territories constitute a flagrant violation of the Geneva Convention...[s]trongly deplores the continuation and persistence of Israel in pursuing those policies and practices and calls upon the Government and people of Israel to rescind those measures, to dismantle the existing settlements and in particular to cease, on an urgent basis, the establishment, construction and planning of settlements in the Arab territories occupied since 1967");

d)     And also resolutions 476 (1980), 478 (1980), 1397 (2002), 1515 (2003), and 1850 (2008) reiterating this position.

25.    This legal consensus has remained unchanged since. See, e.g. Advisory opinion of the International Court of Justice on the Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory (2004)  I.C.J 131 (opinion of the International Court of

Justice holding that all Israeli settlement is illegal in 2004); and UN Security Council Resolution 2334 (2016) (reaffirming illegality of West Bank settlements).

26. Non-governmental organizations, including the International Covenant on the Red Cross, Human Rights Watch, Amnesty International, and others have similarly reaffirmed this consensus.

B) The Israeli Settler Movement

27. The Israeli settler movement is an ideologically-motivated movement to populate the West Bank with Jewish civilian settlers for the purpose of creating "facts on the ground" that could force the international community to relent its opposition to the settlements with sheer numbers and thereby establish Israeli sovereignty over colonized West Bank lands.

28. The movement and its leadership hold overtly violent and extremist views about Palestinians motivated entirely by ethnic and religious differences, including calls for violence against them and advocating their forced displacement or ethnic cleansing on the basis of race or religion, issued sometimes from the standpoint of religious authorities.

29. Some Israeli settler movement groups have been designated as terrorist organizations within Israel and/or by the United States for their activities towards this goal, such as the Kahane Chai movement whose member carried out a mass shooting of Palestinian Muslims in the Ibrahimi Mosque in 1994.

30. While Kahane Chai is officially defunct and no longer designated by the United States as Foreign Terrorist Organization because of its defunct nature as of 2021, Kahane Chai

proxies, affiliates, and others coordinating with Kahane Chai elements continue to proliferate among violent extremists in the Israeli settler movement.

31. In the eyes of the Israeli settler movement, the mere presence of Palestinians in the West Bank constitutes a racial or ethnic barrier to establishing Jewish/Israeli sovereignty over the West Bank.

32. As such, the Israeli settler movement seeks the dispossession and expulsion of Palestinians from the West Bank and/or their forced relocation into smaller and smaller cantons of land.

33. But due to the unambiguous illegality of Israeli settlement activity and subsequent measures by Israeli courts and officials to restrict at least some of the Israeli settlement enterprise, the settler movement has been forced to adopt unlawful and violent methods to establish its end goals of Palestinian dispossession and Jewish/Israeli colonization of land, described infra.

C) Israeli Law and Policy on Settlements, 1979-1992[3]

34. Israeli courts and political echelons have issued various restrictions on at least some Israeli settlement activities since the Israeli conquest of the West Bank.

35. At the outset, it is worth emphasizing that all Israeli settlement activity – whether encroaching on private property, regardless of purpose, and subject only to exceptions that hold no applicability to Israeli settlements generally – unambiguously violates international law,  that Israeli courts have instead decided that arguments premised on international law pertaining to the settlement enterprise are not justiciable in Israeli courts

---

3  For a detailed primer on Israeli law and policy regarding the post-1967 settlements, see B'Tselem, By Hook and By Crook (2010); B'Tselem, Land Grab (2003); and B'Tselem, This is Ours – And This Too (2021).

irrespective of their legal validity, and that Israeli court rulings creating exceptions should therefore not be entitled to legal deference.

36.   Nonetheless, exceptions created by Israeli laws, policies, and court rulings are significant in that they indicate that much Israeli settlement activity and associated crimes are unlawful even under Israeli law.[4]

37.   For the first decade of Israeli rule over the West Bank, Israeli settlement activity took place primarily through military requisition orders in which the Israeli army would designate areas for civilian settlement, largely on the basis of a military doctrine – not a legal one – that viewed civilian settlement as a strategic military asset.

38.   In 1979, the Israeli High Court of Justice issued its first major restriction on the Israeli settlement enterprise, ruling that an Israeli settlement built on Palestinian privately-owned land must be returned to Palestinian owners where there was no convincing military necessity for the settlement, thereby officially prohibiting the seizure of privately-owned Palestinian land for settlement construction.

39.   The ruling prompted Israeli settler ideologues to instead rely for settlement purposes on military declarations of land to be "state land" pursuant to Ottoman, British, and Jordanian law and precedent that had governed the West Bank prior to Israeli conquest.

40.   Much of this process involved military bureaucracy, including a "military appeals committee" that barred Palestinian private owners from meaningfully challenging

---

4   For an extensive description of the administrative and (extra)legal history of the Israeli settlement enterprise, see B'Tselem, <u>This Is Ours – And This Too</u> (2021) and <u>By Hook and By Crook</u> (2010).

factually or legally inaccurate designations of their privately owned land as "state land" even when such declarations were plainly erroneous.[5]

41.     Pursuant largely to these "state land" declarations, the number of Israeli settlements and settlers in the West Bank ballooned between 1979 and 1992.

42.     As with all Israeli settlement, including those not necessarily on Palestinian private property, this created a circumstance in which a large number of Israeli nationals with legal and civil protections under Israeli law live in the West Bank amid a Palestinian population that is subject to military rule with no meaningful protection of their land rights, human rights, or general security, including at the hands of Israeli soldiers or settlers.

43.     In 1987, a mass Palestinian uprising ("Intifada") broke out in the West Bank and other Palestinian areas under Israeli rule.

44.     Subsequent U.S. and Israeli government investigations concluded that the expansion of the unlawful settlement enterprise and the suffering it had caused was one of the driving factors behind the uprising.

D) Restrictions on Settlement Activity & Road Map Peace Plan

45.     In 1992, pursuant to the U.S.-brokered peace process, Israeli Prime Minister Yitzhak Rabin and the Israeli government generally issued restrictions on further settlement construction, and the use of "state land" declarations to seize Palestinian land declined.

46.     Israeli legislation blocked the construction of new settlements without official government approval and (officially) restricted financial incentives for settlement,

_____

5   See By Hook and By Crook, supra note 1 at 25-28; and see B'Tselem, Under the Guise of Legality (2012) (generally discussing the use of state land declarations to seize Palestinian land).

making further construction of Israeli outposts illegal not only under international law, but also under Israeli law.

47. At this time, the U.S. government also issued explicit measures to restrict Israeli settler intransigence, including Executive Order 12947 (1995), which prohibited transactions with various Israeli and Palestinian organizations deemed to be terrorists who seek to disrupt the Middle East peace process and also prohibited transactions with individuals determined to "have committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process, or to assist in, sponsor, or provide financial, material, or technological support for, or services in support of, such acts of violence…".

48. Rather than ending their ideological campaign to seize Palestinian land, the Israeli settler movement simply began constructing Israeli settlement outposts illegally.

49. Settlers that are involved in this specific unlawful activity and the associated creation of outposts are Israeli co-conspirators of Defendants in this case, and will herein be described as "Israeli settler co-conspirators".

50. The continued construction of unlawful Israeli settlement outposts continues today.

51. In 2003, following the outbreak of another Palestinian uprising, the Israeli government accepted the U.S.- and United Nations-sponsored "Road Map" peace plan which involved an explicit Israeli commitment to freeze all settlement activity and dismantle all Israeli settlement outposts built after 2001, explicitly premised on the recognition that removing Israeli settlements is a requirement pursuant to international law and UN Security Council resolutions.

52.     Simultaneously, the Israeli government issued informal commitments to the Bush
        Administration that no new Israeli settlements would be built; that construction would not
        be allowed outside "existing construction lines;" that no more land would be expropriated
        for settlement construction; and that Israel would not provide economic incentives to
        settlements.

E) Sasson Report

53.     At roughly the same time, the Israeli Prime Minister's Office commissioned prosecutor
        Talia Sasson to examine the growth of illegal Israeli settlement outposts in the West
        Bank.

54.     Sasson defined an unauthorized outpost to be an Israeli settlement that is established
        without approval by the Israeli government, not on land determined to be state land, not
        subject to a lawful building scheme, or not subject to boundaries determined by an area
        military commander.[6]

55.     Sasson put it bluntly: "unauthorized is illegal."

56.     She continued, "It is absolutely prohibited to establish outposts on private Palestinian
        property. Such an action may in certain circumstances become a felony."

57.     Sasson's report was damning – not only of Israeli settler co-conspirators themselves but
        of the extensive network of ideologues and government functionaries who had enabled
        the wholly illegal colonization of Palestinian land in violation of Israeli and international
        law.

E.1) Illegal Outposts

---

6   Again, these restrictions are only those existing under Israeli law and do not include
    international law authorities which separately establish that *all* Israeli settlement activity is
    unlawful.

58.     Sasson noted the construction of hundreds of illegal outposts.

59.     Per Sasson, the construction of these outposts, particularly those on or encroaching

        Palestinian-owned land, are "a serious prejudice of the right of possession. This right is a

        basic right in Israel – included in Basic Law: Human Dignity and Freedom, and was

        defined by the Israeli Supreme Court as a constitutional right. Israel High Court of Justice

        ruled that the Commander of the area must protect the fundamental rights of the

        Palestinians in [the West Bank] and Gaza. This means he must also protect their right of

        possession. It is the Commander's duty to prevent the intolerable prejudice of

        Palestinians' right of possession, which an establishment of outposts on their property

        causes."

60.     Describing the process by which Israeli settler co-conspirators would build these

        outposts, Sasson writes "The outposts are mostly established by bypassing procedure and

        violating the law, displaying false pretense towards some of the State authorities, and

        enjoying the cooperation of other authorities in harsh violation of the law."

61.     Among the ways Israeli settler co-conspirators would confiscate land include

        "establishing outposts by "expansions" and "neighborhoods" in disguise, within an

        existing outpost. The new outpost is named as the old one, as though it were just a

        neighborhood, even when it is sometimes kilometers away."

62.     The illegal outposts were built not only without government approval despite official

        settlement freezes, but also on land that was Palestinian private property or whose legal

        status and interests were undetermined.

63.     Where illegal outposts are evacuated by the Israeli government, Sasson notes that Israeli
        settler co-conspirators would often return and simply re-occupy the land.

64.     Noting the role of ideologues in this unlawful process, Sasson writes "The "engine"
        behind a decision to establish outposts are probably regional councils in [the West Bank]
        and Gaza, settlers and activists, imbued with ideology and motivation to increase Israeli
        settlement in the [West Bank] and Gaza territories."

E.2) Agency Capture

65.     Though the outpost construction is unlawful under Israeli law, Sasson describes a process
        in which numerous Israeli government officials and bureaucrats were complicit in the
        process by simply disregarding the law: ""A substantial number of outposts were built
        with the involvement of public authorities and State bodies, but with no authoritative
        decision by the Government of Israel."

66.     Sasson writes, "public authorities and other Israeli government bodies...took, along with
        others, a major role in establishing the unauthorized outposts. Some of which were
        inspired by the political echelon, sometimes by overlooking, sometimes by actual
        encouragement and support, but never as a result of an authorized resolution by the
        qualified political echelon of the State."

67.     Of the Israeli Ministry of Construction & Housing, Ministry of Defense's Civil
        Administration, and the Settlement Division of the World Zionist Organization (a public
        authority), Sasson writes "These authorities have legitimate powers regarding the Israeli
        settlement in [the West Bank] and Gaza, but they apparently use their powers unlawfully
        in connection with unauthorized outposts, as to be described."

68.    She continues, "The decision to establish settlements has "dropped one scale", and became a decision made by officials who were not authorized to do so."

69.    Sasson suggests potential legal action against Israeli officials who were complicit in this process.

E.3) Israeli Settler Co-Conspirators Can Involve the Israeli Army

70.    Though Sasson notes that Israeli soldiers have a legal obligation as the ruling military authorities to protect Palestinians and their property rights, Sasson notes that per Israeli security doctrine, "wherever an Israeli is placed in the territories – he should be protected. Thus, IDF soldiers will arrive at any place where someone decided to build an outpost, and protect him...The result is that IDF is unwillingly dragged to give its "seal" to illegal settlements, by being present and protecting the settlers. In its presence, and by protecting law violators, IDF sets the situation, together with these violators. It gives them protection, instead of evacuating them."

71.    Sasson concludes from this that Israeli settlement outposts allow Israeli settler co-conspirators to direct the presence of the military: "Therefore, any settler who places his home wherever he chooses, even if unauthorized and against the law – gains the protection of the army. The outcome is that the settlers are the ones who set the army's deployment in the territories, not the army."

E.4) Secrecy

72.    Given Sasson's conclusions that Israeli officials were complicit in these crimes despite their blatant illegality, it should be unsurprising that Sasson also found that Israeli agencies were not transparent about their role in the illegal outpost enterprise.

18

73.     For example, Sasson notes that despite requesting documentation per her investigation, "in more than a number of occasions I was under the impression that the office or official in charge of the relevant information was not open to deliver it."

74.     In one instance, an Israeli ministry refused to comply even after Israeli Minister Tzipi Livni intervened.

75.     In another instance, Sasson notes that an official admitted to giving her false data.

76.     Notably, Sasson found that Israeli bureaucrats had disguised unlawful funding for Israeli settlement outposts "in order to bypass the absence of a Government resolution to establish outposts."

77.     In other cases, aid was structured "in order to conceal the fact that [the Ministry] is financing building in unauthorized outposts."

78.     Sasson concludes her report by noting that "The reality drawn up in this opinion shows that all of these deeds seriously endanger the principal of the rule of law…A continuing, bold, institutionalized law violation undermined the rule of law."

E) Continuing Settlement Activity

79.     Despite the official commitments and policy of the Israeli state to end the settlement enterprise and make efforts to comply with international law, and the damning nature of Sasson's investigatory report, Israeli settler co-conspirators continue illegally confiscating land.

80.     From 2011 to 2021, for example, some fifty new illegal outposts have been established in the West Bank. See This is Ours – And This, Too, supra note 4 at 42.

81.   The goal of these outposts remains the same: to dispossess the Palestinian population and maximize the number of Jewish Israelis living on West Bank land, through illegal and violent means.

82.   The ideological agenda behind the outposts, their strategic placement, and the pattern of hiding or deceiving the public and other authorities about the nature of these projects indicate that these outposts should not be seen as individual acts of criminality, but part of a larger, singular scheme to colonize the West Bank by Israeli settler co-conspirators.

F) Death, Destruction, and Dispossession

83.   Though it may seem obvious, the harms to Palestinians, including Plaintiffs, from the Israeli settler co-conspirators' unlawful behavior are numerous.

84.   In addition to the confiscation of physical property, Palestinians, including Plaintiffs, suffer extreme violence at the hands of Israeli settler co-conspirators as well as soldiers who, as described by Sasson, above, are dragged into the fray by Israeli settler co-conspirators' unlawful expansion.

85.   Furthermore, the dispossession of Palestinians of their own properties and the settlements' cantonization of their land into smaller and smaller enclaves effectively constitutes ethnic cleansing.

F.1) Physical Violence

86.   The Israeli settler co-conspirators' violence against Palestinians is well-documented.

87.   For example, between January 2020 and September 2021 alone, Israeli human rights organization B'Tselem documented 451 settler attacks on Palestinians and/or their property, including 27 cases involving the use of live ammunition, 180 involving physical

assaults, 145 attacks damaging private property, 77 attacks on homes, and 35 attacks on passing vehicles. B'Tselem, <u>State Business</u> (2021) at 9.

88.    The B'Tselem study documents incidents of settler violence that took place across various parts of the West Bank at the hands of settlers who were involved in establishing illegal outposts. <u>Id</u>.

89.    The study indicates that settler attacks are not always carried out by Israeli settler co-conspirators who actually live in the outposts, but sometimes take place pursuant to calls put out online or elsewhere for fellow zealots to join in campaigns to commit acts of violence.

90.    Forms of violence that was common throughout the Israeli settler co-conspirators' encroachment over years includes attacking Palestinian farmers and villagers with clubs, sticks, axes, and metal rods; using vehicles and UAVs to disperse and scatter Palestinian flocks; setting dogs on Palestinian shephards; burning and cutting down trees and crops belonging to Palestinian farmers; throwing rocks at Palestinian farmers; stabbings; attacking Palestinian water cisterns to make farming unviable and forcing Palestinian farmers to move; threatening Palestinian farmers at gunpoint; and attacking Palestinian drivers on nearby roads. <u>Id</u>.

91.    These typical harms to Palestinian villagers throughout the West Bank who have been affected by the Israeli settler co-conspirators' encroachment are also typical of Palestinian plaintiffs, particularly Mr. Emad Shujaia, Mr. Bassem Al-Tamimi, and Mr. Ahmed Al-Zeer, who have been physically assaulted, maimed, or killed.

92.   Far from preventing or punishing this violence, Israeli soldiers and police fail to intervene to stop Israeli settler co-conspirators' violence.

93.   Israeli soldier testimonies and investigations by independent groups indicate that this is because, as Sasson noted, Israeli soldiers are partial to Israeli nationals and must protect them, acting with an inherent conflict of interest against Palestinians, whom they view as foreign enemy nationals.[7]

94.   In other instances, Israeli soldiers actively take part in violence against Palestinians – consistent with the "security" doctrine Sasson and others have described in which Israeli settler co-conspirators are seen not as violent lawbreakers but as extensions of Israel's military apparatus.

95.   And consistent with Sasson's observation, when Israeli soldiers do intervene, they often do so at the expense of Palestinians by declaring an area to be a "closed military zone" and removing the Palestinian population, even when Israeli settlers' presence is unlawful and the Palestinian presence is not.

96.   On information and belief, this is what happened when Israeli soldiers shot Plaintiff Ahraf Abu-Rahma and killed Plaintiffs Jawaher Abu-Rahma and Basem Ibrahim Abu Rahma and Mr. Abdelrahman Barghouti, next of kin to Plaintiff Ms. Hiba Barghouthi,

---

[7]   For an extensive study on the failure of Israeli military and police to restrict Israeli settler extremists' violence, see Yesh Din, Mock Enforcement: The Failure to Enforce the Law on Israeli Civilians in the West Bank (2015), generally, and at 107-113 (discussing the phenomenon of Israeli soldiers standing idly by as Israeli settlers commit crimes and the close ties between Israeli soldiers and Israeli settlers). See also Breaking The Silence, On Duty: Settler Violence in the West Bank Soldiers Testimonies, 2012-2020 (extensive testimonies of Israeli soldiers indicating that soldiers' personal and communal ties to Israeli settlers, as well as risk of violence to soldiers by Israeli settlers, resulted in soldiers either disregarding or taking active part in Israeli settler violence against Palestinians, or simply removing Palestinians to accommodate Israeli settler encroachment).

while they were present on their own lands in Palestinian villages that were subject to

encroachment by Israeli settler co-conspirators' outposts.

97.     Similarly, it is what happened when Israeli soldiers opened fire and killed the father of

Plaintiff Jawad Issa Ibrahim Salamah Al Horoob at a checkpoint set up near an illegal

outpost.

98.     Because the presence of Israeli soldiers in and around these outposts is not a function of

independent military policy but rather the result of Israeli settler co-conspirators

mandating an Israeli military presence because of their unlawful encroachments, the

resulting violence of Israeli soldiers to restrict, separate, or "manage" the two populations

when they are in close proximity should be seen as an extension of the settler enterprise

itself.

F.2) Property Confiscation

99.     In addition to the terror and intimidation caused by Israeli settler co-conspirators, the

settlements themselves are often built on privately owned Palestinian land.

100.    Because Israeli settler co-conspirators' outposts are built without any legal process at all,

they unsurprisingly ignore when the land they have confiscated for building is privately

owned by Palestinian owners.

101.    A 2006 survey by Israeli peace organization Peace Now concluded that 43 percent of

unlawful outposts were built on private Palestinian property and an additional 7.6 percent

are built on survey lands whose proprietary status is pending. See Nadav Shragai and

Haaretz Correspondent, Peace Now: Most Outposts Partly Built on Private Palestinian

Land, Ha'aretz (2006), available at https://www.haaretz.com/2006-10-20/ty-article/peace-

now-most-outposts-partly-built-on-private-palestinian-land/0000017f-e141-d7b2-a77f-e347e17d0000.

102.   Such unlawful property confiscation describes some of the specific injuries faced by Plaintiffs Mina Ishaq, Linda Kateeb, and Abdur-Rahim Dudar, described <u>supra</u>.

F.3) Cantonization

103.   The construction of these settlement outposts cannot be viewed as individualized encroachments unrelated to each other.

104.   In fact, the settlement outposts are constructed in groups and in a coordinated fashion by the Israeli settler co-conspirators in order to accomplish particular goals with the control of space in the West Bank. <u>See</u>, <u>e.g.</u> <u>This is Ours – And This Too</u>, <u>supra</u> note 4 (Israeli human rights activists meticulously document how the emergence of illegal settlement outposts outside of the bounds of previous constructed Israeli settlements are designed to secure certain strategic areas of land).

105.   By building these outposts in a coordinated fashion in particular areas, Israeli settler co-conspirators can both illegally take over the most fertile areas of land, including Palestinian private property, but also control and restrict traffic corridors, waterways, and other key aspects of daily life among Palestinians.

106.   Enforced through physical violence, terrorism, and the involvement of the military, Palestinians are forced not only out of particular parcels of land but, as a result of the strategic placement of these illegal outposts, are effectively forced out of specific areas entirely due to the loss of access to roadways, water, and the like.

107.   Such forced displacement is consistent with the stated aims of settler ideologues. <u>See</u> <u>This is Ours – And This Too</u>, <u>supra</u> note 4 at 42.

108.   As a result of this practice, Palestinian-accessible and Palestinian-livable areas of the West Bank are reduced to a handful of disconnected cantons, having been forced out of other areas by illegal encroachment.

F.4) Apartheid

109.   As mentioned <u>supra</u> at ¶ 41, the mere presence of large numbers of Israeli nationals protected by Israeli civil law and entitled to the protection of the military as citizens, amid a large number of Palestinians who hold no Israeli nationality, creates a situation of entrenched inequality.

110.   Human rights organizations have long decried this situation. <u>See</u>, <u>e.g.</u> B'Tselem, <u>By Hook and By Crook</u>, <u>supra</u> note 4 at 51 ("[Settlement] produced a situation in which separate legal systems apply to the two populations living in the area – one the Jewish-Israeli population and the other the Palestinian population...In cases of injury to Palestinians, this system...treats leniently settlers who commit a wide variety of offenses, from violent assaults against Palestinians, damage to Palestinian property, and public disturbances, to building offenses and criminal taking of private Palestinian land for the settlers' use, to pollution of the environment. On the other hand, West Bank Palestinians live under an occupation regime and under a military legal system that systematically infringes their rights, including the right to due process. Granting different rights to civilians living in the same territory, based on their national origin, is a blatant breach of the right to equality."). <u>See also</u> Amnesty International, Amnesty International, <u>Israel's Apartheid</u>

Against Palestinians (2022), available at

https://www.amnesty.org/en/latest/campaigns/2022/02/israels-system-of-apartheid/

(discussing Israeli regime of inequality that amounts to international crime of apartheid

throughout the West Bank as well as other areas ruled by Israel), and Human Rights

Watch, A Threshold Crossed (2021), available at

https://www.hrw.org/report/2021/04/27/threshold-crossed/israeli-authorities-and-crimes-apartheid-and-persecution (drawing similar conclusions).

111.   The outposts specifically expand this regime of inequality to new areas of the West Bank
       that have not yet been settled.

112.   The arrival of new encroachments and confiscations essentially extend and entrench the
       system of inequality described above.

113.   Insofar as the Israeli military follows the settlers rather than their own orders as described
       in the Sasson report, the imposition of unequal regimes of law upon Palestinians in newly
       colonized areas is attributable to the settlers.

F.5) Summary of Israeli Settler Violence

114.   Based on the foregoing facts, it should be clear that the Israeli settlement enterprise in
       general, and particularly the rise of the construction of illegal/unauthorized outposts, is
       part of a single criminal conspiracy to encroach upon as much West Bank land as possible
       by Israeli settler co-conspirators in violation of international and Israeli law and in
       furtherance of the stated goals of the Israeli settler movement to change the demographics
       of the West Bank, even through the use of force and violence.

115.   The resulting harms are not limited to the physical confiscation of land, but also the ensuing violence both by Israeli settler co-conspirators who seek to use terrorism in order to maintain their ill-gotten gains or to intimidate and expel Palestinians, and by Israeli soldiers who are dragged into ensuing altercations by settlers' construction of outposts and lack of the ability to act without a conflict of interest in favor of the settlers.

116.   Where Israeli military personnel are involved because of the Israeli settler co-conspirators' encroachment, the violence and suffering is not limited to clashes themselves but the ensuing regime of military-imposed inequality resulting from the inability of Israeli soldiers to act as neutral parties where there is dispute between the Israeli settlers and the Palestinian population.

117.   The harms further extend to not only the direct and immediate consequences of the violence but the long-term restrictions on the conditions of life in the West Bank for Palestinians, resulting in their dispossession, restriction to particular areas as a result of settlement enclosures, or their expulsion altogether.

118.   And whether displaced or not, so long as Israeli settler co-conspirators encroach on their communities, Palestinians are subject to additional violence and unequal treatment at the hands of soldiers enforcing different regimes of law who arrive only to protect the unlawful activities of the settlers based on national origin.

119.   Plaintiffs' various stated harms are typical of these injuries.

G) U.S.-based Co-Conspirators' Involvement

120.   Prosecutor Sasson's report indicated that much of the funding for the settlement

enterprise was disguised to circumvent Israeli law and policy and its (partial) compliance

with international law.

121.   Therefore, it should come as little surprise that much of the financing for these illegal

settlement expansions came from abroad.

122.   These U.S.-based entities, through their actions, indicate an agreed upon goal to further

illegal behavior by Israeli settler co-conspirators.

123.   Indeed, Israeli settlement watchdog groups like Peace Now have noted that foreign (i.e.

non-Israeli) donors are a "pillar of settlement enterprise". Uri Blau, The U.S. Duty Free

Empire That Funds Israeli Settlements, Ha'aretz (Jul. 1, 2019) available at

https://www.haaretz.com/israel-news/2019-07-01/ty-article/the-u-s-duty-free-empire-

that-funds-israeli-settlements/0000017f-efd0-d497-a1ff-efd01c690000.

124.   U.S.-based co-conspirators, violating both U.S. and Israeli law, have funneled billions of

dollars to the Israeli settlement construction and expansion enterprise.

125.   A Ha'aretz investigation concluded that a "network of tax-exempt nonprofits" based in

the U.S. funneled more than $220 million to Israeli settlements between 2009-2013

alone. See Uri Blau, Haaretz Investigation: U.S. Donors Gave Settlements More Than

$220 Million in Tax-exempt Funds Over Five Years, Ha'aretz (2015), available at

https://www.haaretz.com/2015-12-07/ty-article/haaretz-investigates-u-s-donors-to-israeli-

settlements/0000017f-f6bb-d460-afff-ffffd93e0000.

126. The investigation found that at least fifty organizations from throughout the United States are involved in this scheme.

127. A prior investigation by the New York Times in 2010 indicated that at least forty American groups have collected more than $200 Million in donations over the prior decade. Jim Rutenberg, Mike McIntire and Ethan Bronner, Tax-Exempt Funds Aid Settlements in West Bank, New York Times (July 5, 2010), available at https://www.nytimes.com/2010/07/06/world/middleeast/06settle.html.

128. The funding includes providing support to Jewish terrorists.

129. The U.S.-based co-conspirators funnel money for the purpose of armaments for settler extremists.

130. For example, the One Israel Fund, one of the U.S.-based tax-exempt organizations funneling money to the settlement enterprise provided some $960,000 toward "security" funding, including armored vests, security vehicles, guard trainings, and surveillance equipment. Alex Kane, Meet the U.S. Nonprofit That Funds the Israeli Guards Who Terrorize Palestinians, In These Times (2017), available at https://inthesetimes.com/features/one_israel_fund_settlement_guards.html.

131. Other expenditures have gone to guard dogs, bulletproof vests, rifle scopes, and vehicles to secure illegal outposts in occupied areas. See Rutenberg, et. Al, supra ¶ 125.

132. Where the donations do not go directly to armaments, they are directed to organizations and institutions based in the illegal settlements run by violent ideologues, many of whom have been investigated if not prosecuted for incitement by Israel.

133.   Among those who received funding by the U.S. co-conspirator donors are Rabbis Yitzhak Shapira and Yosef Elitzur, authors of a book that argues that the murder of non-Jews is acceptable in times of war. See, e.g. Adam Serwer, The King's Torah, American Prospect (2011), available at https://prospect.org/article/king-s-torah/.

134.   Friends of Zo Artzeinu/Manhigut Yehudit, a U.S.-based tax-exempt organization, funneled $5.2 million to a settlement run by Shumel Sackett, a former head of Kahane Chai, the aforementioned terrorist organization.

135.   Similarly, Shuva Israel, another U.S.-based tax-exempt organization, raised $2.6 million for entities run directly by Israeli settlers, including David Ha'Ivri, a former lieutenant for Kahane Chai.

136.   In other cases, the funding of these organizations goes toward constructing buildings – including those built on privately-owned Palestinian land. See Alex Kane, Tax-Exempt U.S. Nonprofits Fuel Israeli Settler Push to Evict Palestinians, Intercept (2021) (describing multiple U.S.-based tax-exempt organizations that funneled money to settler construction initiatives in and around the West Bank, including several that advertise their intention to take over plots that are currently inhabited by Palestinians).

137.   For example, in 2007, two of the U.S.-based tax-exempt entities directed thousands of dollars to building temporary structures on land wherein Israeli authorities had determined that the structures were not lawful. See Rutenberg, et. Al, supra ¶ 125.

138.   Consistent with Sasson's report on the methods of setting up illegal outposts, many of these U.S.-based organizations contribute funding to setting up yeshivas (schools), even though they are built illegally on non-state land or privately-owned land.

139.   The violent and racist ideology underpinning the conspiracy is laid bare by statements
       from the settler organizations that receive the funds, such as the Israel Land Fund, which
       explicitly boasts that it was set up to in response to "the danger" of "more and more
       Arabs and non-Jews living and owning land". See Defund Racism, Israel Land Fund
       available at https://defundracism.org/israel-land-fund/.

140.   Some of the U.S.-based co-conspirators have been even less transparent than others.

141.   For example, the Capital Athletic Foundation claimed its $140,000 donations to Kollel
       Ohel Tiferet, a religious study group, was for "educational and athletic purposes" when in
       fact a Senate investigation revealed that the money was used to finance a paramilitary
       operation in an Israeli settlement, including sniper rifle equipment and a military vehicle.
       See Rutenberg, et. al, supra ¶ 125.

142.   In a similar case, the Israeli entity Amitz Rescue & Security raised money from two U.S.
       non-profits to buy night-vision binoculars, bulletproof vehicles, and guard dogs. Id.

143.   U.S. co-conspirators fund various aspects of the settlement enterprise, from illegal
       property confiscation and building encroachments to funding terrorists with armaments.

144.   But while the funds are dispersed in different ways by different organizations, the
       underlying purpose is that which the co-conspirators have made clear through their
       actions and public statements, namely the colonization of the West Bank through illegal
       and violent means, not with random outposts but rather outposts arranged in a strategic
       manner to maximize dispossession and using similar methods to avoid detection.

145.   The organizations' minimal efforts to hide their purposes are belied by public organizing,
       fundraising, and outreach that they carried out for donations.

146. For example, many of these pro-settler organizations would meet at galas organized annually by organizations like the American Israel Public Affairs Committee (AIPAC) which took place in this District.

147. Similarly, U.S.-based co-conspirators like the American Friends of Ateret Cohanim hold expensive galas in New York for donors and co-conspirators where speakers made explicit their intention to carve up the West Bank with unlawful settlement colonies built without regard to Israeli or international law.

H) Defendants' involvement in the conspiracy.

148. Defendants are two of the U.S.-based tax-exempt co-conspirators, and an accounting firm that provides accounting services to the remaining Defendants and other co-conspirators.

149. AFBE has donated estimated tens of millions of dollars to illegal settlement-related activities. Judy Maltz, Fund Headed by Trump's Israel Ambassador Pumped Tens of Millions Into West Bank Settlement, Ha'aretz (Dec. 16, 2016), available at https://www.haaretz.com/israel-news/2016-12-16/ty-article/.premium/fund-headed-by-trumps-ambassador-raised-millions-of-dollars-for-settlement/0000017f-df39-d3a5-af7f-ffbfa05c0000.

a) With funding from AFBE and specifically by David Friedman, former AFBE President, settlers in Bet El have illegally constructed a school on Palestinian private property dedicated to Mr. Friedman, where Mr. Friedman's photo hangs in celebration. Id.

b) AFBE gave money to build in the Ulpana neighborhood on privately owned Palestinian land. TOI Staff, Newly approved settler homes financed by Trump's Israel envoy pick –

32

report, Times of Israel (Feb. 8, 2017) available at https://www.timesofisrael.com/newly-approved-settler-homes-financed-by-trumps-israel-envoy-pick-report/.

c)    Among the yeshiva programs connected to the unlawful settlements funded by AFBE are one run by Rabbi Zalman Melamed, a religious extremist and defender of the settlement enterprise who has called on Israeli soldiers to defy orders to remove illegal settlements. Judy Maltz, David Friedman Raised Millions for Radical West Bank Jewish Settlers, Forward (Dec. 16, 2016), available at https://forward.com/news/breaking-news/357324/david-friedman-raised-millions-for-radical-west-bank-jewish-settlers/.

d)    AFBE has donated to Qomemiyut, an extremist group whose leadership seeks the mass expulsion of Palestinians from the West Bank, which is designated as a terrorist organization in Canada, and which is believed to be an extension of Kahane Chai. Ron Kampeas, Charity headed by David Friedman, US envoy to Israel, gave money to extremist group, JTA (May 11, 2018) available at https://www.jta.org/2018/05/11/united-states/charity-headed-david-friedman-us-envoy-israel-gave-money-former-terrorist-group.

e)    Kahane Chai is still listed as threat to the peace process in Executive Order 12947, and remains designated as a Specially Designated Global Terrorist.

f)    AFBE provides funding to Ateret Cohanim, an Israeli extremist organization that builds illegal settlements that have been ordered evicted by Israeli courts. Ronen Medzini, Barkat Delays Beit Yonatan eviction, Ynet (Dec. 26, 2010), available at

https://www.ynetnews.com/articles/0,7340,L-4004729,00.html (Israeli newspaper discusses legal eviction process of Ateret Cohanim settlement).

g)   American Friends of Ateret Cohanim, one of Defendants' co-conspirators that provides aid specifically for Ateret Cohanim, has indicated that donations to Ateret Cohanim are designated for the purpose of providing military equipment. See Judy Maltz, Trump's Israel Envoy Pick Gave Funds to Settle Jews in Muslim Quarter of Jerusalem's Old City, Ha'aretz (Mar. 7, 2017), available at https://www.haaretz.com/us-news/2017-03-07/ty-article/.premium/trumps-israel-envoy-gave-funds-to-settle-jews-in-arab-jlem/0000017f-dc3b-d3ff-a7ff-fdbbeff30000.

h)   On information and belief, AFBE has also given donations to the Hebron Fund, an extremist group that seeks to keep the West Bank city of Al-Khalil / Hebron "in Jewish hands".

i)   AFBE's funding for these illegal products and extremist and/or terrorist initiatives is not accidental, but an extension of Mr. Friedman's stated ideological goals.

j)   In fact, Mr. Friedman has based much of his life in the Bet El settlement, which was originally constructed by military requisition order and has since continued expanding illegally.

k)   Mr. Friedman has spoken vocally about his views regarding settlements, including his support for annexing most of the West Bank. Yuliya Talmazan, U.S. Ambassador David Friedman reportedly says Israel has the right to annex parts of the West Bank, NBC News (June 8, 2019) available at https://www.nbcnews.com/news/world/u-s-ambassador-david-friedman-says-israel-has-right-annex-n1015436.

l)      In separate statements he has suggested that Jewish groups that seek a two-state solution – by restricting settlement activity – are worse than Jews who collaborated with the Nazis. Richard Lardner, <u>David Friedman confirmed: Man who said liberal Jews worse than Nazi collaborators to be US ambassador to Israel</u>, The Independent (Mar. 23, 2017) <u>available at</u> <u>https://www.independent.co.uk/news/world/americas/us-politics/donald-trump-latest-david-friedman-us-ambassador-israel-jewish-nazi-collaborators-settlements-palestinians-a7647031.html</u>.

m)      On information and belief, discovery will reveal other extensive ties between AFBE and illegal activities involving settlement expansion and violence motivated by the shared agenda of displacing Palestinians.

n)      AFBE's funding of individuals involved in, supportive of, or likely to engage in terrorism, its support for the confiscation of land, and its close ideological ties to others indicate that these donations are not incidental but part of a shared ideological agenda for the shared goal of illegally colonizing the West Bank.

150.    Similar to AFBE and other U.S.-based tax-exempt co-conspirators, KFF has sought to similarly expand illegal settlement activity.

a)      Among others, KFF has donated thousands of dollars to AFBE for the purpose of financing illegal settlement activities. Judy Maltz, <u>Kushner Foundation Donated to West Bank Settlement Projects</u>, Ha'aretz (Dec. 6, 2016), <u>available at</u> https://www.haaretz.com/israel-news/2016-12-06/ty-article/.premium/kushner-foundation-donated-to-west-bank-settlement-projects/0000017f-f856-d318-afff-fb772f540000.

b)  The donations included support for the Od Yosef Chai yeshiva, which served as a base for launching attacks on Palestinian villagers as well as Israeli security forces. Id.

c)  In total, the Kushner Family Foundation has donated hundreds of thousands of dollars – at least – to radical and extremist Israeli settler co-conspirators' activities in the West Bank.

d)  Jared Kushner, KFF's former director from 2006 to 2015, has concealed his involvement in the Foundation's activities while working with the Trump Administration's Middle East diplomatic team, violating ethics rules. JTA, Kushner did not disclose heading of foundation that funded settlement projects, Jerusalem Post (Dec. 5, 2017), available at https://www.jpost.com/American-Politics/Kushner-did-not-disclose-heading-of-foundation-that-funded-settlement-projects-517034.

e)  The Foundation's lack of transparency, a pattern related to illegal settlement funding noted by prosecutor Sasson and common to other U.S.-based co-conspirators, indicates that additional information about the scope of KFF's donations and involvement in unlawful activities may surface during discovery.

f)  Nonetheless, KFF's donations to AFBE for the same purposes as AFBE and its involvement in supporting particularly radical and extremist initiatives even among the settlers, such as Od Yosef Chai, indicates that KFF shared the unlawful goals and aims of other co-conspirators in financing unlawful settlement activity.

151. BFP is an accounting firm that assists the other Defendants and, on information and belief, dozens of other U.S.-based tax-exempt entities, mislead federal authorities by

assisting them in obtaining tax-exempt status by claiming to function as charitable entities when in fact they are financing unlawful activity.

152.   BFP would assist other U.S.-based entities, including the other Defendants, in filing 990, 1040, and other forms with the IRS and U.S. Treasury affirming that their activities were charitable and lawful.

153.   BFP thereby assisted these organizations not only in funneling money but in obtaining favorable tax incentives.

154.   BFP's clientele base of U.S.-based settler-funding non-profits indicates that their services to Defendants and others were not coincidental, and that in fact BFP has set up a practice of assisting U.S.-based entities in laundering funds for illegal settlement-associated activity.

155.   This type of clientele indicates that BFP knew that it was assisting in unlawful money laundering for the purpose of committing the underlying crimes.

156.   All Defendants have either submitted their own 1040, 990, and other documents or submitted such documents belonging to other co-conspirators to the federal government to obtain tax-exempt status.

157.   All of the Defendants have solicited donations and/or clients throughout the United States.

158.   They have done so by e-mailing, texting, calling, and otherwise soliciting donors to attend galas and other conferences for the purpose of networking and finding additional donors.

159.   They have done so across state lines.

160.    In the process of taking part in this conspiracy, Defendants have violated multiple U.S. and Israeli criminal laws.

161.    Specifically, they have violated:

a)    18 U.SC. § 2339, the Justice Against State Sponsors of Terrorism Act, and Executive Order 12947, prohibiting support for terrorism generally and support for individuals and groups dedicated to disrupting the U.S.-brokered Middle East Peace Process specifically, by taking part in the conspiracy described above.

b)    18 U.S.C. § 1952, banning interstate travel to promote unlawful activity, by soliciting donations for this unlawful conspiracy across state lines.

c)    18 U.S.C. § 1956, banning money laundering, by collecting money for "pass through" entities designed to finance unlawful activity.

d)    18 U.S.C. § 960, which bans U.S. citizens from financing foreign militia units, by financing the purchase of weaponry and other military hardware as described above.

e)    18 U.S.C. § 956, which bans any conspiracy to injure foreign civilians or their property, by taking part in the conspiracy described above.

f)    18 U.S.C. § 922, which bans arms trafficking, by financing the purchase of weaponry for unlawful purposes.

g)    18 U.S.C. § 1621, which bans perjury, 26 U.S.C. § 7201, which bans tax evasion, and 18 U.S.C. § 371, which bans attempts to defraud the U.S. government, by lying on tax returns that their donations were for legitimate tax-exempt charitable purposes rather than unlawful purposes.

h)    Laws 5760-2000 and 5763-2003, Israeli laws which respectively ban money laundering and ban the financing of felony offenses such as arson, arms trafficking, and other conduct that independently violates Israeli criminal statutes, by financing the aforementioned activities despite the illegality of raising funds for these purposes in Israel.

i)    Israeli settlement laws as described above in Prosecutor Sasson's report, by financing the construction of illegal settlements and the dispossession of Palestinians.

162.    This criminality has been noted by members of Congress, who have requested that the Secretary of the Treasury re-examine U.S.-based co-conspirators tax-exempt status, including AFBE's. See Exhibit A.

## CLAIMS FOR RELIEF

**Count I: Civil Conspiracy to Commit and Aiding Abetting the Commission of International Law Crimes, Against All Defendants.**

163.    Plaintiffs repeat and re-allege as if fully recited herein the allegations pled in paragraphs 1-160.

164.    Defendants have a legal obligation not to commit, conspire to commit, or aid and abet the commission of international law violations.

165.    A civil conspiracy exists where two or more people agree to participate in an unlawful act or a lawful act in an unlawful manner, resulting in an injury caused by the overt unlawful act by one of the parties to the agreement.

166.    Aiding and abetting liability exists where the party whom the accused aids performs a wrongful act that causes an injury, where the accused is generally aware of their role as

part of an overall illegal or tortious activity at the time of providing the assistance, and the accused knowingly and substantially assists the principal violation.

167.   Among the international crimes for which Defendants have a legal obligation not to commit, conspire to commit, or aid and abet the commission of, are:

a)   Genocide.

i   The International Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), codified by federal statute via 18 U.S.C. § 1091, and the Rome Statute, Article 6, define genocide to mean committing any of the following acts, among others, with the intent to destroy, in whole or in part, a national, ethnical, racial or religious group:

ii   killing members of the group;

iii   causing serious bodily or mental harm to members of the group;

iv   deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part.

b)   Apartheid.

i   The Rome Statute defines the crime of apartheid to mean inhuman acts "of a character similar to those referred to in paragraph 1" committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime.

ii   Acts in "paragraph 1" include: "murder; extermination;...deportation or forcible transfer of population;...imprisonment or other severe deprivation of physical liberty in violation

of fundamental rules of international law; torture...persecution against any identifiable group or collectivity on...racial, national, ethnic, cultural, religious...or other grounds that are universally recognized as impermissible under international law, in connection with any act in this paragraph or any crime [under the Rome Statute].

iii   Similarly, the International Convention on the Suppression and Punishment of the Crime of Apartheid ("Apartheid Convention") defines the crime of apartheid to include the following acts committed for the purpose of establishing and maintaining domination by one racial group of persons over any other racial group of persons and systematically oppressing them:

- (a) denial to a member or members of a racial group or groups of the right to life and liberty of person by murder of members of a racial group or groups; by the infliction upon the members of a racial group or groups of serious bodily or mental harms; by the infringement of their freedom or dignity, or by subjecting them to torture or to cruel, inhuman, or degrading treatment or punishment; by arbitrary arrest and illegal imprisonment of the members of a racial group or groups;

- (b) deliberate imposition on a racial group or groups of living conditions calculated to cause its or their physical destruction in whole or in part…

- (d) any measures...designed to divide the population along racial lines by the creation of separate reserves and ghettos for members of a racial group or groups…the expropriation of landed property belonging to a racial group or groups or to members thereof.

c)   Torture and/or Cruel, Inhuman & Degrading Treatment.

i        According to The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment  ("Torture Convention"), prohibiting torture, torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating and coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

ii        Common Article 3 of the Geneva Convention prohibits "cruel treatment and torture" and Article 147 defines "torture or inhuman treatment" as a "grave breach" of the Geneva Convention.

iii        The International Covenant on Civil and Political Rights states "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

d)        Killing: Common Article 3 of the Geneva Convention prohibits "violence to life and person, in particular murder of all kinds".

e)        Maiming: Common Article 3 of the Geneva Convention prohibits "mutilation" and Article 147 defines "wilfully causing great suffering or serious injury to body or health" as a grave breach of the Geneva Convention.

f)        Forcible transfer of populations

i       Article 49 of the Geneva Convention forbids "individual or mass forcible transfers, as well as deportations of protected persons from occupied territory to the territory of the Occupying power or to that of any other country, occupied or not" regardless of motive.

ii     Article 147 defines "unlawful deportation or transfer or unlawful confinement of a protected person" as a grave breach.

iii    The Rome Statute similarly prohibits "deportation or forcible transfer" defined as "forced displacement of the persons concerned by expulsion or other coercive acts from the area in which they are lawfully present, without grounds permitted under international law."

g)    Confiscation of property

i       Article 33 of the Geneva Convention prohibits "pillage" and "reprisals against protected persons and their property," while Article 53 states "Any destruction by the Occupying Power of real or personal property belonging individually or collectively to private persons, or to the State, or to other public authorities, or to social or co-operative organizations, is prohibited…"

ii     Article 147 of the Geneva Convention defines "extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly" as a grave breach of the Geneva Convention.

iii    Further, the Rome Statute prohibits "destroying or seizing the property of an adversary" except due to military necessity.

168.   The activities of Israeli settler co-conspirators as alleged _infra_ constitute the above-mentioned international law crimes against Palestinians, including Palestinian plaintiffs, as summarized herein:

a)   Genocide

i   Plaintiffs have straightforwardly alleged how Israeli settler co-conspirators have killed members of the Palestinian community, including Plaintiffs, caused severe bodily or mental harm to the Palestinian community, including Plaintiffs, through physical violence and terrorist intimidation.

ii   Plaintiffs have also alleged that Israeli settler co-conspirators have inflicted conditions of life calculated to bring about the group's destruction, such as by destroying farmland, water cisterns, and otherwise causing closures and military altercations making day-to-day life impossible for Palestinians.

iii   These acts have been carried out for an explicit ideological agenda that involves the displacement of as many Palestinians as possible, thereby constituting the requisite intent.

b)   Apartheid

i   Plaintiffs have alleged that Israeli settler co-conspirators act with the intention of establishing Israeli/Jewish sovereignty over the lands in question, even if Palestinians are denationalized, expelled, or subject to other indignities in the process.

ii   Plaintiffs have therefore properly alleged that Israeli settler co-conspirators carry out the predicate acts of Apartheid (below) with the requisite intent of acting "for the purpose of establishing and maintaining domination by one racial group...over another".

iii   Plaintiffs have also identified multiple requisite predicate crimes for this purpose, including:

- murder (see below);

- forcible transfer (see below);

44

- arbitrary arrest and illegal imprisonment (see below);

- torture and or cruel, inhuman or degrading treatment (see below);

- the expropriation of landed property belonging to a racial group (see below);

- infliction upon the members of a racial group of serious bodily or mental harms (see Genocide section, above; and maiming section, below);

- deliberate imposition...of conditions calculated to cause a group's destruction in whole or in part (see Genocide section, above);

- measures designed to divide the population along racial lines by the creation of separate reserves and ghettos, as through cantonization.

iv      Where Israeli settler co-conspirators have intentionally dragged Israeli soldiers into areas of the West Bank to impose unequal rule for the stated aim of dispossessing or displacing Palestinians, and they have committed the underlying predicate offenses listed above, those settlers are responsible for committing the crime of apartheid.

c)      Torture and/or Cruel, Inhuman & Degrading Treatment, Arbitrary Arrest

i       Plaintiffs have alleged that Israeli settler co-conspirators have engaged in conduct amounting to torture where they have violently beaten and even kidnapped and held Palestinians without justification.

ii      While not all legal authorities require consent or acquiescence of public officials for conduct to constitute torture, Plaintiffs have nonetheless established that Israeli authorities are unwilling or unable to intervene in the commission of torture / CIDT.

d)      Killing, Maiming

i        Plaintiffs have straightforwardly alleged how Israeli settler co-conspirators actions

         constitute killing and maiming.

e)       Forcible Transfer of Populations

i        Plaintiffs allege Israeli settler co-conspirators' role in forcible transfer of populations

         where, in addition to explicit calls for expulsion and dispossession, they have taken

         measures designed to make life for Palestinian residents intolerable or, more directly,

         taken measures resulting in closures and restrictions of movement either themselves or by

         involving the military, resulting, in the forced displacement of Palestinians.

f)       Confiscation of Property

i        Plaintiffs have straightforwardly alleged the confiscation of private property from

         Palestinians, including Plaintiffs, as well as the effective confiscation of property through

         attacks and disruptions to farming and agriculture.

169.     Defendants conspired to commit these international violations.

a)       The agreement to conspire with Israeli co-conspirators to carry out these acts can be

         inferred from the pattern of fundraising, its consistency with the unlawful methods

         described by Prosecutor Sasson, the shared ideological purposes it served, the way the

         funds were used (for illegal building; for weaponry), the fact that at least some direct

         recipients were openly violent (Od Yosef Chai), extremist (Hebron Fund, Ateret

         Cohanim), or outright terrorist organizations (Qomemiyut / Kahane Chai), and the fact

         that the settlement outposts financed were not located in random places but in particular

         areas to accomplish the particular goals of the conspiracy.

b)      The acts that Defendants agreed to commit were unlawful (financing international violations and other acts that violated U.S. and Israeli law) or lawful but carried out in an unlawful manner (setting up charities that are nominally legitimate but that launder money for the commission of international law violations and other violations of U.S. and Israeli law).

c)      Those crimes that are not inherent in the process of confiscating land were nonetheless foreseeable given the nature of the settlement enterprise and its illegality, and were carried out in furtherance of the conspiracy.

d)      These acts resulted in the harms discussed infra.

170.    Defendants aided and abetted these international law violations.

a)      Defendants provided financial aid to Israeli settler co-conspirators for their wrongful act of confiscating land and associated violent acts that constitute the above-mentioned international law violations.

b)      Defendants were plainly aware of their part of an overall illegal and tortious activity where the primary reason explaining extensive U.S.-based funding for these specific Israeli entities was because such fundraising had been outlawed in Israel, and where the settlement activities in question openly embraced by Defendants based on their shared ideological agenda.

c)      The Defendants' aid substantially assisted the principal violation where without such aid, the illegal settlement enterprise would likely be unable to expand, let alone as significantly as it has, or commit the violent acts in furtherance of the conspiracy that they did.

171.   These actions have resulted in the damages to Plaintiffs described <u>supra</u>.

### Count II: Violations of Anti-Terrorism Act, Against All Defendants

172.   Plaintiffs repeat and re-allege as if fully recited herein the allegations pled in paragraphs 1-169.

173.   Defendants further have a legal obligation not to take part in international terrorism against U.S. nationals that result in injury to those nationals' person, property, or business. 18 U.S.C. § 2333(a).

174.   "International terrorism" includes activities that –

a)   "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any state;"

b)   "appear to be intended to intimidate or coerce a civilian population; influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction, assassination or kidnapping;"

c)   "and occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1).

175.   Defendants' activities constitute "international terrorism" where:

a)   they "involve" acts that are a violation of U.S. criminal laws, namely laws against murder, battery, property confiscation, forced expulsion, torture, other legal prohibitions restricting violence against persons and property, the violations of international law listed

48

in Count I that are also codified in U.S. law, and U.S. laws listed in ¶ 159, and Executive Order 12497;

b)      the activities are intended to intimidate or coerce a civilian population, namely the Palestinian population of the West Bank, including but not limited to Palestinian and Palestinian-American plaintiffs;

c)      the activities are intended to influence the policies of governments, namely the State of Israel, the United States, and the Palestinian Authority, through the confiscation of land to undermine efforts to enforce international law and the peace process, as discussed supra;

d)      and where the activities transcend national boundaries by virtue of their international transfers of funds.

176.    Defendants and their co-conspirators are directly liable under the Anti-Terrorism Act where their financing acts were a substantial factor in permitting the growth and expansion of the illegal settlement enterprise and associated violent activities, described supra.

177.    Furthermore, Defendant AFBE is secondarily liable under the Anti-Terrorism Act where it donated money to a proxy for Kahane Chai, a designated Foreign Terrorist Organization (FTO).

178.    Furthermore, where affiliates, proxies, and collaborators of Kahane Chai exist throughout the unlawful settlement outpost enterprise, and violent settler attacks are carried out in a coordinated fashion across and between settlements, Plaintiffs plausibly allege that other violent attacks carried out by other settler extremists funded by Defendants and their co-

conspirators can be attributed to Kahane Chai, and therefore to AFBE's secondary liability.

179.   Plaintiffs' harms, described in depth <u>supra</u>, are the result of Defendants' support for terrorism and Defendants are liable for the resulting damages.

**Count III: Participation in Racketeer-Influenced and Corrupt Organizations Act (RICO) Violations under 18 U.S.C. § 1962(c), Against All Defendants.**

180.   Plaintiffs repeat and re-allege as if fully recited herein the allegations pled in paragraphs 1-177.

181.   Plaintiffs include this Count in this Complaint based on § 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which confers a private right of action on any person injured in his or her business or property by reason of a violation of § 1962 of RICO.

182.   The RICO violation itself is the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The pattern of racketeering activity in this instance was comprised of:

a)   money laundering by means of the intentional international transfer of funds for the purpose of committing various specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2);

b)   mail fraud by using the mail to defraud the U.S. government of tax revenue through false statements on 990, 1040, and other tax forms in violation of 18 U.S.C § 1341;

c)   wire fraud by using the wires to defraud the U.S. government of tax revenue through false statements on 990, 1040 and other tax forms in violation of 18 U.S.C. § 1343;

d)   murder, arson, interference with commerce, monetary transactions in property derived from specified unlawful activity, use of interstate commerce to commit murder-for-hire, mayhem, and the intentional infliction of physical violence in violation of 18 U.S.C. § 1961(1).

183.   The RICO enterprise was an association-in-fact composed of all Defendants herein.

a)   Common purpose:

i   The Defendants named herein all fully expected that the results of rendering financial assistance to illegal settlements would result in violent and unlawful activities perpetrated on the Palestinian population, forcing them or pressuring them them to abandon their homes and livelihoods; and generate substantial revenues for all concerned in the process.

b)   Relationships among the members:

i   The Defendants named herein all have an abiding interest in promoting the settlements named in this complaint, which means annexing Palestinian property and engaging in ethnic cleansing through violence.

ii   With these common goals in mind, they have communicated with each other by telephone, fax, email, and texting.

iii   In America, they all host and/or attend fundraising events such as the one held annually by the American Israel Public Affairs Committee.

iv   At all relevant times they each knew what particular settlement and what particular illegal activity, each individual or entity has the intention of funding.

v   For example, AFBE concentrates on funding illegal settlement activities associated with the Settlement of Bet El.

vi      On the Israeli side, the same pattern holds true with the different settler organizations having their officials discuss common interests, for example expulsion of the Palestinian population, annexation of homes, expansion of settlements, construction of housing developments by the international conglomerates, protection and arming of the settlers all paid for with laundered funds.

c)      Longevity:

i       These Defendants, for years, have engaged in activities including money laundering, and violated Treasury regulations governing tax-exempt entities.

ii      The donors and these entities have abused these regulations, which allows the Treasury to rescind their tax-exempt status.

iii     Besides engaging in money laundering, they have conspired for years to defraud the IRS, see 18 U.S.C. § 371, by taking illegal tax write-offs and engaging in illegal activities including money laundering, i.e., providing settlers with military hardware.

184.    The Defendants are individuals or entities capable of holding a legal or beneficial interest in property, and as such constitute "persons" within the meaning of 18 U.S.C. § 1961(3).

185.    This association-in-fact is today and has at all relevant times been a corrupt organization that has participated in a pattern of racketeering activity by knowingly engaging in international money laundering and violating U.S. and Israeli laws and Treasury regulations governing tax-exempt entities.

186.    All of the Defendants named herein participated in the conduct of the affairs of this enterprise.

187. The predicate criminal activity required by RICO initially started when the Defendants first transferred money to Bet El and other West Bank settlements.

188. The Defendants donate with the intent that funds will support and promote the violent expulsion of the local Palestinian population (ethnic cleansing) and other criminal activity, including the annexation of private Palestinian property and trespass thereon, and the attendant violence that has ensued.

189. All of the Defendants named herein did engage in the aforementioned criminal activities knowing that the tax-exempt entities and Israel-based recipients of this funding would use that money to support settlements in the West Bank.

190. The Defendants knew that these settlements were unlawful.

191. Defendants knew at all relevant times that they were funding settlements, and by doing so contravened Israeli government pronouncements and Israeli High Court of Justice opinions.

192. They knew the funds would encourage the confiscation of private Palestinian property, and provide the financial means to assure the settlers that they could trespass, convert, and occupy private Palestinian property without legal repercussions.

193. Defendants furthermore knew that their donations would be used to arm and encourage settlers to seize more private property, which would lead to further conversion of Palestinian property, more violent clashes with local unarmed Palestinian farmers and homeowners, and the dispatching of soldiers and paramilitaries to "protect" the converted property, new houses, and the settlers and their families.

194. This activity results in the inevitable injury and death of more Palestinian citizens and the confiscation of more private Palestinian property.

195. Every similar instance of donation thereafter engaged in by the association-in-fact was a transaction making up a multi-year pattern of racketeering activity up through the present.

196. Every member of the association-in-fact engaged in the aforementioned racketeering activity by participating in raising and transmitting funds to recipients based in Israel who would use those funds to engage in illegal activity as described herein.

197. The tax-exempt entities' role in the racketeering activities was to receive funds earmarked for illegal activities from donors and to distribute the funds to various entities in the settlements.

198. This activity results in the systematic destruction of Palestinian homes,  appropriation of Palestinian lands and olive orchards, and violent restriction of Palestinians' mobility and activities in general designed to destroy the existing infrastructure in the OPT.

199. The Plaintiffs were the victims of the racketeering activity engaged in by the association-in-fact, all of whom have suffered injury and damages as detailed infra.

200. At all relevant times herein, the Defendants named in this count knew that this pattern of racketeering activity would lead to the injury and death of Palestinian citizens engaged in various income-producing endeavors, the destruction of valuable private business property, and the expropriation of Palestinian agricultural property, which provided the sole livelihood of many of the victims, including the Plaintiffs named in this lawsuit.

201. The Plaintiffs herein have suffered business damages as defined in § 1962 in that they lost farmland and real property which were the main sources of business income for the Palestinian population.

202. The acts undertaken by Defendants named herein served to further the pattern of racketeering activity already described herein.

203. But for the Defendants' participation in the aforementioned illegal activities, including the racketeering activity of money laundering in violation of 18 U.S.C. §1962(c), Plaintiffs would not have suffered the aforementioned business damages.

204. The injuries suffered by the Plaintiffs were reasonably foreseeable and/or anticipated by the Defendants as a natural consequence of the Defendants' acts.

205. The Plaintiffs named herein have sustained business damages in the sum of at least $10,000,000.

**Count IV: Negligence, Against Defendant BFP**.

206. Plaintiffs repeat and re-allege as if fully recited herein the allegations pled in paragraphs 1-203.

207. Defendant BFP's principals not only owed a duty of care to their clients to render accurate professional advice, but to any individuals who would be impacted by the nature of that advice.

208. Plaintiffs herein have suffered as a direct result of the pro-occupation tax advice that Defendant BFP provided to donors to provide funds that would be directed to belligerent Israeli settlers and their settlement enterprises.

209. Defendant BFP effectively told donors to the Israeli settlement-funding conspiracy that it was legal to donate and take tax write-offs based on the funding of criminal conduct overseas.

210. Without the annual laundered funding provided by their clients and in reliance on their advice, the criminal activities described supra – money laundering, arms trafficking, genocide, apartheid, torture, additional war crimes, terrorism, and the confiscation of property – would not have taken place.

211. Had they been properly advised that the enterprises to which their money was being funneled were unlawful, donors would presumably located alternative, legitimate tax-exempt entities to provide charitable donations.

212. Instead, due to BFP's negligence, the funds were used for illicit purposes, resulting in the damages to Plaintiffs described infra.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request:

1) A trial by jury;

2) Compensatory, Special and General, and Punitive Damages;

3) Attorneys' Fees and Costs;

4) Any Additional Relief that this Court Deems Property

Respectfully submitted this 8th Day of August, 2022.

/s/ Amith Gupta
Amith Gupta, Counsel for Plaintiffs
American Trial Law Litigators, LLC
925B Peachtree St. NE, Unit 2151
Atlanta, GA 30309
Tel: (408) 355-5782
amithrgupta+law@gmail.com

# EXHIBIT A



**Reps. Tlaib, Ocasio-Cortez, Carson, Betty McCollum, Pocan, Pressley and Bush seek Treasury Dept examination into charities supporting illegal settlements in Palestine**

July 23, 2021



## Congress of the United States
### House of Representatives
### Washington, DC 20515

July 22, 2021

The Honorable Janet Yellen
Secretary of the Treasury
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Dear Secretary Yellen,

We write to express our extreme concern that U.S. charities are funding and providing direct support to Israeli organizations that are working to expand and perpetuate Israel's illegal settlement enterprise in violation of international law, including supporting the dispossession and forced displacement of Palestinians from occupied East Jerusalem neighborhoods. We are concerned that these policies violate U.S. obligations under international law, as well as federal tax law.

Since Israeli forces occupied the West Bank, including East Jerusalem, and the Gaza Strip in 1967, Israeli authorities have pursued an unlawful settlement enterprise in occupied territory—an aggressive policy of seizing lands either privately owned by, or collectively used by Palestinia ns, and allocating them for the use and enjoyment of Jewish Israelis. Israeli authorities utilize discriminatory housing, land, and property legal regimes and impermissible military justifications to dispossess Palestinians of their lands, or destroy Palestinian homes, property, and essential civilian infrastructure. Israeli authorities and private Israeli settler organizations in collaboration with Israeli authorities have established some 200 Jewish -only settlements that house over 600,000 Israeli citizens.[1]

The broader settlement enterprise to create and sustain illegal settlements, pursuant to Israel's policy of settling its civilians in the Occupied Palestinian Territory, is in direct contravention of international humanitarian law. This was reaffirmed by an advisory opinion from the International Court of Justice in 2004[2] as well as UN Security Council Resolution 2334, adopted on December 23, 2016, which reiterates previous Security Council resolutions calling on Israel to cease all settlement activities in the Occupied Palestinian Territory.[3]

The United States government, as a party to the Fourth Geneva Convention and under customary international law, has a duty to not

encourage or recognize violations of international humanitarian law or peremptory norms and must also act to end violations of international humanitarian law.[4] The United States government's obligation prohibits not only explicit recognition of an illegal situation but also extends to actions that would simply imply recognition.[5]

Tax-exempt nonprofit status allows U.S.-based 501(c)(3) entities and their U.S.-based donors to receive an effective subsidy from the U.S. government to support serious breaches of international law and violations of internationally recognized human rights related to the expansion of the illegal Israeli settlement enterprise. Granting and sustaining 501(c)(3) status recognizes and supports this unlawful conduct that is contrary to existing U.S. obligations under international law and established U.S. public policy.

The Central Fund of Israel (CFI), a U.S.-based 501(c)(3) entity registered in New York State, is among several U.S.-based groups fueling the dispossession and displacement of Palestinians to make way for Jewish Israeli settlers. The groups' tax-exempt nonprofit status means their donors receive a form of valuable support from the U.S. government in their efforts to bolster the settlement movement. For example, recent reporting shows that CFI provided funding for nearly the entire budget of the Israel Land Fund (ILF), an organization that is a driving force behind the forced evictions of Palestinian families in the Sheikh Jarrah neighborhood of occupied East Jerusalem.[6]

More broadly, CFI has distributed at least $75 million in funding since 2015 and it's grantees are notable for their essential role in supporting and enabling the illegal Israeli settlement enterprise, including international crimes such as forcible transfer, the unlawful appropriation and destruction of property, and Israel's discriminatory military and housing, land, and property legal regimes, among other violations. The grantees include settler organizations whose mission is to identify and "redeem" land from Palestinians (the Israeli settlement movement's term for transferring land from Palestinian possession to Jewish possession); organizations that support the erection of new structures and projects to develop new settlements and expand existing ones, or that develop activities for the purpose of preventing the Palestinian population from accessing properties or land for farming or for other purposes; and organizations that facilitate the Israeli authorities' unlawful appropriation of Palestinian property.

CFI, however, is not alone in benefitting from U.S. tax exempt 501(c)(3) status to bolster illegal Israeli settlements and other violations of international law. From 2009 to 2013, U.S. charities reportedly funneled over $220 million to Israeli settler organizations, according to a 2015 Haaretz investigation.[7] These organizations include American Friends of Beit El, a foundation headed by former U.S. Ambassador to Israel David Friedman that raised tens of millions of dollars for one of the most prominent, illegal settlements in the West Bank;[8] extreme far-right groups like Qomemiyut, which advocated for the destruction of Gaza;[9] the Hebron Fund, which is dedicated to supporting Israeli settlers and soldiers in the occupied West Bank city of Hebron by "keeping Hebron in Jewish Hands" and strengthening the security apparatus of settlements;[10] and likely hundreds of other organizations fueling the displacement of Palestinians.

CFI and other private actors that fund the Israeli settlement enterprise are receiving concrete benefits and recognition from the Department of the Treasury and its largest bureau, the Internal Revenue Service (IRS), while acting in direct contradiction to the United States government's long-standing public policy position opposing the development and expansion of Israeli settlements within occupied territory.[11] Charitable purposes, by definition, cannot be unlawful or aid and abet serious breaches of international law or internationally recognized human rights, and U.S. -based entities must be prohibited from using federal tax law to help perpetrate violations against Palestinians in direct contravention of both international law and the basic principles behind U.S. charitable law.

We are seriously concerned that conferring the benefit of 501(c)(3) status to these entities is in violation of the United States government's international law obligations to not explicitly or implicitly recognize violations of international humanitarian law or peremptory norms. As systemic discrimination inherent in Israeli government policies denying basic human rights to all Palestinians under its control are increasingly recognized as so severe that they amount to the crimes against humanity of apartheid and persecution .[12] As such, we urgently request that the Department of the Treasury take all necessary measures to increase scrutiny and due diligence on organizations such as CFI to ensure that no U.S.-based entities receive the benefit of 501(c)(3) tax-exempt status where there is credible information their actions are supporting violations of international law. Accordingly, we call on you to answer the following questions by August 22, 2021:

> 1. Do you intend to examine the 501(c)(3) status of CFI and other charities that support illegal settlement activity in the occupied West Bank, including East Jerusalem? If so, please describe your plan to do so. If not, please provide an explanation detailing why this clear violation of U.S. law does not merit examination by your Department.

> 2. Will Treasury issue a clear statement or promulgate a policy regarding the permissibility of 501(c)(3) organizations to aid and abet unlawful conduct in occupied territory, including support to Israeli settlements, or illegal conduct under international law? If so, please provide a timeline for this action and share said statement or policy with our offices once it is made public.

> 3. Can you commit to making public IRS procedures around 501(c)(3) organizations where credible information exists of involvement in violations of internationally recognized human rights and serious breaches of international law in any occupied territory?

> 4. Can you commit to providing the members of the Foreign Affairs Committee of the House of Representatives and the Committee on

Foreign Relations of the Senate with a comprehensive list of American charitable entities operating directly or indirectly in any occupied territory on a biannual basis?

5. Can you commit to assessing the compliance of 501(c)(3) organizations operating in any occupied territory with U.S. law to ensure that the U.S. government, by providing 501(c)(3) status to these organizations, is not recognizing or furthering violations of international humanitarian law or peremptory norms, including but not limited to activities supporting the illegal Israeli settlement enterprise in the occupied West Bank, including East Jerusalem? If so, to the extent further information is needed to assess the lawfulness of the conduct of a particular organization, will you commit to work with the Department of State and all relevant U.S. Embassies and Consulates to help the IRS acquire all necessary information?

We appreciate your urgent attention to this issue. We look forward to your response and working with you to enhance due diligence and compliance measures to ensure that U.S.-based entities supporting the illegal Israeli settlement enterprise are prohibited from obtaining 501(c)(3) status under federal tax law.

Sincerely,

RASHIDA TLAIB
Member of Congress

CORI BUSH
Member of Congress

ALEXANDRIA OCASIO-CORTEZ
Member of Congress

ANDRÉ CARSON
Member of Congress

MARK POCAN
Member of Congress

BETTY MCCOLLUM
Member of Congress

AYANNA PRESSLEY
Member of Congress

-------------

1 *See Statistics on Settlements and Settler Population* , B'TSELEM (Jan. 16, 2019), **https://www.btselem.org/settlements/statistics.**

2 The International Court of Justice, in its Advisory Opinion on the Legal Consequences of the Wall, concluded that settlements , coupled with the construction of the wall inside the occupied West Bank, were a breach of the right to self -determination, a peremptory norm that gives rise to third state obligations. *See* International Court of Justice, Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion (9 July 2004), **https://www.icj-cij.org/public/files/case-related/131/131-20040709-ADV-01-00-EN.pdf.**

3 U.N. Sec. Council Res. 2334, U.N. Doc. S/RES/2334 (December 23, 2016), **https://www.un.org/webcast/pdfs/SRES2334-2016.pdf.** Pursuant to Article 25 of the Charter of the United Nations, U.N. Security Council resolutions are legally binding onmember states.

4 International Committee of the Red Cross, Customary International Humanitarian Law, Vol I: The Rules, Rule 144, https://ihl - databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule144

5 *See* International Court of Justice, Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion (9 July 2004), **https://www.icj-cij.org/public/files/case-related/131/131-20040709-ADV-01-00-EN.pdf**

6 Alex Kane, Tax-Exempt US Non-Profits Fuel Israel Settler Push to Evict Palestinians. The Intercept, May 14, 2021. Available at: **https://theintercept.com/2021/05/14/israel-settler-evictions-jerusalem-nonprofits/**

7 Uri Blau. Hareetz Investigation: US Donors Gave Settlements More Than $22 Million in Tax -Exempt Funds Over Five Years. Hareetz, December 7, 2015. Available at: https://www.haaretz.com/haaretz-investigates-u-s-donors-to-israeli-settlements-1.5429739

8 Judy Maltz. *Fund Headed by Trump's Israel Ambassador Pumped Tens of Millions Into West Bank Settlement.* Hareetz, December 16, 2016. Available at: **https://www.haaretz.com/israel-news/.premium-fund-headed-by-trump-s-ambassador-raised-millions-of-dollars-for-settlement-1.5474789**; Josefin Dolsten, *At NY Gala Supporting Israeli Settlements, Plenty of Love for Trump to Go Around.* Times of Israel, December 5, 2018. Available at: https://www.timesofisrael.com/at -gala-supporting-israeli-settlement-plenty-of-love-for-trump-to-go-around/

9 Ron Kampeas. *Charity Headed by David Friedman, US Envoy to Israel, Gave Money to Extremist Grou p.* Jewish Telegraphic Agency, May 11, 2018. Available at: https://www.jta.org/2018/05/11/united -states/charity-headed-david-friedman-us-envoy-israel-gave-money-former-terrorist-group

10 The Hebron Fund, available at: **https://hebronfund.givecloud.co/donate**

11 For a collation of all the US Government positions outlined below, see: Churches for Middle East Peace 'Statements from U.S. Government Officials Concerning Israeli Settlements' available at: **https://cmep.org/wp-content/uploads/2017/04/SettlementStatements.pdf**

12 Human Rights Watch, A Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecu tion, (April 27, 2021), **https://www.hrw.org/sites/default/files/media_2021/04/israel_palestine0421_web_0.pdf** .